**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

---

F.C., A.B., D.D.R., L.V., Ra.G., R.S., J.D.C.,
W.C., G.G., R.C., D.L., E.I., M.G., E.C., Rh.P.,
L.L., J.J.G., R.V., R.L., A.S., E.A., J.V., A.C.,
A.G., A.A., R.A., Ro.L., Ro.P., S.N., B.M., G.T.,
J.B., E.D.C., V.A., Re.D., C.S., Ra.D., and M.R.,

      Plaintiffs,

      v.

JACOBS SOLUTIONS INC., JACOBS
ENGINEERING GROUP INC., CH2M HILL
COMPANIES, LTD., CH2M HILL
INTERNATIONAL, LTD., and CH2M HILL
INTERNATIONAL B.V.

      Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

---

## I.      NATURE OF THE ACTION

1.      When the 2022 FIFA World Cup was awarded to Qatar in 2010, it kicked off the most ambitious infrastructure-development project in Qatar's history.  To host dozens of games and millions of spectators, the Qatari regime built a new airport, expanded rail infrastructure, and constructed dozens of new hotels.  And the Qatari regime constructed several state-of-the-art stadiums that were designed to keep players, spectators, and media comfortable during scorching, humid days in a place where the temperatures can reach 118 degrees Fahrenheit.  Hailed (by some) as a resounding success (for some), the 2022 FIFA World Cup generated billions of dollars in revenue for Qatar's brutal authoritarian dictatorship.

1

2.      The Qatari regime's World Cup "triumph" was built on a foundation of human trafficking and forced labor.  Qatar's ruling regime realized its dream of hosting the 2022 FIFA World Cup only through untold thousands of migrant workers being subjected to nightmarish conditions.  Construction workers toiled long hours in the desert heat, often without adequate rest, hydration, and nourishment.  Many were routinely forced to work overtime without pay.  Many were forced to live in inhumane, cramped, dirty, and sometimes pest-infested barracks.  Pay was withheld.  Passports were confiscated by the workers' employers, leaving them unable to visit home or find a humane job.  Workers were treated as disposable.  Thousands of migrant workers—including some of the Plaintiffs in this case—suffered severe physical injuries and mental trauma.  At least hundreds more died.  That is why many have referred to human trafficking, forced labor, and related labor abuses during the preparations for the Qatar World Cup as "modern slavery."

3.      In terms of the scale of victims and contemporaneous media condemnation, the 2022 FIFA World Cup involved one of the worst labor-trafficking schemes in recent history.  But this is just the latest episode in Qatar's reprehensible history sponsoring and benefitting from trafficked and forced labor.  Long before the Qatari regime broke ground on new stadiums, it was widely condemned by governments, non-governmental organizations ("NGOs"), journalists, and victims as one of the worst trafficking and forced labor locales on Earth.  Observers across the ideological spectrum routinely and emphatically criticized Qatari conditions under which migrant laborers toiled.  The Qatari regime's (and Qatari employers') reliance on trafficked and forced labor was plainly visible to anyone who bothered to look.

4.      Against this backdrop, Defendants Jacobs Solutions Inc., Jacobs Engineering Group Inc. (collectively "Jacobs"), and Defendants CH2M Hill Companies, Ltd., CH2M HILL

International, Ltd., and CH2M HILL International B.V. (collectively, "CH2M" and, with Jacobs, "Defendants") chose to knowingly participate in—and profit from—ventures that exploited Plaintiffs' labor for construction projects for the 2022 FIFA World Cup.   When they did, Defendants knew that working conditions were unsafe: in an on-the-record interview, a CH2M manager blithely observed that "*his team has estimated that at least 14 people will die while building Qatar's World Cup stadiums*" before joking—about the labor conditions imposed on workers like Plaintiffs—that "*[t]here are quite a few unsafe construction sites . . . I am half expecting bodies to land next to me every time I go past.*" (Emphasis added.)

5.     Plaintiffs were among the thousands of construction workers who were lied to— about the work they would do, the pay they would receive, the inhumane living conditions they would endure, and the fatally dangerous and unsafe conditions they would work in—to build the stadiums and infrastructure for the 2022 FIFA World Cup.  Defendants, richly compensated to oversee and manage the construction projects, with and through the companies with which they jointly ventured, abused the Plaintiffs, subjected migrant laborers to these inhumane working and living conditions—and took away their passports to prevent their escape.

6.     Because Defendants' joint venturers lied to Plaintiffs about the terms and conditions of their employment and living conditions and confiscated Plaintiffs' passports, Plaintiffs were unable to leave Qatar, address their condition of inhumane and forced labor, or change employers.  They were trapped in Defendants' venture's systematic embrace of, and profits from, the institutionalized trafficked and forced labor omnipresent in Qatar.  Defendants' conduct violated state and federal law, including the Trafficking Victims Protection Reauthorization Act (the "TVPRA").  Defendants trafficked Plaintiffs and forced Plaintiffs to work in violation of 18

U.S.C. § 1589 and 18 U.S.C. § 1590.  Defendants, integrally involved in construction preparations for the Qatar World Cup, knowingly benefitted from participation in ventures they knew or should have known relied on trafficked and forced labor.  Defendants are therefore liable pursuant to 18 U.S.C § 1595(a).

## II.    JURISDICTION AND VENUE

7.    Plaintiffs bring their claims in the United States because the United States provides a forum for lawsuits pursuant to the 2013 amendments to the TVPRA, which explicitly provide for extraterritorial jurisdiction.  *See* 18 U.S.C. § 1596.  18 U.S.C. § 1596(a) makes clear that Defendants are liable to the extent their conduct was outside of the United States because they chose to remain present in the United States or be nationals of the United States.

8.    Plaintiffs' TVPRA claims accrued after December 23, 2008, the effective date of 18 U.S.C. § 1596.

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship.  All Plaintiffs are foreign nationals as well as citizens and residents of the Philippines, and each of their claims for damages exceeds $75,000.  Defendants are United States corporations and their subsidiaries.

10.    Defendants are nationals of the United States or are present in the United States, irrespective of nationality, providing this Court with extraterritorial and federal-question jurisdiction under 18 U.S.C. § 1596(a) and 28 U.S.C. § 1331.

11.    No foreign government has prosecuted or is prosecuting Defendants for the conduct alleged herein.

12. Defendants CH2M Hill Companies, Ltd. and CH2M HILL International, Ltd. maintain their corporate headquarters in Colorado. CH2M HILL International B.V. is incorporated in the Netherlands, and has operations, among other places, in Colorado, the Netherlands, and Qatar. Each of CH2M Hill Companies, Ltd., CH2M HILL International, Ltd., and CH2M HILL International B.V. does substantial and continuous business within the State of Colorado, by virtue of CH2M's integration throughout its firm, *see infra* ¶ 27, and its subsidiaries are "present in the United States," knowingly benefitted here from the joint venture's exploitation of forced labor, and on information and belief made decisions and took actions in this District that facilitated the harms Plaintiffs suffered, so they are subject to both general and specific personal jurisdiction before this Court.

13. Plaintiffs' state-law claims arise out of the same case or controversy as their federal-law claims and involve a common nucleus of operative facts. All injuries Plaintiffs suffered were the result of their being trafficked and subjected to harsh conditions performing forced labor. Thus, this Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

14. Under 28 U.S.C. §§ 1391(b)(3) and (c)(2), venue over the Defendants is proper in this District. Based on subsection (b)(3), venue is proper because this District is one where Defendants are subject to personal jurisdiction. Further, based on subsection (c)(2), Defendants are deemed to reside in this District because Defendants are subject to personal jurisdiction here.

### III. THE PARTIES

15. Defendant Jacobs Engineering Group Inc. and Defendant Jacobs Solutions Inc. are incorporated in Delaware and have their global headquarters in Texas.

16.     In August 2022, just before the World Cup 2022 kicked off, Jacobs Engineering Group Inc. became a wholly owned subsidiary of Jacobs Solutions Inc.

17.     Jacobs is a Fortune 300 company, with over 58,000 employees and annual revenue of over $14 billion.  Jacobs has offices all over the world, including in the Philippines and Qatar.

18.     According to Jacobs, it "provides a full spectrum of professional services including consulting, technical, scientific and project delivery for the government and private sector."

19.     In 2017, Jacobs acquired and made into its wholly owned subsidiary Defendant CH2M (including CH2M Hill Companies, Ltd.'s subsidiaries, including CH2M HILL International, Ltd. and CH2M HILL International B.V.).

20.     CH2M Hill Companies, Ltd. publicly disclosed CH2M HILL International, Ltd. is CH2M's "holding company for operations outside of the United States."

21.     Public sources confirm that CH2M Hill Companies, Ltd. and CH2M HILL International, Ltd. performed CH2M work in Qatar, sometimes but not always via CH2M HILL International B.V.

22.     In 2012 CH2M was hired to be the Programme Management Consultant "to ensure the successful delivery" of the 2022 FIFA World Cup in Qatar by managing the massive construction projects necessary to host the event.  Pursuant to that construction management contract, CH2M was tasked with overseeing coordination with Qatari government agencies—all controlled by the Qatari regime—on large infrastructure projects, including the construction of nine new stadiums and the upgrade of three existing ones (the "World Cup Construction Venture" or "Venture").

23.     CH2M had a unique corporate culture, which it has publicly disclosed was governed by foundational and core values captured in "*The Little Yellow Book*," written in 1978 by the firm's cofounder James Howland.  *The Little Yellow Book* was given to **all employees worldwide** on their first day.   CH2M's *The Little Yellow Book* espoused a view, which was integrated across and among all of CH2M's business, regardless of which subsidiary did the work, that CH2M would do what the client wanted, stating explicitly "***[t]he client is king***," as underscored by this image, which *The Little Yellow Book* included:



On information and belief, CH2M's core value of kowtowing to its clients' desires was one of the reasons the Qatari regime, via the Supreme Committee, hired CH2M to oversee and manage delivery of the stadiums for the World Cup Construction Venture.

24.     Jacobs acquired CH2M in 2017, and the companies were integrated such that the two companies and their subsidiaries co-located their offices in Colorado and Texas.  Starting in the year after it acquired CH2M, Jacobs disclosed publicly that it has offices in Qatar.

25.     After Jacobs acquired CH2M, all of CH2M's subsidiaries became wholly owned subsidiaries of Jacobs.

26.     CH2M and—starting in 2017—Jacobs managed and supervised construction for the entirety of the World Cup Construction Venture, including all stadiums—including, but not limited to, Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and Lusail Stadium—and related infrastructure.  In this role, CH2M and Jacobs had significant access to the stadiums, influence over and oversight of the work done at the stadiums, managerial authority, auditing rights, and control over other companies that worked together to construct and deliver the stadiums for the World Cup Construction Venture.

27.     At all relevant times, Defendants practiced integrated one-firm business models such that each entity in the corporate form routinely collaborated with one another.  Jacobs and CH2M and their subsidiaries, through cross-functional teams that ensured that data, analysis, documentation, and the like were all shared seamlessly across and between them, as well as their affiliates, all operated as one.  Consequently, when one Defendant learned a material fact relating to the World Cup Construction Venture, it ordinarily would have and did share such information with the other Defendants.  And when another subsidiary of Jacobs or CH2M learned information, it would and did share such information with the Defendants.  Indeed, Jacobs touts its "One Jacobs" business model, and according to Jacobs, "[o]ur integrated Business Management System (BMS) establishes the 'one Jacobs way' to ensure consistency and efficiency in internal operations and

project delivery."[1]   Under Defendants' "One Jacobs" approach, to which Defendants always adhered, Jacobs Solutions Inc., Jacobs Engineering Group Inc., CH2M Hill Companies, Ltd., CH2M Hill International, Ltd., and CH2M HILL International B.V. routinely collaborated with one another and with Jacobs's and CH2M's other subsidiaries.  *See*, *e.g.*, *infra* ¶¶ 54(a), 85.  Before Jacobs acquired CH2M, CH2M followed a similarly integrated business strategy.  For example, CH2M's Center for Project Excellence was meant to ensure uniform and global dissemination of technologies, procedures, project controls, and business methods, across and among all of CH2M's subsidiaries.  CH2M also had an "Ethics Ambassador program," which was designed to "provide[] employees with direct access to local senior leaders" at "every major office and project site" and who provided the vehicle for a "reliable way to connect our employees in the field to the home office, where ethics policies are set and preventive measures are enforced to ensure compliance." CH2M also had an internal compliance lead in Denver that oversaw CH2M's subsidiaries' work in foreign locations.  Finally, CH2M utilized what it called "Matrix Organization" which was designed to allow employees to be deployed, regardless of which subsidiary doing CH2M's work, based on capabilities and geographic expertise, and to freely exchange information and use any available resources throughout the entirety of CH2M's corporate structure.

28.     At all relevant times, the participants in the World Cup Construction Venture included each of the Defendants, and others that include but are not limited to:

a.   Other subsidiaries of Jacobs and CH2M;

b.   The Supreme Committee for Delivery & Legacy ("Supreme Committee");

---

[1] Jacobs, FY21 ESG Disclosures, https://www.jacobs.com/sites/default/files/2022-04/FY21-ESG-Disclosures.pdf (last accessed Oct. 8, 2023).

c.  *Fédération Internationale de Football Association*, d/b/a FIFA ("FIFA");

d.  Qatar Foundation;

e.  Thornton Tomasetti;

f.  AECOM;

g.  Turner International Middle East;

h.  TiME Qatar;

i.  Birdair;

j.  Taiyo Middle East;

k.  HBK Contracting;

l.  China Railway Construction Corporation;

m.  Foster + Partners;

n.  SIX Co.;

o.  Porr;

p.  Tekfen;

q.  Projacs International;

r.  VINCI;

s.  Tokyo Freight;

t.  J.A.K. Construction Builders;

u.  Al Jaber Engineering;

v.  Imar Trading and Contracting Company;

w.  Midmac Company; and

x.  Rabban Readymix.

29.     Plaintiffs are Filipino construction workers who were trafficked to Qatar and whose coerced labor was used for construction project ventures, in which Defendants participated, for the 2022 FIFA World Cup in Qatar, *i.e.*, the World Cup Construction Venture.  *See infra* V.E.

## IV.     SOURCING

30.     The factual allegations herein are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from witnesses with direct and indirect knowledge, public reports and contract data, Defendants' (inclusive of their employees' and agents') admissions, statements and data relating to the other participants in the World Cup Construction Venture, including Qatar Foundation, U.S. government reports published to Congress under statutory directive, U.N. investigative reports, public investigations, reports, and documentaries published by NGOs, photos and videos, Qatari market data and regulations, public statements by U.S., U.N., and Qatari government officials, English- and Arabic-language media reports, scholarly analyses, think tank publications, and Plaintiffs' own recollections.

## V.     FACTS

**A.     The World Cup Construction Venture Engaged in Human Trafficking and Forced Labor.**

31.     Qatar's economy relied on millions of migrant workers, comprising the vast majority of its labor force.

32.     Pursuant to the Qatari regime's (and Qatari employers') notorious system called "*kafala*" (sponsorship), migrant workers' visas were tied to their employers, which left workers dependent on their employers for their legal residency and status in the country.

11

33.     In Qatar, the *kafala* system made migrant workers vulnerable by granting Qatari employers broad and exploitative powers over migrant workers, allowing them to evade accountability for trafficking and forced labor abuses, and leaving workers beholden to debt and in constant fear of retaliation.  The *kafala* system also made workers depend on their employers not just for their jobs but also for housing and food.

34.     The Qatari regime's (and Qatari employers') *kafala* system was described in 2022 by the widely-followed soccer publication *Tifo Football*—in relation to the World Cup construction projects—as a form of "economic apartheid."  James Montague, author of numerous books and articles about soccer in the Middle East, explained in 2022,

> [t]here has perhaps ***never been a more controversial World Cup host.  Qatar has been rightfully criticised*** for its human rights record, how it won the World Cup bid and especially its treatment of migrant workers. In 100 years from now, humans will look back at kafala [] in . . . Qatar . . . ***as one of the great economic crimes of the twenty-first century***. (Emphasis added.)

35.     Zahra Babar, Associate Director for Research of Georgetown University's Center for International and Regional Studies, noted the ***direct causal relationship*** between the World Cup Construction Venture and horrific trafficking and labor abuses inflicted on migrant workers:

> ***From the initial stages***, human rights and migrants' rights practitioners ***drew a direct causal link*** between the awarding of the World Cup hosting rights to Qatar and the expansion of difficult, ***if not unendurable, working and living conditions for migrant workers***. (Emphasis added.)

36.     It was not until August 2020 that the Qatari regime introduced a law that ended the requirement for migrant workers to obtain their employer's permission to change jobs.  Until late 2020, to change jobs before the end of their contract, each migrant worker would have had to obtain a "No Objection Certificate" from their employer.

37. Earlier in 2020, the Qatari regime ended its requirement that migrant workers obtain an "Exit Permit" to leave Qatar. Before 2020, such a permit was required to depart Qatar.

38. Prior to August 2020, the minimum wage in Qatar was only QR750, or approximately $210, per month. 2020 "reforms" required new minimum wage and food and housing allowances, designed to combat Qatari employers' widely known practice of forcing migrant workers in Qatar to live and work in inhumane conditions. The new minimum wage plus food and housing allowance requires payment of QR1,800, or approximately $500, per month.

39. The Qatari regime's 2020 "reforms" purportedly sought to effectively dismantle the Qatari regime's (and Qatari employers') *kafala* sponsorship system, which provided the basis for exploitation of forced labor throughout Qatar. But even after these Qatari regime "reforms," there remained restrictions on leaving Qatar. For example, many workers could not return home until the end of their two-year contract unless they were willing to both lose their jobs and pay for their way home. In some instances, departing prior to two years of service required repaying the "finder's fee" that had been paid to the Filipino employment agencies or required that Plaintiffs pay the full cost to travel home, in contravention of what was promised during their recruitment.

40. Prior to these "reforms," which still have not been fully implemented, migrant workers' physical movement and freedom were controlled by their employers.

41. James Montague (the widely published soccer scholar) publicly reported in 2022 that "how these new laws were implemented meant that ***little changed on the ground*** for many workers" (emphasis added) as change related to employers' absolute rights over migrant labor has been slow to be implemented.

42.     Additionally, and distinct from the *kafala* system, Qatari employers and labor supply companies frequently delayed, withheld, or arbitrarily deducted migrant workers' wages and/or overtime, or otherwise violated their contracts with migrant workers with impunity; they also frequently forced migrant workers to risk their safety, forced migrant workers to work through the night, sometimes as long as 36 hours straight, and forced migrant workers to live (when housing was provided) in inhumanely crowded, unsafe, and unsanitary conditions.

43.     Additionally, and distinct from the Qatari regime's (and Qatari employers') *kafala* system, Qatari employers and labor supply companies had a commonly known practice of confiscating workers' passports, and then using possession of the passports to restrict workers' physical movement.  By confiscating workers' passports, the companies prevented the workers from returning to their home countries until their contracts expired and restricted workers' ability to change employers in Qatar.

44.     Qatari employers frequently forced migrant workers to work despite this treatment, and therefore exploited forced labor, by (a) taking migrant workers' passports from them; (b) imposing substantial debts—typically, by requiring the migrant worker to pay for the worker's own "recruitment fee," which they must pay off over time as they work; (c) denying migrant workers permission to return home unless they pay sums they cannot afford; and/or (d) threatening legal prosecutions.  Qatar's construction industry was notorious for these types of exploitations of migrant labor, and Defendants knew or should have known that the World Cup Construction Venture would engaged in these types of exploitation.

45.     In 2012, just as construction for the 2022 FIFA World Cup was set to begin, the acclaimed non-governmental organization Human Rights Watch published a landmark report

entitled ***Building a Better World Cup: Protecting Migrant Workers in Qatar Ahead of FIFA 2022*** ("2012 HRW Report") documenting pervasive employer exploitation and abuse of workers in Qatar's construction industry.  Defendants knew or should have known of the abuses detailed in the 2012 HRW Report and were on notice of the exploitative forced labor conditions detailed herein by 2012 when it was published.

46.     That year, Qatari Labor Undersecretary Hussein al-Mulla pledged that the government would replace the Qatari regime's (and Qatari employers') widely criticized *kafala* sponsorship system with a system requiring contracts between the employer and the worker.  Those "reforms" have not been fully implemented.

47.     The World Cup Construction Venture relied upon the Qatari regime's (and Qatari employers') *kafala* system in its construction contracts, and specifically for its subcontracted labor, and Defendants knew or should have known.

48.     In addition to the foregoing, all the examples that follow, *infra generally* V.C, demonstrate that the World Cup Construction Venture relied upon the trafficked and forced labor of Plaintiffs, as well as untold thousands of others.

**B.     Defendants Participated in the World Cup Construction Venture.**

49.     In 2010, the Qatari regime won the bid to host the 2022 FIFA World Cup.  It did so through the payment of massive bribes to a host of actors.  *See infra* ¶¶ 66, 93, 99.

50.     The Qatari regime then assigned the Supreme Committee with direct responsibility for building competition venues.  This included responsibility for building the proposed stadiums and training sites, as well as responsibility for coordinating non-competition venues required by

FIFA and major infrastructure improvements, such as to the New Doha International Airport and the proposed nationwide metro network.

51.     In February 2012, the Qatari regime, through the Supreme Committee, hired CH2M to oversee and manage delivery of the entirety of the World Cup Construction Venture.  CH2M was paid to act on the Supreme Committee's behalf—and therefore, on the Qatari regime's behalf—to oversee construction of all facilities and infrastructure for the 2022 FIFA World Cup.

52.     Pursuant to the contracts entered into by all contractors and subcontractors in the World Cup Construction Venture, including but not limited to the companies that directly employed Plaintiffs, CH2M's (and eventually Jacobs's) responsibility was to oversee and manage all elements of the Venture.  CH2M (and eventually Jacobs) thereby participated in the World Cup Construction Venture by, among other things, assisting, supporting, managing, overseeing, auditing, and facilitating it.

53.     As overseer and manager of the World Cup Construction Venture, CH2M (and eventually Jacobs) was responsible for ensuring that proper labor standards and practices were followed by contractors and subcontractors in the Venture.

54.     After acquiring CH2M in 2017, Jacobs admitted it was responsible for overseeing and managing the delivery—and therefore participated in by assisting, supporting, and/or facilitating—of the entire World Cup Construction Venture.  For example:

a.  In 2018, Steven Demetriou, then Chairman and CEO of Jacobs Engineering Group, publicly stated that "we consider the acquisition of CH2M an opportunity to enhance our human rights program even further," "Jacobs recognizes the significance of CH2M's leadership on human rights and has already begun working to harmonize the companies' programs," and "[w]e are currently in the process of updating Jacobs' Code of Conduct and Supplier Code of Conduct to provide an integrated policy framework for our combined company."

b.  During an earnings call in 2018, Mr. Demetriou said, in relevant part, "we got super excited about 2019 and beyond because by that time, we'll have had the time to really leverage the revenue synergies that we've been talking about," and "the iconic programs that we've talked about several times really showed in some of the Middle East activities they have working on . . . [like] the Qatar World Cup 2022, and now being able to put these capabilities together, and I just gave you just a small sampling of what excites us that's going to cut across all three of our new lines of business as it relates to growth."

c.  In its 2021 publication entitled *FY21 Jacobs Climate Risk Assessment*, Jacobs stated in relevant part that Jacobs had "developed specific climate models for the locations of the FIFA World Cup Qatar 2022."

d.  In February 2022, Jacobs announced in a press release that it had "brought extensive project and program management consultancy experience from major programs around the world including . . . the FIFA World Cup Qatar 2022."

e.  In March 2022, Jacobs stated in a publicly available document that Jacobs "[is] a world-leader in running major program delivery, partnering with our clients to oversee the execution of mega projects [including] FIFA World Cup venues in Qatar."

f.   In December 2022, Jacobs stated publicly that Jacobs was the "delivery partner" for the World Cup Construction Venture, and had been so for "the last decade":



g.  In another Jacobs promotional material, Jacobs stated in relevant part "Jacobs leveraged its experience delivering successful major programs including the . . . ongoing FIFA World Cup Qatar 2022 . . . ."

h.  Jacobs's website, currently accessible (last accessed September 26, 2023) at https://www.jacobs.com/locations, states in relevant part that it "deliver[ed] whole-system solutions" for the World Cup:

> Our visionary team in Qatar provides environmental, industrial and advanced technology, urban development, water and nuclear services. With a history of delivering whole-system solutions, they solve complex problems that include environmental, social and economic sustainability as an integral part of their approach. The FIFA World Cup 2022™, Doha Metro, and **Doha South Sewage Infrastructure Program** are three examples of such programs that require an integrated approach to deliver the vision.

i.  Former and current Jacobs employees, including but not limited to Rehan Khan, Phillip Shaw, Mohammed Razzaq, and Sebastian Lourdusmay, publicly hold themselves out as having worked on the World Cup Construction Venture on behalf of Jacobs. For example, Mr. Khan's profile on LinkedIn states that he has been a Vice President and Country Director for Jacobs since December 2017, and was during that time the Executive Program Director for the Qatar 2022 FIFA World Cup Programme. Mr. Khan worked for CH2M prior to Jacobs's acquisition of CH2M, and was CH2M's Country Director & Executive Programme Director for the World Cup until Jacobs acquired CH2M. Further, Mr. Shaw's LinkedIn profile states that he was a "health and safety" manager for the FIFA World Cup 2022 project for Jacobs, starting in 2017.

j.  Former CH2M employees Sheila Icaro, Fahmi Abul Feilat, and Dinisio Aldrin Bantaculo publicly hold themselves out as having been employed directly by CH2M in Qatar working on the World Cup Construction Venture. Ms. Icaro discloses she worked for CH2M Hill International BV as an "HR Generalist" tasked with being "Administrator and On-boarding and Mobilisation Lead on major projects in Qatar" including the "Qatar 2022 FIFA World Cup." Abul Feilat was employed from 2019 to 2021 by "CH2M Hill International BV" on "World cup 2022 program" as a "Project Management Specialist." From 2013 to 2015, Bantaculo discloses he worked for CH2M Hill International BV as "PMC Planning & Scheduling Engineer for Qatar 2022 FIFA World Cup Programme."

55.  A former Jacobs employee has also confirmed Jacobs participated in the World Cup Construction Venture, and described exactly how that participation worked, at least as regards the work they did. They worked on the ground in Qatar and served as the Precinct Health, Safety, and

Environment Manager for Jacobs's client, the Supreme Committee, at Al Thumama Stadium. This former Jacobs employee disclosed, *inter alia*, that:

a. The former Jacobs employee worked at Al Thumama stadium on behalf of Jacobs from 2017 (the year that Jacobs acquired CH2M) until 2021;

b. "Tekfen-***Al Jaber Engineering Joint Venture***"—the venture on which the former Jacobs employee worked, specifically notable because Al Jaber Engineering was the direct employer to almost one-third of the Plaintiffs named in this Complaint—"ha[d] been awarded the contract by the Qatar Supreme Committee for Delivery and Legacy [] for the turnkey delivery of the engineering and construction work" for the Al Thumama Stadium;

c. The former Jacobs employee's responsibilities included directly overseeing subcontractors' contract compliance: The employee "[w]ork[ed] on [Jacobs's] client's behalf to ***ensure all [environment, health, and safety] activities [were] carried out by the CSC and contractor in accordance with the contract*** . . .;

d. The former Jacobs employee's work included making regular site visits and inspections, including *weekly* "safety tours";

e. Jacobs's role in the Venture was to monitor, direct, and control the labor supply chain, including at Al Jaber Engineering, because the former employee was tasked with "ensur[ing] all" health, safety, and environment "expectations" and health, safety, and environment "culture" were "***implemented*** as per regulatory and client requirement" and "***advise[d] the supply chain on corrective actions***" as they "***monitor[ed]"*** the Venture's "***contractor's compliance*** with Construction phase health and safety Plan"; and

f. Jacobs's role in the Venture was to oversee and monitor everything—and the former Jacobs employee's job was in part to "[e]nsur[e] policy, objectives, targets and standards [were] measured, and recorded to ensure that the highest possible health and safety standards [were] maintained ***in line with*** client procedures, [and] ***contract requirements***."

The reasonable inference, therefrom, is that Jacobs had similar employees at each of the stadium construction projects included in the World Cup Construction Venture, and held positions monitoring and controlling the subcontractors that employed each Plaintiff in this Complaint.

      56. CH2M, and then also Jacobs after it acquired CH2M, therefore had continuous business relationships with the other companies in the World Cup Construction Venture, including

those that directly employed Plaintiffs, and through those continuous business relationships Defendants facilitated successful operation of the World Cup Construction Venture.

**C.      Defendants Knew or Should Have Known the World Cup Construction Venture Engaged in Human Trafficking and Forced Labor.**

57.     Defendants knew or should have known that the World Cup Construction Venture employed migrant laborers pursuant to the then-prevalent Qatari *kafala* system, commonly known Qatar construction industry practices, and widely known public and governmental reports.

58.     At all relevant times it was widely known in the United States, Europe, Qatar, and the Philippines, all of which comprised locations where Defendants conducted business, that the Qatar construction industry relies and relied upon trafficked and forced labor, that the World Cup Construction Venture used trafficked and forced labor in a way that was not materially different from how it was otherwise customary in Qatar, and that Filipinos—in particular—were one of the groups most at risk to be trafficked and subjected to forced labor by Qatari employers in Qatar.

59.     Defendants knew or should have known that the World Cup Construction Venture would and did exploit trafficked and forced labor of Filipino laborers like Plaintiffs.  Specifically, Defendants knew or should have known that workers would be lied to about the terms and conditions of their employment and living conditions; that workers' passports would be and were retained; that workers would be forced to work inhumane and unsafe hours, sometimes without compensation; and that workers would be and were forced to live in unsafe and unsanitary conditions.

60.     Defendants knew these widely understood facts, as well as the other local-Qatar-knowledge-based allegations in this Complaint, in part through their Qatar-focused and/or Qatar-deployed employees' and local agents' local knowledge.  Defendants had hundreds of employees

in Qatar.  Defendants each relied in part on Qatar-knowledgeable employees (including their in-house corporate security and intelligence personnel, *see infra* V.C.3) and local agents in Qatar to keep them abreast of Qatari market conditions and knowledgeable regarding the true nature of the Qatari regime's (and Qatari employers') notorious sponsorship of human trafficking and forced labor in the Qatari construction industry and the World Cup Construction Venture.  Generally, Defendants' Qatar-knowledgeable employees and agents spoke fluent English and often proficient and/or fluent Arabic, had relationships with people in the Qatari locations in which the Venture conducted business, and were well-informed about local conditions.  These agents (who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the World Cup Construction Venture engaged in systematic human trafficking and that any commercial actor who participated in it would necessarily benefit from trafficked and forced labor, including the abuses Plaintiffs allege.

61.    As set forth below, from the beginning, and then time and again throughout the entirety of the duration of Defendants' participation in the World Cup Construction Venture, Defendants knew or should have known about the trafficking and forced labor that would and did occur, including that such misconduct was likely occurring with respect to the Venture's employment of Plaintiffs.

### 1.  Public Reports Published by the U.S. Government, Non-Governmental Organizations, Media, and Documentarians

62.    Defendants knew or should have known about the extreme trafficking and forced labor risks related to their participation in the World Cup Construction Venture because public reports alerted Defendants to such risks before they began participating in the Venture (while they were deciding whether to participate) and then afterwards throughout the period in which they

participated in the Venture.  Reports supporting an inference of Defendants' knowledge are legion, and included, but were not limited to, widely publicized reports authored by the United States, respected NGOs, mainstream media outlets, and documentarians.

63.    **U.S. Government reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge.  Such reports included, but were not limited to:

a.  U.S. Department of Justice.  In 2008, the U.S. Department of Justice published a report that alerted Defendants that "[a] significant number of Filipino men and women who migrate abroad for work are subjected to conditions of involuntary servitude in . . . Qatar."  At the time, the United States placed Qatar on the "Tier 3" list of governments making little effort to address modern slavery.

b.  U.S. Department of State.  On June 20, 2014, the Department of State published its statutorily mandated report, *Trafficking in Persons Report 2014*, which classified Qatar as a "Tier 2 Watch List" country because it did "not fully comply with the . . . minimum standards" of the TVPRA.  This report alerted Defendants that "Qatar [was] a destination country for men and women subjected to forced labor. . . .  Approximately 1.2 million men and women . . . voluntarily migrate[d] to Qatar to work . . . primarily in the construction, oil and gas, service, and transportation industries . . . but many subsequently face[d] forced labor."  Thereafter, Qatar remained a "Tier 2 Watch List" country in 2015 and 2016.

64.    **NGO reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge, and such NGOs sometimes even directly contacted Defendants.  Examples included, but were not limited to:

a.  Human Rights Watch.  In 2012, the year CH2M was appointed to oversee delivery of facilities and infrastructure for the 2022 FIFA World Cup, Human Rights Watch sent letters to the Supreme Committee **_and CH2M_** regarding slave labor in Qatar's construction industry.  CH2M responded at that time that it understood the risk and would have a "zero-tolerance policy for the use of forced labor or other human trafficking practices."  In June 2012, Human Rights Watch published the 2012 HRW Report, *see infra* ¶ 45, which alerted Defendants that "the deeply problematic working conditions of migrant workers throughout the country mean that realizing Qatar's World Cup vision may depend on their abuse and exploitation unless adequate measures are taken to address the human rights problems widespread in the construction industry in Qatar."  The 2012 HRW Report also documented exorbitant fees required to obtain jobs, which led to debt servitude, unsafe and unhealthy working conditions,

overcrowded, unsanitary, and inhumane living conditions, passport confiscations, and delayed, reduced, or denied pay.  The 2012 HRW Report concluded that many of these construction workers are "very likely to be in conditions of forced labor, as defined by international law."

b. Amnesty International.  In 2013, Amnesty International released a report entitled ***The Dark Side of Migration: Spotlight on Qatar's Construction Sector Ahead of the World Cup***, which concluded that migrant workers are subject to forced labor or modern slavery and exploited throughout the construction industry hierarchy, including abuses by subcontractors and multinational corporations overseeing the World Cup Construction Venture.

c. International Trade Union Confederation.  In 2014, Sharan Burrow of the International Trade Union Confederation testified, before a European Parliament hearing regarding migrant slave labor, that companies who "are bidding for the billion dollar infrastructure developments in Qatar" should be held "to account" for doing so.

d. Verité.  In 2017, the year that Jacobs acquired CH2M and thus assumed responsibility for the World Cup Construction Venture, Verité, "a global NGO with a mission to ensure that people around the world work under safe, fair, and legal conditions," published a 355-page report, ***Strengthening Protections Against Trafficking in Persons in Federal and Corporate Supply Chains: Research on Risk in 43 Commodities Worldwide***.  In the section entitled "Labor Abuse in Construction Facilities for the World Cup," the report stated that "[a]n investigation into the working conditions in Qatar during preparations for the 2022 FIFA World Cup has found evidence of severe abuse of migrant laborers and indicators of human trafficking."  The report detailed evidence of withheld pay and passports to restrict workers from leaving, unsafe worksites, inhumane living conditions, and debt servitude with usurious interest rates.

65.  **Media reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge, and such reports sometimes even directly referenced Defendants.  Examples include, but are not limited to:

a. *Equal Times*.  In December 2012, *Equal Times*, a "global news and opinion website focusing on labour [and] human rights," published a "Special Report" entitled ***Qatar: Grand Ambitions, Wretched Lives***, which alerted Defendants by including a collection of articles about Qatar's history of exploiting migrant workers and Qatar's *kafala* system.  *Equal Times* warned that the construction companies building stadiums and infrastructure for the 2022 FIFA World Cup claimed to be committed to social responsibility but "***in practice these companies do little to ensure human and labour rights for migrant workers, especially within their supply chains***." (Emphasis added.)

b. *The Guardian*.  Reports by the *Guardian* regularly alerted Defendants to the anti-trafficking risks attendant to their services.  In December 2012, the *Guardian* published the first of many articles regarding the exploitation of migrant laborers working in Qatar on the World Cup Construction Venture.  Later in 2013, the *Guardian* published an article entitled ***No Respite***

***for Qatar's Migrant Workers, International Trade Union Finds***, which reported that a delegation from the International Trade Union Confederation found there had been no improvement in living and working conditions for migrant workers working on the World Cup Construction Venture, detailed employers' practice of withholding salaries and passports to prevent workers from leaving the country, and quoted a trade union official to say "***International companies should be on notice*** about the reputational risk of doing business in Qatar without respect for workers' rights." (Emphasis added.) Also in 2013, the *Guardian* published another article (entitled ***Qatar's World Cup "Slaves"***), which found "[e]vidence of forced labour on a huge World Cup infrastructure project" and detailed labor abuses, confiscated passports, inhumane living conditions, and debt servitude, and warned that the migrant laborers coming to Qatar to help build the World Cup facilities were uniquely vulnerable to exploitation. In 2014, the *Guardian* published another lengthy investigative report, headlined ***Modern-Day Slavery - Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***. The *Guardian*'s series of reports was entitled ***Modern-Day Slavery in Focus: Qatar***.

c.  <u>*The Economist*</u>. In 2013, the *Economist* published a report about migrant laborers readying Qatar for the World Cup, which detailed exorbitant recruitment fees, unfair labor practices, and the problems with exploitation related to Qatar's *kafala* system. The *Economist* concluded that many workers could be classified as "victims of trafficking."

d.  <u>*New York Times*</u>. In 2015, the *New York Times* published a report that also explicitly alerted Defendants by calling out CH2M's then participation in labor abuses related to the World Cup construction projects. Specifically, the *Times* reported that there had been "[s]crutiny" regarding "labor abuses involving foreign laborers, including during construction in Qatar for the 2022 FIFA World Cup. . . . American construction firms, including CH2M . . . manage or oversee those projects. . . . [A]n official of Amnesty International testifying at a Senate subcommittee hearing on the FIFA corruption scandal said [CH2M] had an obligation to address the conditions faced by such workers, which reports have described as akin to indentured servitude."

e.  <u>*Vox*</u>. In 2015, *Vox* published an article entitled ***The World Cup's Biggest Issue: Modern Slavery and Dead Workers***, which said in relevant part "FIFA officials ***must have known*** that giving hosting rights to Qatar would have ***directly and undeniably meant funneling money to one of the most horrific construction sectors in the world***." (Emphasis added). The article discussed how, even though "[w]orking conditions are . . . horrendous," construction workers could not change jobs because their employers hold their passports. Indeed, the construction workers working on the World Cup Construction Venture were reported to be "***prevented from leaving the company or the country***" and "***forced to work in impossibly hot weather and conditions that virtually guarantee some will die***." (Emphasis added). The report also noted "[s]ome numbers suggest a direct link between the death toll and the World Cup," and concluded "FIFA chose to give the World Cup to Qatar. That means it owns the migrant worker program."

f.  _Wall Street Journal_.  In 2015, the _Wall Street Journal_ published an article entitled **Qatar Called to Publish World Cup Worker Death Figures**, which discussed the "renewed allegations of labor abuse" as the "latest controversy to mar Qatar's plans to host" the World Cup.  Citing a representative from the International Trade Union Confederation, the article noted "up to 500 construction workers a year could die due to limited access to health services and poor working and living conditions that might prompt heat-related illnesses, stress-induced heart attacks and work-related falls and injuries."  And the article noted that "rights officials" have "called on the Qatari government to address the allegations of abuse" endured by "migrant workers."

g.  _Fox News_.  In 2016, _Fox News_ published an article entitled **Critics Call Foul as Qatar's 2022 World Cup City Built With "Slavery."**  Addressing the construction of World Cup infrastructure in Qatar, including Lusail Stadium, _Fox News_ reported that Qatar's "migrant workforce faces deadly conditions, miserable accommodations and low wages."  Quoting a representative from the International Trade Union Confederation, the article stated that "'[c]onditions in camps are simply inhuman.'"  "'FIFA,'" according to that same person, "'is **content for the World Cup to be built on modern slavery**.'"  (Emphasis added.)

66.     On top of the above, the media also reported about the corruption scandal related to Qatar winning the bid to host the World Cup, and detailed one of the greatest corruption scandals in recent world history.  The corruption scandal is yet another reason Defendants knew or should have known that the World Cup Construction Venture would and did engage in trafficked and forced labor.  Indeed, media articles _made the connection_.  For example, _Vox_ reported in 2015 that while "Swiss prosecutors" had recently "begun an investigation into possible corruption in the bidding process that awarded Qatar the 2022 World Cup," "**one scandal involving the Qatar games [was] already obvious: the widespread and vast abuse of migrant workers**."  (Emphasis added.)  Similarly, _CNN_ reported in 2014 that "new allegations" of corruption in the hosting-bid process came after "a slew of negative reports surrounding Qatar's hosting of the 2022 World Cup finals," including "[a]llegations of migrant worker abuse under the so-called kafala system of sponsorship, which has been heavily criticized by international human rights groups."

67.     Media reports, at the time, also regularly described the practices at the World Cup Construction Venture as "slavery."  Examples of such reporting include, but are not limited to:

a. <u>The Guardian</u>.  In 2013, the *Guardian* reported—in an article entitled **Revealed: Qatar's World Cup "Slaves"**—that migrant workers in Qatar "face[d] exploitation and abuses that amount[ed] to *modern-day slavery*."  (Emphasis added.)

b. <u>USA Today</u>.  In 2015, *USA Today* published an article—entitled **FIFA Must Pull Cup Out of Qatar**—reporting that, "[a]s for migrant workers, the kafala sponsorship system is *just a fancy term for slavery*."  (Emphasis added.)

c. <u>Huffington Post</u>.  In 2016, *Huffington Post* reported—in an article entitled **Report Tells FIFA To Protect Human Rights Or Move World Cup From Qatar**—that "Amnesty International recently interviewed more than 200 migrant workers to document human rights abuses at these construction sites. The global human rights group criticized FIFA for not pressuring Qatar to implement promised reforms, leaving intact a labor system that other groups have likened to **'modern slavery.'**"  (Emphasis added.)

d. <u>Ottawa Citizen</u>.  In 2016, the *Ottawa Citizen* reported, in an article entitled **Qatar, 2022: Where We'll Play Sports in the Place Built by Slaves**: "The 2022 World Cup is **driving more demand for slavery**. Many migrants killed by the job, many more living squalidly, no one meaningfully protected from being forced to stay somewhere against their will."  (Emphasis added.)

e. <u>CNN International</u>.  In 2016, CNN reported that "Qatar actually commissioned a report by an international law firm **about two years ago**, which said very clearly that the kafala system, or the sponsorship system can facilitate and drive **modern-day slavery**."  (Emphasis added.)

68.    **Television Reports and Documentaries** also alerted Defendants—through stark videos and photos—that they were participating in a trafficking venture and support an inference of Defendants' knowledge.  Several prominent news outlets, investigative journalists, and non-governmental organizations released detailed news segments and published documentary videos that addressed the squalid conditions in which migrant construction workers in Qatar lived, highlighting labor abuses related to the World Cup Construction Venture.  A non-exhaustive list of such reports follows:

| Broadcaster / Program | Title of Segment About Labor Abuses in Qatar and Trafficking and Forced Labor by World Cup Construction Venture | Year |
|---|---|---|
| International Trade Union Confederation | ***Hidden Faces of the Gulf Miracle***<br><br>https://tinyurl.com/mrxuw5mp (last accessed October 11, 2023) | 2011 |
| The *Guardian* / *Guardian* Online | ***Qatar World Cup 2022: Migrant Workers Forced to Work for No Pay***<br><br>https://tinyurl.com/6jddprue (last accessed October 11, 2023) | 2013 |
| HBO / Last Week Tonight (with John Oliver) | ***FIFA and the World Cup***<br><br>https://tinyurl.com/389shwcc (last accessed October 11, 2023) | 2014 |
| ESPN / E:60 | ***Qatar's World Cup***<br><br>https://tinyurl.com/3sy66dtt (last accessed October 11, 2023) | 2014 |
| The *Guardian* / *Guardian* Online | ***Qatar World Cup: Migrants Wait a Year to be Paid for Building Offices***<br><br>https://tinyurl.com/3kd8c3e5 (last accessed October 11, 2023) | 2014 |
| BBC / BBC News | ***"Forced Labour" at Qatar World Cup Site***<br><br>https://tinyurl.com/bdertvsn (last accessed October 11, 2023) | 2016 |
| Amnesty International | ***Investigating Conditions in Qatar Migrant Camps***<br><br>https://tinyurl.com/43cz8ebk (last accessed October 11, 2023) | 2016 |

69. Such video coverage spanned the political spectrum. For example, MSNBC's *All In With Chris Hayes* broadcast a piece entitled ***FIFA Corruption Scandal*** in 2015, https://tinyurl.com/46xd6vpy (last accessed October 11, 2023), which stated in relevant part that "[t]he situation is extraordinarily grim in Qatar where ***migrant workers are building World Cup stadiums in slave-labor conditions, with hundreds, perhaps thousands, dying in the process***." Similarly, in a segment titled ***FIFA Sponsors Voice Concerns in Wake of Corruption Scandal***, which aired in 2015, https://tinyurl.com/3sxn4tz2 (last accessed October 11, 2023), *Fox News*

observed: "[l]ook at the Qatar World Cup.  Hundreds of immigrant workers have died building World Cup stadiums there."

70.    Moreover, news outlets, investigative journalists, and non-governmental organizations published (and republished) imagery that revealing the squalid and inhumane conditions of migrant construction workers' lives in Qatar, such as the following examples:

a.  Sleeping quarters for migrant workers during World Cup Construction Venture (*Guardian*, July 2014):[2]



---

[2] This video can be seen on the *Guardian*'s website where it hosts its news item entitled "Qatar World Cup worker: 'I want to go home but I don't have any money,'" (July 28, 2014) ("Qatar World Cup Video"), *available at* https://tinyurl.com/43ww2njy (last accessed October 11, 2023).

b.  Restrooms provided to migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



c.  Group kitchen provided to migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



d.  Group bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



e.  Toilet-stall bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



f.  Toilet-stall bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



g.  Housing for migrant workers during World Cup Construction Venture (Amnesty Int'l, March 2016):



h.  Successful attempt to shut down interview, by World Cup Construction Venture participant, when interviewee was asked about the Venture's use of migrant labor to build the stadiums (*Guardian*, Qatar World Cup Video, July 2014):



71.     Defendants knew the sum and substance of each publicly available U.S. government, NGO, media, and documentary report referenced throughout this Complaint for at least four reasons.  *First*, media outlets in the United States, Europe, the Middle East, and Asia routinely published, and republished, such reports, which on information and belief Defendants' U.S. and overseas employees and agents regularly reviewed in the normal course of work for Defendants (and whose resulting knowledge is imputed to Defendants).  *Second*, on information and belief, Defendants' internal corporate security and intelligence departments, *see infra* V.C.3, ordinarily monitored, and recirculated, such public reports in the normal course of their work for Defendants, ensuring that Defendants knew, or should have known, of such reports.  Indeed, mass collection and analysis of open source data like government, NGO, and media reports are core functions of corporate security and intelligence functions at large, data-driven, multi-national

corporations like Defendants. *Third*, on information and belief Defendants' due-diligence operations alerted them to these reports, *see infra* V.C.4. *Fourth*, on information and belief, Defendants were at times asked to comment on such stories pre- or post-publication, which further alerted Defendants to the human trafficking and forced labor risks associated with the World Cup Construction Venture.

### 2. Google and Wikipedia

72.     Defendants also knew or should have known that they were participating in a trafficking venture because two of the most widely used, free, and generally accurate research tools online alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs: (1) Google; and (2) Wikipedia.

73.     **Google** products alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge. On information and belief, Defendants' (inclusive of their employees' and agents') use of Google products alerted Defendants to the relevant trafficking risks in two ways.

74.     *First*, on information and belief, one or more of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture conducted searches on Google's proprietary search engine relating to human trafficking and forced labor in Qatar and/or human trafficking and forced labor by any participant in the Venture (*i.e.*, they "Googled" it). In so doing, Defendants were inundated with credible reports, including on information and belief many of such reports referenced herein, confirming that employers in Qatar widely, and systematically, engaged in trafficking and forced labor, and that migrants employed by the Venture were victims of trafficking and forced labor.

75.     *Second*, on information and belief, one or more of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture used Google's "Notification" feature—in which a person can identify any word or phrase and automatically receive a Google-generated email containing a link to any article that pings on such word or phrase after the person signs up—to receive automatically generated emails from Google (a "Google Alert") relating to words like "Jacobs Engineering," "Qatar," "World Cup," and/or "human trafficking."[3]  Each person who acted for Defendants and signed up for such Google Alerts was likely inundated with credible media reports, including on information and belief many of the reports referenced herein, confirming that employers in Qatar widely and systematically engaged in trafficking and forced labor, and that migrant workers employed by the Venture were victims of human trafficking and forced labor.  That is because Google's artificial intelligence-based algorithms captured each public report identified by Plaintiffs in this Complaint; accordingly, it is likely Google emailed the link to many such public reports to Defendants' personnel as a "Google Alert."

76.     **Wikipedia** also alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge.  Such Wikipedia pages included, but were not limited to:

a.  The contemporaneous version of the "2022 FIFA World Cup" Wikipedia page prominently noted that Qatar has been "the subject of ***intense criticism*** because of the way it has handled many of the construction projects; ***hundreds of workers have died*** since the country was

---

[3] Plaintiffs' belief is based upon common practices in every white-collar industry, in which professionals routinely set up "Google Alerts" on items relating to their work.  Given Defendants' scale, general industry practices, and the intense public focus on the World Cup Construction Venture, it would be implausible that not even one of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture ever set up Google Alerts to help them do their jobs.

awarded the competition in 2010." Wikipedia, "2022 FIFA World Cup" (Jul. 9, 2014) (*available at* https://tinyurl.com/bp9w28h6) (emphasis added). The page's "Concerns and controversies" subsection noted one investigation found that "many workers are denied food and water, have their identity papers taken away from them, and . . . are not paid on time or at all, ***making some of them in effect slaves***." *Id.* (emphasis added).

b.  The contemporaneous version of the "Human rights" subsection of the "Qatar" Wikipedia page stated: "Qatar is a destination for men . . . who migrate willingly, but are ***subsequently trafficked into involuntary servitude*** as domestic workers and labourers." Wikipedia, "Qatar" (Oct. 4, 2011) (*available at* https://tinyurl.com/ywxxc5kf) (emphasis added). "The most common offence was forcing workers to accept worse contract terms than those under which they were recruited. Other offences include bonded labour, withholding of pay, restrictions on movement, arbitrary detention, and physical, mental, and sexual abuse." *Id.* Citing the U.S. State Department's *Trafficking in Persons Report*, the Wikipedia page continued: "men and women who are lured into Qatar by promises of high wages are often forced into underpaid labour" and "laws against forced labour are rarely enforced." *Id.*

c.  The contemporaneous version of the "Kafala system" Wikipedia page included a "Qatar" subsection that explained: "[m]ost of the workers" in Qatar's workforce "labor under near-feudal conditions that Human Rights Watch has likened to 'forced labor.'" Wikipedia, "Kafala system" (Apr. 15, 2014) (*available at* https://tinyurl.com/yc2jfsrr). Qatar was, according to the General Secretary of the International Trade Union Confederation, "'fundamentally'" a "'***slave state[]***.'" *Id.* (emphasis added).

77.    On information and belief, Defendants' agents and employees reviewed these, and similar, Wikipedia entries relating to the World Cup Construction Venture and the pervasiveness of human trafficking and forced labor by Qatari employers throughout Qatar. Plaintiffs' belief is based upon the ubiquity of Wikipedia, which rivals essentially only Google as one of the world's most widely used, and relatively accurate, online research tools. In his book, *How the Internet Happened*, author Brian McCullough explained:

> What confounded everyone who learned of the success of Wikipedia was that it actually worked! … It turned out that the "infinite monkey theorem" about giving enough monkeys typewriters and eventually producing Shakespeare was not exactly fanciful. Enough self-interested strangers could achieve a fair degree of accuracy on a wide range of topics. In 2006, there were 45,000 active editors of the English-language version of Wikipedia alone.

And Wikipedia had unique advantages that the web made possible. In the coming years, as any news or historical event occurred, Wikipedia contributors would post an up-to-the-minute factual summation of these events, and then amend the entries to reflect changing circumstances or new information. Wikipedia was often accurate and authoritative in near-real time, and it had the infinite space and resources of the Internet to play with, so it could serve what became known as the "long-tail" of content. … No other encyclopedia in history was capable of that sort of breadth of topics.

Wikipedia was a modern miracle and soon became one of the most trafficked websites in the world … [as] an open-source counterweight to the proprietary "answer engine" that is Google.

### 3. Defendants' Corporate Security and Intelligence Functions

78.     Defendants also knew or should have known that they were participating in a trafficking venture because Defendants' internal corporate security and intelligence functions alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs.

79.     Defendants' operation of substantial, highly sophisticated, corporate security and intelligence functions[4] ensured that Defendants knew, or should have known, about trafficking by Qatari employers in Qatar, by the Venture, and against Filipinos—migrant laborers like Plaintiffs. Indeed, Jacobs regularly claimed that its purpose-built "intelligence" functions provided state-of-the-art visibility into open source and internal data alike in a manner that gave Defendants, and their clients, like the World Cup Construction Venture, a significant competitive advantage.  The

---

[4] For example, Jacobs touts: "If you're in the Intelligence Community or Department of Defense, you can count on Jacobs to provide operations and analysis services for your classified missions, systems and facilities designed to collect, analyze, process and use products of various intelligence sources. In addition to our flight operations support contracts, we also develop and integrate collection and analysis systems and techniques to support strategic and tactical intelligence systems, networks and facilities." Jacobs, *Cyber & Intelligence Solutions*, https://www.jacobs.com/cyber-intelligence-solutions (last accessed Oct. 5, 2023).

same corporate security and intelligence functions from which Defendants derived competitive advantages also alerted them to the trafficking because, in both instances, such functions supplied Defendants with relevant, specific, and potentially actionable data.

### 4. Defendants' Industry-Standard Due Diligence

80. Defendants also knew or should have known that they were participating in a trafficking venture because, on information and belief, Defendants conducted industry-standard due diligence, which alerted Defendants to the risks. On information and belief, such diligence included, but was not limited to: (1) review of the reports described above; (2) preparation and review of due diligence materials (*e.g.*, summaries and emails) prepared by Defendants and/or Defendants' consultants or agents; and (3) discussions with persons who were knowledgeable about prevailing construction practices in Qatar and prevailing labor practices in the Philippines, both of which would be a relevant consideration for any companies, like Defendants, that were considering participating in the World Cup Construction Venture.

81. Plaintiffs' due diligence allegations apply with equal force to CH2M's decision to participate in the Venture, originally, as well as Jacobs's diligence of CH2M before acquiring CH2M. For example, in 2017, Steven Demetriou, Chairman of the Board, CEO, and President of Jacobs Engineering Group Inc. assured its shareholders during an earning call, among other things:

a. "We [*i.e.*, Jacobs] conducted extensive due diligence across CH2M's business, including a deep focus on their project portfolio and their project delivery capabilities and toolsets."

b. Jacobs "ha[d] jointly [] developed" "cost synergy opportunities" "with CH2M leaders during the due diligence" of Jacobs's acquisition of CH2M.

c. "[W]e [*i.e.*, Jacobs] developed a strategy and took a step back and identified where we see where capital is going to be spent globally and where we bring the capabilities to match up on that global capital spend, but we match that up with a separate process to really understand where we're making money, where we're not, by customer, by geography, by office. And

therefore, we do believe we now have a much more systematic system that starts with the pursuit process and going after a business that is going to deliver our stated goals of margin improvement, organic growth and create shareholder value.  As we now put that together with CH2M's system, which again, we're very excited about the fact that our due diligence revealed that they have very similar culture and initiatives."

82.     Relatedly, Defendants publicly disclosed that they received counsel from the law firm Gibson, Dunn & Crutcher LLP.  That firm's client alerts alerted Defendants that the World Cup Construction Venture may have used trafficking and forced labor of migrant workers like Plaintiffs.  One such alert from February 2015, entitled, "Webcast: FCPA Trends in the Emerging Markets of Asia, the Middle East, and Africa," included a page entitled "Middle East Case Study: Qatar and the World Cup," which explained "*[i]n addition to the allegations of corruption, Qatar is facing increased scrutiny over allegations concerning the treatment of workers building the stadia to be used.*"  (Emphasis added.)  On information and belief, Jacobs reviewed that presentation from its legal counsel before it acquired CH2M and participated in the Venture.

83.     At a minimum, Defendants' industry-standard due diligence supports an inference of Defendants' knowledge of the trafficking and forced labor abuses committed by the World Cup Construction Venture in which they participated.  Given the nature and extent of the public reports described throughout this Complaint it would not have been possible for Defendants to "clear" the trafficking and forced labor risks in the normal course of the due diligence they conducted.

### 5.    Defendants' State-of-the-Art Artificial Intelligence and Big Data

84.     Defendants also knew or should have known that they were participating in a trafficking venture because Defendants' state-of-the-art artificial intelligence, machine learning, and big data expertise alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs.

85.     Defendants routinely touted the competitive advantages they derived from Jacobs's cutting-edge artificial intelligence, machine learning, and big data solutions, and specifically observed how such technologies made Jacobs far more aware of its commercial surroundings (and therefore better able to generate profits) than nearly every other company worldwide.  For example, during a Jacobs earnings call in 2019, a Vice President of Jacobs Connected Enterprise, Heather Wishart-Smith, assured shareholders, among other things, that:

> The components of [Jacobs's digital approach] have been around for quite some time. What makes them *so significant now is the full integration of components like the Internet of Things, artificial intelligence and data analytics*.  What makes them so significant for Jacobs is to have not just the digital capability in order to bring this transformative solution but to have all of the clients that we currently have . . . who have trusted us for decades to now be able to bring the solution in.

> The market is poised for explosive growth, and Jacobs is positioned with the technical skills and the clients to capitalize on that growth.  Jacobs is different because we have the combined strength and capabilities of both [engineering, management and consulting lines of business] . . . and have digital capability and domain expertise, which then creates opportunities and value that go far beyond just . . . [what] I've just described with you. …

> *All around the world, [Jacobs's segments] are working together* to develop and provide new innovative smart city solutions, not just to our traditional clients, but we're attracting new clients along the way.  *And that is exactly what makes Jacobs a company like no other*.  With our digital capability and our deep domain expertise and with the combined capabilities of [Jacobs's engineering, management, consulting, and digital segments], we are winning more, earning more and creating substantial value for our clients, for our employees and for our investors. (Emphasis added.)

86.     On information and belief, Defendants deployed the same, or substantially similar, artificial intelligence, machine learning, and big data capabilities, functions, personnel, and processes when Defendants participated in the World Cup Construction Venture, which would have made them know that the Venture used trafficked and forced labor.

### 6.  Qatar Foundation's Notorious Role, Reputation, and History

87.     Defendants also knew or should have known that they were participating in a trafficking venture because Qatar Foundation's notorious role, reputation, and history also alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs, and ensured that Defendants should have detected, and did detect, abuses and forced labor relating to the Venture.

88.     Qatar Foundation was controlled by the Qatari regime.  It was chaired by Sheikha Moza bint Nasser Al-Missned, the Qatari emir's influential mother, and the CEO was Sheikha Hind bint Hamad Al Thani, the emir's sister.  According to the U.S. State Department's 2022 Country Report, Qatar Foundation housed "[s]everal quasi-governmental organizations" that "rarely criticized" the government.  As such, Qatar Foundation was was widely recognized as a regime mouthpiece whose role is to do the bidding of the regime.  According to public reporting by *The Daily Beast* in 2017, Qatar Foundation was "seen in the emirate as a state-within-the-state," and its "budget is considerable although opaque and remains unpublished."  Further, Hussain Abdul-Hussain and David Adesnik, of the Foundation for Defense of Democracies, reported in 2022 that "Qatar Foundation and the government in Doha cultivate bigotry throughout" Qatar by, *inter alia*, promoting and broadcasting the views of "violent extremists."

89.     Defendants knew that due to their participation in the Venture, they were closely intertwined with Qatar Foundation, which openly and notoriously helped play a public leadership role in the Venture.  Indeed, Qatar Foundation touted its role on its website:

> Throughout the 12-year buildup to the FIFA World Cup Qatar 2022™, and the four spectacular weeks of the tournament itself, Qatar Foundation (QF) was at the heart of a nationwide effort to deliver amazing.
>
> As a key supporter of the first FIFA World Cup™ in the Middle East, QF channeled its expertise, its values, its platforms, and its people into the preparations for the tournament, the welcome it would offer to people throughout the world…and the legacy it will create.

90.     Defendants were aware of the World Cup Construction Venture's inextricable linkage to Qatar Foundation due to public reporting.  For example, an article published by *The Daily Beast* in 2017, and entitled ***Qatar's Foundation for Hypocrisy***, reported that "[o]ne of the most ambitious stadiums Qatar is building for the controversial 2022 World Cup competition is in the [Qatar Foundation]'s Education City."

91.     Due to Defendants' interaction with and work with Qatar Foundation, Defendants knew Qatar Foundation served as the Qatari regime's notorious "reputation washing" front that

was purpose-built to enable the regime's priorities, including its support for endemic trafficking of migrant workers, like Plaintiffs, by Qatari employers under Qatar's *kafala* system, which provided the economic foundation for the Qatari regime's dictatorship.  For example, in 2013, the *Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported (headline: ***The Middle East's Migrant Workers: Forget About Rights***) as follows:

> ***Attempts to improve the lot of migrants working in the Middle East are unlikely to make much difference***[.]
>
> ***"Our workers are treated worst in the Gulf," says Walden Bello, a Filipino parliamentarian, referring to those of his countrymen who seek their fortune abroad.*** … Many pay up to $3,000 to recruitment agencies, only to find themselves working long hours for a pittance and with no time off in jobs that often differ vastly from the ones they signed up for back home. Mistreatment, including the sexual sort, is relatively common. ***The International Labour Organisation (ILO), a UN body, reckons that 600,000 workers in the region can be classed as victims of trafficking.***
>
> ***This is the sort of bad press Qatar wants to avoid in the run-up to the 2022 football World Cup, as it imports more workers to build stadiums for the tournament using a labour force already 94% foreign. The Qatar Foundation, an organisation founded by the emir, has drawn up rules for foreign workers.*** …
>
> Sarah Leah Whitson of Human Rights Watch, a New York-based lobby, says the Qatar Foundation code is a model that could spark regional change. ***But she worries that the regulations--which have not been enshrined in Qatari law--will not be put into practice. …*** A Domestic Workers Convention adopted by the ILO in 2011 has found little support in the region. ***Cruelty towards foreign workers … remains widespread.***
>
> ***The migrant workers' lot is unlikely to improve until the reform of the kafala system, whereby workers are beholden to the employers who sponsored their visas.*** The system blocks domestic competition for overseas workers in the Gulf countries. …
>
> ***Rulers of the Gulf states, where workforces are made up of low-paid foreigners, are loth to change the system, since it ensures cheap labour.*** Eyeing unrest elsewhere in the region, they are wary of upsetting locals. ***The migrants' suffering is not about to end.***  (Emphases added.)

92.     From 2013 until at least 2020, Qatar confirmed Ms. Whitson's, and Human Rights Watch's, skepticism in the above quote:   The Qatari regime made no meaningful changes to Qatar's *kafala* system and, consequently, Qatar Foundation's role was merely to reputation wash for the World Cup Construction Venture.   Similarly, in accordance with Defendants' pervasive corporate policy and general theme and subservience to the Supreme Committee and the Qatari regime, *supra* ¶ 23 ("the client is king" to whom you must bow down), Defendants kowtowed to the Qatari regime and assisted it as it refused to reform, slowed reform, did not implement reforms, and obfuscated regarding the need for reform or failures to do so.   The labor abuses detailed in this Complaint continued in part due to Defendants' subservience to their client, even after any purported "reforms."

93.     In 2014, the *Guardian*, published a lengthy investigative report headlined ***Modern-Day Slavery – Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***, *supra* ¶ 65(b), and stated in relevant part:

> Migrant workers who built luxury offices used by Qatar's 2022 football World Cup organisers have told the Guardian they ***have not been paid for more than a year and are now working illegally from cockroach-infested lodgings***. . . .
>
> The project, a Guardian investigation shows, was directly commissioned by the Qatar government and the workers' plight is ***set to raise fresh doubts over the autocratic emirate's commitment to labour rights as construction starts this year on five new stadiums for the World Cup.***
>
> ***The offices, which cost £2.5m to fit, feature expensive etched glass, handmade Italian furniture, and even a heated executive toilet, project sources said. Yet some of the workers have not been paid, despite complaining to the Qatari authorities months ago and being owed wages as modest as £6 a day.***
>
> ***By the end of this year, several hundred thousand extra migrant workers from some of the world's poorest countries are scheduled to have travelled to Qatar to build World Cup facilities and infrastructure. The acceleration in the building***

*programme comes amid international concern over a rising death toll among migrant workers and the use of forced labour. . . .*

The migrants are squeezed seven to a room, sleeping on thin, dirty mattresses on the floor and on bunk beds, in breach of Qatar's own labour standards. They live in constant fear of imprisonment because they have been left without paperwork after the contractor on the project, Lee Trading and Contracting, collapsed. They say they are now being exploited on wages as low as 50p an hour. . . .

Qatar's World Cup organising committee confirmed that it had been granted use of temporary offices on the floors fitted out by the unpaid workers. …

*Jim Murphy, the shadow international development secretary, said the revelation added to the pressure on the World Cup organising committee after . "They work out of this building, but so far they can't even deliver justice for the men who toiled at their own HQ," he said.*

*Sharan Burrow, secretary general of the International Trade Union Confederation, said the workers' treatment was criminal. "It is an appalling abuse of fundamental rights, yet there is no concern from the Qatar government unless they are found out," she said. "In any other country you could prosecute this behaviour." . . .*

Contracts show the project was commissioned by Katara Projects, a Qatar government organisation under the auspices of the office of the then heir apparent, Sheikh Tamim bin Hamad al-Thani, who is now the emir. He also heads the supreme committee, the World Cup organising body. The committee is spending at least £4bn building new stadiums for the tournament, which has become mired in allegations of bribery, while there is disbelief at the prospect of playing the tournament in Qatar's 50C [*i.e.*, 122 degrees Fahrenheit] summer heat. …

*The problems at the Tower of Football workers are not isolated, despite Qatar's pledges to monitor salary payments and abolish the kafala sponsorship system, which stops migrant workers changing job or leaving Qatar without their employer's consent. In 2012 and 2013, 70 labourers from India, Nepal and Sri Lanka died from falls or strikes by objects, 144 died in traffic accidents and 56 killed themselves, the government's own figures show. Dozens more young migrant workers die mysteriously in their sleep from suspected heart attacks every summer.*

The *Guardian* discovered *more projects where salaries had not been paid*. They included a desert camp of 65 workers who had not been paid for several months, were sleeping eight to a room, and were living with dirty drinking water, filthy, unplumbed toilets and no showers.

45

Another group said they were being paid only sporadically, that there was sometimes no water in their housing and no electricity to power air conditioning.

***This month, the Qatar Foundation, a state body, published a report examining trafficking, debt bondage and forced labour among migrant workers. It identified practices that contravene International Labour Organisation conventions on forced labour and UN anti-trafficking protocols, "widespread" non-payment of wages and bribery and extortion among recruitment agents and employers. . . .***

"We know there is much more to do," said Abdullah al-Khulaifi, Qatar's minister of labour and social affairs in a statement detailing progress on labour law reforms. "But we are making definite progress and are determined to build momentum."

94.     Abdullah al-Khulaifi's statement above was a lie, the cover for which was provided by Qatar Foundation.  Qatari regime officials made similar statements every year between 2013 and 2020, typically in contexts in which Qatar Foundation was also referenced, like here.  And, of course, that was the point all along:  A front (which provides "cover") only works if one claims to oppose the thing that they are engaging in, *i.e.*, one lies.  Otherwise, it would not provide "cover" to the regime's sponsorship of trafficking and forced labor under Qatar's *kafala* system in the first instance.  Similarly, the fact that Qatar Foundation regularly published reports confirming that trafficking was widespread was a feature, not a bug, of Qatar Foundation's role as a front.[5]  Given Defendants' sophistication, including their employment of security and intelligence professionals, Defendants understood that the practices described in articles like those published by the *Guardian*

---

[5] Given that the its purpose was to simply persuade gullible audiences that the Qatari regime was trying to improve conditions for laborers (when it was not), Qatar Foundation had no choice but to regularly issue reports observing the obvious—that trafficking was endemic in Qatar—so that Qatar Foundation could then say that it was credible and people could trust it when it claimed to be fighting trafficking.  In this way, Qatar Foundation was like a corrupt political leader who claimed to be cracking down on bribery when, in reality, he was simply leveling corruption charges against his competitors in the bribery marketplace so his own economic needs would be satisfied.

could not be reconciled with Qatar Foundation's declarations unless one concluded that the latter was, in fact, a front rather than an organization dedicated to combatting trafficking.

95.    The same 2014 *Guardian* report also contained a link to a 14-minute short film documentary by the *Guardian*'s journalists,[6] which supported the conclusion that thousands of migrant laborers who worked on the World Cup Construction Venture likely died as a result of their work on the Venture because the Venture's migrant laborers from India and Nepal alone accounted for 882 reported deaths during the Venture during the 2012–2013 period alone.  On information and belief, the Venture's participants pervasively underreported the numbers of deaths, substantial injuries, and physical, including sexual, assaults that were committed against migrant laborers trafficked by and for the Venture and its participants.

96.    The same *Guardian* documentary video report provided substantial video and photographic evidence of the pervasive trafficking and labor abuses perpetrated against migrant laborers who worked on the World Cup Construction Venture, like Plaintiffs.  *See supra* ¶ 70 (images of labor abuses captured from *Guardian* Qatar World Cup Video).  Summing up the inhumane and unlawful working and living conditions under which migrant laborers, like Plaintiffs, were trafficked by the Venture and its participants, the *Guardian* concluded that the Qatari regime, the Venture, and Venture participants had treated, and continued to treat, migrant laborers working on the Venture as "***just another disposable commodity***."   (Emphasis added.) This comports with reporting regarding an Amnesty International investigation which concluded "World Cup workers [were] 'treated like cattle.'"

---

[6] *See* Qatar World Cup Video, *available at* https://tinyurl.com/y9hcmc8k.

97.     In 2014, Human Rights Watch publicly called out Qatar Foundation for serving, in effect, as a fig leaf for the Qatari regime's (and Qatari employers') ongoing refusal to do anything meaningful that would prevent laborers, like Plaintiffs, from being trafficked in connection with the World Cup Construction Venture:

> The Qatar Supreme Committee, the body charged with delivering the Gulf state's 2022 World Cup, this morning released its Workers' Welfare Standards. In this detailed 50-page document, the committee outlines how it intends to ensure the basic rights of foreign migrant workers involved in select projects related to the construction of stadiums and associated infrastructure. *(Another quasi-governmental body, the Qatar Foundation, released a similar set of standards in April 2013.)*
>
> These … efforts … do not go nearly far enough in a country with such a dismal record on workers' rights. …
>
> *[I]t would be credulous to regard this as a long-term solution to very serious problems in Qatar and the rest of the Gulf.  The new standards don't ensure a worker's rights to change employers, leave the country, or bargain collectively for better pay and conditions.*  And the standards will impact only a small fraction of migrant workers in Qatar, excluding even some of those serving the World Cup, such as the construction workers building the hotels where fans will stay, or the taxi drivers who will shuttle tourists around the capital, Doha. *The standards don't alter the fact that, more than three years after Qatar won the bid to host the 2022 World Cup, Qatar's legal and regulatory framework still facilitates the trafficking and forced labor of migrant workers.*
>
> *Qatar's labor system needs a major overhaul, not a minor makeover.  Reform should be led by the relevant government authorities, not the World Cup delivery committee*, and it should address all migrant workers in the country, not just those who will build futuristic stadiums.

98.     Defendants also knew, or should have known, of a litany of contemporaneous reports that alleged that Qatar Foundation, and its associated charities, had directly funded HAMAS, Hezbollah, al-Qaeda, and other notorious trafficking ventures (and terrorist groups), which were known for engaging in significant and systematic human trafficking, including when

Defendants worked closely with Qatar Foundation, which alerted Defendants that Qatar Foundation was not a legitimate charity, but instead a front that enabled human trafficking.

99.     For example, the *Australian Review* publicly reported in 2012 that "Qatar Foundation" had "attracted [] negative headlines due to allegations that the non-profit organisation had provided funding to terrorists." Similarly, in 2015, Shurat HaDin Israeli Law Center, an Israeli NGO dedicated to fighting extremism in the Middle East, launched a media campaign, including a detailed press release, that publicly "called on FC Barcelona to suspend ties with the Qatar Foundation on the grounds that it [was] 'immoral to receive funding from a country that supports terrorist groups,'" during which Nitsana Darshan-Leitner, the NGO's president, warned anyone adjacent to Qatar Foundation, like Defendants, that "[w]e know that Qatar [through Qatar Foundation] has … funded … groups like Islamic State, Al-Qaeda and Hamas." And in 2017, Israeli attorney Louis Garb publicly observed that "Qatar" was "a vicious, terror-supporting dictatorship" such that "Qatar, through Hamas and Hezbollah, support[ed] terror worldwide" and "also use[d] slave labor to build the stadiums needed to indulge the megalomania of its rulers who, through bribery, won the opportunity to host the next World Cup."

100.    Defendants knew that HAMAS was a notorious trafficker, which further contextualized their awareness of the role of Qatar Foundation. In 2007, for example, *Deutsche Presse Agentur* (*i.e.*, the German Press Agency), publicly reported that Dutch researchers had concluded that "the militant Palestinian Hamas movement" financed itself, in substantial part, through the "[l]arge sums of money" HAMAS received "from the money [that] originate[d] from … human trafficking." Similarly, in 2014—while Qatar Foundation was ramping up its support for HAMAS—numerous sources in Israeli media confirmed HAMAS's bedrock reliance on

trafficking, like when *Israel National News* reported that, "Palestinian Authority … Chairman Mahmoud Abbas's Fatah … exposed that Hamas is running a human trafficking network."[7]

101.    Defendants knew that Hezbollah was a notorious trafficker, which further contextualized their awareness of the role of Qatar Foundation.   In 2017, for example, Representative Ann Wagner and Dr. David Asher, of the Foundation for Defense of Democracies, had the following exchange regarding Hezbollah's human trafficking:

> WAGNER: Dr. Asher … We also know that Hezbollah generates revenue from … human trafficking in the Americas.   Can you please discuss ***Hezbollah's involvement in human trafficking in Lebanon, Syria, globally***?
>
> ASHER: … I'm aware of one of the top tier targets, we call them super facilitators. We actually had a thing called Iran-Hezbollah Super Facilitators Initiative targeting key functional financiers for the Hezbollah-Iran network globally. And I'm aware of one very significant case of Syrian children being trafficked all the way into West Africa by this [Hezbollah] individual.  And it was a very painful case for us because the U.S. government was well aware of it and we did nothing. And it still haunts me that these poor children, and they were like young girls and boys were sent to a heinous country in West Country probably to their death ***because the guy in charge seemed to like torturing children***.  So, that is one case.  He was definitely a Hezbollah senior functional official … (Emphasis added.)

102.    Defendants knew that al-Qaeda and ISIS—which were part of the same organization until 2014, and followed the same general approach with respect to trafficking—were notorious traffickers, which further contextualized their awareness of the role of Qatar Foundation.

---

[7] More generally, Defendants' knowledge that Qatar Foundation was in the business of directly supporting groups that committed systematic violence like trafficking humans, beheading hostages, and detonating car bombs, also alerted Defendants that Qatar Foundation was ***not a legitimate charity***.   When Defendants collaborated with Qatar Foundation, they were not partnering with a legitimate charitable institution—they were partnering with a notorious front that the Qatari regime used to funnel money to its violent, human trafficker allies like HAMAS, Hezbollah, al-Qaeda, and ISIS, among the many notorious hostage-taking trafficking ventures/terrorist groups with which the regime was aligned.

Indeed, slavery was literally written into ISIS's founding charter.  Per a *CNN* headline in 2014:
"***ISIS: Enslaving, Having Sex With 'Unbelieving' Women, Girls Is OK***."

103.    Defendants' knowledge that Qatar Foundation was directly involved in aiding notorious trafficking ventures (and terrorist groups) like HAMAS, Hezbollah, al-Qaeda, and ISIS confirms that Defendants knew, or should have known, that Qatar Foundation supported human trafficking in Qatar.  These groups that Qatar Foundation supported were notoriously engaged in human trafficking and forced labor, including, but not limited to, by engaging in hostage-taking and ransoms, forced labor and services, and sex trafficking.

104.    Due to all these red flags about Qatar Foundation, Defendants knew that Qatar Foundation was, and is, best understood as a reputation washing front designed to enable trafficking, including in relation to the World Cup Construction Venture, rather than serving as a legitimate charitable foundation.  Defendants knew of Qatar Foundation's true nature for at least three reasons.  *First*, media reports, including but not limited to the *Economist*'s reporting, alerted Defendants to this reality.  *Second*, the contexts in which Defendants operated made such conclusion obvious, *e.g.*, the ineluctable conclusion that Qatar Foundation's anti-trafficking words were lip service designed to provide cover for continued trafficking given the Qatari regime's absolute power and control over the country and Qatar Foundation.  *Third*, Defendants' corporate security and intelligence personnel also knew such facts to be true because such understanding of Qatar Foundation was widespread throughout the Middle East, and was of the nature that Defendants' monitoring processes would have gathered sufficient data to alert them to Qatar Foundation's true nature.

105.    For all these reasons, Defendants' work with Qatar Foundation made them know, or they should have known, that the World Cup Construction Venture engaged in human trafficking and forced labor.

### 7.   Defendants' Venture-Related Policies and Procedures

106.    Jacobs's and CH2M's compliance with their stated policies and procedures also alerted Defendants to the anti-trafficking risks, and should have detected, and did detect, labor abuses and forced labor, relating to the World Cup Construction Venture in which they participated.  Jacobs represents that its employees "do things right," "always act with integrity," "tak[e] responsibility for our work," and "stay[] focused on safety."  To that end, Jacobs says it has "taken a variety of actions to verify the absence of modern slavery in [its] supply chain."  As described below, Defendants' policies and procedures alerted Defendants to the anti-trafficking risks they faced:

a.  Supplier Code of Conduct.  Jacobs has a "Supplier Code of Conduct," through which Jacobs claims that it demands its suppliers, and Jacobs's suppliers' suppliers, to "[c]omply with applicable laws concerning . . . forced labor, human trafficking, working hours, . . . [and] fair wages."  Pursuant to the Supplier Code of Conduct, Jacobs claims that it "*regularly conduct[s] audits and thoroughly investigates possible non-compliance*" therewith.  Jacobs also uses a "human rights prequalification questionnaire" to screen suppliers.  (Emphasis added.)

b.  Internal Reporting.  Jacobs says that it encourages its "employees, suppliers and stakeholders to speak up, without retribution, about any concerns regarding human rights and modern slavery in [its] operations or supply chain" and pledges to "investigat[e] reports in an appropriately robust and timely manner."

c.  Supply Chain Mapping and Risk Assessments.  Jacobs represents that it "*conduct[s] due diligence* to avoid complicity in human rights abuses."  For example, Jacobs "periodically conduct[s] global supply chain mapping and human rights risk assessment, . . . sometimes with the support of third-party consultants," and identifies "highest risk areas for human rights and *modern slavery exposure, with a particular emphasis on geography, service type and operational context*."  (Emphasis added.)

d. <u>Post-Execution Due Diligence</u>.  Jacobs also knew of the abuses because it purportedly "conduct[s] ongoing due diligence of suppliers based on international indices, ***media searches*** and other indicators of supplier risk."  (Emphasis added.)

e. <u>Post-Execution Audits</u>.  Jacobs recently stated that it "***conducted worker accommodation and employment practices audits*** of suppliers employing foreign migrant workers in a high-risk geography," "identif[ied] areas for improvement," and "***engaged with suppliers to implement corrective actions***."  (Emphasis added.)

Via each of these acts, Jacobs knew or should have known that there was trafficked and forced labor throughout the World Cup Construction Venture.

107.    Before beginning work on the World Cup Construction Venture, CH2M disclosed in its 2011 Sustainability Report that it similarly, as a matter of policy and procedure, takes actions that alerted it (or should have alerted it) that there was trafficked and forced labor in the Venture. CH2M stated in relevant part that it:

> ***monitors engagement*** of suppliers, contractors, and labor brokers ***who are from or use labor from countries identified by the United Nations and the U.S. State Department as high risk for human rights abuses, including, but not limited to, the use of forced or child labor***.  ***We have identified the Middle East***, central and southwest Asia, and certain countries in Central Europe as ***areas with higher risk of human rights and trafficking in labor violations***.  Therefore, we have developed ***special protocols to screen our labor brokers and vet our contractors and suppliers*** to reduce our risks of inadvertently enabling human rights violations or child or ***forced labor situations***.  (Emphasis added.)

108.    For these reasons, Defendants knew or should have known, due to their own execution of their purported policies and procedures, that the Venture relied upon trafficked and forced labor.

### 8. Defendants' Roles in the World Cup Construction Venture

109.    Defendants' specific roles in the World Cup Construction Venture also alerted Defendants to the anti-trafficking risks, and ensured that Defendants should have detected, and did detect, labor abuses and forced labor, relating to the Venture in which they participated.

Defendants, as managers and overseers of the entire World Cup Construction Venture, had the right to assign tasks to other venture participants in the World Cup Construction Venture, and were able to control the means and details by which the other Venture participants in the World Cup Construction Venture performed their work in furtherance of the Venture. Defendants' management, oversight, and ability to control how other venture participants worked on the World Cup Construction Venture included the ability to prevent Defendants' venture partners from exploiting forced or trafficked labor.

110.    For example, in 2013, a spokesperson for CH2M asserted where CH2M, in its role as manager and overseer of the development of the stadiums in the World Cup Construction Venture, had "control, we take the strongest possible action to protect migrant labor," and where they were in a supervisory role, when there are "safety issues," "we take action, working with our clients to investigate and respond in an appropriate manner."

111.    That same spokesperson publicly stated that CH2M "ensure[s] that appropriate terms and conditions are properly placed in the procurement documents of our clients. In cases where we have a supervisory role over a contractor, we apply our health and safety guidelines."

112.    Jacqueline Hinman, then CEO of CH2M, publicly confirmed in November 2016 that due to the "serious concerns about worker welfare," CH2M actively

> worked with clients Qatar 2022 [World Cup] . . . to improve standards for employment, safety, and worker accommodations. . . . *we strengthened supply-chain qualification requirements for procurement and contractor selection with an inspection regime for enforcement*. . . . We see this as a valuable program-management tool to empower workers and *ensure these welfare standards are being met*.

113.    CH2M, and then Jacobs after it acquired CH2M, purportedly took actions to ensure labor welfare, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions.

114.    CH2M, and then Jacobs after it acquired CH2M, claimed to ensure proper terms and conditions, and health and safety guidelines were in place and followed by the other Venture participants in the World Cup Construction Venture, including but not limited to Plaintiffs' employers, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions.

115.    A CH2M spokesperson also touted that CH2M, in its role as overseer and manager of the World Cup Construction Venture, would "lead by example" to "significantly improve the treatment of workers" by setting "standards" for things such as ethical recruitment, employment standards, and health and safety, "establishing an inspection and enforcement regimen" including "audits at multiple levels within the organization and periodic workers inspections," and managing "contractor selection" to "establish a procurement approach that verifies contractor worker welfare."

116.    CH2M, and then Jacobs after it acquired CH2M, took on the role of inspecting Plaintiffs' worksites and living conditions, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions.

117.    CH2M, and then Jacobs after it acquired CH2M, was responsible for setting standards for ethical recruitment, employment standards, and workers' health and safety, per its

contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions.

118.     CH2M, and then Jacobs after it acquired CH2M, audited at multiple levels within the organization and conducted periodic inspections of work and living sites, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions.

119.     During the entirety of the World Cup Construction Venture, CH2M (and then Jacobs after it acquired CH2M) had policies of evaluating subcontractors' worker welfare policies, which required it to regularly visit worksites.  As such, CH2M (and then Jacobs after it acquired CH2M) had a practice of "screen[ing] before engaging a supplier, and monitor[ing] during the work phase."  As part of this practice, CH2M (and then Jacobs after it acquired CH2M) engaged with the entities who directly employed construction laborers.  Given their policies and screening practices, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions.

120.     CH2M, and then Jacobs after it acquired CH2M, managed contractor selection to establish a procurement approach that verified contractor worker welfare, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions.

121.     CH2M, and then Jacobs after it acquired CH2M, with the role as overseer and manager of the entire World Cup Construction Venture, was responsible for "ensur[ing] that appropriate terms and conditions [were] properly placed in the procurement documents" of the Venture participants and used "strategic procurement and performance monitoring as additional

means to address labor standards issues."  As such, CH2M, and then Jacobs after it acquired CH2M, had direct control over the terms and conditions of workers' employment and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions.

122.    For all these reasons, as overseer and manager of the World Cup Construction Venture, CH2M and Jacobs were frequently involved in the day-to-day aspects of each stadium construction project.

123.    By way of example, Jacobs employee Mr. Shaw's LinkedIn page details that he worked with another health and safety professional from Jacobs, Sajith Sathyan, to improve safety conditions at a particular worksite.  Additionally, another CH2M worker, Ali Marcotte, served as a Program Management Consultant for the World Cup Construction Venture, and publicly listed her responsibilities as including "conceiv[ing] and implement[ing] a performance management system for contractual execution across the [Venture] supply chain," which entailed, among other things, "schedule, budget, sustainability, [health and safety] and worker welfare through contractual terms and conditions for all [] suppliers," and "performance monitoring requirements." Another former Jacobs employee publicly touted the work they did for Jacobs on the Al Thumama Stadium, in direct interaction with Al Jaber Engineering, in a role that required weekly site visits and safety tours, with the responsibility of ensuring contract compliance and that health and safety standards were obeyed and implemented.  By virtue of this evident direct participation in the Venture, *see generally supra* V.B, Defendants knew or should have known that the Venture was engaging, throughout, in human trafficking and forced labor.

124.     Because Defendants were managing performance of the other participants in the World Cup Construction Venture, Defendants by virtue of their participation in the Venture knew or should have known of Plaintiffs' inhumane and exploited conditions.

125.     Because Defendants were exerting management across the entire World Cup Construction Venture supply chain to purportedly ensure worker welfare, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions.

126.     Because Defendants had control over contractual terms and conditions for all suppliers in the World Cup Construction Venture, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions.

127.     Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the Venture's use of forced and trafficked labor and, with full knowledge of the forced and trafficked labor, chose to financially benefit by continuing to do business with the partners in the Venture and participate in the Venture.

128.     Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the Venture's exploitation of Plaintiffs by confiscating workers' passports upon their arrival and refusing to return the passports until conclusion of the worker's contractual term, as a way to

a.   control and limit Plaintiffs' movements while in Qatar, to preclude a search for new employment, and to preclude Plaintiffs' return to the Philippines;

b.   ensure they were forced to endure unsafe, unsanitary, and exploitative living conditions, including but not limited to the provision of unsanitary or insufficient food and forced living in crowded conditions;

c.  ensure Plaintiffs were forced to endure unsafe and exploitative working conditions, such as forced work for extremely long hours, working in inhumane conditions such as without sufficient water; and

d.  not providing fair or promised compensation, including for overtime.

Fully knowing these facts, Defendants chose to financially benefit by participating in the World Cup Construction Venture.

129.    Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the Venture's exploitation of Plaintiffs, including lies told to Plaintiffs regarding working and living conditions, and pay, to induce them to agree to travel to Qatar and work for Venture.  Fully knowing these facts, Defendants chose to financially benefit by continuing to do business with the other participants and participate in the World Cup Construction Venture.

130.    Without discovery the terms of the contracts between and among the different joint venture partners for the World Cup Construction Venture are not knowable, but publicly available information indicates CH2M (and then Jacobs once it acquired CH2M) had direct control or the right to control each joint venturer's conduct vis-à-vis the construction workers, and exerted that control through auditing, oversight, inspections, and mandated policies and procedures.

### 9.  Defendants' Venture-Related Course of Dealings

131.    Defendants' course of dealings—including those of their partners, *e.g.*, the Supreme Committee and FIFA—also alerted Defendants that they were participating in a trafficking and forced labor venture and provides further direct evidence that Defendants knew of these abuses in the World Cup Construction Venture in which they participated.  Plaintiffs are aware of at least four instances when such course of dealings confirms that Defendants knew or

should have known that Plaintiffs were being trafficked by the World Cup Construction Venture in which Defendants participated. The examples below are not exhaustive; they reflect what Plaintiffs have been able to piece together without discovery. The full details of Defendants' course of dealings (and knowledge gained by the course of dealings of the other participants in the Venture, with whom Defendants communicated) rest within Defendants' sole control. Discovery will likely uncover many other similar instances when such course of dealings demonstrate that Defendants knew or should have known of the trafficking and forced labor throughout the Venture.

132.    *First*, CH2M knew of *kafala* and the terrible conditions of the working environment in Qatar. in 2013, CH2M's Assurance Director admitted that CH2M knew that working conditions were unsafe. He was quoted to say that "***his team has estimated that at least 14 people will die while building Qatar's World Cup stadiums,***" and "***[t]here are quite a few unsafe construction sites . . . I am half expecting bodies to land next to me every time I go past.***" (Emphasis added.) Although that admission was controversial at the time, in fact, CH2M dramatically underestimated the number of World Cup 2022 construction worker deaths, and some estimates put the number of such workers' deaths in the thousands. Defendants thus knew or should have known that the World Cup Construction Venture mistreated migrant workers in the ways discussed *supra* ¶¶ 42–44.

133.    *Second,* in 2013, FIFA acknowledged that "fair working conditions [for migrant workers] with a lasting effect must be introduced quickly in Qatar." However, the Qatari regime would not begin implementing those "reforms" until 2020; even after, ongoing labor practices continued to violate the TVPRA.

134.    *Third,* in 2015, VINCI, a construction company working on the Al Rayyan Stadium and Precinct project for the World Cup, and thus a part of the World Cup Construction Venture Defendants participated in, admitted to confiscating passports after a related public accusation.

135.    *Fourth*, in 2015, CH2M, via CH2M HILL International B.V., entered into a memorandum of understanding with the State of Qatar (*i.e.*, the Qatari regime), the Supreme Committee, and Qatar Foundation, to access and provide technology assistance called "Better Connections" in the "residential compounds" of the migrant workers.  One public report noted:

> ***The programme is expected to cover expatriate workers from*** India, ***The Philippines***, Nepal, Sri Lanka, Pakistan, Bangladesh, Ethiopia, Thailand, Vietnam and Ghana. ictQATAR also inked MoUs with the Supreme Committee for Delivery & Legacy (SC), Qatar Foundation (QF) and CH2M HILL International BV (CH2M) which work on the most iconic infrastructure projects in the country. (Emphasis added.)

Via this program, CH2M had access to and thus witnessed the inhumane living conditions the trafficked and forced laborers endured.  CH2M, as a whole, and via CH2M Hill Companies, Ltd. in its 2016 Sustainability and Corporate Citizenship Report, took responsibility for and credit for the "Better Connections" program in Qatar, showing how CH2M as a whole was involved:

> We won the award ***with our partner***, Qatar's Ministry of Information and Communications Technology (ictQatar), in recognition for ***our leadership on ictQatar's Better Connections Program***. . . . the program provides Internet access and technology training to low-income migrant construction workers, so they may stay in touch with their families and loved ones back home.  The Better Connections Program ***has set up and equipped 100 new ictQatar facilities at worker accommodations, reaching thousands of migrant workers across Qatar***.  ***Other Better Connections partners include the Supreme Committee for Delivery & Legacy (our 2022 FIFA World Cup Qatar client)***, Qatar's National Human Rights Committee, Qatar Foundation, and Microsoft Qatar.  (Emphasis added.)

**D.      Defendants Knowingly Benefitted from Participation in the World Cup Construction Venture.**

136.    Defendants entered into a contract to oversee and manage the World Cup Construction Venture.  The value and total scope of the World Cup contract to Defendants is not known at this time.  On information and belief, Defendants realized, at least, more than $50 million dollars in profit from their participation in the Venture, because it is not plausible that Defendants received less than $5 million per year in net profit given the scale of the Venture.  Discovery is likely to reveal Defendants earned far more, likely hundreds of millions of dollars more.

137.    Trafficking Plaintiffs and Plaintiffs' forced labor allowed Defendants to benefit from an inadequately compensated, captive workforce, working excessive hours, with inadequate allowances for food and cheap, substandard, overcrowded, and unsanitary housing.  Plaintiffs' forced labor allowed Defendants and their Venture partners to complete World Cup construction projects more quickly and cheaply than would have been possible without Plaintiffs' forced labor. Defendants benefited thereby.

**E.      Each Plaintiff Was a Victim of Trafficking by the Venture.**

138.    Each Plaintiff was a victim of trafficking by the Venture.  Below, Plaintiffs set forth each Plaintiff's allegations as to both that individual Plaintiff's injuries, as well as the pattern and practice demonstrated by all the Plaintiffs—and the allegations of all the Plaintiffs further corroborate the allegations of each individual Plaintiff.  Accordingly, all Plaintiffs' allegations below are relevant to each Plaintiff's individual allegations.

139.    **Plaintiff F.C.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2012–2014, and specifically on the construction of Khalifa Stadium and the Lusail Stadium, in which Defendants participated and from which they knowingly

benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his employment until the end of his contract.  F.C. asked for the return of his passport, so that he could travel to the Philippines before the end of his contract due to a family emergency.  This request was refused, and he was not allowed to leave.  He was forced to work through exhaustion, sometimes as many as 36 hours straight, and he was denied compensation for overtime work.  He felt he had no choice but to work.

140.    **Plaintiff A.B.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013–2016, and specifically on the construction of the Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract, which caused him to be frightened and depressed.  He was forced to work through exhaustion and sleep deprivation and was regularly forced to work as many as 72 hours straight. He was hospitalized multiple times due to fatigue and dehydration.  He was lied to about his pay. He also, at times, received less pay than he was promised and had earned.  At times, he was forced to sleep in a truck, because the Venture participants did not provide him a bed.  He was not allowed to go home at the end of one of his contracts but instead was forced to stay in Qatar and continue working.

141.    **Plaintiff D.D.R.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2019, and specifically on the construction of Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer

was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  His employer specifically told him that he could not leave Qatar until the end of his contract.  Because his passport was taken from him, he felt distressed because he would be unable to leave Qatar, even if there was an emergency, and he could not switch employers.  He was forced to live in crowded and inhumane living conditions.  He was forced to work through exhaustion, with a typical day starting with a bus ride to the stadium at 5 a.m., and sometimes working until midnight—an 18-hour workday.  Although he was forced to provide at least 2 hours of extra overtime work per day, he was denied compensation for that work.  He either received delayed pay for overtime or received no overtime pay at all.  His salary was sometimes significantly delayed, thus impacting his family in the Philippines and forcing him to borrow money to send to his family.  He felt he was being treated like a slave.

142.    **Plaintiff L.V.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel helpless and frightened.  He was forced to work through exhaustion and sleep deprivation and at times worked as many as 24 hours straight.  He was forced to live in crowded and inhumane living conditions, packed into a small room with between seven and nine other people.  There were infestations of bed bugs in the barracks.  He was provided a food allowance, but it was insufficient to appropriately feed him.  He was hospitalized after

suffering an aneurysm, and his employer covered only initial hospital costs related to his treatment and then sent him home to the Philippines without sufficient funds to make the trip home.

143.    **Plaintiff Ra.G.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2019, and specifically on the construction of Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  Because his passport was confiscated, he had anxiety, and felt trapped and helpless, because he knew he had to stay and work regardless of inhumane treatment.  He was forced to live in crowded and inhumane living conditions, packed into a room so tightly with others that he could not sleep.  He was not given sufficient food, was at times forced to eat spoiled food due to no alternatives, and often went hungry.  He regularly left the barracks at 4 a.m. to travel to the construction site, was forced to render overtime and through exhaustion, and did not return from the site until after midnight.  Though temperatures were often extremely hot with high humidity, workers were not regularly supplied with drinking water, and he observed several workers collapse from overwork and heat exhaustion.  He was denied pay he was promised and had earned, and at times received delayed payments, which caused him distress because his family in the Philippines depended on him to regularly send funds and was forced to take out loans.

144.    **Plaintiff R.S.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2016–2018, and specifically on the construction of Al Thumama Stadium and the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was J.A.K. Construction Builders.  When he first

arrived in Qatar and began work, World Cup Construction Venture participants took his passport from him so that he could not leave the job or the country until the end of his contract. Because his passport was confiscated, he did not feel free to leave the barracks or to find new employment, causing him emotional distress. He was forced to live in crowded and inhumane living conditions, packed into a room so tightly with others that he could not sleep. He was not given sufficient allowance for food and often went hungry. He was forced to work through exhaustion, sometimes as much as 36 hours straight. And he was lied to about his pay and was denied pay that was promised him. He believes his depression while in Qatar was due to being overworked and underpaid.

145. **Plaintiff J.D.C.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017, and specifically on the construction of Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. Because his passport was confiscated, and he knew that another worker had asked for his passport back to attend a funeral in the Philippines and was denied, he felt anxiety and emotional distress and that he was being treated like a prisoner. He was forced to live in crowded and inhumane living conditions. He was not given enough food and often went hungry. He was forced to work through exhaustion, regularly forced to do at least four hours of overtime per day. And he was lied to about his pay, denied pay he was promised and had earned, and at times received delayed payments, which caused him distress, trauma, and sleeplessness because his family in the Philippines depended on him to regularly send funds and was forced to take out loans.

146.     **Plaintiff W.C.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013–2014, and specifically on the construction of Lusail Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Tokyo Freight.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  Because his passport was confiscated, he felt trapped, that he could not leave Qatar even if there was an emergency at home, and that he could not change employers if he was mistreated. He was forced to live in crowded and inhumane living conditions, packed four-people deep into a small room.  He was forced to work through exhaustion, at times as many as 36 hours straight, without adequate compensation for all overtime hours he worked.  He felt depression because he was forced to work so much and was not able to sleep.

147.     **Plaintiff G.G.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017–2018, and specifically on the construction of Khalifa Stadium and the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  When he asked that he be able to keep his passport, his request was denied, and he was told he could not get his passport back even in case of an emergency.  This distressed both him and his family.  He was not given enough food allowance, so he was often hungry.  He was forced to work overtime regularly but was not compensated for all overtime hours he worked.  In one two-month period he was forced to work 230 hours of

overtime but was only paid for 30 of those hours, causing him emotional distress and economic harm.

148.   **Plaintiff R.C.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015–2018, and specifically on the construction of Khalifa Stadium and the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was told that his passport had been taken to stop him from going back to the Philippines or changing employers for the entirety of his contract.  This caused him distress because he would not be able to go home even in the event of an emergency. He was forced to work through exhaustion.  He also was regularly forced to work overtime— sometimes as many as 24 hours straight.  He was provided a food allowance insufficient to purchase three meals per day.

149.   **Plaintiff D.L.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2021, and specifically on the construction of Al Wakrah Stadium, the Thumama Stadium, and the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  Because his passport had been confiscated, and he was told his employer would keep it to ensure he stayed for the full contract term, he was scared and felt fear and dread, and he restricted his movement in Qatar so as to not be found by authorities without his documentation.  He was forced to work through

exhaustion.  He also was regularly forced to work overtime, sometimes as many as 36 hours straight, and he was not compensated for all overtime hours he worked.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided a food allowance that was insufficient for nourishment considering his heavy workload.

150.   **Plaintiff E.I.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013–2014, and specifically on the construction of Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was told his passport had been taken to stop him from going back to the Philippines or from changing employers.  This caused him emotional distress.  He was forced to work through exhaustion.  He also was regularly forced to work overtime—sometimes as many as 24 hours straight—and was not paid for all overtime worked.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  When he passed out due to exhaustion, he was hospitalized, and his employer refused to pay for transportation to or from the hospital.  He was provided a food allowance insufficient to properly feed himself.

151.   **Plaintiff M.G.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2015, and specifically on the construction of Lusail Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  Because his passport was confiscated, he was distressed because he had no ability

to leave and no freedom to protest the conditions of his work and life in Qatar. He was forced to work through exhaustion and sleep deprivation. He also was regularly forced to work overtime—sometimes as many as 36 hours straight—and was not paid for all overtime worked. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. He was provided a food allowance that was insufficient to properly feed himself. His pay was delayed, at times, which caused him distress because his family at home in the Philippines depended on him regularly sending funds, and although he was embarrassed to do so, he at times had to borrow money from his coworkers to send home.

152. **Plaintiff E.C.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015, and specifically on the construction of Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Imar Trading & Contracting Company. Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him distress. He was lied to about his pay. He also, at times, was denied pay or received less than he was promised and had earned. When he was ill and took a day to rest, he was docked three days of pay. When he asked if he could leave Qatar, he was threatened with the prospect of having to repay his recruitment fees. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. He was provided food, but it was often unsanitary.

153. **Plaintiff Rh.P.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017-2018, and specifically on the construction of Al Thumama Stadium and Al Wakrah Stadium, in which Defendants participated and from which

they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress, and he felt he had no freedom because he could not get access to his passport.  He was lied to about his pay.  He also, at times, was denied pay or received less than he was promised and had earned, particularly for significant overtime work he was forced to supply.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided a food allowance, but it was insufficient to appropriately feed him.

154.  **Plaintiff L.L.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017, and specifically on the construction of the Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He understood that he would have no choice but to endure inhumane treatment.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and sometimes had to work as many as 24 hours straight.  The forced overtime caused him depression and hypertension.  He was not compensated for all the overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.

155.  **Plaintiff J.J.G.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016–2017, and specifically on the construction of the Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct

employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and sometimes had to work as many as 24 hours straight.  The forced overtime caused him depression and hypertension.  He was not compensated for all the overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided a food allowance that was insufficient to cover the cost of food he needed.

156.   **Plaintiff R.V.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015–2016, and specifically on the construction of the Khalifa Stadium, among others, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress: He understood he could not leave until his contract was complete.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and at times was forced to work 24 hours straight. He was not compensated for all the overtime work he provided.  He was provided a food allowance that was insufficient to cover the cost of food he needed.

157.   **Plaintiff R.L.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2015, and specifically on the construction of the Lusail Stadium, the Al Khalifa Stadium, and the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture

participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress: He understood he could not leave until his contract was complete.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and at times was forced to work 36 hours straight.  The long hours and hot working conditions caused him hypertension.  He was not compensated for all the overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided a food allowance that was insufficient to cover the cost of food he needed.

158.   **Plaintiff A.S.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015–2018, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was told that his passport had been confiscated to ensure that he finished his contract, causing him emotional distress.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and at times was forced to work 24 hours straight.  When he told his supervisors he did not wish to work as much overtime as was demanded, due to his exhaustion and worsening hypertension, he was threatened with the unexpected financial penalty of having to pay his own air fare and other fees to go home, and he was told to go back to work.  Because he could not pay that cost, he felt he had no choice but to go back to work.  He was not provided the compensation he was promised.  He was forced to live

in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided food, but it was unsanitary.

159.   **Plaintiff E.A.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2018–2020, and specifically on the construction of the Lusail and Al Thumama Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Imar Trading and Contracting Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was told that his passport had been taken to ensure that he finished his contract and did not transfer to another employer.  This caused him fear and distress.  He was forced to work through exhaustion, sleep deprivation, and medical conditions.  He was forced to routinely provide overtime work such that he only slept approximately three hours per night.  He was docked pay for having medical issues addressed.  While providing labor for the Venture, he experienced a significant injury.  He was not provided the compensation he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided food, but it was unsanitary.

160.   **Plaintiff J.V.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013–2014, and specifically on the construction of the Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Rabban Readymix.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and often had to work as many as 36

hours straight.  He was not compensated for all the overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided a food allowance that was insufficient to cover the cost of food he needed.

161.    **Plaintiff A.C.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014, and specifically on the construction of the Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Midmac Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He felt trapped because he did not have sufficient money to pay for fees that would be required if he left his job.  He was forced to work through exhaustion and sleep deprivation, and he was forced to routinely provide overtime work.  He was not paid what he was promised for his overtime work.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food that he was provided was not clean.

162.    **Plaintiff A.G.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2016, and specifically on the construction of the Lusail and Khalifa Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Midmac Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He understood he could not leave until his contract was complete.  He was forced to work through exhaustion and sleep deprivation and was forced to routinely provide overtime work.  He was not paid what he was promised and

had earned.  He also was not compensated for all overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food that he was provided was not clean and caused him medical complications.

163.    **Plaintiff A.A.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2016, and specifically on the construction of the Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Midmac Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He understood he could not leave until his contract was complete.  He was forced to work through exhaustion and sleep deprivation, routinely over 16 hours per day, and was forced to routinely provide overtime work.  He was not paid what he was promised and had earned.  He was not compensated for all overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food that he was provided was not clean.

164.    **Plaintiff R.A.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2016, and specifically on the construction of the Lusail and Khalifa Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Midmac Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He understood he could not leave until his contract was complete, which caused him distress.  He was forced to routinely provide overtime work.  He was not paid what he was promised and had earned.  He also was not compensated for all overtime

work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food that he was provided was insufficient and not clean.

165.  **Plaintiff Ro.L.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2016, and specifically on the construction of the Lusail and Khalifa Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He understood he could not leave until his contract was complete, which caused him to be scared and anxious.  He was forced to routinely provide overtime work.  He was not paid what he was promised and had earned.  He also was not compensated for all overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food allowance that he was provided was insufficient to properly feed him.

166.  **Plaintiff Ro.P.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016-2018, and specifically on the construction of the Lusail and Al Thumama Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He understood he could not leave until his contract was complete, which caused him to feel afraid.  He was forced to routinely provide overtime work.  He was not paid what he was promised and had earned.  He also was not compensated for all overtime

work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.

167.   **Plaintiff S.N.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016–2017, and specifically on the construction of the Lusail and Al Thumama Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He understood he could not leave until his contract was complete, which caused him distress.  He was forced to routinely provide overtime work.  He was not paid what he was promised and had earned.  He also was not compensated for all overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food that he was provided was insufficient and not clean, so he went hungry.  Even after he demanded to leave, because of the poor treatment and poor living and working conditions, his employer did not return his passport and allow him to leave for two months.

168.   **Plaintiff B.M.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017–2019, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Imar Trading and Contracting Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He understood he could not leave until his contract was complete, regardless of how he was treated, which caused him to feel anxious and

scared, and caused him to restrict his movements in Qatar. He was forced to routinely provide overtime work. He was not paid what he was promised and had earned. He also was not compensated for all overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. The food that he was provided was insufficient and not clean. He was forced to work through sickness, and denied access to a doctor, when he fell ill with chicken pox.

169. **Plaintiff G.T.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel helpless and frightened. He was routinely forced to work overtime, and he was not fully compensated for his work. He was forced to live in crowded and inhumane living conditions, packed into a small room with seven other people. There were infestations of bed bugs in the barracks. He was provided a food allowance, but it was insufficient to appropriately feed him.

170. **Plaintiff J.B.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015–2017, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants confiscated his passport when he first arrived in Qatar and began work, and he understood and feared this precluded him from leaving the country or his job until the end of his contract. This caused him to feel worried and

scared.  He was routinely forced to work overtime, and he had to work through exhaustion, sometimes as many as 24 hours straight.  He was neither paid what he was promised nor fully compensated for the overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a small room with seven to nine other people in a room designed to accommodate four.  He was provided a food allowance, but it was insufficient to appropriately feed him.

171.  **Plaintiff E.D.C.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2016, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and worried.  He was routinely forced to work overtime, and was forced to work through exhaustion, sometimes as many as 24 hours straight.  He was not paid what he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a small room with nine other people.  His bed was infested with bedbugs, which caused him to be even more exhausted.  The food he was provided was not nutritious and was at times unsanitary.

172.  **Plaintiff V.A.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016–2018, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until

the end of his contract.  This caused him to feel frightened.  He was routinely forced to work overtime.  He was not paid what he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a small room with seven other people.  The room was infested with bedbugs.  He was promised a food allowance, but it was not provided, so he was forced to spend the limited money he was paid on food.

173.    **Plaintiff Re.D.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013–2015, and specifically on the construction of the Al Khalifa and Lusail Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Midmac Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and afraid, and he opted to stay in the barracks as much as possible thereafter.  He was forced routinely to work overtime.  He was not paid what he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a small room with others, and without sufficient access to toilets.  He was provided food, but it was not properly cooked.

174.    **Plaintiff C.S.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017–2019, and specifically on the construction of the Al Rayyan and Lusail Stadiums, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Imar Trading and Contracting Company.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and afraid, and like he was a prisoner.  He was forced to work through exhaustion and sleep deprivation

and routinely was forced to work overtime.  He was routinely forced to work 16-hour days, which after travel to and from work allowed for only three hours of sleep.  He was not paid what he was promised.  He was lied to about what he would be paid, and about whether he would have to repay his travel expenses to Qatar.  He was forced to live in crowded and inhumane living conditions, packed into a small room with seven other people, and he was often transferred from location to location to live without notice.  He was provided food, but it was not properly cooked.

175.  **Plaintiff Ra.D.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014–2016, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted.  His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel frightened.  He was forced to work through exhaustion and sleep deprivation and routinely was forced to work overtime.  He was not paid what he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a small room with nine other people.  He was provided food, but it was not properly cooked.

176.  **Plaintiff M.R.** worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015–2017, and specifically on the construction of the Al Rayyan Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering.  Venture participants confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel frightened.  He was forced to work through exhaustion and sleep deprivation and routinely was forced to work overtime.  Sometimes he was

forced to work 19 hours per day.  He was not paid what he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a small room with seven to nine other people.  He was provided food, but it was poorly prepared and at times inedible.

### COUNT 1
### TRAFFICKED AND FORCED LABOR
### TVPRA, 18 U.S.C. §§ 1589, 1590, and 1595

177.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

178.    The World Cup Construction Venture engaged in trafficked and forced labor.

179.    Defendants' construction ventures obtained Plaintiffs' and others' labor by means of abuse and/or threatened abuse of law or legal process by misrepresenting the terms and conditions of their employment in Qatar, confiscating Plaintiffs' passports, telling Plaintiffs they could not leave and must endure the conditions imposed upon them, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

180.    Defendants' construction ventures obtained the labor of Plaintiffs and others by means of a scheme, plan, or pattern of acts intended to cause Plaintiffs to believe that if they did not work they would be subjected to serious harm, including but not limited to, by confiscating Plaintiffs' passports, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

181.    Plaintiffs were forced to work in extreme and dangerous conditions, many hours more than they would have otherwise, and for lengths of time they otherwise would not have, and to live in inhumane, unsafe, and unhealthy conditions, due to the fact that they were not in possession of their passports and were made to believe they had no other choice.

182.    Defendants' venture partners lied to Plaintiffs about the conditions Plaintiffs would live in and the terms of Plaintiffs' working conditions and compensation, and this fraud caused Plaintiffs to agree to go to Qatar and be lured into conditions of forced labor for the benefit of the World Cup Construction Venture.

183.    Each Plaintiff worked for the World Cup Construction Venture by providing construction labor for one or more of the projects included therein, such as one or more of Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and/or Lusail Stadium, and related infrastructure.

184.    Each Plaintiff was subjected to abusive practices by his employer(s) (who each were participants with Defendants in the World Cup Construction Venture), including by having his passport confiscated, not being able to leave Qatar and/or change employers in Qatar, being forced to work inhumane hours, being forced to live and work in unsafe and unsanitary conditions, and/or being underpaid or denied or delayed payments.

185.    Plaintiffs were therefore victims of trafficked and forced labor under 18 U.S.C. § 1589 and 18 U.S.C. § 1590, triggering Defendants' liability under 18 U.S.C. § 1595.

186.    Defendants participated in the World Cup Construction Venture.   Indeed, Defendants signed a contract to oversee and manage construction of all the facilities and

infrastructure for the World Cup, including but not limited to Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and Lusail Stadium.

187.   Defendants knew or should have known the World Cup Construction Venture engaged in trafficked and forced labor in light of the prevalence of Qatar's *kafala* system; the norms of the construction industry in Qatar; public reporting, government reports, and non-profit reports; notices provided directly to Defendants; Defendants' internal processes and procedures; Google and Wikipedia; Defendants' role as overseer and manager (with rights to, and contractual responsibilities for, inspecting, auditing, and overseeing employment practices); Qatar Foundation's role; Defendants' due diligence; Defendants' corporate security and intelligence functions; Defendants' artificial intelligence technology; Defendants' interactions with other Venture participants; and via Defendants' agents and employees in Qatar and in the Philippines.

188.   Defendants knowingly benefitted from their participation in the World Cup Construction Venture.  They received, at a minimum, $5 million dollars each year they participated in the Venture, and likely much more.  Defendants profited thereby.

189.   Defendants are therefore liable to Plaintiffs for damages and attorneys' fees under 18 U.S.C. § 1595(a).

## COUNT 2
## RESTITUTION
## TVPRA, 18 U.S.C. § 1593

67.   Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

68.   Plaintiffs are victims of Defendants' offenses under the TVPRA.

69.     Plaintiffs are therefore entitled to the greater of the full amount of the gross income or value to Defendants of Plaintiffs' labor or the value of Plaintiffs' labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act.

**COUNT 3**
**UNJUST ENRICHMENT**

70.     Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

71.     Defendants received financial and other benefits at each Plaintiff's expense, namely through forced and/or trafficked labor under inhumane working and living conditions.

72.     It would be unjust for Defendants to retain the financial and other benefits that Defendants received from each Plaintiff's forced and/or trafficked labor under inhumane working and living conditions.

73.     Plaintiffs' allegations regarding forced and/or trafficked labor under inhumane working and living conditions fall outside of, and arose after, any contracts entered into between Plaintiffs and the World Cup Construction Venture.

74.     Plaintiffs are therefore entitled to restitution of all amounts that Defendants received as a result of Plaintiffs' forced and/or trafficked labor under inhumane working and living conditions.

**COUNT 4**
**NEGLIGENCE**

84.     Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

85.     When engaging in the wrongful conduct alleged herein, Defendants were tasked with overseeing and managing the delivery of the World Cup Construction Venture, including all Venture participants, facilities, and infrastructure related thereto.

86.     Each entity involved in the World Cup Construction Venture construction projects was overseen and managed by Defendants.

87.     Defendants had a duty to the public generally and to Plaintiffs specifically to take reasonable steps to ensure that the World Cup Construction Venture would not engage in, benefit from, and/or use forced and/or trafficked labor, and/or otherwise require humane working and living conditions.

88.     Defendants failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

89.     Once Defendants undertook the management and oversight of the World Cup Construction Venture, Defendants undertook a duty to take reasonable efforts to ensure that Plaintiffs would not be trafficked, Plaintiffs' labor would not be forced, and Plaintiffs would not otherwise be required to live and work under inhumane conditions.

90.     Defendants were negligent by, at a minimum, overseeing and managing the World Cup Construction Venture, including the construction projects on which Plaintiffs worked, without taking reasonable measures to ensure that Plaintiffs would not be trafficked, Plaintiffs' labor would not be forced, and Plaintiffs would not otherwise be required to live and work under inhumane conditions.

91.     Defendants' negligent acts proximately caused legal injuries to Plaintiffs, entitling Plaintiffs to damages in an amount to be ascertained at trial.

## COUNT 5
## GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

92.     Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

93.     When engaging in the wrongful conduct alleged herein, Defendants were tasked with overseeing and managing the delivery of the World Cup Construction Venture, including all Venture participants, facilities, and infrastructure related thereto.

94.     Each entity involved in the World Cup Construction Venture construction projects was overseen and managed by Defendants.

95.     Defendants' acts and omissions constitute gross neglect, recklessness, and willful and wanton conduct.

96.     Viewed objectively and from the standpoint of Defendants at the time of the injuries to Plaintiffs, Defendants' acts and omissions implicated an extreme degree of risk that Plaintiffs would be trafficked, and/or that Plaintiffs' labor would be forced, and/or Plaintiffs would otherwise be required to live and work under inhumane conditions.

97.     Defendants, in face of this extreme degree of risk that Plaintiffs would be trafficked and/or that Plaintiffs' labor would be forced and/or Plaintiffs would otherwise be required to live and work under inhumane conditions, nevertheless demonstrated utter indifference to or conscious disregard for the safety of others, including but not limited to Plaintiffs.

98.     Defendants' gross negligence, recklessness, and/or willful and wanton conduct proximately caused legal injuries to Plaintiffs, entitling Plaintiffs to damages in an amount to be ascertained at trial.

99.     Exemplary damages are warranted for Defendants' gross negligence, recklessness, and/or willful and wanton conduct.

## COUNT 6
## NEGLIGENT SUPERVISION

100.     Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

101.     When engaging in the wrongful conduct alleged herein, Defendants were tasked with overseeing and managing the delivery of the World Cup Construction Venture, including Venture participant, facilities, and infrastructure related thereto.

102.     Each entity involved in the World Cup Construction Venture construction projects was overseen and managed by Defendants.

103.     Defendants exercised control over the actions and provided direction to each entity involved in the World Cup Construction Venture construction projects.

104.     Defendants had the authority to supervise, control, and/or regulate the actions of each entity involved in the World Cup Construction Venture construction projects.

105.     Defendants had a duty to Plaintiffs to ensure that the World Cup Construction Venture construction projects did not utilize forced labor or otherwise require that Plaintiffs live and work under inhumane conditions.

106.     Defendants knew or should have known that there was an unreasonable risk that the World Cup Construction Venture construction projects carried out by entities that Defendants supervised, controlled, and regulated, would involve the use of forced labor or otherwise require that Plaintiffs live and work under inhumane conditions.

107.     Defendants failed to exercise due care by failing to prohibit or failing to enforce prohibitions on trafficked and/or forced labor, and/or failing to sufficiently supervise, control, and regulate the entities involved in the World Cup Construction Venture construction projects so as to avoid the use of trafficked and/or forced labor.

108.     Due to Defendants' breach of its duty to Plaintiffs, Plaintiffs suffered injuries entitling them to damages in an amount to be ascertained at trial.

### VI.     JURY TRIAL

109.     Plaintiffs demand trial by jury on all issues so triable.

### VII.     PRAYER FOR RELIEF

110.     WHEREFORE, Plaintiffs pray this Court will enter an Order:

(a)     Entering judgment in favor of Plaintiffs on all counts of the Complaint;

(b)     Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to restitution, fees and costs paid, debts incurred, and wages promised but not paid;

(c)     Awarding each of the Plaintiffs consequential damages;

(d)     Awarding each of the Plaintiffs damages for mental anguish and pain and suffering Plaintiffs experienced as a result of being forced to labor against their will, in inhumane conditions, and at risk of injury and death;

(e)     Awarding each of the Plaintiffs punitive and exemplary damages for their federal-law claims;

(f)     Awarding Plaintiffs any and all other damages allowed by law according to proof to be determined at trial;

(g)    Awarding Plaintiffs reasonable attorneys' fees and costs; and

(h)    Granting such other relief as the Court deems just and equitable.

Respectfully submitted this 12th day of October, 2023,

*/s/ Eli J. Kay-Oliphant*
Eli J. Kay-Oliphant
 eli.kay-oliphant@sparacinopllc.com
Ryan R. Sparacino (application forthcoming)
 ryan.sparacino@sparacinopllc.com
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel:  (202) 629-3530

Sean Grimsley, Atty. Reg. # 36422
 sgrimsley@olsongrimsley.com
Jason Murray, Atty. Reg. # 43652
 jmurray@olsongrimsley.com
Eric Olson, Atty Reg. #36414
 eolson@olsongrimsley.com
Abigail Hinchcliff, Atty Reg. #47942
 ahinchcliff@olsongrimsley.com
Olson Grimsley Kawanabe Hinchcliff & Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Tel: 303-535-9151

*Counsel for Plaintiffs*