# EXHIBIT B

An official website of the United States Government Here's how you know

⊙ **Live Now:** Department Press Briefing

[Home](#) > ... > Philippines

# 2022 Trafficking in Persons Report: Philippines

OFFICE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS

**IN THIS SECTION /**
**PHILIPPINES (TIER 1)**

## Philippines (Tier 1)

The Government of the Philippines fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the Philippines remained on Tier 1. These efforts included identifying more victims than in 2020, drafting standard operating procedures (SOPs) on the identification and monitoring of trafficking-related corruption cases, sentencing nearly all traffickers to significant prison terms, and creating an executive-level Department of Migrant Workers. Victim-witness coordinators supported more victims participating in the criminal justice process than in the previous reporting period, and the government increased funding to the interagency anti-trafficking council. Although the government meets the minimum standards, it did not report vigorously investigating labor trafficking crimes that occurred within the Philippines or take adequate steps to investigate and arrest individuals suspected of purchasing commercial sex from trafficking victims, nor did it provide training for labor inspectors on indicators of human trafficking. The government prosecuted and convicted fewer traffickers, and it did not report holding accountable officials allegedly complicit in human trafficking crimes.

## PRIORITIZED RECOMMENDATIONS:

- Increase efforts to investigate, prosecute, and convict complicit officials and labor traffickers.
- Strengthen the capacity of local government units to provide reintegration services for trafficking survivors, including trauma-informed care, job training, and in-country employment.
- Increase support to government and NGO programs that provide specialized care for trafficking victims, including child victims of online sexual exploitation.
- Establish and implement a process to ensure systematic and ongoing input from a diverse community of survivors on the design, implementation, monitoring, and evaluation of anti-trafficking policies and programs.
- Increase efforts to ensure victims receive court-ordered restitution and compensation ordered through civil judgments.
- Increase resources for anti-trafficking task forces to conduct timely investigations, coordinated operations, and prosecutions while providing robust victim and witness assistance services.
- Increase efforts to identify and assist labor trafficking victims, including by providing training to law enforcement, social service providers, and labor inspectors on indicators of trafficking.
- Increase resources for law enforcement units designated to investigate all forms of trafficking.
- Consistently implement the coordinated interagency response to providing services to returning Filipinos exploited in sex and labor trafficking overseas.

Create a central database for information on illegal recruiters and human trafficking cases to facilitate interagency coordination in detecting, investigating, and prosecuting traffickers.

## PROSECUTION

The government slightly decreased anti-trafficking law enforcement efforts. The 2003 and 2012 anti-trafficking acts criminalized sex trafficking and labor trafficking and prescribed penalties of up to 20 years' imprisonment and fines of between 1 million and 2 million pesos ($19,600 to $39,190). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

The government did not report the total number of anti-trafficking operations and investigations of illegal recruitment as it did in prior years; however, it reported 168 law enforcement-led anti-trafficking investigations, compared with 248 anti-trafficking operations and 233 investigations of illegal recruitment in the previous reporting period. The government initiated prosecution of 298 alleged traffickers (377 in the previous reporting period); these included 62 labor trafficking defendants, 224 sex trafficking defendants, and 12 defendants for unspecified exploitation. The government reported 1,297 prosecutions remained ongoing from previous reporting periods. The government convicted 56 traffickers—46 for sex trafficking, five for forced labor, and five for unspecified forms of exploitation—compared with 73 convictions in the previous reporting period. Courts sentenced nearly all traffickers convicted under the anti-trafficking act to significant prison terms, ranging from four years to life imprisonment, and fines ranging from 500,000 to 10 million pesos ($9,800 to $195,960). Courts continued to use plea bargaining in human trafficking cases, particularly in those involving the online sexual exploitation of children (OSEC), which significantly decreased the time to reach case resolution and further reduced the potential for re-traumatizing child witnesses in trials, many of which involved traffickers who were family members. In response to the pandemic-related restrictions in 2020, the Supreme Court continued to facilitate the court filings and proceedings through email and video conferencing as authorized in a circular issued in 2020, which enabled the government to secure some trafficking convictions through video conferencing; however, equipment and stable internet connections were not consistently available, especially for victim-witnesses. Additionally, pandemic-related lockdowns at various points of the reporting period delayed in-person law enforcement actions due to personnel shortages, increased health protocols, and mandatory quarantines.

A prosecution of a police officer investigated for cyber-facilitated sex trafficking remained ongoing during the reporting period. The Department of Justice (DOJ) continued an investigation of nine Bureau of Immigration (BI) officers for facilitating the illegal airport departure of potential trafficking victims. The prosecution of a police officer who allegedly aided a suspected trafficker to avoid prosecution, remained pending at the end of the reporting period. The government did not report any convictions of government employees complicit in human trafficking crimes during the reporting period. Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Observers reported police and immigration officials, especially at lower levels, accepted bribes to facilitate or ignore trafficking crimes, including tampering with or producing fraudulent travel documents. An international organization reported the Armed Forces of the Philippines (AFP) unlawfully recruited and used one child soldier in a support role during the reporting period. The Inter-Agency Council Against Trafficking (IACAT) drafted SOPs on the identification and monitoring of trafficking-related corruption cases, which included reporting mechanisms and employee suspension guidelines.

The DOJ continued to oversee and support operations and training for 24 interagency anti-trafficking task forces (a DOJ-led task force, a national interagency task force, 16 regional task forces, and six air and seaport task forces). Designated prosecutors led the task forces with the assistance of prosecutors who worked on trafficking cases in addition to their regular workloads; they were responsible for enhancing law enforcement efforts and ensuring the reporting, referring, and filing of trafficking cases. IACAT continued to use the prosecutor's trafficking case management system to monitor case progress and outcomes. Through continued operation of the Philippine Internet Crimes Against Children Center, the Philippines National Police (PNP) Women and Children's Protection Center (WCPC) and the National Bureau of Investigation Anti Human Trafficking Division partnered with foreign law enforcement agencies and an international NGO to improve the effectiveness of investigations of OSEC. The PNP led the investigation of most OSEC cases and operated regional WCPC cyber protection units focused specifically on OSEC crimes. The government reported cooperating with the several foreign governments—including Australia, Ireland, Malaysia, the United Kingdom, and the United States—on trafficking investigations, primarily involving OSEC.

Government agencies continued to report the need for additional anti-trafficking law enforcement personnel, funds for operations, and equipment for forensic analysis of digital evidence due in part to the extremely high volume of cybercrime tips related to child sexual exploitation the DOJ Office of Cybercrime received, totaling more than 3 million in 2021. Slow moving courts, the need for additional training on handling digital evidence in

hearings and trials, and too few prosecutors also hindered the effective and timely prosecution of trafficking crimes. NGOs reported police did not take sufficient steps to investigate and arrest purchasers of commercial sex, including foreign sex tourists and those who purchased commercial sex acts from trafficking victims, and often did not question customers who were present during operations in entertainment establishments. The government (both independently and in partnership with civil society organizations) trained police, prosecutors, judges, immigration officers, and other officials on various topics, including anti-trafficking laws, proactive investigation strategies, and identification of trafficking victims.

# PROTECTION

The government increased victim protection efforts. The government lacked a reliable mechanism to consolidate statistics on the total number of victims identified and assisted. The government reported identifying 1,802 victims, compared with 1,534 potential victims identified in the previous reporting period. Of the 1,802 victims identified, traffickers exploited 535 in sex trafficking, 501 in forced labor, and 766 in unspecified exploitations; 551 were male and 1,251 were female. The Department of Foreign Affairs (DFA) reported identifying 248 potential Filipino trafficking victims abroad from July to December 2021, primarily in the Middle East and Asia, compared to 2,429 in the previous reporting period. In addition to victims identified by the government, NGOs and an international organization reported identifying 985 sex trafficking victims (228 men, 742 women, 197 boys, and 545 girls) and six adult female labor trafficking victims during the reporting period.

The government reported providing all identified victims with direct services or referrals to various protection services, including shelter provisions of basic needs, medical care, education assistance, psycho-social counseling, and livelihood assistance. The Department of Social Welfare and Development (DSWD) continued to implement the national referral system, maintained the national recovery and reintegration database, and operated 44 residential care facilities that provided services to victims of trafficking and other forms of exploitation. Of these facilities, 24 served children, 13 served women, four served older persons, one served men, and two operated as temporary processing centers. The government allocated 24.8 million pesos ($485,990) to implement DSWD's recovery and reintegration program for trafficking victims, compared with 22.9 million pesos ($448,760) in 2020.

IACAT continued to operate a center in metro Manila that served as a specialized shelter for trafficking survivors and a one-stop service center for reporting potential cases of trafficking and providing referrals without the need for victims to contact multiple agencies. In 2021, the center provided 482 potential victims, including 83 children, with temporary accommodation prior to their referral to other shelters pending the results of COVID-19 testing. The government continued efforts to finalize the construction of a shelter for men in region nine, where armed conflict continued. DSWD referred trafficking survivors to the local social welfare and development office in their community for follow-up services, which observers noted often lacked the personnel and resources to provide individualized case follow-up. Staff permitted adult victims residing in shelters to leave unchaperoned, provided there were no threats to their personal security or psychological care issues. DSWD assisted foreign national victims, including through temporary shelter and psycho-social intervention, and coordinated repatriation with the relevant foreign embassies. Such specialized assistance services, as well as reintegration follow-up services and job training and placement, remained inadequate to address the needs of adult trafficking victims.

The government continued to support victims who served as witnesses during trials and hired three additional victim-witness coordinators during the reporting period. Seven regional task force victim-witness coordinators provided trauma-informed support and assistance, including by providing continuous support throughout the criminal justice process, to 476 victims (130 in 2020). One trafficking victim entered the witness protection program in 2021 (11 in 2020), which included housing, livelihood and travel expenses, medical benefits, education, and vocational placement. In addition, DOJ operations center personnel continued to provide transportation and security protections for victims to participate in case conferences and hearings. Police and prosecutors continued the use of recorded child victim interviews at the inquest stage and in some trials, which reduced the number of times officials interviewed victims and the potential for re-traumatizing children who served as witnesses. The government also reported increasing the use of financial and digital evidence to prove trafficking and OSEC crimes in court, reducing the reliance on victim testimony and decreasing potential re-traumatization of child victims. The government did not report any orders of restitution paid by traffickers to victims of trafficking, and NGO observers reported that although judges continued to award victims compensation for damages, victims almost never received damages in practice and courts lacked effective mechanisms to collect damages from traffickers.

DFA, in collaboration with the IACAT and its member agencies, implemented whole-of-government procedures to ensure interagency coordination of services for repatriated Filipino trafficking victims. The government continued to deploy DSWD social workers in Philippine diplomatic missions in Hong Kong, Kuwait, Malaysia, Qatar, Saudi Arabia, South Korea, and the United Arab Emirates (UAE). DFA allocated 1 billion pesos ($19.6 million), similar to the amount allocated in 2020, for the Assistance to Nationals Fund (ATN), which covered assistance such as airfare, meal allowance,

shelter, medical care, and other needs of overseas Filipino workers (OFWs). DFA reported dispersing 62.8 million pesos ($1.23 million) from the ATN, compared with 28.38 million pesos ($556,140) in the previous reporting period. DFA provided nine Philippine overseas missions with funds to support shelters or temporary accommodations for Filipino trafficking victims awaiting the resolution of their cases or their repatriation. In 2021, DFA reported assisting 431 potential victims of human trafficking identified by overseas missions (2,575 in 2020), of which the majority experienced illegal recruitment. DSWD social workers, responsible for assisting distressed overseas Filipinos and their families, assisted 536 victims of trafficking or illegal recruitment, compared with 1,133 in 2020. Social services provided to OFW trafficking victims included coordination with the host government, contract buy-out, shelter, provision of personal necessities, medical aid, financial assistance, payment of legal fees, repatriation, and referral to appropriate agencies. With donor support and in cooperation with an NGO, the IACAT operated the Task Force Against the Trafficking of Overseas Filipino Workers, which assisted 248 Filipino domestic workers repatriated from the Middle East, from July to December 2021, who reported experiencing indicators of trafficking.

## PREVENTION

The government slightly increased efforts to prevent trafficking. IACAT, the lead coordinating body responsible for overseeing and monitoring implementation of the government's anti-trafficking efforts and which the secretaries of DOJ and DSWD chaired and co-chaired respectively, met regularly to share information and coordinate policies. Three NGOs participated as members of IACAT, which also involved additional NGOs, private sector representatives, and survivors in technical working groups and other fora. In partnership with an NGO, IACAT created a working group that met to consider the creation of a formal council for trafficking survivors to advise and make recommendations to the government on anti-trafficking policies. The government allocated 68.4 million pesos ($1.34 million) to the IACAT Secretariat's budget, compared with to 65.2 million pesos ($1.28 million) in 2020. IACAT reported creating 76 permanent staff positions for the Secretariat's staff; approval of these positions was pending at the end of the reporting period. The government continued to implement its 2017-2021 national action plan (NAP), which expired in December 2021; the government began developing an updated NAP at the end of the reporting period. NGOs noted insufficient resources within the government's anti-trafficking structures, especially for law enforcement, specialized trainings, and support services, and for ensuring local government units implemented trafficking laws.

The government—including IACAT, its member agencies, and anti-trafficking regional task forces—both independently and in partnership with civil society, held national, regional, and local-level trafficking awareness-raising campaigns targeting community leaders, local officials, potential migrant workers, and the general public on human trafficking indicators, potential risk factors, and the various forms of trafficking. The government conducted a series of orientation meetings reaching more than 3,000 child protection actors in the public and private sectors, as well as a social media awareness campaign, on the Special Protection of Children in Situations of Armed Conflict (CSAC) Act, which prohibited the recruitment of children in armed conflict. The government also held a webinar attended by 450 participants from government agencies, including the PNP and AFP, covering the CSAC Act. The AFP and UNICEF approved a Strategic Plan to End Recruitment of Children and other Grave Violations in June 2021; the plan supports the implementation of the CSAC Act.

IACAT continued to operate and fund a 24/7 hotline dedicated to assisting trafficking victims; the hotline identified 36 potential trafficking cases in 2021 and referred all cases to law enforcement and all victims to services. PNP and the Commission on Filipinos Overseas (CFO) also continued to operate hotlines, and the DFA Office of Migrant Workers Affairs maintained a HELP Facebook page for Filipinos working abroad who were in distress and their families to request assistance. In partnership with an international organization and an NGO, IACAT began developing an online mechanism to provide migrant workers with access to frequently asked questions to help triage claims and link migrants with existing grievance mechanisms.

The Department of Labor and Employment (DOLE) overseas labor officers continued to review overseas Filipino workers' labor contracts and assist them with labor contract violations and allegations of abuse. The Philippines Overseas Employment Administration (POEA) filed 868 administrative charges against licensed recruitment agencies for disallowed practices and cancelled 18 agencies' licenses, compared with 508 charges and 22 cancellations of agencies' licenses in the previous reporting period. In December 2021, the president signed Department of Migrant Workers (DMW) Act, which elevated POEA to an executive department. The government officially formed DMW in February 2022 and mandated it to oversee law enforcement action against illegal recruitment agencies, create a database to track recruiters involved in trafficking crimes, and raise awareness of trafficking indicators among migrant workers. The government maintained bilateral labor agreements with various destination countries on the recruitment of migrant workers and the protection of their rights. International organizations continued to report that the high volume of employment contracts requiring verification by POEA and the Philippine Overseas Labor Office often caused delayed in the issuance of overseas employment certificates required for departures. The BI Travel Control and Enforcement Unit continued to screen departing passengers and

deferred the departure of 13,805 passengers (11,706 in 2020), including 683 potential victims of trafficking, due to incomplete or suspicious travel documents or misrepresentation. BI stopped six foreign registered sex offenders from entering the country.

The lack of a centralized database tracking illegal recruitment and human trafficking continued to hamper the government's efforts to prevent trafficking and hold traffickers accountable. Observers stated the government did not adequately fund and staff the labor inspectorate, and the government did not report providing training for labor inspectors to identify indicators of trafficking, which may have impeded the government's ability to identify potential cases of forced labor. The government did not prioritize identifying forced labor on fishing vessels and employed notably few inspectors dedicated to conduct inspections on fishing vessels. Despite conducting more than 59,100 labor inspections, the government reported identifying only six child labor violations in 2021. The government did not make efforts to reduce the demand for commercial sex acts. DOJ continued to introduce government officials to initiatives aimed at addressing human trafficking in public procurement and supply chains.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the Philippines, and traffickers exploit victims from the Philippines abroad. Traffickers exploit women and children from rural communities, conflict- and disaster-affected areas, and impoverished urban centers in sex trafficking, forced domestic work, forced begging, and other forms of forced labor in tourist destinations and urban areas around the country, and traffickers exploit men in forced labor in the agricultural, construction, fishing, and maritime industries, sometimes through debt-based coercion. NGOs and government officials continue to report cases in which family members sold children to employers for domestic labor or sexual exploitation, and there are reportedly hundreds of thousands of children involved in selling and begging on the streets at risk to trafficking. One study found that approximately 50,000 Filipino children are employed as domestic workers in the Philippines, including nearly 5,000 who are younger than the age of 15. A significant percentage of working children faced hazardous working conditions, including in mines, factories, and farms, where they likely experienced indicators of forced labor. Indigenous persons and many of the approximately 340,000 internally displaced persons in Mindanao are at risk of trafficking, including through fraudulent promises of employment. Non-state armed groups operating in the Philippines, including the New People's Army, Maute Group, Moro National Liberation Front, Abu Sayyaf Group, and Bangsamoro Islamic Freedom Fighters, unlawfully recruit and use child soldiers, at times through force, for combat and noncombat roles. In 2021, reports also indicate the AFP unlawfully recruited and used child soldiers. Non-state supporters of ISIS reportedly subject women and girls to sexual slavery in the Philippines. NGOs report orphans and unaccompanied children are vulnerable to recruitment by armed forces and nonstate groups.

The government processes approximately 2.3 million new or renewed contracts for Filipinos to work overseas in nearly 170 countries each year; however, temporary travel restrictions related to the pandemic prevented many Filipino workers from departing for overseas employment. A significant number of Filipino migrant workers become victims of sex trafficking or labor trafficking in numerous industries, including industrial fishing, shipping, construction, manufacturing, education, home health care, and agriculture, as well as in domestic work, janitorial service, and other hospitality-related jobs, particularly in the Middle East and Asia but also in all other regions. Traffickers, typically in partnership with local networks and facilitators and increasingly using social networking sites and other digital platforms, recruit unsuspecting Filipinos through illegal recruitment practices, such as deception, hidden fees, and production of fraudulent passports, overseas employment certificates, and contracts, to exploit migrant workers in sex and labor trafficking. In January 2021, media reported traffickers fraudulently recruited dozens of Filipino domestic workers to work in the UAE but instead transported them to Damascus for forced domestic work. Using tourist visas available in Middle East countries where many Filipinos work in household service jobs, traffickers lure children from remote areas of Mindanao and other regions then sell them to employment sponsors who exploit them. Traffickers also use student and intern exchange programs and fake childcare positions, as well as porous maritime borders, to circumvent the Philippine government and destination countries' regulatory frameworks for foreign workers and evade detection. Traffickers exploit Filipinos already working overseas through fraudulent employment offers to work in another country. Traffickers sometimes take advantage of the absence of adequate immigration personnel at smaller airports in the Philippines. Observers report traffickers are increasingly using "intra-company transferee" and "short-term visitor" visas—both legitimate and fraudulent—to facilitate the travel of Filipino engineers and undergraduate students to Japan, where traffickers subsequently exploit them in forced labor in factories.

Sex trafficking occurs in tourist destinations, such as Boracay, Angeles City, Olongapo, Puerto Galera, and Surigao, where there is a high demand for commercial sex acts. Although the availability of child sex trafficking victims in commercial establishments declined in some urban areas, child sex trafficking remains a pervasive problem, typically abetted by taxi drivers who have knowledge of clandestine locations. Many sex tourists in the Philippines are convicted or charged sex offenders or pedophiles in their home countries and are most commonly citizens of Australia, Japan, New Zealand, the United Kingdom, and the United States, with an increasing number of reports from Canada, Morocco, Iraq, and Denmark. Filipino men also purchase commercial sex acts from child trafficking victims. Law enforcement information indicates that the Philippines is one of the largest

known sources of online sexual exploitation of children, in which traffickers sexually exploit children, individually and in groups, in live internet broadcasts in exchange for compensation wired through a money transfer agency by individuals most often in another country, including the United States, Australia, Canada, and the United Kingdom. The traffickers are often parents or close relatives who operate in private residences or small cyber cafes, and many child victims, girls and boys, are younger than 12 years. Identified hotspots for this form of sex trafficking in Luzon and Visayas include Iligan, Lapu-Lapu, Pampanga, Quezon City, Malabon, Pasig, Taguig, and Caloocan. Reports cited a nearly 265 percent increase in unconfirmed reports of online child sexual abuse during the pandemic. Economic impacts of the pandemic, combined with an increased amount of time children spent at home, resulted in an increasing number of families forcing their children into online sexual exploitation. Traffickers exploit PRC national and other Asian women in commercial sex in locations near offshore gaming operations that cater to PRC nationals; however, in 2020 the pandemic resulted in a massive departure of PRC nationals employed in offshore gaming operations, resulting in decreased reports of sex trafficking among this community. PRC nationals employed in the Philippines at worksites affiliated with the PRC's Belt and Road Initiative were vulnerable to forced labor.

Officials, including those in diplomatic missions, law enforcement and immigration agencies, and other government entities, allegedly have been complicit in trafficking or allowed traffickers to operate with impunity. Some corrupt officials allegedly accept bribes to facilitate illegal departures for overseas workers, operate sex trafficking establishments, facilitate production of fraudulent identity documents, or overlook illegal labor recruiters. Reports in previous years asserted police conduct indiscriminate or fake raids on commercial sex establishments to extort money from managers, clients, and victims. Some personnel working at Philippine embassies reportedly withhold back wages procured for their domestic workers, subject them to domestic servitude, or coerce sexual acts in exchange for government protection services. There were anecdotal reports that police and local government units subjected individuals—who had voluntarily surrendered to officials in relation to the government's anti-drug campaign—to forced labor.

TAGS

Bureau of East Asian and Pacific Affairs    Human Trafficking    Office to Monitor and Combat Trafficking in Persons    Philippines

White House
USA.gov
Office of the Inspector General
Archives
Contact Us

Privacy Policy
Accessibility Statement
Copyright Information
FOIA
No FEAR Act

https://www.state.gov/reports/2022-trafficking-in-persons-report/philippines                                                                                          6/6