# EXHIBIT C

**News**Room

1/10/23 This Day (Nigeria) (Pg. Unavail. Online)
2023 WLNR 1132085

This Day (Nigeria)
Copyright (c) 2023 This Day

January 10, 2023

'Who is the Practitioner, Without a Teacher?'

The coveted rank of Senior Advocate of Nigeria, is the very pinnacle for any Lawyer in Nigeria. But, Lawyers in the Ivory Tower, are made to walk the toughest road towards attaining this prestigious rank. Professor Joy Ngozi Ezeilo, SAN, Professor of Public Law, Dean Emeritus, Faculty of Law, University of Nigeria, and former United Nations Special Rapporteur on Trafficking in Persons, Especially Women and Children, walked that rough road to SANship and was elevated to the rank last month. In a chat with Onikepo Braithwaite and Jude Igbanoi, she spoke about her passion, providing succour and free legal services to women, children and the underprivileged through her NGO Women'sAid Collective (WACOL), which recently turned 25 years old. She also discussed the worrisome issue of human trafficking, her concern about continued police brutality which has continued to claim lives, and with her endless list of accomplishments, confessed that she feels fulfilled, both personally and professionally

Learned Silk, tell us about your journey from New Wig to Professor and Dean, and then to your elevation to being one of the few female Senior Advocates of Nigeria. Are you fulfilled?

I feel fulfilled, professionally and personally, but it has been a long road to these accomplishments which I often describe as the journey from local to global, if one takes into account my humble beginnings. As you may be aware, I served globally between 2008 to 2014 as the United Nations Special Rapporteur on Trafficking in Persons, Especially Women and Children.

The breaking news of my elevation to the rank of Senior Advocate of Nigeria (SAN) came on a day, date, and hour that I least expected it. I was at Oxford University attending a programme, and my phone being roamed was on silent during my meeting on the day the list was released 29th September, 2022. It was then I saw the avalanche of surging goodwill and congratulatory messages, from persons cheering in my moment of joy in attaining this height of distinction in the legal profession. I give all the glory to God Almighty, who makes everything perfect in its own time. I'm grateful to family, friends, and colleagues who have been with me collaborating, encouraging, and supporting me as I journeyed through the personal and professional development of what I termed from local to global. God is indeed awesome, and I'm a living witness to that. May God bless all those who contributed in one way or the other to the many successes recorded in the course of my career as a Lawyer, Law Professor, and Activist, which culminated in this honour of bestowing me with the SAN rank. I definitely didn't, and couldn't have done it all by myself.

I feel reinvigorated to therefore dedicate this professional privilege to continue my academic work geared towards social transformation, activism for human rights protection, gender equality; giving voices to the voiceless, and championing access to justice through free legal aid and assistance as a Pro Bono Lawyer, and supporting the work of women and Collective (WACOL) and Tamar SARC amongst other humanitarian works that I'm involved in.

As I wrote in my professorial inaugural lecture - I will cease to live the day I stopped being responsive to the injustices and oppressions in my environment. My work, our work, is far from being done! Thus, the journey continues! Once more I thank

God - the author and finisher of our fate for the divine mercies and favours, that impelled me to reach the pinnacle of my profession as a Lawyer and Law Professor.

To your question in relation to my tenure as the Dean of the Faculty of Law, University of Nigeria, my tenure as the Dean was remarkable, and widely acknowledged as laudable and the recorded achievements speak for itself. As you may be aware, we are the first Faculty of Law in Nigeria, and our goal is to remain the first and the best so as to be a reference point in the University. We have tried to establish an environment where people can work; and since my Deanship, we have instituted various projects, particularly targeted at infrastructural development, so that every Lecturer can have a decent office and working environment and students, the best learning environment. By God's grace, we hugely succeeded in building the relevant infrastructure to that effect.

Today, we have a lot to showcase, with over 60 projects completed within two years of my deanship. I did my best to run an open, transparent and accountable administration. The direct labour approach helped us to manage our scarce resources raised from alumni, donors, friends and colleagues, effectively and efficiently.

My dream, foregrounded by the broad vision of the University's and my extensive experience as a visiting Professor in universities around the globe, is to have a world-class Law Faculty or Law School as they describe it in some other climes. Undoubtedly, my achievements would not have been possible without the full support and encouragement of the University administration, colleagues at the Faculty, and importantly, our donors and financial supporters. I vigorously mobilised resources from our alumni, donors and friends to leapfrog infrastructural development that has created an adequate, effective and enabling work environment.

We have set the pace in putting this Faculty hopefully, on an irreversible developmental gear. No one can push and pull us back. I can boldly say that the Faculty of Law, UNN is the best in the country, amongst both public and private institutions. Kindly, take a trip and see things for yourself. To God be the glory that we have blazed the trail, and demonstrated that, working together, we can make this Faculty truly the first and the best. We must constantly remind ourselves that our work is not done, and we must work harder to ensure that this transformational change is sustained. The slogan from now on is 'forward ever, backward never'.

I strongly believe that we should use every leadership opportunity, to impact lives and one's immediate constituency positively. I am committed to forward-looking and transformational leadership.

2. The Legal Practitioners Privileges Committee recently released new requirements for the award of the rank of Senior Advocate of Nigeria, particularly the requirements for Academics. This has come with many criticisms. What is your opinion?

The changing requirements has been a constant, if you have been following the LPPC Guidelines. They're continually reviewing, revising and tightening loose ends to enhance the process and ensure that the rank remains a coveted one.

However, this time around, it appears that some significant steps have been taken that will affect in particular, Academics applying to be considered for elevation to the rank of SAN. There has always been strong opposition to Professors taking Silk, and the current guidelines seem to have been tilted in favour of restrictive awards of SAN, whilst relaxing that of Legal Practitioners a bit.

I have come to respect LPPC as a body of distinction, and one that is also responsive in its quest for excellence in raising the Bar. Consequently, I think the body is flexible to revising itself, if they think the changes would become problematic or discriminatory against a group. So, let's watch and see whether this would stand the test of time. It is pertinent to point out that, Academics walk the toughest track to SANship. You would have noticed that usually one may need to have attained a professorial rank, published extensively, and still be active in NBA at State and national levels. Student's supervision at the graduate and post-graduate levels is required, including persons the candidates have mentored. I strongly believe that Law

Teachers are most deserving of being awarded the rank for their scholarship, teaching and contributions in advancing legal education in Nigeria. Who is the Practitioner, without a Teacher?

3. The NGO, Women'sAid Collective (WACOL) which you founded just turned 25, with so many initiatives which have impacted women and men over the years. How have you been able strike a balance between strenuous academic work as a Law Professor, and the daunting task of managing such a big NGO? Tell us what WACOL is involved in.

I founded WomenAid Collective (WACOL) in 1997- to advance human rights and gender equality, in particular, access to justice for women and children whose rights have been violated. In its 25 years of existence, WACOL has made enormous contributions to Human Rights development in Nigeria. In fact, free legal aid and integrated assistance to victims and survivors of human rights violations is the mainstay of WACOL, because I believe that without redress and accountability, the impunity of human rights violations will continue.

Over the years, my role has thinned to that of a Director on the Board, which oversees and provides general guidance and leadership to the organisation, and not involvement in the day to day running of the organisation. WACOL has become and institution with relevant capacities, staffing and structure, to pursue its vision and mission without my daily interference.

The idea behind the formation of WACOL, was to have an organisation with a strong focus on access to justice for women and children in especially difficult circumstances. From my experiences belonging to membership organisations such as Women in Nigeria (WIN) and the International Federation of Female Lawyers (FIDA), I noticed the gap in unmet justice needs of this category, especially poor women and girls doubly disadvantaged and discriminated against because of their sex and gender. The search for justice by this category of persons, often ends in futility. Hence, the need to provide information and necessary support that would enable those whose human rights have been violated, to recognise and respond to such violations. The myriads of challenges for those seeking to obtain redress from Nigeria's legal system, is what WACOL exists to tackle. WACOL was established in 1997 as an independent, non-political, non-governmental and non-profit organisation; registered as a company limited by guarantee, that is, as a charitable organisation.

WACOL's vision is a democratic society free from violence and abuse, where human rights of all, in particular, women and young people, are recognised in law and practice. Its mission is to assist in the education, social, economic and political development of women and young people, through a wide range of services: training, research, advocacy, shelter, free legal and financial aid, intra-familial conflict resolution, and information and library services. WACOL works throughout Nigeria and in the West African subregion, and its offices in Nigeria are located in seven States namely: Abuja (FCT), Enugu, Owerri, Cross River, Anambra, Ebonyi, and Edo States. WACOL in general, works in four thematic areas namely; gender/human rights, peace advocacy/conflict resolution, democracy/good governance and reproductive health /rights.

At the onset of WACOL, I had the privilege of winning the MacArthur Funds for Leadership Development in February 1998, and that award then gives the individual winner $75,000 for a period of three years, to conduct research and develop whatever initiative they consider a priority in the field of reproductive health and rights. I used my funds to carry out research on 'Legal Constraints to Adolescents' Sexual and Reproductive Rights in Nigeria'. It was the first of its kind looking at the law, the protection it offers young women and men, and gaps and challenges in mainstreaming sexual and reproductive health and rights. The findings of that formative study revealed and reinforced the interconnectedness of rights and how gender impacts the enjoyment of human rights of women, including health decision-making. Furthermore, it demonstrated how the personal becomes political and women's body the site of struggle. In fact, the conceptualised dichotomy of public and private spheres, productive and reproductive exacerbates gender inequalities, discrimination, as well as gender based violence against women and girls.

The journey of WACOL started in 1997, and by 1998, WACOL was up and functioning in our first rented duplex accommodation with boys' quarters at New Haven. We immediately started the safe house in 1998, to shelter women and girls at the peak of crises who have suffered human rights violence and/or are victims of sexual and gender based violence (SGBV). The

MacArthur personal funds leadership I won, made it possible for me to financially support WACOL, before it got other funding opportunities.

It was the same year 1997 that I started teaching the course, Women, Children and Law at the University of Nigeria, Faculty of Law. I felt additionally energised after my LLM at the University of London in 1995 with a full Chevening Scholarship managed by the British Council, to also engage in scholarship that would advance social transformation. Thus, I worked to blend theory and practice manifested in my scholarship and activism.

My mother's widowhood experiences (God bless her memory) helped to shape my passion in defending human rights, and of course, in studying and practising law.

WACOL is a dream come true, and its vision has been translated into action, and her mandate is being realised, given the recorded milestones achieved in the last 25 years. I cannot believe is a quarter of a century already. Indeed, time to begin a transitional phase of handing over the baton to the next generation of female transformational leaders, to continue the struggle we have started and build on the existing foundation and structure. The achievements are encouraging, especially assisting over sixty thousand women and children in need, through our free legal aid programme.

WACOL works throughout Nigeria and beyond. It has established itself as a credible and committed organisation, whose work is well recognised beyond the shores of Nigeria. It has an observer status with the African Union, African Commission on Human Rights (since 2001), and it also has an NGO Special Consultative status with the United Nations (approved in 2010 by ECOSOC). WACOL is a formidable organisation that can boast of institutional capacity for sustainable work, in the field of advancing human rights, gender equality, democracy and good governance.

WACOL is considered as the number one legal aid service provider for women and girls in Nigeria, providing assistance to about 2,000 on an annual basis, with over 4,000 drop-ins yearly. The organisation registers an average of 20 cases daily, at her legal clinic. This is evidence-based and well-documented. From 1998 to date, approximately 62,000 women and girls have accessed free legal aid and assistance services.

WACOL provides free legal services for women and young people, in our offices across the country. We also ran community law centres across selected States in the country.

Today, we are happy that WACOL has made the desired progress, and is steadily working to achieve the vision that birthed it.

Human rights are women's rights, and are universal in character. We must keep defending the rights of poor women and children, who without being provided with the necessary information, legal aid, and other assistance will not recognise those rights, nor respond by seeking redress for violations they have suffered. It is my place as an advocate and a Lawyer, to use my privileged position to raise the voice of the voiceless, and in concert with like minds, demand accountability for breaches of fundamental human rights, especially violence against women and girls.

Key Achievements of WACOL

WACOL programme and projects are wide and varying and include: Research; Advocacy for law reform to benefit the disadvantaged, including women, children and persons with disability; Capacity building on legislative advocacy for CSOs; Promoting women's rights and access to justice under Sharia and Customary law; Legal education and awareness, including the training of paralegals; Provision of free legal aid and assistance to women and children whose human rights have been abused; Running of Shelter for battered women; Establishment and running of one stop holistic Centre for sexual assault cases called TAMAR Sexual Assault Referral Centre (TAMAR SARC); Engaging law enforcement officers - Police, prison officers, prosecutors on human rights and the rule of law; Promoting domestic implementation and monitoring of international human rights law and access to justice; Training of administrators of justice, including Judges, Magistrates, Sharia and Customary courts

officials; Campaign to eliminate discrimination and violence against women, Campaign to end human trafficking, forced labour and unsafe migration; Integrated assistance to women victims of State torture and violent conflicts; Moot Courts on human rights and women's rights; Curriculum development and building local jurisprudence for the teaching of gender, reproductive health and rights in universities/law faculties in Nigeria; sexual and reproductive rights advocacy, peer health education, Family life education, Publication of legal literacy series (over 20 on different subjects) and other simplified and reader friendly public enlightenment books and IEC's numbering over 30 on Electoral Law, Constitution, Civic Education, trafficking, rape, women's rights, children's rights, widows rights, family life/sex education, etc. Publication of training manuals on advocacy, gender, election monitoring, international human rights law, law enforcement and human rights; popular participation in constitution-making, training manual for the Judiciary, training health practitioners on gender-based violence, engaging traditional and religious leaders, etc. WACOL deploys the media and new technologies to promote awareness of human rights, gender equality and violence against women and girls (VAWG)/SGBV.

Specifically, on Sexual and Gender Based Violence (SGBV), it has undertaken a number of actions in the last twenty years, including research, advocacy, legal aid and assistance to victims/survivors of human trafficking, shelter, public education and awareness of the ugly phenomenon of SGBV, to break in particular, the culture of silence and impunity surrounding SGBV. WACOL has contributed to the passage of laws protecting women, girls and persons with disability from violence. Notably, it advocated and got the Violence Against Persons Prohibition Law of Enugu State passed in 2019. WACOL was also part of an advocacy and network of gender-focused organisations, that also worked on and succeeded in getting the Violence Against Persons Prohibition Act, 2015 passed by the National Assembly, and subsequently, signed into law by then President Goodluck Jonathan.

Most importantly the recent signing of the Practice Direction and Guidelines on Application for Protection Order 2022, which provides a standard practice direction and guidelines model for seeking protection order for victims of SGBV, signposts a landmark and epochal achievement in the fight against Sexual and Gender Based Violence (SGBV) within the jurisdiction of the Federal Capital Territory, Anambra and Edo States. It is a big win for both the Judiciary in these implementing States and its technical partners, who worked in the most concerted manner to deliver this well resourced adjudicatory instrument for efficient justice delivery to victims of SGBV, as championed by some civil society organisations and the entire human rights community. We acknowledge the support of the global community through the EU/ROLAC British Council Project for supporting the implementation and development of guidelines for the issuance of Protection Order in FCT, Anambra Edo and Adamawa States respectively. At the foundation of this great stride, is the strategic partnership between ROLAC/ British Council Project and WACOL, a non-governmental human rights organisation with over 25 years consistent activism in the promotion and protection of human rights, especially in the area of Sexual and Gender-Based Violence, which has materialised in this adjudicatory instrument of note.

4. You are a well-known advocate of female reproductive rights. What is your position on the rights of women over abortion? Are you pro-life or pro-choice, though generally abortion is an offence in Nigeria, except under the Penal Code which is applicable in Northern Nigeria and the Federal Capital Territory in special circumstances?

I think you have stated the position under the law, and also answered the questions posed to me.

To further add to your position is the importance of State responsibility to protect, respect and remedy recognised rights under international law for which they're parties to.

The last time I checked Nigeria is still a party to the Maputo Protocol on the Rights of Women in Africa with 41 other African Countries, and consequently, bound by its provisions.

Article XIV (14) is on health and reproductive rights of women. It stipulates that States Parties shall ensure that the right to health of women, including sexual and reproductive health is respected and promoted. This includes: The right to control their

fertility; the right to decide whether to have children, the number of children and the spacing of children; the right to choose any method of contraception; the right to have family planning education.

Importantly, article 14 (2) (C ) provides that States Parties shall take all appropriate measures to protect the reproductive rights of women, by authorising medical abortion in cases of sexual assault, rape, incest, and where the continued pregnancy endangers the mental and physical health of the mother or the life of the mother or the foetus. Unsafe abortion and their complications are a major cause of maternal mortality. Article 12 of CEDAW provides for the right to health, which includes the right to bodily autonomy and freedom of women and girls to be have sexual and reproductive freedom.

The Cairo Programme of action, in one of it's recommendation, provides that comprehensive reproductive health care, includes family planning; safe pregnancy and delivery services; abortion where legal; prevention and treatment of sexually transmitted infections (including HIV/AIDS); information and counselling on sexuality; and elimination of harmful practices against women (such as genital cutting and forced marriage).

Although reproductive health and rights issues are still somewhat contentious in Nigeria and elsewhere in Africa, it has nevertheless, moved from the narrow conception of maternal and child health programmes to include a broad range of other issues of concern namely:- Family Planning, STDs, HIV/AIDs, Harmful Traditional Practices (HTP), Sexual and Domestic Violence.

I think from what I have stated, it is abundantly clear that sexual and reproductive rights have been recognised as human rights attributable to individuals. Thus, there is an obligation for Nigeria to implement at domestic/national levels, treaties which they have ratified.

5. There has been an astronomical increase in domestic violence, including rape, incest and defilement of toddlers. Beyond conventional legal mechanisms, what else can be done to ensure an end, or at least, a drastic reduction in these cases?

Prevention is imperative, and education through public awareness, sensitisation, and engaging with perpetrators, and the at risks groups and empowering victims/survivors to speak out about their victimisation without being stigmatised or doubly jeopardised. It is not enough to have laws that are not effectively implemented. As it were, the bane is low prosecution and lack of accountability to gender based crimes committed.

From available statistics, women and girls in Nigeria suffer from SGBV in different spheres of life, and from different actors. The prevalence of VAWG/SGBV has not changed, rather it appears to be rising

In Nigeria, VAWG/SGBV is aggravated by patriarchy, religion, traditional and cultural practices. The emergence of Boko Haram terrorist group has escalated SGBV in the form of sexual slavery, abduction, forced marriage to the terrorists, kidnapping and trafficking of girls as mercenaries and comfort women for the insurgents, and 'sex-for-food', especially in the North East of Nigeria.

There are also discriminatory laws that condone, and even legalise certain forms of violence against women. The Police and the criminal justice system have failed to offer protection to victims of VAWG by classifying such violence as private or family matter, only reluctantly intervening where absolutely unavoidable. Compounding the problem of women and their rights is Nigeria's pluri-legal legal systems, which include Customary and Sharia Laws that often reinforces sex stereotypes, including giving a man the right to batter the wife and/or make decisions on her behalf.

WACOL was able to provide free legal services to many indigent women and children who came to our offices seeking redress against violation of their rights, particularly in matters relating to sexual violence, disinheritance, harmful widowhood practices, harmful traditional practices, physical, emotional and psychological abuses, forceful ejection from home, abandonment, custody of children and maintenance among others.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

There has been steady increase in the number of cases reported at WACOL legal clinics - the head office in Enugu and other branch offices in Anambra, Imo, Edo, Ebonyi, Katsina and Abuja FCT. Meanwhile, from January 2012 to August 2022, over 20,000 clients visited our legal clinic for free Legal Aid advice and counselling, pro bono services and legal representation in Court. We registered an average 20 cases daily. 80% of these cases, bordered on physical, verbal, emotional and other forms of abuses, whilst 20 % centred on sexual violence .

The Covid-19 19 outbreak in 2020, saw a decline in the number of cases reported in that year, with a less than 1,000 cases reported in that year, unlike the previous years.

Though we developed online response to clients and their complaints, but, the short fall came from clients who were not internet savvy, and as a result, could not contact us through our online outlets.

About 5,000 women were provided with Free Legal Aid/assistance on rights to land, housing, properties and inheritance. We currently have about 100 cases pending in various courts, Police and the criminal justice generally, on behalf of our clients under our Legal Aid Scheme.

Apart from the legal representation in court, we also use Alternative Dispute Resolution (ADR) mechanisms to wit; conciliation, reconciliation negotiation and mediation in arriving at peaceful settlement of disputes, in view of the high cost of litigation and the delay in obtaining judgement in our courts of law.

6. The landmark judgement by the Apex Court on women's inheritance rights amongst the Igbos, Ukeje v Ukeje doesn't seem to have settled that age long issue, as most families don't seem to respect nor obey this judgement. What is your view on this?

Ukeje v Ukeje, Mojekwu v Mojekwu, Uke v Iro , Mojekwu v Ejikeme, Anekwe v Nweke are landmark court judgements that voided the Igbo customary law which disentitled female children from inheriting land or immovable property of their deceased fathers, as repugnant to natural justice, equity, and good conscience, and violating both Section 42(1) (the right to freedom from discrimination based on sex or circumstance of birth) and Section 42(2) (the right to acquire and own immovable property) of the Nigerian Constitution.

Notwithstanding these progressive judicial decisions, discrimination persists in practice. The problem has been the absence of a legal and policy framework empowering women and granting them explicit right to land in their capacity as citizens with full legal capacity, as envisaged by both the United Nations Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW: 1979); and the Protocol to the African Charter on the Rights of Women in Africa (Maputo Protocol, 2003).

Furthermore, it is a reflection of the gulf between law in the books and law in action - de jure and de facto.

It is a demonstration that law is not a panacea, but a useful beginning requiring other enabling environments to take root firmly. The culture and prevailing customary laws and practices favour the rule of primogeniture and inheritance through male lineage, which flies in the face of the constitutional prohibition of sex discrimination and international human rights treaties that have entrenched the principles of equality and nondiscrimination, which Nigeria is a party to and consequently, bound to protect, respect and remedy.

It is important to note that inheritance right is fundamental and at the core of women's empowerment, and hence, must be respected within and outside the courtroom. Of course, we celebrate the landmark Supreme Court decision that has settled the issue of customary laws informed by tradition are very discriminatory against women in relation to the inheritance of a deceased husband's estate. While the law of inheritance and succession under English law is reasonably settled, the aspect dealing with customary law is not, which breeds conflict and acrimony among heirs. What is more, the law discriminates among beneficiaries, especially women. The discriminatory aspects of property inheritance under customary law in Nigeria manifests in different

forms and scope, ranging from primogeniture rules, right of spouses, rights of adopted children and rights of illegitimate children (constitutionally no child is illegitimate).

Women in Nigeria despite the appellate Court's decisions continue to suffer discrimination in the sale, letting, and use of immovable property such as land, because of their gender. Communal land is still largely governed by custom and tradition that discriminates against women's right to land, property, housing, and inheritance. Women hardly have farming rights, even on the land they cultivate. Yet, the role of women in agricultural development is paramount. It is glaring that when you look at ownership, access, and control of land, very few women have independent rights of ownership or access or control of lands.

This calls for heightened social and legislative advocacy, public enlightenment and community legal outreach and sensitisation programmes, that gender discrimination in property relations is inconsistent with the Nigerian Constitution which guarantees rights to property and equal protection without discrimination on grounds of sex.

There is urgent need to scale up sensitisation and awareness on women's rights, bearing in mind that customary law still governs the majority of people in localities or Igboland where this is prevalent. All actors should to do more to publicise the judgement, and ensure that it becomes the jurisprudence, the norm in Igbo communities.

7. Human trafficking is a global crime, for which Nigeria has been portrayed in a bad light across the world. You were a United Nations Rappoteur on human trafficking, share with us your experiences with this shameful global crime.

Human trafficking, trafficking in human beings or trafficking in persons, is, unfortunately thriving in today's world. Trafficking in persons (TiP) remains one of the fastest-growing criminal activities in the world, which results in serious breaches of human rights. Africa and South East Asia, remain the most impacted continents in the world.

In Africa, Nigeria is the worst country affected by trafficking. Although TiP is very difficult to quantify, it is hugely underestimated because of its insidious, complex and dynamic nature. Trafficking occurs within and across national borders, victims often transit through many countries to reach their final destination; thus, trafficking knows no border. This phenomenon poses an increasingly serious challenge to humanity. Although the focus of anti-trafficking responses has mainly been on demand for commercial sexual exploitation, particularly of women and girls, other forms of trafficking which also affect men and boys are thriving, including trafficking for the purpose of labour exploitation, domestic work, removal and sale of organs, as well as begging.

Nigeria is a source, transit and destination country as far as trafficking in persons (TIP) is concerned. This modern-day slavery is, unfortunately, growing in scale and repercussions. Nigerians are trafficked for the purpose of sexual exploitation, forced labour, slavery or practices similar to slavery or the removal of organs to Europe, Asia, and other parts of Africa, especially those with close proximity to Europe like Libya and Morocco. Baseline surveys conducted by WACOL found that countries of interest for Nigerians trafficked internationally from Edo State include (1) Europe: Italy, Spain, Germany, Switzerland, France, Denmark and Nederland; (2) Middle East and Asia include: Malaysia, Indonesia, Asia, India, UAE/Dubai and Malta.

The root causes of trafficking include: growing poverty, youth unemployment and gender inequality, discrimination and gender-based violence, which increases the vulnerability to trafficking, especially of women and girls. The problem of human trafficking in Nigeria also touches on areas such as corruption and lack of good governance, which results in the feeling of hopelessness and the desperation to leave Nigeria by all means amongst the most at risk groups, particularly young men and women.

There is no part of the world you will not find Nigerians in a trafficking situation, including involvement in unsafe or irregular migration. It is tales of woes, for Nigerian victims/survivors of human trafficking.

As the United Nations Special Rapporteur on trafficking in persons, especially women and children, I travelled around the world galvanising support to end the ugly phenomenon of human trafficking. The backbone of my work has been to

advocate for a human rights based approach to combatting trafficking. Violations of human rights, are both a cause and a consequence of trafficking in persons. Thus, efforts to combat trafficking in persons will not be effective, unless they are centred on universal respect for the human rights of all individuals, particularly trafficked persons and persons at risk of being trafficked. Victims of trafficking suffer grave violations of their fundamental rights; therefore, it is crucial that any response to trafficking be constructed around the common goal of remedying such violations. I will never advocate enough, for the formulation and implementation of anti-trafficking responses based on 5Ps (protection, prosecution, punishment, prevention, promoting international cooperation and partnership), 3Rs (redress, recovery and reintegration) and 3Cs (capacity, cooperation and coordination), guided by international human rights law and standards.

The international community provided an important tool in the global fight against trafficking, by adopting the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organised Crime, in 2000, and which came into force 25th December, 2003.

It is pertinent to observe that cooperation and partnership among all stakeholders, are critical to fighting trafficking in persons. We must speak against human trafficking; collectively work to stop the trafficking and human enslavement. We must act, buy and consume services/products responsibly, demand accountability and promote and protect trafficked persons, ensuring in particular that their right to decent work and livelihood is not exploited by traffickers and their cohorts.

We must work together to stop the impunity for trafficking, and guarantee non-repetition. Prevention through awareness raising and socio-economic empowerment, is key to keeping vulnerable people from falling in the traps of traffickers. For those whose journeys took them within the claws of criminals and were able to escape, we need to guarantee access to justice without fear of reprisal, and provide them with a clear path to recovery and reintegration, while protecting their privacy for a return to normalcy without fear of stigma.

8. There seems to be a growing problem, especially with Arab countries where African women are employed as domestic workers, and some end up being raped, starved, maimed or even murdered. There was a case in Kenya, where the lady was returned to her country no longer able to speak, and it seems that her employer has been able to get away with whatever harm was done to her. What is an organisation like the UN or other NGOs doing, to bring these criminals to book?

In fact, it is tales of woes from Africans and South East Asian domestic workers who have fallen victim. It is, unfortunately, growing in scale and repercussions, despite UN Protocol to Prevent, Punish and Suppress Trafficking and the ILO Domestic Worker's Convention, which was adopted and came into force during my tenure as the UN Special Rapporteur on Trafficking in Persons, Especially Women and Children. I had official engagements on this subject in several Arab countries, United Arab Emirates, Qatar, Bahrain, Egypt, Jordan, Kuwait, Morocco and Turkey Although, some Arab countries have taken step to stem the this menace of gross abuses and exploitation of domestic workers, it is still not Uhuru yet.

In Philippines, during my country mission in November 2012 at the invitation of the Government, I met over 40 repatriated domestic workers victims/survivors who narrated their ordeals in the Middle East and where they were employed as domestic workers, and were subjected to various forms of exploitation. I found that children, women and men are trafficked within the country and abroad for the purpose of sexual exploitation, including sex tourism, cybersex and pornography, forced and bonded labour, domestic servitude and organ transplantation. The high demand for female domestic workers from the Philippines and the large number of Filipinos seeking overseas employment in this sector, has led to trafficking for domestic servitude being one of the most prevalent forms of cross-border trafficking.

According to the International Labour Organisation (ILO), 1 million Filipino men and women leave the country annually to work abroad, and a total of 10 million Filipinos live and work overseas. Many of these overseas Filipino workers (OFWs), men and women, are trafficked abroad, mostly through recruitment agencies forming part of organised criminal networks and often with the help of corrupt local officials. These workers subsequently become victims of forced labour and/or debt bondage, in

destination countries. The situation is similar to Nigeria, India, Thailand, Myanmar etc. The problem of exploitation of domestic workers exists, even in the diplomatic community.

The United Nations, including its agencies such as UN Human Rights, ILO have legal frameworks/standards that hold State parties to them accountable. The Special procedure mechanism of the UN Human Rights Council, including treaty bodies, special rapporteurs, independent experts, working groups and committees can receive communications and adjudicate on reported cases against countries, for lack of due diligence in ensuring the elimination of such exploitation of domestic workers.

There are abiding obligations on United Nations member States, including Nigeria to implement the Convention against Transnational Organised Crime and its Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, as well as other core international human rights treaties. In particular to ensure full implementation of ratified ILO conventions, including No. 129 on the abolition of forced labour, No. 105 concerning forced or compulsory labour, No. 182 on worst forms of child labour and No. 189 concerning decent work for domestic workers.

In Nigeria, NAPTIP and other NGOS, including WACOL, are working in this field to ensure effective remedies to victims/ survivors, especially children exploited in the house help phenomenon that is widespread in Nigeria and nothing short of child labour, abuse and exploitation. The National Industrial Court is also empowered constitutionally to enforce ILO treaties, and deal with related labour and employment disputes.

The problem is the lack of awareness, so that those affected can y and respond to violations that they have suffered. NAPTIP is doing a great job and of course, partnerships, including public and private cooperation and collaboration, is key in tackling such menaces.

9. The gruesome murder of female Lawyer, Mrs Omobolanle Raheem by Assistant Superintendent of Police Drambi Vandi on Christmas Day, following the murder of Gafaru Buraimoh by Officers of the same Ajewi Police Station, Ajah as ASP Vandi, has left many in tears and anger. This is several deaths too many, as Mrs Raheem was said to be pregnant with twins. How do you think we can eradicate this ugly trend of senseless extra-judicial killings by law enforcement agents? It seems that the #EndSARS Protest of October 2020 yielded little or no results.

I strongly condemn any form of extra judicial killings and Police brutality.

It is sad that barely two years after the #EndSARS revolution that brought to light the issue of Police brutality in Nigeria, we are still dealing with such horrific cases. I served on the Police Brutality Judicial Panel of Inquiry in response to the aftermath of #EndSARS, and some of the cases that were brought to our attention still cry for justice. Unfortunately, it has become a bazaar of impunity.

Mrs Omobolanle Raheem was a pregnant mother and Lawyer, who would have been alive today but for the indiscipline of a trigger-happy Assistant Superintendent of Police, Drambi Vandi, who is attached to Ajiwe Police Station, Ajah, Lagos State.

Indeed, we cannot continue with such inhumane, wicked, absurd, ridiculous, and barbaric acts. It is high time that people are held accountable and duly punished, to serve as a deterrent to others. As it were, accountability for such atrocious acts is still low, and we shouldn't make mistake to think that this is just a Police matter - it spans through the entire gamut of the security sector.

I recommend worthy collaborations of both public and private sector, that will raise accountability stake through :

1. Investigation to determine responsibility, and bring to justice all perpetrators.

2. Training and Re-training of the members of the Police Force on the rules of engagement and standard operating procedures (S.O.P).

3. Medical and Psychiatric evaluation of each member of the Nigeria Police Force to ascertain their mental position, and provide help to those that may need it.

4. Expeditious justice delivery on cases of Police brutality to support citizens confidence in the process, and restore hope to the common man.

Accountability to women and girls rights is a State responsibility, and must be implemented in accordance with regional and international standards that Nigeria has ratified. In other words, the State has an obligation to protect, respect and remedy any violation of women's rights. It must be borne in mind that, gender inequality is both a cause and consequence of gender discrimination, sexual and gender based violence and women and girls unequal access to education, employment, resources, power etc. Importantly, despite progress made it is still a long road to gender equality and women's struggles are at crossroads, especially given the myriad of existential problems confronting the nation-state of Nigeria.

We need to ensure the inclusion of women in all spheres of life: social, economic, political, and cultural. Poverty and lack of livelihood opportunities are exacerbating violence against women, exploitation, and abuse, including the trafficking of women and girls. For progress, more investment in women and girls, strengthening institutional mechanisms, and providing adequate resources to ensure systematic gender mainstreaming; gender justice, and accountability.

Women's rights are under threat, and the impunity of human rights abuses against women and children must be halted. I am committed to WACOL's vision of transforming societies, for greater respect for women's rights. What is paramount to me is continuing my activism, using my training as a Lawyer to offer free legal aid to women and children, especially in difficult situations and in search of justice.

10. How would you rate the performance of the outgoing administration? A few days ago, it was reported in the news that the President declared during a visit to Kogi State, that his administration had delivered on its campaign promises. Do you agree? What are your main expectations from the incoming administration?

There is no doubt that the outgoing administration recorded some milestones, but, notwithstanding, it is a far cry from the promises and vision shared, upon which they were elected in 2015. The most challenging - are insecurity, poverty and hunger in the land. The domestic debt profile by recent data, put at over N70 trillion, is mind-blowing. We are back to spending colossal amounts in servicing foreign debts. Is this sustainable? How did we get here as a country? Is this feeding the corruption web, or judiciously used for our collective good? The state of affairs would suggest otherwise.

In terms of unifying the country they didn't do well, to give full effect to the constitutional provision espoused in Section 14 (3). Nepotism has been widespread, and ethnic and religious fault lines exacerbated to the detriment of the Nigeria State and peaceful co-existence and mutual development. The restructuring the ruling party promised, never materialised. The exchange rate in 2015 when the party took the mantle of leadership and now, tells a story of creeping inflation and the sharp drop in the quality of living of Nigerians. There is no justification to have the Naira, on this type of free fall. My salary as a Professor that has reached the last step of promotion, is about Five Hundred US dollars. Yet, I'm expected to invest in research, scholarship and teaching.

I always give the example of South Africa. I visited SA first in 1998, when I took our law students to a Moot Court Competition that took place in Mozambique. We transited through South Africa, and I stopped over on the return leg in Johannesburg. I recall that the exchange rate then was 9 rand to one USD. Recently, in November 2022 when I traveled to Cape Town, SA, it was about 14 rand to one USD. And, over the years due to my work, I travel a lot to South Africa on academic exchange visits and other networks of Africans working in the human rights and development arena. It has not gone up to 20 or beyond in the last twenty years plus - that's a country with an economy- juxtapose this with the Nigeria's situation.

Anyway, the problem is multi-faceted and a reflection of decades of not doing the right thing, and allowing ethnicity and religion to impact on our democracy and development. It didn't start with this regime, and it will be unfair to place all the blame on them. However, the legitimate expectations of Nigerians and the high goodwill and trust in the person of the President, were really squandered.

There is nowhere in the world where you have people in every nook and cranny, dollar hawkers/money exchange. In fact, before you find where to exchange money in SA, it must be a bank or the few national and international Exchange Bureaus, unlike Nigeria. Importantly, they will make copies of the dollar you are changing.

My expectations from a new Government come May/June 2023, is for them to build on good policies and programmes of President Buhari, and also be prompt to put reverse others that are counterproductive. The education and health sectors, need to be prioritised.

The unity of the country has never been challenged, as it has never been since the civil war. So, urgent priority should be placed on unifying the country, restoring security, inclusive governance, economy, fast tracking human and capital infrastructural development. Importantly, ensuring participation of all geopolitical zones in Government, providing safe schools for our children, our economy is in shambles and extreme poverty has become pervasive. This is evidenced by recent statistics.

The World Bank estimates that around 8.5% of the world's population (685 million people) could be extremely poor by the end of 2022. According to a report launched by the Federal Government of Nigeria through the National Bureau of Statistics, about 63% of persons living within Nigeria (133 million people) are multidimensionally poor.

The incoming government should invest in digitalisation, especially creating more opportunities and platforms for talented youths to display their innovations and ideas, to solve problems on the national and international spaces.

**---- Index References ----**

Company: AFRICAN COMMISSION ON HUMAN AND PEOPLES RIGHTS; University of Nigeria; NATIONAL BASKETBALL ASSOCIATION, INC.; UNIVERSITY OF OXFORD; National Assembly Services, Inc.; THE UNIVERSITY OF LONDON; AFRICAN UNION; International Labour Organization; Federal Government of Nigeria

News Subject: (African Union (1AF88); Crime (1CR87); Emerging Market Countries (1EM65); Gender Relations (1GE36); Health & Family (1HE30); Health & Wellness (1HE60); Human Rights (1HU19); Smuggling & Illegal Trade (1SM35); Social Issues (1SO05); United Nations (1UN54); World Organizations (1IN77))

Industry: (Contraception (1CO66); Healthcare (1HE06); Healthcare Practice Specialties (1HE49); Women's Health (1WO30))

Region: (Africa (1AF90); Arab States (1AR46); Asia (1AS61); East Africa (1EA80); Eastern Asia (1EA61); Europe (1EU83); Far East (1FA27); Gulf States (1GU47); Mediterranean (1ME20); Middle East (1MI23); Morocco (1MO33); Mozambique (1MO22); Nigeria (1NI88); North Africa (1NO44); Philippines (1PH56); South Africa (1SO81); Southeast Asia (1SO64); Southern Africa (1SO66); Southern Asia (1SO52); United Arab Emirates (1UA66); West Africa (1WE48))

Language: EN

Other Indexing: (United Nations Special Rapporteur on Trafficking in Persons; Women'sAid Collective; WomenAid Collective; Legal Practitioners Privileges Committee; Women in Nigeria; International Federation of Female Lawyers; British Council Project; TAMAR Sexual Assault Referral Centre; TAMAR SARC; Sexual and Gender Based Violence; UN Human Rights Council; Anambra Edo; Apex Court; Supreme Court; NAPTIP; National Industrial Court; Ajewi Police Station; Nigeria

Police Force; World Bank; African Commission on Human Rights; University of Nigeria; NBA; Oxford University; National Assembly; University of London; African Union; International Labour Organisation; Federal Government of Nigeria)

Word Count: 7648

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room