UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

F.C., A.B., D.D.R., L.V., Ra.G., R.S., J.D.C.,
W.C., G.G., R.C., D.L., E.I., M.G., E.C., Rh.P.,
L.L., J.J.G., R.V., R.L., A.S., E.A., J.V., A.C.,
A.G., A.A., R.A., Ro.L., Ro.P., S.N., B.M., G.T.,
J.B., E.D.C., V.A., Re.D., C.S., Ra.D., and M.R.,

                         Plaintiffs,

        v.

JACOBS SOLUTIONS INC., JACOBS
ENGINEERING GROUP INC., CH2M HILL
COMPANIES, LTD., CH2M HILL
INTERNATIONAL, LTD., and CH2M HILL
INTERNATIONAL B.V.,

                         Defendants.

Case No. 1:23-cv-02660-MEH

**ORAL ARGUMENT REQUESTED**

**<u>DEFENDANTS' MOTION TO DISMISS</u>**

Habib Nasrullah
Frederick R. Yarger
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202-5647
303-244-1800

Maura Kathleen Monaghan
Mark W. Friedman
William H. Taft V
Natascha Born
Justin R. Rassi
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000

*Attorneys for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 4

I.     THE SUPREME COMMITTEE'S CONSTRUCTION OF THE 2022 FIFA
       WORLD CUP STADIUMS........................................................................... 4

II.    PLAINTIFFS' ALLEGED MISTREATMENT BY UNNAMED VENTURE
       PARTICIPANTS ......................................................................................... 5

III.   CH2M'S LIMITED ROLE AS A CONSULTANT TO THE SUPREME
       COMMITTEE ............................................................................................. 6

IV.    PLAINTIFFS' OTHER ALLEGATIONS REGARDING QATAR................................. 9

NAMED DEFENDANTS....................................................................................... 10

ARGUMENT..................................................................................................... 11

I.     PLAINTIFFS LACK ARTICLE III STANDING ............................................... 11

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE TVPRA .............................. 15

       A.    Plaintiffs Seek an Impermissibly Extraterritorial Application of the
             TVPRA ............................................................................................. 15

             1.    The TVPRA's Private Right of Action Does Not Apply
                   Extraterritorially........................................................................ 15

             2.    Plaintiffs Do Not Seek a Domestic Application of Section 1595 ............. 20

       B.    Plaintiffs Fail to Plead the Elements of a TVPRA Claim ...................................... 21

             1.    Plaintiffs Do Not Plead a Violation of Sections 1589 and 1590.............. 22

             2.    Plaintiffs Do Not Plead "Participation in a Venture" ............................... 25

                   a.    Plaintiffs Have Not Alleged a Venture ......................................... 26

                   b.    Plaintiffs Have Not Alleged That Defendants "Participated"
                         in Any Venture.............................................................................. 29

             3.    Plaintiffs Do Not Plead Defendants' Knowledge of TVPRA
                   Violations...................................................................................... 31

          4.        Plaintiffs Do Not Plead a Knowing Benefit Received by Defendants ............................................................................... 33

    C.      Plaintiffs Cannot Assert a Claim Under Section 1593 ......................................... 34

III.    PLAINTIFFS' NON-FEDERAL LAW CLAIMS FAIL ................................................. 35

    A.      Qatari Law Applies to Plaintiffs' Non-Federal Claims ....................................... 35

    B.      Plaintiffs Fail to State a Claim under Qatari Law .................................................. 36

    C.      Even if Colorado Law Applies, Plaintiffs Still Fail to State a Claim .................. 37

          1.        Plaintiffs' Claims Are Time-Barred Under Colorado Law...................... 37

          2.        Plaintiffs Fail to State a Claim for Negligence or Gross Negligence ....... 38

          3.        Plaintiffs Fail to State a Claim for Negligent Supervision ...................... 39

          4.        Plaintiffs Fail to State a Claim for Unjust Enrichment ............................ 40

    D.      The Court Should Not Exercise Supplemental Jurisdiction ................................. 41

IV.    THE COURT LACKS PERSONAL JURISDICTION OVER THE JACOBS ENTITIES AND CH2M B.V. ........................................................................................... 41

    A.      The Court Lacks General Jurisdiction over the Jacobs Entities and CH2M B.V. ....................................................................................................... 42

    B.      The Court Lacks Specific Jurisdiction over the Jacobs Entities and CH2M B.V. ....................................................................................................... 43

    C.      All Claims Against Jacobs Solutions Must Also Be Dismissed on the Merits ................................................................................................................. 45

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*A.D. v. Choice Hotels Int'l, Inc.*,
  2023 WL 3004547 (M.D. Fla. Apr. 19, 2023) .........................................................30

*A.D. v. Wyndham Hotels & Resorts, Inc.*,
  2020 WL 8674205 (E.D. Va. July 22, 2020) .........................................................30

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023)................................................................................................21

*Adhikari v. KBR Inc.*,
  845 F.3d 184 (5th Cir. 2017) .................................................................................20

*AE, Inc. v. Goodyear Tire & Rubber Co.*,
  168 P.3d 507 (Colo. 2007)......................................................................................35

*Air Century SA v. Atlantique Air Assistance*,
  447 Fed. Appx. 879 (10th Cir. 2011)......................................................................41

*Allen v. Wright*,
  468 U.S. 737 (1984)................................................................................................12

*Archangel Diamond Corp. v. Lukoil*,
  123 P.3d 1187 (Colo. 2005)....................................................................................42

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................25

*Behav. Analyst Certification Bd., Inc. v. Solis*,
  2022 WL 17736781 (D. Colo. Dec. 16, 2022).........................................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................22

*Bella Health & Wellness v. Weiser*,
  -- F. Supp. 3d --, 2023 WL 6996860 (D. Colo. Oct. 21, 2023) .............................14

*Bennett v. Spear*,
  520 U.S. 154 (1997)...........................................................................................12, 13

*Benton v. Cameco Corp.*,
  375 F.3d 1070 (10th Cir. 2004) .............................................................................44

*Birse v. CenturyLink, Inc.*,
    2019 WL 9467530 (D. Colo. Oct. 23, 2019) ........................................................4

*Bistline v. Parker*,
    918 F.3d 849 (10th Cir. 2019) ................................................................... *passim*

*Brightspot Sols., LLC v. A+ Prods., Inc.*,
    2021 WL 1251512 (D. Colo. Apr. 5, 2021)................................................39, 40

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*,
    582 U.S. 255 (2017)........................................................................................43, 44

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)................................................................................................12

*Clinton v. Sec. Benefit Life Ins. Co.*,
    63 F.4th 1264 (10th Cir. 2023) ............................................................................4

*Coleman v. Farnsworth*,
    90 F. App'x 313 (10th Cir. 2004) ......................................................................4

*Coubaly v. Cargill, Inc.*,
    610 F. Supp. 3d 173 (D.D.C. 2022) ..................................................................14

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)........................................................................................42, 43

*Dental Dynamics, LLC v. Jolly Dental Grp.*,
    946 F.3d 1223 (10th Cir. 2020) ....................................................................44, 45

*Doe #1 v. Red Roof Inns, Inc.*,
    21 F.4th 714 (11th Cir. 2021) ......................................................................27, 30

*Doe I v. Apple Inc.*,
    2021 WL 5774224 (D.D.C. Nov. 2, 2021) ................................................. *passim*

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
    514 F.3d 1063 (10th Cir. 2008) ........................................................................42

*Duquesne Light Co. v. EPA*,
    166 F.3d 609 (3d Cir. 1999)................................................................................13

*Elvig v. Nintendo of Am., Inc.*,
    696 F. Supp. 2d 1207 (D. Colo. 2010)..........................................................35, 36

*Fernandez v. Clean House, LLC*,
    883 F.3d 1296 (10th Cir. 2018) ............................................................38

*Foreign Trade Corp. v. Otter Prod., LLC*,
    2020 WL 13450951 (D. Colo. Mar. 5, 2020) ........................................35

*G.G. v. Salesforce.com, Inc.*,
    76 F.4th 544 (7th Cir. 2023) ................................................................31

*Gabbidon v. Wilson*,
    2023 WL 2520732 (S.D.W. Va. Mar. 14, 2023) ....................................34

*Gilbert v. U.S. Olympic Comm.*,
    2019 WL 1058194 (D. Colo. Mar. 6, 2019) ..........................................29

*Gilbert v. U.S. Olympic Comm.*,
    423 F. Supp. 3d 1112 (D. Colo. 2019) ..................................................29

*Gilbert v. USA Taekwondo, Inc.*,
    2020 WL 2800748 (D. Colo. May 29, 2020) ........................................34

*Habecker v. Town of Estes Park, Colo.*,
    518 F.3d 1217 (10th Cir. 2008) ............................................................12

*Hood v. Am. Auto Care, LLC*,
    21 F.4th 1216 (10th Cir. 2021) ........................................................42, 43

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ..............................................................................42

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ..........................................................................19

*KBR, Inc. v. United States ex rel. Carter*,
    575 U.S. 650 (2015) ..............................................................................18

*Keller v. Koca*,
    111 P.3d 445 (Colo. 2005) ....................................................................39

*Kelvion, Inc. v. PetroChina Canada Ltd.*,
    918 F.3d 1088 (10th Cir. 2019) ............................................................37

*Kennedy v. Mountainside Pizza, Inc.*,
    2020 WL 4454897 (D. Colo. May 14, 2020) ........................................44

*Kiobel v. Royal Dutch Petrol. Co.*,
    569 U.S. 108 (2013).................................................................................21

*Koch v. City of Del City*,
    660 F.3d 1228 (10th Cir. 2011) ...........................................................41

*L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*,
    125 F. Supp. 3d 1155 (D. Colo. 2015)..................................................41

*L.H. v. Marriott Int'l, Inc.*,
    604 F. Supp. 3d 1346 (S.D. Fla. 2022) ................................................27

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ...............................................................13

*Lewis v. Casey*,
    518 U.S. 343 (1996)..............................................................................14

*Lewis v. Lewis*,
    189 P.3d 1134 (Colo. 2008)..................................................................40

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..............................................................................12

*Lundstrom v. Choice Hotels Int'l, Inc.*,
    2021 WL 5579117 (D. Colo. Nov. 30, 2021) ......................................32

*Macias v. Monterrey Concrete LLC*,
    2020 WL 5638710 (E.D. Va. Sept. 21, 2020)................................22, 24

*Melea, Ltd. v. Jawer SA*,
    511 F.3d 1060 (10th Cir. 2007) ...........................................................42

*Menocal v. GEO Group, Inc.*,
    635 F. Supp. 3d 1151 (D. Colo. 2022)..................................................40

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir. 2018) .............................................................24

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................17, 19

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ..........................................................23, 25

*Nasious v. Two Unknown B.I.C.E. Agents*,
  492 F.3d 1158 (10th Cir. 2007) ..........................................................24

*Nestlé USA Inc. v. Doe*,
  141 S. Ct. 1931 (2021)..........................................................................21

*Nova Health Sys. v. Gandy*,
  416 F.3d 1149 (10th Cir. 2005) ..........................................................12

*Oliver v. Meow Wolf, Inc.*,
  2020 WL 6939875 (D.N.M. Nov. 25, 2020) ........................................11

*Owino v. CoreCivic, Inc.*,
  2018 WL 2193644 (S.D. Cal. May 14, 2018)........................................34

*Pritkin v. Dep't of Energy*,
  254 F.3d 791 (9th Cir. 2001) ...............................................................13

*Raleigh v. Performance Plumbing & Heating, Inc.*,
  130 P.3d 1011 (Colo. 2006)..................................................................39

*Ratha v. Phatthana Seafood Co.*,
  35 F.4th 1159 (9th Cir.), *cert. denied*, 143 S. Ct. 491 (2022)...........20, 32

*Ricchio v. McLean*,
  853 F.3d 553 (1st Cir. 2017)...........................................................29, 30

*Riggs v. Hull*,
  2016 WL 742923 (W.D. Ky. Feb. 23, 2016) ........................................34

*RJR Nabisco, Inc. v. European Cmty.*,
  579 U.S. 325 (2016)...............................................................15, 16, 17, 20

*Rocky Mountain Planned Parenthood, Inc. v. Wagner*,
  467 P.3d 287 (Colo. 2020)....................................................................39

*Roe v. Howard*,
  917 F.3d 229 (4th Cir. 2019) ...............................................................20

*Roland v. Letgo, Inc.*,
  644 F. Supp. 3d 907 (D. Colo. 2022)....................................................39

*Roman v. Tyco Simplex Grinnell*,
  2017 WL 2427251 (M.D. Fla. June 5, 2017).........................................22

*S.J. v. Choice Hotels Int'l, Inc.*,
    473 F. Supp. 3d 147 (E.D.N.Y. 2020) ...................................................................32

*Seismic Reservoir 2020, Inc. v. Paulsson*,
    785 F.3d 330 (9th Cir. 2015) ...............................................................................36

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)................................................................................................12

*Sosa v. Alvarez–Machain*,
    542 U.S. 692 (2004)..............................................................................................17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..............................................................................................13

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) ...........................................................................11

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)..........................................................................................14

*United States v. Collins*,
    859 F.3d 1207 (10th Cir. 2017) ...........................................................................18

*United States v. Fu Sheng Kuo*,
    620 F.3d 1158 (9th Cir. 2010) .............................................................................34

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011)..............................................................................................24

*United States v. Martinez*,
    812 F.3d 1200 (10th Cir. 2015) ...........................................................................34

*United States v. Papagno*,
    639 F.3d 1093 (D.C. Cir. 2011) ...........................................................................31

*Walden v. Fiore*,
    571 U.S. 277 (2014)..............................................................................................44

*Warth v. Seldin*,
    422 U.S. 490 (1975)..............................................................................................12

*Wasatch Equal. v. Alta Ski Lifts Co.*,
    820 F.3d 381 (10th Cir. 2016) .............................................................................7

*Western Stock Ctr., Inc. v. Sevit, Inc.*,
    578 P.2d 1045 (Colo. 1978) ................................................................................40

*Williams v. Sisolak*,
    2022 WL 2819842 (D. Nev. July 18, 2022) ........................................................14

**Statutes**

18 U.S.C. § 1585 ...........................................................................................16, 19

18 U.S.C. § 1586 ....................................................................................................19

18 U.S.C. § 1589 ..............................................................................................*passim*

18 U.S.C. § 1590 ...........................................................................................23, 25

18 U.S.C. § 1591 ....................................................................................................30

18 U.S.C. § 1592 ...........................................................................................18, 24

18 U.S.C. § 1593 ....................................................................................................34

18 U.S.C. § 1593A .................................................................................................18

18 U.S.C. § 1595 ..............................................................................................*passim*

18 U.S.C. § 1596 .......................................................................................17, 18, 20

18 U.S.C. § 1964 ....................................................................................................16

18 U.S.C. § 3271 ...........................................................................................18, 19

18 U.S.C. § 3664 ....................................................................................................34

28 U.S.C. § 1332 ....................................................................................................41

Colo. Rev. Stat. § 13-80-102 ................................................................................37

Colo. Rev. Stat. § 13-80-108 ................................................................................37

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Ch. 96...............16, 20

Trafficking Victims Protection Reauthorization Act, Pub. L. No. 108–193, 117
    Stat. 2875 (2003)............................................................................................*passim*

**Other Authorities**

154 Cong. Rec. S10388-03, 2008 WL 4425748 (Oct. 1, 2008) ....................................................19

154 Cong. Rec. S10936-01, 2008 WL 5191148 (Dec. 11, 2008).................................................19

*Black's Law Dictionary* (8th ed. 2004)........................................................................................27

Fed. R. Civ. P. 44.1 .....................................................................................................................36

Fed. R. Evid. 201 .........................................................................................................................11

*Oxford English Dictionary* (2d ed. 1989) ...................................................................................30

Restatement (Second) of Conflict of Laws § 145 ........................................................................35

## PRELIMINARY STATEMENT

The Complaint purports to bring a claim for violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA") and tag-along claims under non-federal law, but utterly fails to allege that the consulting services Defendants allegedly provided to the government agency responsible for hosting the 2022 World Cup caused Plaintiffs' employment-related injuries in Qatar. The Complaint must therefore be dismissed for lack of Article III standing, failure to state a claim, and lack of jurisdiction over three of the Defendants.

Plaintiffs are foreign nationals who worked on stadium construction projects in Qatar and assert they were mistreated there by unidentified foreign companies that are not before this Court. Defendants are not alleged to have employed Plaintiffs, directly or indirectly, or to have interacted with Plaintiffs or the companies who recruited them to work in Qatar. Nowhere does the Complaint explain how Defendants caused, or could have prevented, Plaintiffs' alleged injuries. Plaintiffs try to distract from those deficiencies with a slew of conclusory assertions parroting statutory elements of the TVPRA, unsupported factual inferences, and broadsides against the Qatari government and its labor laws, but neither the U.S. Constitution nor the TVPRA nor the applicable non-federal law permits such a claim against these Defendants.

Instead of targeting the unidentified, unscrupulous labor recruiters in the Philippines and employers in Qatar who allegedly sub-contracted work on stadium projects, the 38 Plaintiffs – all of them residents and nationals of the Philippines – seek to impose liability on the Defendants for consulting services provided to the Supreme Committee for Delivery & Legacy ("Supreme Committee"), a Qatari government agency. Defendants cannot and should not be held responsible for alleged injuries caused by third parties who are not plausibly alleged to have had

any contractual or commercial relationship with Defendants.  Moreover, the TVPRA does not provide a private right of action for conduct and injuries wholly outside the United States.

The Complaint cannot plead around these basic defects by *ipse dixit* contending that the Defendants were "participants" in an ill-defined, sprawling "venture" under the TVPRA. Indeed, as the Complaint and the materials attached to it essentially acknowledge, the work allegedly performed by certain Defendants did not entail employing any of the Plaintiffs or controlling their recruitment or working conditions, and there is no basis for inferring that Defendants benefitted from Plaintiffs' labor or shared risk or commercial interests with Plaintiffs' employers.  The Complaint draws the alleged "World Cup Construction Venture" so widely that it would include not just the Defendants, but everyone associated with the planning, development, and execution of the 2022 World Cup, subjecting the Qatari Supreme Committee, FIFA, the hundreds or thousands of companies engaged by those entities, and even the soccer players playing the games to criminal and civil liability for abuses allegedly suffered by anyone who worked on any of the stadium or infrastructure projects over the course of a decade.

Plaintiffs' theory of liability casts far too wide a net.  The Complaint should be dismissed for the following reasons.

*First*, Plaintiffs lack standing under Article III because their injuries are not fairly traceable to Defendants.  Plaintiffs do not plausibly allege that Defendants played ***any*** part in the unnamed perpetrators' alleged misconduct.

*Second*, Plaintiffs do not have a claim under the TVPRA.  Congress did not provide a private right of action under the TVPRA for extraterritorial injuries, which would essentially deputize plaintiffs' firms to extend U.S. law to wholly foreign events governed by a foreign

state's laws.  The TVPRA's extraterritorial effect is, by design, limited to criminal liability and regulated by prosecutorial discretion.  And Plaintiffs independently fail to plausibly allege the elements of a TVPRA claim.  The Complaint lacks the required specific factual allegations that would permit the Court to infer that each Plaintiff had in fact been trafficked or coerced to labor. In addition, Plaintiffs' overbroad theory of "venture" liability fails because Plaintiffs have not even identified the "venture participants" who supposedly trafficked them, nor have they alleged the close association between the Defendants and those perpetrators that would justify holding *Defendants* liable for *the perpetrators'* wrongdoing.

*Third*, Plaintiffs' non-federal law claims fail.  Qatari law applies, as Qatar has the most significant relationship to the dispute, and Qatari law required Plaintiffs to assert any such claims against their employers – not Defendants – in Qatar.  Even under Colorado law, Plaintiffs' claims are time-barred and fail on the merits, as Defendants were under no legal duty to somehow prevent trafficking or coercion by unrelated third parties.

*Fourth*, the Court lacks personal jurisdiction over CH2M HILL International B.V. ("CH2M B.V.") – a Dutch entity – and over the two Jacobs entities because those Defendants are incorporated and headquartered in other jurisdictions, and the claims lack sufficient connection to Colorado to create specific jurisdiction.

## STATEMENT OF FACTS[1]

I.      **The Supreme Committee's Construction of the 2022 FIFA World Cup Stadiums**

Over the course of a decade leading up to the 2022 World Cup, Qatar "constructed several state-of-the-art stadiums," including the five stadiums that Plaintiffs claim to have worked on, namely the Al Rayyan, Lusail, Al Khalifa, Al Wakrah, and Al Thumama Stadiums (the "Stadiums"). Compl. ¶¶ 1, 139-76. Qatar assigned the Supreme Committee the responsibility for building these Stadiums, as well as "coordinating" other "major infrastructure improvements" in advance of the event. *Id.* ¶¶ 50-51. The Supreme Committee, in turn, engaged contractors to build the Stadiums, and those contractors then hired their own subcontractors for various parts of the work. *Id.* ¶¶ 52, 55(b). Those subcontractors would generally turn to labor recruitment companies to supply workers. *Id.* ¶¶ 42-43. Separately, the Supreme Committee engaged CH2M[2] to be its "Programme Management Consultant" ("PM Consultant"). *Id.* ¶ 22. CH2M provided consulting services to the Supreme Committee regarding the construction of the Stadiums and helped "oversee[] coordination with Qatari government agencies," *id.* ¶¶ 22, 51, but did not build the Stadiums or employ the laborers who worked on the Stadiums.

---

[1] The factual allegations in the Complaint are taken as true for the purposes of this motion, except where they are contradicted by other allegations or by the cited documents. *See Coleman v. Farnsworth*, 90 F. App'x 313, 316 (10th Cir. 2004) (Courts "will not accept" allegations that "are contradicted" by "other allegations."); *Birse v. CenturyLink, Inc.*, 2019 WL 9467530, at *4 (D. Colo. Oct. 23, 2019) (Courts need not accept as true "factual allegations" that are "contradicted" by a document the complaint "references."). The Court may also consider documents Plaintiffs rely on that are "central to the complaint, when no party disputes [their] authenticity." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023). Copies of such documents are attached as exhibits to the accompanying Declaration of Natascha Born. (Defs.' Ex. 1.)

[2] Plaintiffs define "CH2M" to include all three CH2M entities. CH2M was acquired by Jacobs in 2017. Compl. ¶¶ 4, 19.

Rather, the Complaint alleges that the subcontractors engaged by the Stadium contractors "employed each Plaintiff," specifically Al Jaber Engineering, Imar Trading and Contracting Company, Midmac Company, Rabban Readymix, Tokyo Freight, and J.A.K. Construction Builders (the "Employers"). *Id.* ¶¶ 55, 139-76. For example, the Supreme Committee awarded the Tekfen-Al Jaber Engineering Joint Venture a contract "for the turnkey delivery of the engineering and construction work for the Al Thumama Stadium." *Id.* ¶ 55(b) (quotation marks omitted). One of the two companies that comprised the joint venture – Al Jaber Engineering – then hired a number of the Plaintiffs to help construct the Al Thumama Stadium. *Id.* Nowhere does the Complaint allege facts showing that Defendants interacted with any Plaintiff, nor could that be reasonably inferred from CH2M's role as a consultant to the Supreme Committee.

## II.    Plaintiffs' Alleged Mistreatment by Unnamed Venture Participants

The Complaint includes virtually no specific factual allegations supporting Plaintiffs' claims that they were trafficked to Qatar and then coerced to work on the Stadiums. Apart from a series of boilerplate paragraphs that hardly vary from Plaintiff to Plaintiff, the Complaint spends almost no time on *these specific Plaintiffs'* experiences in Qatar. Compl. ¶¶ 139-76. For example, Plaintiffs assert generally that they "were lied to" about the terms and conditions of "the work they would do," that "debt bondage" was imposed on them, and that they were threatened with "legal prosecutions," *id.* ¶¶ 5, 180-82, but there is not a single well-pleaded factual allegation to support those general assertions, *id.* ¶¶ 139-76. Plaintiffs do not explain what they were told and how that differed from the truth, under what circumstances they incurred debt or to whom it was owed, or when or how they were threatened with "legal prosecutions."

Plaintiffs do not even identify the alleged perpetrators who they claim trafficked them

and coerced them to labor by supposedly misrepresenting the terms and conditions of "the work they would do" in Qatar. *Id.* ¶¶ 5, 39. The Complaint also carefully avoids identifying the "venture participants" who allegedly coerced Plaintiffs to work – most often by confiscating their passports – and sometimes withheld pay, mandated excessive overtime work, and provided inadequate living conditions. *Id.* ¶¶ 139-76. Plaintiffs never specify whether these unidentified "venture participants" were Qatari "labor supply companies," the Employers, the Filipino recruiters, some other entity or individual, or a combination of the foregoing. *Id.* ¶¶ 42-43, 139-76. Because the Complaint does not even state *who* allegedly caused the harm complained of, there is absolutely no basis on which to conclude that person or entity is related to any Defendant, or that they were actually part of the supposed "World Cup Construction Venture."

### III.    CH2M's Limited Role as a Consultant to the Supreme Committee

Despite the strategic ambiguity about the scope and composition of the alleged venture, the few specific factual allegations and the documents the Complaint cites make clear that none of the Defendants had any control over whether Plaintiffs were trafficked or coerced to labor in Qatar. Plaintiffs do not allege (nor could they) that CH2M itself built the Stadiums, or hired any of the contractors or subcontractors who did. Nor do they allege that any of the Defendants directed the Employers, the Filipino recruiters, or the other unnamed "venture participants" to engage in the alleged wrongdoing. Plaintiffs also do not allege that the Defendants shared any profits or risks with the Employers or other supposed venture participants, or that Defendants had an incentive to keep the Employers' labor costs low. And Plaintiffs do not identify any action or inaction by any of the Defendants that caused or contributed to their alleged injuries.

Instead, the Complaint resorts to conclusory and unsupported assertions that CH2M was

hired to oversee and control all members in the vast World Cup Construction Venture, including

(paradoxically) its own client, the Supreme Committee, and all of the Supreme Committee's

contractors and subcontractors.  Compl. ¶ 109.  Most of Plaintiffs' allegations consist of

impermissible legal conclusions about CH2M's contractual rights and duties.  For example,

Plaintiffs simply assert, with sweeping generality, that CH2M "had the right to assign tasks to

other venture participants in the World Cup Construction Venture, and [was] able to control the

means and details by which the other Venture participants . . . performed their work in

furtherance of the Venture."  *Id.*  General conclusions about CH2M's "right[s]" or ability to

"control" other venture participants are not well-pleaded factual allegations.  *See Wasatch Equal.

v. Alta Ski Lifts Co.*, 820 F.3d 381, 386 (10th Cir. 2016) ("[We] don't accept the nonmoving

party's legal conclusions as true.").

Where the Complaint attempts to marshal evidence of CH2M's supposed control over

contractors and subcontractors, the examples are either irrelevant or actually contradict

Plaintiffs' contentions.  For example, as support for CH2M's supposed control "of the entire

World Cup Construction Venture," Compl. ¶ 109, the Complaint references: (i) a statement by a

Jacobs employee noting "the significance of CH2M's leadership on human rights," *id.* ¶ 54(a),

and a series of generic references to Defendants' "extensive project and program consultancy

experience" based in part on the 2022 World Cup, *id.* ¶ 54(d), and to Jacobs being a "delivery

partner" to the Supreme Committee, *id.* ¶ 54(f).  The Complaint also misleadingly refers to

Defendants' policies and practices that would have applied had Defendants controlled sourcing,

but that was not their role as consultant to the Supreme Committee.  *Id.* ¶¶ 106-07, 111, 119.  A

CH2M spokesperson drew this precise distinction in one of the emails cited in the Complaint,

stating that where CH2M exercised "control, we take the strongest possible action to protect

migrant labor," but that CH2M "*ha[d] no input into the terms and conditions of employment of

a contractor's labor force on this [Qatar] project*."  Defs.' Ex. 1.1, ESPN Emails, at 2, cited at

Compl. ¶ 110 (emphasis added).  The Complaint omits that key language, misleadingly

suggesting the spokesperson was confirming that CH2M exercised control over migrant labor

with respect to the Stadiums in Qatar.  Compl. ¶ 110.

Perversely, the Complaint points to CH2M's advice to the Supreme Committee on how

"to improve standards for employment, safety, and worker accommodations" to justify holding

Defendants responsible for third parties' alleged mistreatment of workers.  *Id.* ¶ 112; *see also*

Defs.' Ex. 1.2, ESPN Article, cited at Compl. ¶¶ 110-11, 115.  But providing advice on how to

improve labor standards obviously does not support Plaintiffs' contention that CH2M "had direct

control over the terms and conditions of workers' employment," Compl. ¶ 121, much less that it

had any control over *Plaintiffs'* employment conditions.  Similarly, the Complaint cynically

quotes a statement by CH2M's Assurance Director in April 2013 – before construction on the

Stadiums even began[3] – that "his team has estimated that at least 14 people will die while

building Qatar's World Cup stadiums," accusing CH2M of "blithe[]" indifference to worker

safety.  *Id.* ¶¶ 4, 132 (quoting Defs.' Ex. 1.3, Amnesty International Report, at 89, cited at

Compl. ¶¶ 64(b), 132).  But Plaintiffs omit the passage from that same report in which the

Secretary-General of the Supreme Committee explained that CH2M had projected "the

*unmitigated potential* for accidents and deaths on a project of this magnitude" based on standard

---

[3] *See* Defs.' Ex. 1.3, Nov. 18, 2013 Amnesty International Report, at 87, cited at Compl.
¶¶ 64(b), 132 ("according to media reports, construction of the first stadium *could* begin in late
2013") (emphasis added).

industry metrics, and that the Supreme Committee "ha[d] ***committed itself*** to take the steps

necessary to ensure that the historical trend is not allowed to prevail." Defs.' Ex. 1.3, at 89

(emphases added). In what Human Rights Watch described as a "creditable effort[]" Defs.' Ex.

1.4, HRW Dispatches, cited at Compl. ¶ 97, the Supreme Committee promulgated its "detailed"

rules in 2014 "to ensure the basic rights of foreign migrant workers involved in select projects

related to the construction of stadiums and associated infrastructure," Compl. ¶ 97 (quoting

Defs.' Ex. 1.4).

The Complaint also conflates CH2M's role in ***monitoring*** the performance of the

Supreme Committee's contractors and subcontractors with ***control*** over the contractors and

subcontractors. For example, with respect to one of the Supreme Committee's contractors (the

Tefken-Al Jaber Engineering Joint Venture), CH2M allegedly "monitor[ed]" compliance with

the "health and safety Plan," "measured[] and recorded" "policy, objectives, targets and

standards," and "advise[d] the supply chain on corrective actions." Compl. ¶ 55 (emphasis

omitted). Even taken at face value, monitoring, measuring and recording policy standards, and

advising are far different than "direct control" over the Plaintiffs' employers or any other third

parties. *Cf. id.* ¶ 121. Plaintiffs' conclusory allegations that Defendants had "the ability to

prevent" their unnamed "venture partners from exploiting forced or trafficked labor," *id.* ¶ 109,

thus not only lack any basis, but are contradicted by documents referenced in the Complaint.

## IV.    Plaintiffs' Other Allegations Regarding Qatar

Plaintiffs attempt to distract from their Complaint's many deficiencies with criticism of

the Qatari government; the experiences of migrant laborers from other countries, working on

other projects, who are not before this Court; and even terrorist groups who have no conceivable

bearing on this case.  For example, the Complaint relies heavily on allegations about workers who are "like Plaintiffs," but are not actually Plaintiffs in this litigation, *see, e.g.*, Compl. ¶¶ 4, 59, 68, 72, 78-79, 82, 84, 87, 91, 96-97, and features video stills of ***other*** migrant workers, *id.* ¶ 70.  Most of Plaintiffs' allegations have nothing to do with the construction of the Stadiums, these specific Plaintiffs, or the Defendants, focusing instead on the Qatari construction industry and Qatar's *kafala* labor law generally.[4]  Plaintiffs' desperate effort to link Defendants to terrorist groups "like HAMAS, Hezbollah, al-Qaeda, and ISIS" on the basis that Defendants should have known that the Qatar Foundation – a separate government entity – was a "reputation washing front designed to enable trafficking" for the "World Cup Construction Venture" is totally unsupported, offensive, and simply absurd.  *Id.* ¶¶ 90-104.

## NAMED DEFENDANTS

Plaintiffs name as Defendants CH2M B.V., CH2M HILL Companies, Ltd., CH2M HILL International, Ltd., Jacobs Engineering Group Inc. ("Jacobs Engineering") and Jacobs Solutions Inc. ("Jacobs Solutions").  Of these five companies, only CH2M HILL Companies, Ltd., and CH2M HILL International, Ltd., are headquartered in Colorado.  Compl. ¶ 12.  CH2M B.V. is incorporated in the Netherlands.  *Id.*  Plaintiffs allege that Jacobs Engineering acquired CH2M in 2017, *id.* ¶ 19, after at least half of the Plaintiffs' work tenures concluded, *id.* ¶¶ 139-40, 142, 146, 150-52, 160-65, 169, 171, 173, 175.  Both Jacobs entities are incorporated in Delaware and

---

[4] Plaintiffs devote 65 of the 137 paragraphs in Sections I-V.D of the Complaint to the alleged inequity of the *kafala* system, labor conditions in Qatar, or preparations for the World Cup generally.  *See* Compl. ¶¶ 1-3, 31-50, 57-70, 87-105.  A number of these paragraphs do not even mention the World Cup.  *Id.* ¶¶ 31-33, 36-44, 46, 63, 98-103.  And most of the articles Plaintiffs cite do not describe the working conditions at the Stadiums or the means by which stadium workers' labor was procured.  *See, e.g., id.* ¶¶ 45, 63, 64(a), 65(a), 65(d)-(e), 66, 67(c), 76, 82, 88-102.  Many of Plaintiffs' sources also pre-date any construction on the Stadiums.  *See, e.g., id.* ¶¶ 45, 63(a), 64(a), 65(a), 65(c), 67(a).

headquartered in Texas, *id.* ¶ 15, and Jacobs Solutions was incorporated on March 4, 2022, Defs.' Ex. 1.5, Entity Details, after the Plaintiffs completed their work, Compl. ¶¶ 139-76.[5]

## <u>ARGUMENT</u>

Plaintiffs' inability to link Defendants' conduct to their alleged injuries through plausible factual allegations requires dismissal of all of their claims because Article III does not permit litigants to seek redress from defendants who did not cause their injuries. The TVPRA claims are also foreclosed because the statute does not provide a private cause of action for foreign plaintiffs injured in a foreign country, the threadbare allegations fail to show that any individual Plaintiff was trafficked or forced to labor, and Defendants did not form a "venture" with the unidentified third parties who allegedly harmed Plaintiffs, much less participate in it. To hold otherwise would effectively impose strict liability on the hundreds or thousands of individuals and companies that worked or even advised on Qatari infrastructure projects for alleged forced labor offenses committed by unrelated companies that happened to work on World Cup projects roughly contemporaneously.

## I.    PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs lack standing to pursue their claims under Article III because they cannot allege that any of the Defendants – rather than unnamed "venture participants" who are not before the Court – caused their alleged injuries.

To meet the "the irreducible constitutional minimum of standing," there must be "a causal connection between the injury and the conduct complained of – the injury has to be fairly

---

[5] Although Plaintiffs omit this fact from their Complaint, the Court may take judicial notice of the date of incorporation and the Delaware Department of State website. *Oliver v. Meow Wolf, Inc.*, 2020 WL 6939875, at *5 (D.N.M. Nov. 25, 2020) (citing *Tal v. Hogan*, 453 F.3d 1244, 1264-65 n.24 (10th Cir. 2006), and Fed. R. Evid. 201(b)(2)).

. . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).  Article III requires "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury," and that burden "is not satisfied when '[s]peculative inferences are necessary to connect [the] injury to the challenged actions.'"  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156-57 (10th Cir. 2005) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)); *see also Allen v. Wright*, 468 U.S. 737, 759 (1984) (plaintiffs lacked standing where the "links in the chain of causation" involved "numerous third parties" and their "independent decisions").

The fact that, in this case, one or more third parties were "the direct cause of [the] plaintiff[s'] harm" makes it "substantially more difficult" to show that, "in fact, the asserted injury was the consequence of the defendants' actions."  *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).  To make this more demanding showing, Plaintiffs must plausibly allege Defendants effectively controlled the third parties who harmed Plaintiffs, such that, "by determinative or coercive effect upon the action of someone else," the Defendants caused the injury.  *Bennett v. Spear*, 520 U.S. 154, 169 (1997).  Courts will generally not "endorse standing theories that rest on speculation about the decisions of independent actors."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Plaintiffs fall far short of these requirements because, other than conclusory allegations that "Defendants trafficked Plaintiffs and forced Plaintiffs to work," *e.g.*, Compl. ¶ 6, the Complaint contains no well-pleaded allegations that Defendants ***directly*** caused Plaintiffs'

injuries.  For example, Plaintiffs do not (and cannot) allege that Defendants recruited or

employed Plaintiffs, or even had any direct interaction with them.  To the contrary, they attribute

the wrongful conduct to other "venture participants," presumably a combination of the

Employers, Filipino recruiters, and labor supply companies, or to the mere existence of Qatar's

*kafala* system, *see* Compl. pp. 83-90, foreclosing standing to assert claims against Defendants.[6]

Plaintiffs' allegations are insufficient to establish even ***indirect*** causation under

Article III.  For example, Plaintiffs do not allege that their injuries at the hands of these unnamed

venture participants were "produced by" the Defendants' "determinative or coercive effect upon"

the perpetrators.  *Bennett*, 520 U.S. at 169.  The Complaint likewise contains no well-pleaded

allegations that Defendants directed or instructed the "venture participants" to engage in the

alleged misconduct, or that CH2M exercised control over the Employers or other participants in

its capacity as consultant to the Supreme Committee.  *Supra* pp. 4-10; *see also* Compl. pp. 83-90.

Consequently, Plaintiffs have not met their burden of establishing standing under Article III.  *See*

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[A]t the pleading stage, the plaintiff must

clearly . . . allege facts demonstrating each element of standing." (quotation marks omitted)).

Other courts have dismissed TVPRA claims for lack of standing, even when supported

with more specific allegations of harm.  *See Doe I v. Apple Inc.*, 2021 WL 5774224, at *7

(D.D.C. Nov. 2, 2021) (dismissing TVPRA claim where plaintiffs' injuries mining cobalt were

not fairly traceable to the buyers of processed cobalt, as the alleged forced labor "involve[d] the

---

[6] *See Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) ("Because any harm to the plaintiffs
results from the actions of third parties not before this court, the plaintiffs are unable to
demonstrate traceability."); *Pritkin v. Dep't of Energy*, 254 F.3d 791, 798 (9th Cir. 2001) (no
standing where the "injury is manifestly the product of the independent action of a third party")
(cleaned up); *Duquesne Light Co. v. EPA*, 166 F.3d 609, 613 (3d Cir. 1999) (same).

actions of several independent third parties in the causal chain between Plaintiffs and Defendants"); *Coubaly v. Cargill,* Inc., 610 F. Supp. 3d 173, 182 (D.D.C. 2022) (dismissing TVPRA claim and concluding that traceability was lacking where plaintiffs alleged "that non-parties trafficked them" and "subjected them to forced labor on cocoa farms that were owned by non-parties"); *Williams v. Sisolak,* 2022 WL 2819842, at *4 (D. Nev. July 18, 2022) (dismissing TVPRA claim alleging that Nevada facilitated sex-trafficking in other states by legalizing sex trafficking where the "independent decisions" of numerous third parties significantly impacted plaintiffs' injuries). Unlike in those prior cases, Plaintiffs have not even clearly identified which non-parties allegedly harmed them, making it impossible to conclude that Defendants influenced or interacted with them at all.

Nor can Plaintiffs rely on their assertions that Defendants participated in a venture and that other – often anonymous – participants in that venture harmed Plaintiffs. *See, e.g.*, Compl. ¶ 4. Even if Plaintiffs could establish venture liability under the TVPRA, which they cannot, as discussed in Section II.B.2 *infra*, "the TVPRA's venture theory of liability cannot relieve plaintiffs of Article III's constitutional causation requirement." *Coubaly*, 610 F. Supp. 3d at 180; *cf. TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2205 (2021) ("[A] statutory prohibition . . . does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III."). Plaintiffs must demonstrate standing separately "as to *each defendant*, not collectively." *Bella Health & Wellness v. Weiser*, -- F. Supp. 3d --, 2023 WL 6996860, at *9 (D. Colo. Oct. 21, 2023). Accordingly, it is not enough to claim that Defendants were part of a group that included companies or individuals who harmed Plaintiffs. "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Article III

requires ***these*** Plaintiffs to plead facts demonstrating that ***these*** Defendants caused their alleged injuries. This Complaint fails to satisfy that constitutional minimum and should be dismissed in its entirety.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE TVPRA

Even if Plaintiffs could establish standing, their TVPRA claims would still fail because (1) the TVPRA does not apply extraterritorially to Plaintiffs' injuries in Qatar, and (2) the TVPRA does not impose liability when the Complaint fails to plead facts connecting the Defendants and the unnamed perpetrators or the Plaintiffs.

### A.    Plaintiffs Seek an Impermissibly Extraterritorial Application of the TVPRA

Plaintiffs' federal claims are barred by the presumption against extraterritoriality, which instructs that, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016). In applying that presumption, the Supreme Court has adopted a two-step framework that asks (1) "whether the presumption against extraterritoriality has been rebutted" and, if not, (2) "whether the case involves a domestic application of the statute." *Id.* at 337. Applying the Court's two-step analysis, Plaintiffs' claims are impermissibly extraterritorial and must be dismissed.

### 1.    The TVPRA's Private Right of Action Does Not Apply Extraterritorially

The Complaint must be dismissed because the TVPRA does not contain "a clear, affirmative indication" that Section 1595's private right of action in particular "applies extraterritorially." *RJR Nabisco*, 579 U.S. at 337.

Here, the private right of action in Section 1595 contains **no indication at all** – much less a clear, affirmative one – that it applies extraterritorially.  On its face, Section 1595 says absolutely nothing about extraterritorial application.  The statute simply provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).  It is thus missing the type of "explicit foreign-oriented language" courts have previously found necessary to rebut the presumption.  *RJR Nabisco*, 579 U.S. at 353 n.12; *Apple*, 2021 WL 5774224, at *14 (holding that Section 1595 "does nothing to rebut the presumption that it applies only domestically").  Section 1595 is functionally identical to the private right of action in the Racketeer Influenced and Corrupt Organizations Act ("RICO") that the Supreme Court held "does not indicate extraterritorial application."[7]  *RJR Nabisco*, 579 U.S. at 350.  It contains no "clear, affirmative indication" that it applies extraterritorially.  Hence it is presumed **not** to apply extraterritorially.

The fact that certain of the TVPRA's **substantive** provisions by their terms apply extraterritorially – just like RICO's predicate offenses do – does not indicate that the **private right of action** applies abroad as well.  *See, e.g.*, 18 U.S.C. § 1585 (criminalizing "on any foreign shore seiz[ing] any person with intent to make that person a slave").  As the Supreme Court

---

[7] *Compare* 18 U.S.C. § 1595(a) ("An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.") *with id.* § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.").

explained in *RJR Nabisco*, the "presumption against extraterritoriality must be applied separately to substantive prohibitions and [their] private right of action," and must be overcome as to both. 579 U.S. at 350. These separate inquiries are necessary because "creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Id.* at 346 (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 727 (2004)). A private right of action thus "creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *Id.* at 346-47. Those concerns are front and center in this case, which accuses the Qatari government of paying lip service to worker welfare, while simultaneously facilitating and profiting from forced labor.

Plaintiffs' reliance on Section 1596 to support extraterritoriality is misplaced in two respects.[8] Compl. ¶ 7. *First*, Section 1596 addresses subject matter jurisdiction, not the geographic reach of the substantive prohibitions. It grants "***the courts of the United States*** . . . extra-territorial jurisdiction" over any "offense . . . under section 1581, 1583, 1584, 1589, 1590, or 1591" subject to certain conditions. 18 U.S.C. § 1596(a) (emphasis added). Jurisdictional provisions like Section 1596 concern "a tribunal's power to hear a case," which is separate from the "merits question" of "what conduct" a statute "reaches." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) (quotation marks omitted). By contrast, when Congress sought to expand the extraterritorial scope of the TVPA's criminal offenses for U.S. government

---

[8] Under Plaintiffs' presumed reading, Section 1596, which applies only to a U.S. national or a person "present in" the United States, does not extend to Defendant CH2M B.V. *See* Defs.' Ex. 4, Decl. of Sally Miles ¶¶ 3-10.

employees, it did so expressly, and without reference to the jurisdiction of the U.S. courts.  *See*
18 U.S.C. § 3271(a) (imposing liability on government employees for certain offenses
committed "outside the United States").

*Second*, Section 1596 applies only to certain extraterritorial ***criminal*** offenses under the
TVPRA.  That does not give extraterritorial effect to the private right of action.  Section 1596 by
its terms applies only to "any offense" "under section 1581, 1583, 1584, 1589, 1590, or 1591" –
and conspicuously omits the civil remedy in Section 1595.[9]  Furthermore, the word "offense" is a
term of art that, in Title 18 of the U.S. Code, refers exclusively to violations of criminal law and
thus cannot be read to implicitly extend to the civil remedy too.  *See KBR, Inc. v. United States
ex rel. Carter*, 575 U.S. 650, 659 (2015) ("[W]hile the term 'offense' is sometimes used [to refer
to civil violations], that is not how the word is used in Title 18."); *United States v. Collins*, 859
F.3d 1207, 1213-14 (10th Cir. 2017) ("The term 'offense' traditionally refers to crimes.").  The
rest of Section 1596, which refers to "offender[s]" and limits certain "prosecution[s]" of
"offense[s]," reinforces that it is "focused on criminal, not civil, applications."  *Apple*, 2021 WL
5774224, at *15.  Hence by its plain terms Section 1596 applies only to extraterritorial criminal
activity that the Department of Justice, in the exercise of its discretion, determines is worthy of
prosecution.

The legislative history of Section 1596 likewise confirms that it is limited to criminal
prosecutions and does not apply to the private right of action under Section 1595.  Both Senator

---

[9] Congress appears to have selected the provisions listed in Section 1596 carefully.  In addition
to the civil remedy in Section 1595, Congress also excluded, for example, provisions that already
specified their extraterritorial reach, §§ 1582, 1585, 1586, 1587, 1588, a provision criminalizing
the confiscation of passports in the course of or with intent to violate other TVPRA offenses,
§ 1592, and a provision imposing criminal venture liability for all TVPRA offenses, § 1593A.

Durbin, who introduced the legislation, and Senator Leahy, chairman of the Judiciary

Committee, explained that the provision was intended to permit the ***prosecution*** of certain crimes

that had been committed abroad. *See, e.g.*, 154 Cong. Rec. S10388-03, at 10389, 2008 WL

4425748 (Oct. 1, 2008) (statement of Sen. Leahy) ("This legislation would permit the

Department of Justice to prosecute offenders of trafficking crimes abroad if they are present in

the United States and punish human traffickers who attempt to seek refuge in this country."); 154

Cong. Rec. S10936-01, at 10937, 2008 WL 5191148 (Dec. 11, 2008) (statement of Sen. Durbin)

("[T]he TVPRA . . . will allow Federal prosecutors to investigate and prosecute traffickers found

in the United States even if their trafficking crimes were committed abroad.").

Moreover, the fact that the TVPRA contains certain criminal provisions that expressly

apply extraterritorially confirms that Section 1595 cannot be read to have extraterritorial

application. *See, e.g.*, 18 U.S.C. § 3271(a) (criminalizing trafficking "outside the United States"

committed by persons "employed by or accompanying the Federal Government"); *id.* § 1585,

1586 (criminalizing voluntarily serving "on board of any vessel employed or made use of in the

transportation of slaves from any foreign country or place to another" as a citizen or resident of

the United States). "[W]hen a statute provides for some extraterritorial application, the

presumption against extraterritoriality operates to limit that provision to its terms." *Morrison*,

561 U.S. at 265. Here, there are good reasons for Congress not to empower foreign plaintiffs to

sue U.S. companies for injuries arising from employment in foreign countries, and nothing in

Section 1595 indicates Congress created such a right. *See Jesner v. Arab Bank, PLC*, 138 S. Ct.

1386, 1406 (2018) (plurality op.) (recognizing the risk of discouraging U.S. companies from

investing "in developing economies where the host government might have a history of alleged

19

human-rights violations," deterring the "corporate investment that contributes to the economic development that so often is an essential foundation for human rights").

Although the Fourth Circuit concluded that Section 1595 does apply extraterritorially in *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019), its reasoning directly contradicts the holding of *RJR Nabisco*.[10]  The court in *Roe* found determinative that Section 1595 "incorporates a set of predicate offenses" that apply extraterritorially, 917 F.3d at 242, ignoring the Supreme Court's instruction that the "presumption against extraterritoriality must be applied separately to [a statute's] substantive prohibitions and its private right of action," and that it is "not enough to say that a private right of action must reach abroad because the underlying law" does.  *RJR Nabisco*, 579 U.S. at 350.  The Supreme Court in *RJR Nabisco* squarely held that a private remedy must be assessed independently for clear indicia of extraterritorial application.  *Id.* at 338-50.  As with RICO, because Congress did not affirmatively provide for the TVPRA's private right of action to have extraterritorial reach, it applies only domestically.  *Roe* is not binding on this Court, and the Court should reject its reasoning.

### 2.    Plaintiffs Do Not Seek a Domestic Application of Section 1595

Nor do Plaintiffs seek a permissible, domestic application of the statute with their assertion of claims focused entirely on Qatar.  *See RJR Nabisco*, 579 U.S. at 337.  The Complaint is crystal clear that this is an extraterritorial case:  Both the alleged trafficking and the alleged injuries occurred entirely outside the United States.  Plaintiffs indisputably rely entirely on the harm they allegedly suffered in Qatar.  Compl. ¶¶ 139-76.  Equally indisputably, all of the

---

[10] Some appellate courts have assumed but not decided that Section 1596 applies to Section 1595.  *See Adhikari v. KBR Inc.*, 845 F.3d 184, 200 (5th Cir. 2017); *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1168 (9th Cir.), *cert. denied*, 143 S. Ct. 491 (2022).

conduct that allegedly violated the TVPRA occurred outside the United States:  Plaintiffs assert

that they were recruited in the Philippines and worked in Qatar.  *Id.* ¶¶ 177-89; *see Apple*, 2021

WL 5774224, at *16 (holding that "the focus of the TVPRA will naturally fall where the

violation occurred").  Because there are zero allegations of any relevant domestic conduct,

Plaintiffs' claim is plainly extraterritorial.  *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600

U.S. 412, 419 (2023) ("Of course, if all the conduct regarding the violations took place outside

the United States, then courts do not need to determine the statute's focus at all." (cleaned up)).

The mere fact that certain Defendants are located in the United States does not make

Plaintiffs' claim domestic for purposes of the presumption against extraterritoriality.  *See Kiobel*

*v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 125 (2013) ("it would reach too far to say that mere

corporate presence suffices" to make a claim domestic).  Nor do Plaintiffs' conclusory assertions

that Defendants "knowingly benefitted here" and "on information and belief made decisions and

took actions in this District that facilitated" Plaintiffs' injuries suffice.  Compl. ¶ 12; *see Nestlé*

*USA Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021) ("general corporate activity – like decisionmaking

– cannot alone establish domestic application").  This claim, concerning alleged events and

injuries in Qatar, plainly calls for the extraterritorial application of Section 1595, and therefore

must be dismissed.

### B.    Plaintiffs Fail to Plead the Elements of a TVPRA Claim

In order to state a claim under Section 1595, Plaintiffs must plausibly allege facts

demonstrating that each Defendant "knowingly benefit[ted]" "financially or by receiving

anything of value from participation in a venture which [they] knew or should have known has

engaged in an act in violation of" a TVPRA predicate offense.  18 U.S.C. § 1595(a); *see Bistline*

*v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). Plaintiffs' TVPRA claim fails because they

cannot plausibly allege (1) that their labor was coerced or that they were trafficked in violation of

Sections 1589 and 1590, (2) that Defendants participated in a venture that committed those

violations, (3) that Defendants either knew or should have known about the forced or trafficked

labor, and (4) that Defendants knowingly benefitted from participating in the venture. Plaintiffs'

suggestion that discovery would surely reveal the missing information, Compl. ¶¶ 130-31, 136,

gets it backwards. A "plaintiff does not get discovery until he alleges a plausible claim." *Behav.*

*Analyst Certification Bd., Inc. v. Solis*, 2022 WL 17736781, at *3 (D. Colo. Dec. 16, 2022).

### 1.     Plaintiffs Do Not Plead a Violation of Sections 1589 and 1590

The Complaint's cursory factual allegations regarding each Plaintiff's treatment are not

sufficient to establish that they were trafficked or coerced. *See Macias v. Monterrey Concrete*

*LLC*, 2020 WL 5638710, at 10 (E.D. Va. Sept. 21, 2020) (Complaint must allege "each Plaintiff

was subjected to a level of coercion that is redressable under the TVPA."). Critically, Plaintiffs

do not even allege which individual or entity took the alleged actions directed towards each

Plaintiff. Compl. ¶¶ 139-76. They plead most of those allegations in the passive voice to avoid

specifying who participated, and the vast majority of the remaining allegations refer only to

unidentified "venture participants." *Id.* Plaintiffs cannot plead violations of Sections 1589 and

1590 without identifying which individuals or entities violated the statute. *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 565 n.8 (2007) (A pleading that "mentioned no specific time, place, or

person" failed to "give[] the notice required by Rule 8."); *Roman v. Tyco Simplex Grinnell*, 2017

WL 2427251, at *5 (M.D. Fla. June 5, 2017) (dismissing Section 1589 claim where plaintiff

failed to allege "who threatened him, how he was threatened, and for what purpose").

Even if Plaintiffs had identified the alleged perpetrators, the TVPRA claims would still fail.  As relevant here, Section 1589(a)(3) and (4) prohibit knowingly providing or obtaining labor by means of "abuse or threatened abuse of law or legal process," or "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint," and Section 1590(a) imposes liability on "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services" in violation of Section 1589.  Plaintiffs cannot plausibly allege a claim under any of these three provisions.

*First*, Plaintiffs do not plausibly allege that any "venture participants" abused or threatened to abuse any law or legal process in violation of Section 1589(a)(3).  Compl. ¶ 179.  Plaintiffs' general assertions of wrongdoing do not involve the "use of a law or legal process . . . in any manner or for any purpose for which the law was not designed."  18 U.S.C. § 1589(c)(1).  Although Plaintiffs assert that the "ventures" "threaten[ed] legal prosecutions," the Complaint simply tracks the statute without reference to a single factual allegation supporting that assertion, such as who was threatened, with what charge, and under what circumstances.  Compl. ¶ 179.  And while Plaintiffs allege that "[v]enture participants" "confiscated" their passports, they do not allege facts supporting a claim that those perpetrators withheld Plaintiffs' passports as an "implicit threat of arrest."  *Muchira v. Al-Rawaf*, 850 F.3d 605, 623 (4th Cir. 2017).

*Second*, Plaintiffs do not plausibly allege that the Employers coerced Plaintiffs' labor "by means of a scheme, plan, or pattern of acts intended to cause Plaintiffs to believe that if they did not work they would be subjected to serious harm" in violation of Section 1589(a)(4).  Compl. ¶ 180.  Although the Complaint claims that unspecified "construction ventures" "impos[ed] debt

bondage by requiring Plaintiffs to pay for their own 'recruitment fee' or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, den[ied] Plaintiffs permission to return home unless they paid sums they could not afford, and/or threaten[ed] legal prosecutions," *id.*, they do not include *any* factual allegations to support those general assertions with respect to the vast majority of the 38 Plaintiffs, *id.* ¶¶ 139-76; s*ee Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) ("to state a claim in federal court, a complaint must explain what each defendant did to [each plaintiff, and] when the defendant did it"). Where Plaintiffs do include such allegations, they are general and conclusory, and do not identify the entity that supposedly made the statements. Compl. ¶¶ 152, 158, 161, 174.

Plaintiffs generically allege that "[v]enture participants" "confiscated" each Plaintiff's passport, but the Complaint is devoid of the type of factual allegations that would permit the Court to infer that the perpetrators thereby threatened a harm "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2); *see also Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir. 2018) (Plaintiffs must allege "that an unlawful means of coercion caused them to render labor."); *Macias*, 2020 WL 5638710, at *8-10 (plaintiffs did not state a claim merely by alleging that defendants retained their passports). Indeed, the statutory structure makes clear that passport confiscation alone does not violate Section 1589: Congress separately criminalized taking a passport with *intent* to violate Section 1589 and imposed a lesser penalty. 18 U.S.C. § 1592(a)(2). That provision would be superfluous if confiscating a passport violated Section 1589. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (Courts

are "hesitant" to interpret a statutory provision in a way that "renders superfluous another portion" of the law.).  Nor do Plaintiffs allege that the perpetrators had the requisite scienter and intended Plaintiffs to believe they "would suffer serious harm."  *Muchira*, 850 F.3d at 618.

*Third*, Plaintiffs' trafficking claim under Section 1590 is based entirely on their forced labor claim under Section 1589 and fails for the same reasons.  *See* Compl. ¶¶ 177-89.

### 2.      Plaintiffs Do Not Plead "Participation in a Venture"

Plaintiffs notably never allege that whatever mistreatment they encountered occurred at the hands of Defendants; they could not truthfully make any such allegation.  Instead, they depend entirely on their conclusory allegations that the Defendants were participants in a venture with the largely unidentified wrongdoers.  But the Complaint also fails to establish that any of the Defendants are "equally liable" by virtue of their "participation in a 'venture' with the primary offender[s]," precluding liability under the TVPRA.  *Bistline*, 918 F.3d at 871, 874.

Most obviously, Plaintiffs fail to allege who the "primary offender" is.  Instead, they simply assert that "venture participants" committed the predicate violations, which may mean the Employers, the Qatari government, unidentified labor recruiting companies, or practically anyone else linked to preparations for the 2022 World Cup.  Compl. ¶¶ 28, 139-76.  Whether any of those entities really were "venture participants" is a legal conclusion that is not taken as true, and the Complaint provides zero facts that would make the assertions plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action . . . do not suffice."); *Apple*, 2021 WL 5774224, at *11 ("whether Defendants are in a venture is a legal conclusion that the Court need not accept as true").  Because Plaintiffs have not even identified the supposed perpetrators, there are no factual allegations establishing that they formed a

venture, let alone that the Defendants, who are not themselves alleged to have acted as primary
wrongdoers, participated in that venture.

### a.    Plaintiffs Have Not Alleged a Venture

Plaintiffs' ill-defined "World Cup Construction Venture" or "Venture" falls far short of
showing an association in fact and a sharing of risks and benefits between any of the Defendants
and the Employers (much less the unnamed labor supply companies or recruiters) that would, at
a minimum, be required to establish a "venture" for purposes of Section 1595.

The Tenth Circuit defines "venture" for purposes of Section 1589(b) – and thus,
presumably, Section 1595(a) – to mean "any group of two or more individuals associated in fact,
whether or not a legal entity." *Bistline*, 918 F.3d at 873.  In *Bistline*, the court outlined the type
of joint enterprise or undertaking that rises to the level of an association in fact.  In that case,
Warren Jeffs, the leader of the Fundamentalist Church of Jesus Christ of Latter-Day Saints,
forced members of that community to engage in physical labor and sex acts by exercising total
control over their lives and meting out "swift and horrendous punishments."  *Id.* at 871.  The
court held that Jeffs's lawyers had formed a venture with Jeffs where they designed a legal
strategy "*expressly* for the purpose of facilitating [his] crimes and also ensuring that defendants
would personally reap ample benefits therefrom," including because the forced labor was used to
pay their legal fees and at times exchanged directly for legal services.  *Id.* at 873-76.

There is no such association between Defendants and any of the Employers or any
employment or labor supply companies the Employers may have worked with.  Unlike in
*Bistline*, the Complaint contains no allegations that the Defendants designed strategies expressly
to facilitate the perpetrators' alleged crimes, or that they personally benefitted from those crimes.

For example, the Complaint does not allege that any of the Defendants either contracted with the Employers or had any other business relationship with them.  Nor does the Complaint allege that Defendants shared any risks or profits with the Employers in connection with the construction of the Stadiums.  *See Black's Law Dictionary* 1591 (8th ed. 2004) (defining "venture" as "[a]n undertaking that involves risk; esp., a speculative commercial enterprise"); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-27 (11th Cir. 2021) (citing Black's Law Dictionary and holding that plaintiffs had not alleged that hotel franchisors formed a venture with sex traffickers where "they do nothing to show that the franchisors participated in a common undertaking involving risk or profit").  Plaintiffs' allegations that the Supreme Committee hired CH2M as PM Consultant and that, in that role, CH2M "engaged with the entities who directly employed construction laborers," Compl. ¶ 119, do not establish a contractual relationship with the Employers or an association in fact between Defendants and the Employers that could render Defendants "equally liable" for the Employers' TVPRA violations.  *Bistline*, 918 F.3d at 873-74.

Plaintiffs' definition of "venture" is also incoherent and overly broad.  The Complaint vaguely asserts that the "World Cup Construction Venture" or "Venture" comprised "large infrastructure projects, including the construction of nine new stadiums and the upgrade of three existing ones."  Compl. ¶ 22.  The breadth and lack of precision makes those allegations insufficient.  *See L.H. v. Marriott Int'l, Inc.*, 604 F. Supp. 3d 1346, 1360 (S.D. Fla. 2022) (dismissing TVPRA claims that were "long on unsupported and sweeping generalizations but short on actual, particularized facts" showing "any kind of *common* undertaking"); *Apple*, 2021 WL 5774224, at *11 (dismissing TVPRA claims alleging a venture comprising "the entirety of the cobalt industry").  Plaintiffs appear to include in the "Venture" any and all construction

projects in Qatar in advance of the 2022 World Cup, as they cite sources referring to construction projects with no relationship to the Stadiums (or even other infrastructure projects in many cases) as evidence regarding the "Venture." *E.g.*, Compl. ¶¶ 65(b), 68, 93 (citing a *Guardian* article regarding an office building); ¶ 65(g) (citing a Fox News article regarding "the government-planned city of Lusail"); ¶ 70(a) (citing video depicting an office building).

As Plaintiffs tacitly concede, their theory has no logical endpoint. Plaintiffs cannot name the participants in the Venture: they allege only that it "include[s] but [is] not limited to" the Defendants and at least 24 additional entities, including a London-based architecture firm, the Qatari government, and FIFA, *id.* ¶ 28, and they imply but do not allege that it may also include Filipino recruiters and Qatari labor suppliers, *id.* ¶¶ 39, 42-43. On Plaintiffs' interpretation of the statute, liability for their injuries would extend far beyond Defendants to the suppliers of raw materials, the architects and designers, the soccer players, the coaches, the vendors selling food or merchandise at the games, and so on. Indeed, Plaintiffs allege that Defendants "knew or should have known that they were participating in a trafficking venture" largely because they presumably used Google and Wikipedia. *Id.* ¶¶ 72-77. The suppliers, architects and designers, players, coaches, and vendors presumably also had access to Google and Wikipedia, and were presumably compensated for their participation in the 2022 World Cup by FIFA, the Supreme Committee, or other alleged "venture participants." These examples are not far-fetched: Plaintiffs themselves describe an unidentified individual in a *Guardian* video as a "World Cup Construction Venture participant," even though the individual appears to be a Qatari soccer coach. *Id.* ¶ 70(h). Plaintiffs' "Venture" would also encompass any NGOs that the Supreme

28

Committee or any other "Venture" participant engaged to help monitor and improve human rights. That cannot be right.

The alleged "Venture" here bears no resemblance to the kinds of relationships that courts have previously found rise to the level of an association in fact. *E.g.*, *Bistline*, 918 F.3d at 873-76 (lawyers formed a venture with Jeffs where they designed a legal strategy specifically to facilitate his crimes and directly benefitted from them); *Ricchio v. McLean*, 853 F.3d 553, 555-57 (1st Cir. 2017) (hotel operator formed a venture with sex trafficker where he "enthusiastically" confirmed his intent to reinstate their sex trafficking business by high-fiving the trafficker); *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1134, 1138 (D. Colo. 2019) (U.S. Olympic Committee and USA Taekwondo, Inc. formed a venture with an athlete where, as per the description in *Gilbert v. U.S. Olympic Comm.*, 2019 WL 1058194, at *15 (D. Colo. Mar. 6, 2019), both sides assumed risk in their joint enterprise because the institutions invested in the athlete, and the athlete took the risk of competing). Each of these cases involved the affirmative creation of a clearly discernable joint enterprise or undertaking – be it commercial or criminal – by one or more individuals or entities. The hundreds and more likely thousands of different individuals and companies that participated in the "World Cup Construction Venture" do not share anything like the same association in fact.

> **b.** **Plaintiffs Have Not Alleged That Defendants "Participated" in Any Venture**

Plaintiffs also have not plausibly alleged that any of the Defendants "participated" in the World Cup Construction Venture under any reasonable definition of that term. To participate requires active and intentional involvement; the Complaint fails to allege any facts suggesting that any of the Defendants engaged at that level with any of the Employers and unnamed entities

who allegedly harmed Plaintiffs.

Although the Tenth Circuit has not directly addressed the meaning of "participation" for purposes of Section 1595, in *Bistline*, it held that Jeffs's lawyers had participated in a venture with him by "constructing a scheme for the purpose of enabling" his criminal conduct.  918 F.3d at 874-76; *see also Ricchio*, 853 F.3d at 555-57 (holding plaintiff had pleaded participation in the venture where the defendant agreed to reinstate a forced labor scheme with a trafficker).  The *Bistline* decision is therefore consistent with the definition of "participation in a venture" found in 18 U.S.C. § 1591(e)(4): "assisting, supporting, or facilitating a violation of" the relevant TVPRA offense.[11]  Plaintiffs have not alleged that Defendants assisted, supported, or facilitated the alleged TVPRA violations, and they thus have not pleaded "participation."  To the contrary, Plaintiffs allege that CH2M consulted on worker welfare standards for the Stadium projects, and then monitored the Supreme Committee's implementation of those standards, Compl. ¶¶ 55, 112-20, 123, 125, all of which would tend to *frustrate* any efforts to use forced labor, *cf. A.D. v. Choice Hotels Int'l, Inc.*, 2023 WL 3004547, at *4 (M.D. Fla. Apr. 19, 2023) (allegations that hotel franchisor did "not fight hard enough to keep these traffickers from using the hotel" or took "ineffective steps to curtail the traffickers" did not establish participation in a venture).

Applying the common meaning of "participation" produces the same result.  The "ordinary meaning" of "participation is to take part in or share with others in common or in an association."  *Red Roof Inns*, 21 F.4th at 725; *see also Oxford English Dictionary* 268 (2d ed.

---

[11]  The Tenth Circuit has referred to other definitions in Section 1591(e) when construing Section 1595, *see Bistline*, 918 F.3d at 873, making it reasonable to construe "participation" in Section 1595 consistently with the Section 1591(e) standard, *see A.D. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 8674205, at *3 (E.D. Va. July 22, 2020) ("[T]he definition of 'participation' in § 1591 is also informative" for Section 1595.).

1989) (defining participation as "taking part, association, or sharing (with others) *in* some action

or matter"). Participation thus requires active engagement in a joint endeavor, and more than

just assistance or aid. *See United States v. Papagno*, 639 F.3d 1093, 1098 (D.C. Cir. 2011)

(Kavanaugh, J.) (holding "assistance" does not amount to "participation," and reasoning that the

"officers who provide security at a Taylor Swift show certainly assist, but no one would say that

they participate"). In line with that definition, the Seventh Circuit holds that where the defendant

"provides assistance, support, or facilitation to the trafficker through" a "continuous business

relationship," evidenced by multiple contracts over a number of years, "a court or jury may infer

that the participant and trafficker have a tacit agreement that is sufficient for participation." *G.G.

v. Salesforce.com, Inc.*, 76 F.4th 544, 560 (7th Cir. 2023) (quotation marks omitted).

Here, Plaintiffs have not alleged any "continuous business relationship" or other basis for

inferring an agreement between Defendants and the Employers. The fact that CH2M served as

the PM Consultant *to the Supreme Committee* does not establish the requisite relationship *with

the Employers*. *Cf. id.* at 560-61 (Salesforce participated in Backpage venture when it

contracted *with Backpage* to provide it with "targeted solutions" and "tailored," "active," and

"ongoing" support). Moreover, Plaintiffs do not plausibly allege that Defendants received any

compensation from the Employers (or whoever was directly responsible for the alleged forced

labor violations), or that CH2M's compensation was increased as a result of the perpetrators'

conduct. *Cf. Bistline*, 918 F.3d at 874-75 (lawyers participated in a venture where their legal fees

were paid for by the venture and the forced labor).

### 3. Plaintiffs Do Not Plead Defendants' Knowledge of TVPRA Violations

Plaintiffs do not plausibly allege that any of the Defendants "knew or should have

known" that the Employers (or unnamed third parties) had "engaged in an act in violation of"

Sections 1589 and 1590 regarding these Plaintiffs. 18 U.S.C. § 1595(a). Allegations that

Defendants were on notice of forced or trafficked labor in the Qatari construction industry

generally, or even at the Stadiums, are not sufficient to establish constructive knowledge of

TVPRA violations as to these particular Plaintiffs. *See*, *e.g.*, *Ratha*, 35 F.4th at 1177 ("Sweeping

generalities about the Thai shrimp industry are too attenuated to support an inference that

[defendant] knew or should have known of the specifically alleged TVPRA violations.");

*Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117, at *8 (D. Colo. Nov. 30, 2021)

(Allegations that "defendant was on notice about the prevalence of sex trafficking generally at its

hotels and in the hotel industry" are "not sufficient to show that defendant should have known

about what happened to plaintiff."); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154

(E.D.N.Y. 2020) (refusing to impose liability "simply because [hotel franchisors] were generally

aware that sex trafficking sometimes occurred on their franchisees' properties").

The Complaint ludicrously relies on the general availability of Google and Wikipedia to

assert that Defendants (apparently in company with every other modern business in the world)

were supposedly on notice of labor conditions in the Qatari construction industry or on the

World Cup construction sites. Compl. ¶¶ 72-77. But the Complaint includes no factual

allegations that Defendants either knew or should have known of the alleged TVPRA violations

by the unnamed "venture participants" ***with respect to the 38 Plaintiffs in this litigation***. For

example, Plaintiffs rely heavily on statements by supposed "venture participants" FIFA and

VINCI, even though the Complaint does not allege that either was an Employer, or had any other

connection to Plaintiffs. *Id.* ¶¶ 133-34.

Although Plaintiffs assert that CH2M was required to visit worksites, *id.* ¶ 119, they do not explain how such visits would reveal that "venture participants" were supposedly violating the TVPRA by "misrepresenting the terms and conditions of [Plaintiffs'] employment in Qatar" or through the other alleged misconduct, *id.* ¶¶ 179-80. Similarly, Plaintiffs' conclusory allegations that CH2M had "access to and thus witnessed the inhumane living conditions the trafficked and forced laborers endured" are contradicted by the very reporting that Plaintiffs cite. *Id.* ¶ 135. The report says that CH2M was involved with the "Better Connections" program that provided workers with internet access and training, but does not indicate that CH2M itself installed the technology or provided training, and instead identifies third parties who did so. Defs.' Ex. 1.6, *Gulf Times* Article, at 3, cited at Compl. ¶ 135. Plaintiffs' only other allegations that CH2M "took on the role of inspecting" Plaintiffs' living quarters are unsupported legal conclusions about CH2M's contractual duties. Compl. ¶¶ 116, 118.

### 4. Plaintiffs Do Not Plead a Knowing Benefit Received by Defendants

Finally, Plaintiffs do not allege that any of the Defendants knowingly benefitted "financially or by receiving anything of value from participation" in a venture with the Employers (or other supposed participants). 18 U.S.C. § 1595(a). Plaintiffs allege that CH2M was engaged by the Supreme Committee. Compl. ¶ 51. Plaintiffs do not allege that Defendants received any compensation from the subcontractors who constructed the Stadiums and interacted directly with Plaintiffs, or that Defendants stood to benefit in any way – either directly or indirectly – from the alleged TVPRA violations. Although Plaintiffs claim that their "forced labor" allowed "Defendants" to complete the Stadiums "more quickly and cheaply" than would have otherwise been possible, they do not explain how CH2M, a consultant that did not itself

construct the Stadiums or engage any contractors or subcontractors for that purpose, would

benefit from cheaper or faster construction.  *Id.* ¶ 137.  As this Court has recognized, "there must

be a close connection between the benefit received, the knowledge of the benefit, and the

improper conduct," *Gilbert v. USA Taekwondo, Inc.*, 2020 WL 2800748, at *6 (D. Colo. May 29,

2020), but here the Complaint is devoid of factual allegations showing any connection at all.

### C.    Plaintiffs Cannot Assert a Claim Under Section 1593

Although Plaintiffs purport to assert a separate claim under Section 1593, Compl. pp. 85-

86, ¶¶ 67-69, they have once again conflated criminal aspects of the TVPRA with the more

limited private right of action.  Section 1593 concerns restitution following a criminal conviction

and does not create an additional cause of action.  *See Gabbidon v. Wilson*, 2023 WL 2520732,

at *1 (S.D.W. Va. Mar. 14, 2023) (Section 1593 does "not provide an individual cause of

action").[12]  Section 1593 mandates a procedure that is possible only after a conviction by

requiring that any restitution order "be issued and enforced in accordance with section 3664."

Section 3664 requires the court, among other things, to "order the probation officer" to include

certain information in the presentence report, and the defendant to list her assets as of her arrest

date.  18 U.S.C. §§ 3664(a), (d)(3); *see United States v. Martinez*, 812 F.3d 1200, 1205 (10th Cir.

2015) (holding Section 3664's procedure is mandatory).  Because Section 1593 can only be

applied following a criminal conviction, Plaintiffs cannot assert a separate cause of action under

that provision.

---

[12] *See also Riggs v. Hull*, 2016 WL 742923, at *2 (W.D. Ky. Feb. 23, 2016) ("Under 18 U.S.C.
§ 1593(a), . . . [r]estitution is not a claim for relief; it is a remedy."); *Owino v. CoreCivic, Inc.*,
2018 WL 2193644, at *13 n.7 (S.D. Cal. May 14, 2018) (Section 1593 "applies '*only* to cases in
which a defendant has been convicted of [a criminal] offense under the [TVPRA].'" (quoting
*United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1164 (9th Cir. 2010))).

III.    **PLAINTIFFS' NON-FEDERAL LAW CLAIMS FAIL**

Plaintiffs' unparticularized claims for negligence, gross negligence, negligent

supervision, and unjust enrichment must also be dismissed.  Plaintiffs do not even identify a

source of law for those claims.  Qatari law applies under well-settled choice of law rules, yet it

does not provide employees with a tort or unjust enrichment cause of action against third parties

like Defendants for employment-related injuries.  Accordingly, Plaintiffs' non-federal claims

must be dismissed for failure to state a claim.  And even if Colorado law applies, the result

would be the same, as Colorado law does not impose liability where Defendants have not caused

or contributed to Plaintiffs' injuries.

A.    **Qatari Law Applies to Plaintiffs' Non-Federal Claims**

Colorado choice of law rules, which apply to non-federal claims in this Court, follow

Section 145 of the Restatement (Second) of Conflict of Laws to assess choice of law for tort

claims.  *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007); *see generally*

*Foreign Trade Corp. v. Otter Prod., LLC*, 2020 WL 13450951, at *3 (D. Colo. Mar. 5, 2020).

Under the Restatement's "most significant relationship" test, it is clear that the jurisdiction with

the most significant relationship to this dispute is Qatar.  The Complaint is rife with allegations

that Plaintiffs were harmed by Qatari labor practices as they worked on stadium projects in Qatar

in order to prepare for an historic event taking place in Qatar that was a high priority of, and

coordinated by, the Qatari government.  Indeed, the word "Qatar" and its derivatives occur no

fewer than 403 times in the Complaint.  The fact that Plaintiffs were allegedly injured in Qatar

"effectively creat[es] a presumption that that jurisdiction provides the appropriate law."  *Elvig v.*

*Nintendo of Am., Inc.*, 696 F. Supp. 2d 1207, 1210 (D. Colo. 2010).  There is plainly no other

jurisdiction with a more significant relationship to the dispute – certainly not Colorado, given

that this is a claim by Filipino nationals relating to labor conditions in Qatar.  Because Qatar has

the only significant relationship with the case, and by far the strongest policy interest in

regulating worker welfare and recruitment practices in Qatar, Qatari law governs Plaintiffs' non-

federal claims.  *See id.* at 1210 n.2.

### B.    Plaintiffs Fail to State a Claim under Qatari Law

Qatari law creates a comprehensive regime governing claims arising in employer-

employee relationships, including claims brought by migrant laborers such as Plaintiffs seeking

redress for harm suffered in the workplace, failure to pay wages, and labor abuse.  *See* Defs.' Ex.

2, Expert Report of Salman Mahmood ("Mahmood Report") at ¶¶ 17, 20, 25-42; *see generally*

Fed. R. Civ. P. 44.1 (permitting consideration of "any relevant material or source, including

testimony" in determining foreign law).  Under Qatari law, employment-related claims must be

brought exclusively against the employer and before the Labour Disputes Committee and are

subject to a one-year statute of limitations, measured from the conclusion of the employment

relationship or issuance of any medical report.  Defs.' Ex. 2, ¶¶ 22-23.  Because the last Plaintiff

stopped working in Qatar in 2021, the one-year limitation period has run with respect to each

Plaintiff's claims, requiring dismissal of the non-federal claims.  *See* Compl. ¶ 149.

Even if Plaintiffs' non-federal claims were not time-barred under the applicable statute of

limitations, they must still be dismissed because they fail to state a claim against Defendants

under Qatari law.  *See, e.g.*, *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir.

2015) (affirming dismissal of Canadian law-governed counterclaim for failure to state a claim).

Because Plaintiffs assert claims based on injuries arising from their employment, their sole cause

of action under Qatari law lies against their Employers and not third parties. Defs.' Ex. 2, ¶ 17.

Although Qatari law also provides a cause of action for general tort liability, as well as for unjust

enrichment, no Qatari court or tribunal has *ever* found liability relating to a worker's

employment where the defendant did not have a direct relationship with the employee. *Id.* ¶¶ 17,

43, 46 ("I am not aware of any decision by the Labour Disputes Settlement Committee or any

other Qatari court or agency that imposes liability on someone other than the employer, an entity

functionally identical to the employer, or some other entity that directly wronged the employee,

for wrongs arising out of an employment relationship like those alleged by Plaintiffs."). The

Complaint does not and cannot allege that Defendants directly harmed the Plaintiffs or that

Defendants were "functionally identical" to employers. Therefore, the Qatari law-governed

claims for negligence, gross negligence, negligent supervision, and unjust enrichment must be

dismissed for failure to state a claim.[13]

### C.    Even if Colorado Law Applies, Plaintiffs Still Fail to State a Claim

### 1.    Plaintiffs' Claims Are Time-Barred Under Colorado Law

Even if Colorado law applied, the outcome is the same. Under Colorado law, Plaintiffs'

claims are time-barred because Colorado subjects tort claims to a two-year statute of limitations.

Colo. Rev. Stat. § 13-80-102(1)(a). A tort action "accrue[s] on the date both the underlying

injury and its cause are known or should have been known" by the plaintiff. Colo. Rev. Stat.

§ 13-80-108(1). Here, Plaintiffs all knew about their alleged injuries before October 12, 2021

---

[13] Even if Plaintiffs could assert viable Qatari law claims, they should still be dismissed under
the doctrine of *forum non conveniens*. *See Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d
1088, 1091 (10th Cir. 2019) ("Generally, *forum non conveniens* is proper when an adequate
alternative forum is available and public- and private-interest factors weigh in favor of
dismissal.").

(two years before they filed the Complaint).  Virtually all of the Plaintiffs affirmatively allege

that they completed their work on the Stadiums well before 2021, Compl. ¶¶ 139-148, 150-76,

and the single remaining Plaintiff claims to have left Qatar at some point in 2021 and does not

allege that he worked past October 12, *id.* ¶ 149.  Presumably, the incidents (if any) underlying

his claim of negligence or unjust enrichment (none of which is pled with specificity as against

any Defendant) would have occurred sometime before the conclusion of his employment.  All

Plaintiffs were on notice of the alleged causes of their injury well before October 2021, too, as

the vast majority of the sources Plaintiffs cite have been public for years.  *E.g., id.* ¶¶ 45, 63-70,

76, 82; *see also id.* ¶ 58 (arguing that "[a]t all relevant times it was widely known . . . that the

World Cup Construction Venture used trafficked and forced labor").  As the Complaint "itself

admits the elements of the affirmative" statute of limitations defense, Plaintiffs' time-barred

claims should be dismissed.  *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir.

2018).

### 2.    Plaintiffs Fail to State a Claim for Negligence or Gross Negligence

Plaintiffs have not plausibly alleged a claim for negligence, let alone gross negligence,

under Colorado law because none of the Defendants owed any duty to these Plaintiffs, who

complain of actions taken by unnamed "venture participants."  Although Plaintiffs claim that

Defendants were negligent by failing to "tak[e] reasonable measures to ensure that Plaintiffs

would not be trafficked" and that "Plaintiffs' labor would not be forced," Colorado law does not

require Defendants to take such affirmative actions with respect to other companies' employees.

Compl. p. 87, ¶ 90.

Under Colorado law, a negligence claim must allege "(1) the existence of a legal duty to

the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the

defendant's breach of duty caused the injury." *Raleigh v. Performance Plumbing & Heating,*

*Inc.*, 130 P.3d 1011, 1015 (Colo. 2006).  Claims based on alleged failure to control or prevent

wrongdoing by third parties, or nonfeasance, like Plaintiffs' claims here, require pleading a

"special relationship" between the parties.  *Roland v. Letgo, Inc.*, 644 F. Supp. 3d 907, 918 (D.

Colo. 2022).  This relationship must be of "such a character that social policy justifies the

imposition of a duty to act," *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d

287, 295 (Colo. 2020), and, to date, Colorado has recognized only six such special relationships,

none of which is or could be alleged in the Complaint, *Roland*, 644 F. Supp. 3d at 918  (these six

are "(1) common carrier/passenger; (2) innkeeper/guest; (3) possessor of land/invited entrant; (4)

employer/employee; (5) parent/child; and (6) hospital/patient.").  In the absence of any such

relationship among the parties, Plaintiffs' negligence claims fail under Colorado law.

The Complaint's failure to state a claim for negligence "also eliminates a claim for gross

negligence." *Id.*  In any event, Plaintiffs do not allege any facts showing "willful and wanton

conduct" or "conscious disregard for the safety of others." *Id.* at 917.  To the contrary, the

Complaint and documents referenced therein describe several of CH2M's efforts to promote

worker welfare and safety.  *Supra* pp. 8-9, 30

### 3.    Plaintiffs Fail to State a Claim for Negligent Supervision

Plaintiffs' negligent supervision claims fail because Colorado law limits the doctrine to

"the context of employment or agency relationships." *Brightspot Sols., LLC v. A+ Prods., Inc.*,

2021 WL 1251512, at *10 (D. Colo. Apr. 5, 2021); *see generally Keller v. Koca*, 111 P.3d 445,

448 (Colo. 2005).  The Complaint does not even say who Defendants supposedly negligently

supervised, referring only to unidentified "entities involved in the World Cup Construction

Venture construction projects." Compl. p. 90, ¶ 107. What is clear is that there is no allegation

that Defendants' negligently supervised their own employees or agents and thus injured

Plaintiffs, as Colorado law requires. This Court has properly refused to extend Colorado's

negligent supervision law beyond the employer/principal context, reasoning that federal courts

"should apply the state common law as it is and leave the crafting of such law to the respective

state courts." *Brightspot,* 2021 WL 1251512, at *10 (declining to extend duty to "possible

bailment relationship"); *see also Western Stock Ctr., Inc. v. Sevit, Inc.*, 578 P.2d 1045, 1049

(Colo. 1978) (declining to extend duty to employer-independent contractor relationship).

### 4. Plaintiffs Fail to State a Claim for Unjust Enrichment

Plaintiffs' unjust enrichment claims would fail under Colorado law for two independent

reasons. *First*, the Complaint contains only conclusory assertions that any Defendant received a

financial benefit at Plaintiffs' expense. *See supra* p. 33-34; Compl. p. 86, ¶ 71; *see generally*

*Menocal v. GEO Group, Inc.*, 635 F. Supp. 3d 1151, 1196 (D. Colo. 2022) (quoting *Lewis v.*

*Lewis*, 189 P.3d 1134, 1141 (Colo. 2008)) (setting forth elements of unjust enrichment). Just as

the Complaint fails to establish any continuous business relationship between Defendants and the

alleged perpetrators, *supra* pp. 25-29, the Complaint never describes how CH2M, as consultant

to the Supreme Committee, would benefit from the Employers' increased productivity or

reduced labor expenses. In the absence of allegations establishing the relationship between

Defendants' supposed gain and Plaintiffs' loss, the claim for unjust enrichment must be

dismissed. Otherwise, Plaintiffs could presumably assert the same claim against anyone

employed in any capacity in connection with the 2022 World Cup.

*Second*, Plaintiffs fail to state a claim for unjust enrichment because the claim overlaps entirely with their other claims for relief.  Courts reject duplicative claims for unjust enrichment that merely seek to add another cause of action to other claims based on the same injury.  *See L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1175 (D. Colo. 2015) ("[U]njust enrichment is an equitable remedy that is not available when a remedy at law lies to address the same conduct.").  Plaintiffs claim (without any factual support) that Defendants were unjustly enriched "through forced and/or trafficked labor under inhumane working and living conditions," which is the gravamen of their other claims, too.  Compl. p. 86, ¶ 71.

### D.    The Court Should Not Exercise Supplemental Jurisdiction

In the event that the Court exercises personal jurisdiction over CH2M B.V. but dismisses Plaintiffs' federal TVPRA claims, the Court should dismiss the case in its entirety for lack of subject matter jurisdiction over any remaining non-federal claims.  The presence of CH2M B.V. would destroy diversity for purposes of Section 1332(a)(2).  *See Air Century SA v. Atlantique Air Assistance*, 447 Fed. Appx. 879, 881 (10th Cir. 2011) (holding "the presence of foreign parties on both sides of the dispute destroys the complete diversity required by [28 U.S.C.] § 1332(a)(2)").  Absent diversity jurisdiction, when "all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining [non-federal] claims."  *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

## IV.    THE COURT LACKS PERSONAL JURISDICTION OVER THE JACOBS ENTITIES AND CH2M B.V.

Only two of the five defendants are subject to personal jurisdiction in Colorado, requiring dismissal of all claims against Jacobs Engineering and Jacobs Solutions – which are both headquartered in Texas – and CH2M B.V., a Dutch company (collectively, the "non-Colorado

Defendants"). The Due Process Clause requires a non-resident defendant to have "'certain minimum contacts' with the forum State to assure 'that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1221 (10th Cir. 2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[14] A court may thus exercise "general jurisdiction over any claims against defendants who are essentially at home there," and specific jurisdiction only where there is "an affiliation between the forum and the underlying controversy." *Id.* (cleaned up). On a motion to dismiss, it is Plaintiffs' burden to make "a *prima facie* showing of personal jurisdiction," and courts take Plaintiffs' allegations as true only insofar as they are "plausible, non-conclusory, and non-speculative," *Dudnikov*, 514 F.3d at 1070, and are "not contradicted by the defendant's affidavits," *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007).

Plaintiffs make no jurisdictional allegations at all against the two Jacobs entities, *see* Compl. ¶¶ 7-14, and therefore fail to establish a *prima facie* showing of either general or specific jurisdiction, and their conclusory assertions regarding CH2M B.V. do not (and could not) support the exercise of jurisdiction over that foreign company.

### A. The Court Lacks General Jurisdiction over the Jacobs Entities and CH2M B.V.

Plaintiffs do not (and cannot) allege that the non-Colorado Defendants are "essentially at home" in Colorado, as is required to exercise general jurisdiction over a defendant. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (requiring that a "corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render it essentially at home in the

---

[14] In this case, the constitutional limits on jurisdiction are determinative because Colorado's long-arm statute "confers the maximum jurisdiction permissible consistent with the Due Process Clause." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (citing *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005)).

forum State" (cleaned up)).  The paradigmatic examples of general jurisdiction are "the place of incorporation and principal place of business."  *Id.* at 137; *see also Hood*, 21 F.4th at 1221.  The Jacobs entities are incorporated in Delaware and headquartered in Texas, Compl. ¶ 15, where they maintain their principal place of business, Defs.' Ex. 3, Decl. of Amy Lanctot ¶¶ 3, 5-6. Having subsidiaries in Colorado does not make them "at home" there.  *See Daimler*, 571 U.S. at 136 (companies are not subject "to general jurisdiction whenever they have an in-state subsidiary").

CH2M B.V. likewise is not at home in Colorado because it is incorporated in the Netherlands, Compl. ¶ 12, and has no employees, operations, place of business, subsidiaries, or real property in the United States, Defs.' Ex. 4, Decl. of Sally Miles ¶¶ 5-9.  Plaintiffs' assertion that CH2M B.V. is subject to general jurisdiction because it "does substantial and continuous business" in Colorado, Compl. ¶ 12, is directly contrary to the Supreme Court's holding in *Daimler* rejecting the long-standing continuous and systematic course of business standard as sufficient to support general jurisdiction.  *See* 571 U.S. at 138 (exercising general jurisdiction in "every State in which a corporation engages in a substantial, continuous, and systematic course of business" is "unacceptably grasping" (quotation marks omitted)).

**B.  The Court Lacks Specific Jurisdiction over the Jacobs Entities and CH2M B.V.**

The Complaint also fails to allege any substantial connection between Plaintiffs' claims and activity directed at or occurring in Colorado, such that the Court lacks specific personal jurisdiction over the non-Colorado Defendants.  *See generally Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 264 (2017) ("In order for a court to exercise specific jurisdiction," there "must be an affiliation between the forum and the

43

underlying controversy, principally, an activity or an occurrence that takes place in the forum

State." (cleaned up)).  As set forth above, the Complaint fails to show any causal connection

between Defendants' conduct and Plaintiffs' alleged injuries, *supra* pp. 11-15, much less that

their alleged injuries arose "out of the defendant's forum-related activities" in Colorado, *Dental*

*Dynamics, LLC v. Jolly Dental Grp.*, 946 F.3d 1223, 1229 (10th Cir. 2020).  And all of the

specific injuries allegedly suffered by Plaintiffs were experienced in Qatar, not in Colorado.

Compl. ¶¶ 139-76.

Plaintiffs' conclusory assertion that all of the Defendants "practiced integrated one-firm

business models," that included the operations of the Colorado-headquartered CH2M entities

does not alter the analysis.  *Id.* ¶¶ 12, 27.  Plaintiffs must establish personal jurisdiction "as to

each defendant."  *Bristol-Myers*, 582 U.S. at 268; *see also Walden v. Fiore*, 571 U.S. 277, 286

(2014) ("a defendant's relationship with" other entities, "standing alone, is an insufficient basis

for jurisdiction").  Each Defendant "has a separate corporate existence" and must be "treated

separately from" each other where Plaintiffs have not alleged any facts "justifying disregard of

the corporate entity."  *Kennedy v. Mountainside Pizza, Inc.*, 2020 WL 4454897, at *6 (D. Colo.

May 14, 2020) (quoting *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004)), *report*

*and recommendation adopted*, 2020 WL 4448771 (D. Colo. Aug. 3, 2020).  Here, the Jacobs

entities did not even become affiliated with the CH2M entities until 2017, well after the alleged

events underlying Plaintiffs' claims had begun.  *See* Compl. ¶¶ 139-76 (alleging that many

Plaintiffs worked in Qatar pre-2017).  In the absence of any factual allegations identifying

actions taken specifically by CH2M B.V. in Colorado that relate to Plaintiffs' claims, and in the

absence of any jurisdictional allegations *at all* relating to the Jacobs entities, the Complaint

should be dismissed as against those defendants.

Although not a necessary consideration absent a *prima facie* jurisdictional showing, exercising personal jurisdiction would not comport with fair play and substantial justice, given that Colorado has no particular interest in resolving claims by foreign Plaintiffs against foreign Defendants regarding conduct that took place abroad.  *See Dental Dynamics*, 946 F.3d at 1229.

### C.     All Claims Against Jacobs Solutions Must Also Be Dismissed on the Merits

Even if the Court concludes that it may exercise personal jurisdiction over Jacobs Solutions, it should dismiss all of Plaintiffs' claims against it on the merits.  Jacobs Solutions was not incorporated until March 4, 2022, Defs.' Ex. 1.5, after the Plaintiffs had completed their work in Qatar, Compl. ¶¶ 139-76.  Accordingly, Jacobs Solutions cannot have played any part in the conduct Plaintiffs attribute to "Jacobs" – defined to include both Jacobs entities, *id.* ¶ 4 – in their Complaint, and Plaintiffs have not stated a claim against Jacobs Solutions.

## <u>CONCLUSION</u>

For all of these reasons, the Court should dismiss the Complaint.

Dated:  New York, New York          DEBEVOISE & PLIMPTON LLP
        January 19, 2024

                                    /s/ *William H. Taft V*

                                    Maura Kathleen Monaghan
                                    Mark W. Friedman
                                    William H. Taft V
                                    Natascha Born
                                    Justin R. Rassi
                                    DEBEVOISE & PLIMPTON LLP
                                    66 Hudson Boulevard
                                    New York, NY 10001
                                    212-909-6000
                                    mkmonaghan@debevoise.com
                                    mwfriedman@debevoise.com
                                    whtaft@debevoise.com
                                    nborn@debevoise.com
                                    jrassi@debevoise.com

                                    Habib Nasrullah
                                    Frederick R. Yarger
                                    WHEELER TRIGG O'DONNELL LLP
                                    370 17th Street
                                    Suite 4500
                                    Denver, CO 80202-5647
                                    303-244-1800
                                    nasrullah@wtotrial.com
                                    yarger@wtotrial.com

                                    *Attorneys for Defendants*