UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| F.C., A.B., D.D.R., L.V., Ra.G., R.S., J.D.C., W.C., G.G., R.C., D.L., E.I., M.G., E.C., Rh.P., L.L., J.J.G., R.V., R.L., A.S., E.A., J.V., A.C., A.G., A.A., R.A., Ro.L., Ro.P., S.N., B.M., G.T., J.B., E.D.C., V.A., Re.D., C.S., Ra.D., M.R., L.P., I.E., M.A., Ro. D., A.D., Ri.D., Rod.O., M.D.L., Ri.O., En.C., Ron.O., G.S., B.D., C.C., and N.C., | Case No. 1:23-cv-02660-MEH |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| JACOBS SOLUTIONS INC., JACOBS ENGINEERING GROUP INC., CH2M HILL COMPANIES, LTD., CH2M HILL INTERNATIONAL, LTD., and CH2M HILL INTERNATIONAL B.V., | |
| Defendants. | |

**<u>DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>**

Habib Nasrullah
Frederick R. Yarger
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202-5647
303-244-1800

Maura Kathleen Monaghan
Mark W. Friedman
William H. Taft V
Natascha Born
Justin R. Rassi
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000

*Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .................................................................................... 4

    I.    Plaintiffs' Alleged Mistreatment by Unspecified Venture Participants ................. 4

    II.    CH2M's Limited Role as a Consultant to the Supreme Committee ...................... 6

NAMED DEFENDANTS ..................................................................................... 10

ARGUMENT ................................................................................................ 10

    I.    PLAINTIFFS LACK ARTICLE III STANDING ................................................ 10

    II.    PLAINTIFFS' AC STILL FAILS TO STATE A CLAIM UNDER THE TVPRA ................................................................................................ 14

        A.    Plaintiffs Seek an Impermissibly Extraterritorial Application of the TVPRA ...................................................................................... 14

            1.    The TVPRA's Private Right of Action Does Not Apply Extraterritorially................................................................ 15

            2.    Plaintiffs Do Not Seek a Domestic Application of Section 1595.............................................................................. 19

        B.    Plaintiffs Still Fail to Plead the Elements of a TVPRA Claim ................. 21

            1.    Plaintiffs Do Not Plead a Violation of Sections 1589 or 1590.............................................................................. 22

            2.    Plaintiffs Do Not Plead "Participation in a Venture" .................. 24

                a.    Plaintiffs Have Not Alleged a Venture ............................ 25

                b.    Plaintiffs Have Not Alleged That Defendants "Participated" in Any Venture.................................................... 29

            3.    Plaintiffs Do Not Plead Defendants' Knowledge of TVPRA Violations.................................................................... 31

            4.    Plaintiffs Do Not Plead a Knowing Benefit Received by Defendants.................................................................... 33

        C.    Plaintiffs Cannot Assert a Claim Under Section 1593.............................. 33

    III.    PLAINTIFFS' NON-FEDERAL LAW CLAIMS FAIL....................................... 34

A.     Qatari Law Applies to Plaintiffs' Non-Federal Claims ............................ 34

B.     Plaintiffs Fail to State a Claim under Qatari Law ...................................... 35

C.     Even If Colorado Law Applies, Plaintiffs Still Fail to State a Claim ....... 36

      1.     Plaintiffs' Claims Are Time-Barred Under Colorado Law ........... 36

      2.     Plaintiffs Fail to State a Claim for Negligence or Gross Negligence ................................................................................. 37

      3.     Plaintiffs Fail to State a Claim for Negligent Supervision ........... 38

      4.     Plaintiffs Fail to State a Claim for Unjust Enrichment ................ 39

D.     The Court Should Not Exercise Supplemental Jurisdiction .................... 40

IV.     THE COURT LACKS PERSONAL JURISDICTION OVER THE JACOBS ENTITIES AND CH2M B.V. ................................................................ 40

A.     The Court Lacks General Jurisdiction over the Non-Colorado Defendants ................................................................................................ 41

B.     The Court Lacks Specific Jurisdiction over the Non-Colorado Defendants. ............................................................................................... 42

C.     All Claims Against Jacobs Solutions Must Also Be Dismissed for Lack of Standing and on the Merits ........................................................ 45

CONCLUSION .................................................................................................................... 45

## **TABLE OF AUTHORITIES**

**Cases**

*A.D. v. Choice Hotels Int'l, Inc.*, 2023 WL 3004547 (M.D. Fla. Apr. 19, 2023) ........................30

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412 (2023) ............................20

*AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507 (Colo. 2007) ...........................34

*Air Century SA v. Atlantique Air Assistance*, 447 Fed. Appx. 879 (10th Cir. 2011) ....................40

*Allen v. Wright*, 468 U.S. 737 (1984) ................................................................11, 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................24

*Behav. Analyst Certification Bd., Inc. v. Solis*, 2022 WL 17736781 (D. Colo. Dec. 16, 2022) ..............................................................................................22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................................23

*Bella Health & Wellness v. Weiser*, -- F. Supp. 3d --, 2023 WL 6996860 (D. Colo. Oct. 21, 2023) ....................................................................................13

*Bennett v. Spear*, 520 U.S. 154 (1997) ..............................................................12

*Benton v. Cameco Corp.*, 375 F.3d 1070 (10th Cir. 2004) ...........................................44

*Birse v. CenturyLink, Inc.*, 2019 WL 9467530 (D. Colo. Oct. 23, 2019) .......................4

*Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) .......................................... *passim*

*Brightspot Sols., LLC v. A+ Prods., Inc.*, 2021 WL 1251512 (D. Colo. Apr. 5, 2021) ........................................................................................38, 39

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255 (2017) ...............................43, 44

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..................................................12

*Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023) ............................4

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ........................................................41, 42

*Dental Dynamics, LLC v. Jolly Dental Grp.*, 946 F.3d 1223 (10th Cir. 2020).......................42, 45

*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) .................................26, 30

*Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024) ...............................................................13, 26

*Doe I v. Apple Inc.*, 2021 WL 5774224 (D.D.C. Nov. 2, 2021), *aff'd*, 96 F.4th 403
    (D.C. Cir. 2024) ...........................................................................................15, 17, 20, 25

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008) .......................41

*Elvig v. Nintendo of Am., Inc.*, 696 F. Supp. 2d 1207 (D. Colo. 2010) .........................................35

*Fernandez v. Clean House, LLC*, 883 F.3d 1296 (10th Cir. 2018)...................................................37

*First Horizon Merch. Servs., Inc. v. Wellspring Cap. Mgmt., LLC*, 166 P.3d 166
    (Colo. App. 2007) ...................................................................................................2, 39, 45

*Foreign Trade Corp. v. Otter Prod., LLC*, 2020 WL 13450951 (D. Colo. Mar. 5,
    2020) ...................................................................................................................................34

*Frontier Station, Inc. v. Kloiber Real Est. Holdings, LLC*, 2019 WL 4643683 (D.
    Colo. Aug. 12, 2019)...........................................................................................................43

*G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023) ...................................................30, 31

*Gabbidon v. Wilson*, 2023 WL 2520732 (S.D.W. Va. Mar. 14, 2023)...........................................34

*Gilbert v. U.S. Olympic Comm.*, 2019 WL 1058194 (D. Colo. Mar. 6, 2019) .............................28

*Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019)......................................28

*Gilbert v. USA Taekwondo, Inc.*, 2020 WL 2800748 (D. Colo. May 29, 2020) ..........................33

*Griffith v. SSC Pueblo Belmont Operating Co.*, 381 P.3d 308 (Colo. 2016)................................44

*Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217 (10th Cir. 2008) ....................................11

*Hood v. Am. Auto Care, LLC*, 21 F.4th 1216 (10th Cir. 2021)................................................40, 41

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)......................................................................41

*IT Portfolio, Inc. v. NER Data Corp.*, 2018 WL 3055767 (D. Colo. May 17, 2018)...................43

*Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018) ...........................................................................18

*Jobe v. BNSF Ry. Co.*, 2024 WL 474405 (D. Colo. Jan. 30, 2024)..............................................44

*K. H. v. Riti, Inc.*, 2024 WL 505063 (11th Cir. Feb. 9, 2024) .....................................................30

*KBR, Inc. v. United States ex rel. Carter*, 575 U.S. 650 (2015) ..................................................17

*Keller v. Koca*, 111 P.3d 445 (Colo. 2005) ................................................................38

*Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d 1088 (10th Cir. 2019) ...................36

*Kennedy v. Mountainside Pizza, Inc.*, 2020 WL 4454897 (D. Colo. May 14, 2020) ...................44

*Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108 (2013) ................................................20

*Koch v. City of Del City*, 660 F.3d 1228 (10th Cir. 2011) ..............................................40

*L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155 (D. Colo. 2015) ...........................................................................................................39

*L.H. v. Marriott Int'l, Inc.*, 604 F. Supp. 3d 1346 (S.D. Fla. 2022) ...............................27

*Lewis v. Casey*, 518 U.S. 343 (1996) ..........................................................................13

*Lewis v. Lewis*, 189 P.3d 1134 (Colo. 2008) ...............................................................39

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................11, 13

*Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117 (D. Colo. Nov. 30, 2021) ...........................................................................................................31

*Macias v. Monterrey Concrete LLC*, 2020 WL 5638710 (E.D. Va. Sept. 21, 2020) ...................22

*Melea, Ltd. v. Jawer SA*, 511 F.3d 1060 (10th Cir. 2007) ..........................................41, 43

*Menocal v. GEO Group, Inc.*, 635 F. Supp. 3d 1151 (D. Colo. 2022) ..........................39

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) .....................................17, 19

*Nestlé USA Inc. v. Doe*, 593 U.S. 628 (2021) ..............................................................21

*Nova Health Sys. v. Gandy*, 416 F.3d 1149 (10th Cir. 2005) ......................................11

*Oliver v. Meow Wolf, Inc.*, 2020 WL 6939875 (D.N.M. Nov. 25, 2020) ......................10

*Owino v. CoreCivic, Inc.*, 2018 WL 2193644 (S.D. Cal. May 14, 2018) ......................34

*Raleigh v. Performance Plumbing & Heating, Inc.*, 130 P.3d 1011 (Colo. 2006) .......................37

*Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159 (9th Cir. 2022) ................................31

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) ..................................................28, 29

*Riggs v. Hull*, 2016 WL 742923 (W.D. Ky. Feb. 23, 2016) .........................................34

*RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016) ........................................14, 15, 16, 19

*Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287 (Colo. 2020) ....................38

*Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) ..............................................................................16

*Roland v. Letgo, Inc.*, 2024 WL 372218 (10th Cir. Feb. 1, 2024) .................................................37

*Roland v. Letgo, Inc.*, 644 F. Supp. 3d 907 (D. Colo. 2022), *aff'd*, 2024 WL
 372218 (10th Cir. Feb. 1, 2024) ............................................................................................38

*Roman v. Tyco Simplex Grinnell*, 2017 WL 2427251 (M.D. Fla. June 5, 2017) ..........................23

*S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020) ......................................32

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ......................................................11, 13

*Sosa v. Alvarez–Machain*, 542 U.S. 692 (2004) ..........................................................................16

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...............................................................................13

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ............................................................................13

*United States v. Collins*, 859 F.3d 1207 (10th Cir. 2017) ...........................................................17

*United States v. Martinez*, 812 F.3d 1200 (10th Cir. 2015) .........................................................34

*United States v. Papagno*, 639 F.3d 1093 (D.C. Cir. 2011) ........................................................30

*Walden v. Fiore*, 571 U.S. 277 (2014) ..........................................................................................44

*Warth v. Seldin*, 422 U.S. 490 (1975) ...........................................................................................11

*Wasatch Equal. v. Alta Ski Lifts Co.*, 820 F.3d 381 (10th Cir. 2016) ..........................................33

*WildEarth Guardians v. Extraction Oil & Gas, Inc.*, 457 F. Supp. 3d 936 (D.
 Colo. 2020) ...........................................................................................................................23

*Williams v. Sisolak,* 2022 WL 2819842 (D. Nev. July 18, 2022) .................................................12

**Statutes**

18 U.S.C. § 1585 .............................................................................................................................16

18 U.S.C. § 1589 ..........................................................................................................21, 22, 23, 31

18 U.S.C. § 1590 ..........................................................................................................21, 22, 23, 31

18 U.S.C. § 1591 ................................................................................................................29

18 U.S.C. § 1593 .............................................................................................................33, 34

18 U.S.C. § 1595 ............................................................................................................. *passim*

18 U.S.C. § 1596 ......................................................................................................17, 18, 19

18 U.S.C. § 1964 ................................................................................................................15

18 U.S.C. § 3271 ................................................................................................................17

18 U.S.C. § 3664 ................................................................................................................34

28 U.S.C. § 1332 ................................................................................................................40

Colo. Rev. Stat. § 13-80-102 .............................................................................................36

Colo. Rev. Stat. § 13-80-108 .............................................................................................36

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Ch. 96 ..............15, 19

Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. No.
    108–193, 117 Stat. 2875 (2003)
    ...................................................................................................................... *passim*

**Other Authorities**

154 Cong. Rec. S10388-03, 2008 WL 4425748 (Oct. 1, 2008) .....................................18

154 Cong. Rec. S10936-01, 2008 WL 5191148 (Dec. 11, 2008)...................................18

*Black's Law Dictionary* (8th ed. 2004)............................................................................26

*Oxford English Dictionary* (2d ed. 1989) .......................................................................30

Restatement (Second) of Conflict of Laws § 145 (1971) ..............................................34

## PRELIMINARY STATEMENT

Plaintiffs' Amended Complaint ("AC") alleging violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") − which Plaintiffs submitted rather than confronting Defendants' Motion to Dismiss − cures none of the initial complaint's defects and must be dismissed. Instead of alleging additional pertinent facts, the AC attempts to paper over the prior pleading's shortcomings with boilerplate "information and belief" allegations and conclusory legal assertions. The AC must therefore be dismissed in its entirety for lack of Article III standing, failure to state a claim, and for lack of jurisdiction over three of the Defendants.

Among many other shortcomings, the AC still fails to adequately allege that the consulting services Defendants allegedly provided to the government agency responsible for hosting the 2022 World Cup − the Supreme Committee for Delivery & Legacy ("Supreme Committee") − caused Plaintiffs' employment-related injuries in Qatar. Instead, the 53 Plaintiffs, all Philippine nationals who likely have never set foot in the United States, allege that unspecified foreign companies not before this Court duplicitously recruited the Plaintiffs in the Philippines to work on construction projects in Qatar, where other unspecified foreign contractors hired to build soccer stadiums mistreated them. They do not plausibly allege any facts demonstrating that Defendants − who were not building the stadiums − recruited or employed them, or controlled the companies that did. Indeed, they do not plausibly allege that Plaintiffs ever even interacted with the Defendants. Consequently, the AC makes abundantly clear that the Defendants had no direct involvement in the Plaintiffs' employment relationships, and of course did not themselves traffic the Defendants or subject them to labor conditions that the TVPRA might forbid.

Nor can the Plaintiffs plead around these basic defects by contending that the Defendants were "participants" in an ill-defined yet sprawling "venture" with the third parties who allegedly trafficked them for forced labor.  As the AC and the materials it references establish, Defendants were not part of any such trafficking venture.  Careful review of the AC reveals that none of the Defendants controlled, is affiliated with, or even contracted with the companies that allegedly recruited and employed the Plaintiffs.  And despite this being the Plaintiffs' second attempt to plead a case, the AC still does not plausibly allege, and does not even provide a basis to infer, that the Defendants benefitted financially from Plaintiffs' allegedly coerced labor, or that they shared risk or commercial interests with Plaintiffs' employers.

The breathtakingly vast scope of what the AC calls the "World Cup Construction Venture" only highlights the fundamental lack of meaningful connection between the Defendants and Plaintiffs' alleged injuries.  The AC defines this "World Cup Construction Venture" so widely that it would include not just the Defendants, but everyone associated with the construction in preparation for the 2022 World Cup.  Plaintiffs' reading of the statute would impose civil and even criminal liability on the Qatari Supreme Committee, FIFA, the hundreds or thousands of companies engaged by those entities, and even the participating soccer players and coaches, for abuses allegedly suffered by anyone who worked on any of the stadium or infrastructure projects over the course of a decade.  Neither the Constitution nor the TVPRA permits Plaintiffs to cast the net that widely.

The AC should accordingly be dismissed for the following reasons.

*First*, Plaintiffs lack standing under Article III because their injuries are not fairly traceable to Defendants.  Plaintiffs still do not plausibly allege a constitutionally sufficient link

between the Defendants and the unnamed perpetrators' alleged misconduct.

*Second*, Plaintiffs simply do not have a claim under the TVPRA, and the AC cannot fix that because the underlying claim remains unchanged.  As a preliminary matter, Congress did not provide a private right of action for extraterritorial injuries, which would essentially deputize plaintiffs' firms to extend U.S. law to wholly foreign events.  The TVPRA's extraterritorial effect is, by design, limited to criminal liability and regulated by prosecutorial discretion.

And Plaintiffs independently fail to plausibly allege the elements of a TVPRA claim. Despite the Defendants' first motion to dismiss having alerted Plaintiffs to the defects in their initial complaint, the AC still lacks the required specific factual allegations that would permit the Court to infer that each Plaintiff had in fact been trafficked or coerced to labor.  In addition, Plaintiffs' overbroad theory of "venture" liability fails because Plaintiffs have not even identified the "venture participants" who supposedly trafficked them, nor have they alleged the close association between those perpetrators and the Defendants that would make the Defendants liable for the perpetrators' wrongdoing.

*Third*, Plaintiffs' non-TVPRA claims, which are governed by Qatari law, fail because Plaintiffs were required to assert any such claims against their employers – not Defendants – in Qatar.  Even under Colorado law, Plaintiffs' claims are time-barred and fail on the merits, as Defendants had no duty to somehow prevent trafficking or coercion by unrelated third parties.

*Fourth*, the Court lacks personal jurisdiction over CH2M HILL International B.V. ("CH2M B.V.") – a Dutch entity – and over the two Jacobs entities because those Defendants are incorporated and headquartered in other jurisdictions, and the claims lack sufficient connection to Colorado to create specific jurisdiction.

**STATEMENT OF FACTS**[1]

## I.   Plaintiffs' Alleged Mistreatment by Unspecified Venture Participants

According to the AC, over the course of a decade leading up to the 2022 World Cup, Qatar "constructed several state-of-the-art stadiums," including the Al Rayyan, Lusail, Al Khalifa, Al Wakrah, and Al Thumama Stadiums (the "Stadiums").  AC ¶¶ 1, 147-99.  Qatar assigned the Supreme Committee responsibility for building these Stadiums, as well as for "coordinating" other "major infrastructure improvements" in advance of the event.  *Id.* ¶ 56.  The Supreme Committee, in turn, engaged contractors to build the Stadiums.  Those contractors then hired a wide variety of subcontractors for various parts of the work.  *Id.* ¶¶ 58, 61(b).

The Plaintiffs contend that they became trafficking victims because while they were still in the Philippines they "were lied to" about the terms and conditions of "the work they would do" in Qatar, and that once there they became employees of a handful of subcontractors – Al Jaber Engineering, Imar Trading and Contracting Company, Midmac Company, Rabban Readymix, Tokyo Freight, J.A.K. Construction Builders, and Electro Mechanical Enterprises Qatar (together, the "Employers") – and were in "debt bondage" and threatened with "legal prosecutions" as they performed construction work on the stadiums.  *Id.* ¶¶ 5, 203-04.

Just like their initial complaint, however, Plaintiffs' AC contains virtually no specific factual allegations supporting their claims that they were trafficked to Qatar and forced to labor. The AC relies on the same boilerplate paragraphs that hardly vary from Plaintiff to Plaintiff, and

---

[1] In addition to the factual allegations in the Amended Complaint, the Court may consider documents the complaint "references," *Birse v. CenturyLink, Inc.*, 2019 WL 9467530, at *4 (D. Colo. Oct. 23, 2019), and also indisputably authentic documents that are "central to the complaint." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023).  Copies of such documents are attached to the accompanying Declaration of Natascha Born. (Defs.' Ex. 1.)

still devotes almost no time to **these specific Plaintiffs'** experiences in Qatar.  *Id.* ¶¶ 147-99.  For example, Plaintiffs still do not explain what they were told and how that differed from the truth, under what circumstances they incurred debt or to whom it was owed, or when or how they were threatened with "legal prosecutions."  Plaintiffs for the most part do not identify or even describe the alleged perpetrators who they claim lied to them, held debts over their heads, took their passports, or committed any of the other alleged abuses the AC invokes.  The AC's meager additional assertion that the supposed lies were uttered by venture partners "including but not limited to Plaintiffs' direct employers," *id.* ¶ 206, only emphasizes the AC's speculative and implausible quality, especially since they make even that vague addition on "information and belief."  The Plaintiffs provide no explanation for their failure to provide even the most basic facts about **their own experiences**.

Instead, the Plaintiffs devote most of the AC to generic public reporting on construction projects in Qatar, much of which is about the experiences of **different** migrant laborers from other countries, working on other projects.  For example, the AC relies heavily on allegations about workers who are "like Plaintiffs," but are not actually plaintiffs in this litigation, *see, e.g.*, *id.* ¶¶ 4, 65, 78, 84-85, 88, 90, 93, 97, 102-03, and features video stills of **other** migrant workers, *id.* ¶ 76.  Most of Plaintiffs' allegations have nothing to do with the construction of the Stadiums or these specific Plaintiffs, focusing instead on the Qatari construction industry and Qatar's *kafala* labor law generally.  In an effort to further sensationalize their claims, Plaintiffs name-check terrorist groups like "al-Qaeda, and ISIS," who are not alleged to have any connection to the Plaintiffs, the Defendants, or the construction of the Stadiums.  *Id.* ¶¶ 95-111.

Further embellishing this exceedingly wide canvas, the AC then attempts to paint a

picture of what it calls "the World Cup Construction Venture."  The AC remains deliberately vague about this alleged venture's origins, structure, contours, goals, or composition.  The alleged venture includes what appears to be a non-exclusive and partial list of at least 25 entities encompassing Qatari State agencies, FIFA, various international construction companies, local or regional companies, and others.  *Id.* ¶ 34.  Yet the alleged venture is apparently far bigger than even this already long list, since the AC also contends that an unidentified soccer coach giving an interview to a journalist was another "Venture participant."  *Id.* ¶ 76(h).  All of which implies that this massive venture encompasses every individual or entity who had anything to do with the World Cup stadiums, including every State agency, NGO, media outlet, advertising agency, soccer team, parts or equipment supplier – perhaps even the concession vendors and the soccer fans who attended the games.  According to the AC's loose but capacious logic, all of them and more were apparently participants in the venture that trafficked the Plaintiffs, and had knowledge of it because Google and Wikipedia told them all they needed to know about abusive labor conditions in Qatar.  *See, e.g.*, *id.* ¶¶ 78-83.

## II.     CH2M's Limited Role as a Consultant to the Supreme Committee

It is in this context that the AC alleges that the Defendants were also participants in the World Cup Construction Venture.  According to the AC, in addition to engaging the contractors responsible for constructing the Stadiums (who, in turn, contracted with the Employer subcontractors), the Supreme Committee separately engaged CH2M[2] to be its "Programme Management Consultant" ("PM Consultant").  AC ¶¶ 22, 61.  CH2M provided consulting services to the Supreme Committee relating to Stadium construction and helped "oversee[]

---

[2] Plaintiffs define "CH2M" to include all three CH2M entities.  CH2M was acquired by Jacobs Engineering Group Inc. in 2017.  AC ¶¶ 4, 19.

coordination with Qatari government agencies." *Id.* ¶¶ 22, 57.  According to the AC, then, CH2M was not in any way a principal in the project, but a provider of advice and coordination among non-defendant sovereign entities.

It is clear from the AC that, like many of the other alleged venture participants, none of the Defendants themselves trafficked Plaintiffs or coerced them to labor in Qatar.  Plaintiffs do not allege (nor could they) that CH2M built the Stadiums, or hired any of the contractors or subcontractors who did.  Nor do they allege that any of the Defendants directed the Employers, the Filipino recruiters, or the other unnamed "venture participants" to engage in the alleged wrongdoing.  Plaintiffs also do not allege that the Defendants shared any profits or risks with the Employers or other supposed venture participants, or that Defendants had an incentive to keep the Employers' labor costs low.  And Plaintiffs still cannot identify any specific action or inaction by any of the Defendants that caused or contributed to their alleged injuries.

Instead, the AC resorts to conclusory and unsupported assertions that CH2M was hired to oversee and control all members in the vast World Cup Construction Venture, including (paradoxically) its own client, the Supreme Committee, and all of its contractors and subcontractors.  *Id.* ¶ 115.  Most of Plaintiffs' allegations consist of impermissible legal conclusions about CH2M's contractual rights and duties.  For example, Plaintiffs simply assert, without citing any facts, that CH2M "had the right to assign tasks to other venture participants in the World Cup Construction Venture, and [was] able to control the means and details by which the other Venture participants . . . performed their work." *Id.*  Plaintiffs' embellishment in the AC that Defendants "knew or should have known of and could have prevented or influenced" Plaintiffs' alleged harms are likewise entirely unsupported.  *Id.* ¶¶ 119-20, 122-27.

Where the AC attempts to marshal evidence of CH2M's supposed control over contractors and subcontractors, the examples are either irrelevant or they contradict Plaintiffs' contentions.  For example, as support for CH2M's supposed control "of the entire World Cup Construction Venture," *id.* ¶ 115, the AC references: (i) a statement by a Jacobs employee noting "the significance of CH2M's leadership on human rights," *id.* ¶ 60(a); (ii) a series of generic references to Defendants' "extensive project and program consultancy experience" based in part on the 2022 World Cup, *id.* ¶ 60(d); and (iii) the shorthand phrase that Jacobs acted as "delivery partner" to the Supreme Committee, *id.* ¶ 60(f).  In many instances, the AC's references undermine and disprove its allegations.  For example, the AC cites a statement by a CH2M spokesperson to prove that CH2M exercised control over migrant labor.  *Id.* ¶¶ 116-17, 121.  In that statement, the spokesperson actually said that where CH2M exercises "control, we take the strongest possible action to protect migrant labor," but that CH2M "***ha[d] no input into the terms and conditions of employment of a contractor's labor force on this [Qatar] project***." Defs.' Ex. 1.1, ESPN Emails, at 2, cited at AC ¶ 116 (emphasis added).  By omitting that critical distinction, the AC misleadingly suggests the spokesperson was confirming that CH2M exercised control over migrant labor at the Qatar stadiums when he was in fact explaining why that was not the case.

When specifically describing work CH2M performed, the AC's allegations confirm that – far from engaging in trafficking – CH2M sought to promote worker safety and deter improper labor practices.  Perversely, the AC points to CH2M's advice to the Supreme Committee on how "to improve standards for employment, safety, and worker accommodations" to justify holding Defendants responsible for third parties' alleged mistreatment of workers.  *Id.* ¶ 118; *see also*

Defs.' Ex. 1.2, ESPN Article, cited at AC ¶¶ 116-17, 121.  But providing advice on how to improve labor standards obviously does not support Plaintiffs' contention that CH2M "had direct control over the terms and conditions of workers' employment," or "could have prevented or influenced Plaintiffs' inhumane and exploited conditions," AC ¶ 127, much less that it had any control over ***Plaintiffs'*** employment conditions.  Similarly, the AC cynically quotes a statement by CH2M's Assurance Director in April 2013 – before construction on the Stadiums even began[3] – that "his team has estimated that at least 14 people will die while building Qatar's World Cup stadiums," accusing CH2M of "blithe[]" indifference to worker safety.  *Id.* ¶¶ 4, 138 (quoting Defs.' Ex. 1.3, at 89).  But Plaintiffs omit the passage from that same report in which the Secretary-General of the Supreme Committee explained that CH2M had projected "the ***unmitigated potential*** for accidents and deaths on a project of this magnitude" based on standard industry metrics, and that the Supreme Committee "ha[d] ***committed itself*** to take the steps necessary to ensure that the historical trend is not allowed to prevail."  Defs.' Ex. 1.3, at 89 (emphases added).

The AC also conflates CH2M's role in ***monitoring*** the performance of the Supreme Committee's contractors and subcontractors with ***control*** over the contractors and subcontractors.  For example, with respect to one of the Supreme Committee's contractors (the Tefken-Al Jaber Engineering Joint Venture), CH2M allegedly "monitor[ed]" compliance with the "health and safety Plan," "measured[] and recorded" "policy, objectives, targets and standards," and "advise[d] the supply chain on corrective actions."  AC ¶ 61 (emphases omitted).  Even taken at face value, monitoring, measuring, and recording policy standards, and advising

---

[3] *See* Defs.' Ex. 1.3, Nov. 18, 2013 Amnesty International Report, at 87, cited at AC ¶¶ 70(b), 138 ("according to media reports, construction of the first stadium could begin in late 2013").

are far different than "direct control" over the Plaintiffs' employers or any other third parties. *Cf.* *id.* ¶ 127. Plaintiffs' conclusory allegations that Defendants had "the ability to prevent" their unnamed "venture partners (including Plaintiffs' employers) from exploiting forced or trafficked labor," *id.* ¶ 115, or "could have prevented or influenced Plaintiffs' inhumane and exploited conditions," *id.* ¶¶ 119-20, 122-27, thus not only lack any basis, but are contradicted by the very documents the AC references.

## NAMED DEFENDANTS

Plaintiffs name as Defendants CH2M B.V., CH2M HILL Companies, Ltd., CH2M HILL International, Ltd., Jacobs Engineering Group Inc. ("Jacobs Engineering") and Jacobs Solutions Inc. ("Jacobs Solutions"). Of these five companies, only CH2M HILL Companies, Ltd., and CH2M HILL International, Ltd., are headquartered in Colorado. AC ¶ 12. CH2M B.V. is incorporated in the Netherlands. *Id.* Plaintiffs allege that Jacobs Engineering acquired CH2M in 2017, *id.* ¶ 19, after nearly half of the Plaintiffs' work tenures concluded, *id.* ¶¶ 147-48, 150, 154, 158-60, 164-65, 168-73, 177, 179, 181, 183, 187, 189-90, 192, 197-99. Both Jacobs entities are incorporated in Delaware and headquartered in Texas and – as Plaintiffs now concede – Jacobs Solutions was incorporated ***after*** Plaintiffs completed their work, AC ¶ 13, on March 4, 2022, Defs.' Ex. 1.4, Jacobs Solutions Entity Details; *Oliver v. Meow Wolf, Inc.*, 2020 WL 6939875, at *5 (D.N.M. Nov. 25, 2020) (taking judicial notice of the date of incorporation).

## ARGUMENT

## I.     PLAINTIFFS LACK ARTICLE III STANDING

The AC only confirms Plaintiffs' lack of Article III standing. Plaintiffs simply cannot allege that any of the Defendants who are before this Court – rather than unspecified "venture

participants" – caused their alleged injuries.  Although Plaintiffs now try to paper over that deficiency by adding conclusory and irrelevant boilerplate to various existing paragraphs in their AC, *see* AC ¶¶ 119-20, 122-27, they fall far short of satisfying Article III.

To meet the "the irreducible constitutional minimum of standing," there must be "a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).  Article III requires "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury," and that burden "is not satisfied when '[s]peculative inferences are necessary to connect [the] injury to the challenged actions.'" *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156-57 (10th Cir. 2005) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)); *see also Allen v. Wright*, 468 U.S. 737, 759 (1984) (plaintiffs lacked standing where the "links in the chain of causation" involved "numerous third parties" and their "independent decisions").

The AC is replete with factual allegations that bad actors – often unnamed – other than the Defendants engaged in conduct that harmed Plaintiffs, including Employers, Filipino recruiters, and labor supply companies, and even the designers of Qatar's *kafala* system.  But the AC does not and could not allege facts demonstrating that the Defendants directly caused Plaintiffs' injuries.  The fact that, in this case, one or more third parties were "the direct cause of [the] plaintiff[s'] harm" makes it "substantially more difficult" to show that "the asserted injury was the consequence of the defendants' actions." *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).

To make this more demanding showing, Plaintiffs must allege facts establishing that, "by determinative or coercive effect upon the action of someone else," Defendants indirectly caused the injury that the third parties directly inflicted. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Courts will generally not "endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *see also Williams v. Sisolak,* 2022 WL 2819842, at *4 (D. Nev. July 18, 2022) (dismissing TVPRA claim alleging that Nevada facilitated sex-trafficking by legalizing prostitution where the "independent decisions" of numerous third parties significantly impacted plaintiffs' injuries).

Here, Plaintiffs do not plausibly allege that Defendants controlled the bad actors and thereby caused the Plaintiffs' harm.  Instead, they allege almost the exact opposite:  that Defendants *failed to control* the bad actors and thus supposedly failed to *prevent* Plaintiffs' injuries.  In response to Defendants' initial motion to dismiss, they have added allegations that "Defendants could have prevented or influenced Plaintiffs' inhumane and exploited conditions." AC ¶¶ 119-20, 122-27.  But the new allegations do not solve their standing problem; to the contrary, they confirm it.  Put another way, if Defendants did not exist, or had never been engaged by the Supreme Committee, Plaintiffs' own allegations are that they would have suffered the exact same injury because in those circumstances too Defendants would not have prevented it.  The Plaintiffs' injuries are therefore not traceable to Defendants for purposes of Article III.

Nor can Plaintiffs rely on their overly broad interpretation of the TVPRA's venture provision to establish standing.  As the Supreme Court has explained, it "is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a

plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).  Accordingly, the TVPRA's venture theory of liability cannot abrogate the constitutional requirement that an injury be traceable to the particular defendant before the Court.  Indeed, it is black-letter law that "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  A plaintiff must demonstrate standing separately "as to *each defendant*, not collectively." *Bella Health & Wellness v. Weiser*, -- F. Supp. 3d --, 2023 WL 6996860, at *9 (D. Colo. Oct. 21, 2023).  That principle applies with even greater force where Plaintiffs' claim of injury is traceable not to these Defendants or even a co-defendant, but to the actions of third parties not before this Court.

The D.C. Circuit recently rejected a claim under the TVPRA, articulating along the way what Defendants submit is an overly generous view of Article III standing.  *Compare Doe 1 v. Apple Inc.*, 96 F.4th 403, 409-12 (D.C. Cir. 2024), *with Lujan*, 504 U.S. at 560, *Allen*, 468 U.S. at 759, and *Simon*, 426 U.S. at 45.  But notwithstanding the decision's broad interpretation of the traceability element of standing (which is not binding on this Court), even that decision only held that plaintiffs' claims under the TVPRA met the constitutional minimum for standing where those claims actually "mirror[ed] the aiding and abetting liability long established at common law." *Apple*, 96 F.4th at 411.  The aiding and abetting analogy sheds light on why these Plaintiffs lack standing to assert their claims against these Defendants. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023) (aiding and abetting is "a conscious, voluntary, and culpable participation in another's wrongdoing").  As the D.C. Circuit recognized, to state an aiding and abetting claim, a Plaintiff must allege facts establishing that the Defendants "knowingly and substantially assisted in the principal violation." *Apple*, 96 F.4th at 411.  But Plaintiffs nowhere

allege that Defendants aided or encouraged or "substantially assisted" the Employers, recruiters, or others to engage in trafficking.  They don't actually allege that Defendants took action even to indirectly *harm* them.  Instead, they allege that Defendants should somehow have done more to *help* them, without explaining what more could have been done in any particular instance.  *See, e.g.*, AC ¶ 127 (asserting Defendants "could have prevented or influenced Plaintiffs' inhumane and exploited conditions").  That is not sufficient to meet the constitutional elements of standing.

## II.    PLAINTIFFS' AC STILL FAILS TO STATE A CLAIM UNDER THE TVPRA

### A.    Plaintiffs Seek an Impermissibly Extraterritorial Application of the TVPRA

Plaintiffs initially claimed they were entitled to bring claims concerning injuries suffered by Philippine nationals working in Qatar because the TVPRA "provide[s] for extraterritorial jurisdiction."  Dkt. No. 1 ¶ 7.  Faced with the authorities that Defendants cited showing that the TVPRA provides no private cause of action for extraterritorial claims, Plaintiffs' AC attempts to repackage the same allegations, involving the same plaintiffs and the same injuries, as a "domestic" claim.  But Plaintiffs' conclusory allegation that "Defendants participated in and knowingly benefitted from" the "Venture" in "Colorado," AC ¶ 7, does not change the nature of their claim and is legally irrelevant to the analysis of where the TVPRA claim arises.

Despite Plaintiffs' attempt to recharacterize their claims, the TVPRA claims are barred by the presumption against extraterritoriality, which instructs that, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016).  In applying that presumption, the Supreme Court has adopted a two-step framework that asks (1) "whether the presumption against extraterritoriality has been rebutted" and, if not, (2) "whether the case

involves a domestic application of the statute." *Id.* at 337.  Applying the Court's two-step

analysis, Plaintiffs' claims are impermissibly extraterritorial and must be dismissed.

### 1.      The TVPRA's Private Right of Action Does Not Apply Extraterritorially

The AC must be dismissed because the TVPRA does not contain "a clear, affirmative

indication" that Section 1595's private right of action in particular "applies extraterritorially."

*RJR Nabisco*, 579 U.S. at 337.

The private right of action in Section 1595 contains ***no indication at all*** – much less a

clear, affirmative one – that it applies extraterritorially.  On its face, Section 1595 says absolutely

nothing about extraterritorial application.  The statute simply provides:

> An individual who is a victim of a violation of this chapter may bring a civil
> action against the perpetrator (or whoever knowingly benefits, or attempts or
> conspires to benefit, financially or by receiving anything of value from
> participation in a venture which that person knew or should have known has
> engaged in an act in violation of this chapter) in an appropriate district court of
> the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).  It is thus missing the type of "explicit foreign-oriented language" courts

have previously found necessary to rebut the presumption.  *RJR Nabisco*, 579 U.S. at 353 n.12;

*Doe I v. Apple Inc.*, 2021 WL 5774224, at *14 (D.D.C. Nov. 2, 2021) (holding that Section 1595

"does nothing to rebut the presumption that it applies only domestically"), *aff'd*, 96 F.4th 403

(D.C. Cir. 2024).  Section 1595 is functionally identical to the private right of action in the

Racketeer Influenced and Corrupt Organizations Act ("RICO") that the Supreme Court held

"does not indicate extraterritorial application."[4]  *RJR Nabisco*, 579 U.S. at 350.  It contains no

---

[4] *Compare* 18 U.S.C. § 1595(a) ("An individual who is a victim of a violation of this chapter
may bring a civil action against the perpetrator . . . in an appropriate district court of the United
States and may recover damages and reasonable attorneys fees.") *with id.* § 1964(c) ("Any

"clear, affirmative indication" that it applies extraterritorially.  Hence it is presumed ***not*** to apply extraterritorially.

The fact that certain of the TVPRA's ***substantive*** provisions by their terms apply extraterritorially – just like RICO's predicate offenses do – does not indicate that the ***private right of action*** applies abroad as well.  *See, e.g.*, 18 U.S.C. § 1585 (criminalizing "on any foreign shore seiz[ing] any person with intent to make that person a slave").  As the Supreme Court explained in *RJR Nabisco*, the "presumption against extraterritoriality must be applied separately to substantive prohibitions and [their] private right of action," and must be overcome as to both. 579 U.S. at 350.  These separate inquiries are necessary because creating "a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion."  *Id.* at 346 (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 727 (2004)).  A private right of action thus "creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct."[5]  *Id.* at 346-47.  Those concerns are front and center in this case, which accuses the Qatari government – a U.S. ally – of facilitating and profiting from forced labor.

Indeed, the fact that certain criminal provisions in the TVPRA expressly apply

---

person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.").

[5] Although the Fourth Circuit concluded that Section 1595 applies extraterritorially in *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019), its reasoning directly contradicts the holding of *RJR Nabisco* and this court should reject it.  *Roe*'s holding that Section 1595 applies abroad because it "incorporates a set of predicate offenses" that apply extraterritorially, 917 F.3d at 242, contravenes the Supreme Court's clear instructions in *RJR Nabisco* that a private remedy must be assessed independently for clear indicia of extraterritorial application.  *Id.* at 346.

extraterritorially only confirms that Section 1595 cannot be read to have extraterritorial application. *See, e.g.*, 18 U.S.C. § 1585; *id.* § 3271(a) (criminalizing trafficking "outside the United States" committed by persons "employed by or accompanying the Federal Government"). "[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010).

Plaintiffs cannot save their TVPRA claim by invoking Section 1596's provision for limited extraterritorial jurisdiction, because Section 1596 applies only to certain extraterritorial ***criminal*** offenses. Section 1596 reflects a choice by Congress not to give extraterritorial effect to the private right of action, but to permit federal prosecution of trafficking crimes in specified circumstances. Section 1596 by its terms applies only to "any offense" "under section 1581, 1583, 1584, 1589, 1590, or 1591" – and conspicuously omits the civil remedy in Section 1595. Furthermore, the word "offense" is a term of art that, in Title 18 of the U.S. Code, refers exclusively to violations of criminal law and thus cannot be read to implicitly extend to the civil remedy too. *KBR, Inc. v. United States ex rel. Carter*, 575 U.S. 650, 659 (2015) ("[W]hile the term 'offense' is sometimes used [to refer to civil violations], that is not how the word is used in Title 18."); *United States v. Collins*, 859 F.3d 1207, 1213-14 (10th Cir. 2017) ("The term 'offense' traditionally refers to crimes."). The rest of Section 1596, which refers to "offender[s]" and "prosecution[s]" of "offense[s]," reinforces that it is "focused on criminal, not civil, applications." *Apple*, 2021 WL 5774224, at *15 (D.D.C.). Hence by its plain terms Section 1596 applies only to extraterritorial activity that the Department of Justice, after weighing U.S. foreign policy considerations, determines is worthy of criminal prosecution.

The legislative history of Section 1596 likewise confirms that it is limited to criminal prosecutions and does not apply to the private right of action under Section 1595.  Both Senator Durbin, who introduced the legislation, and Senator Leahy, chairman of the Judiciary Committee, explained that the provision was intended to permit the *prosecution* of certain crimes that had been committed abroad.  *See, e.g.*, 154 Cong. Rec. S10388-03, at 10389, 2008 WL 4425748 (Oct. 1, 2008) (statement of Sen. Leahy) ("This legislation would permit the Department of Justice to prosecute offenders of trafficking crimes abroad if they are present in the United States and punish human traffickers who attempt to seek refuge in this country."); 154 Cong. Rec. S10936-01, at 10937, 2008 WL 5191148 (Dec. 11, 2008) (statement of Sen. Durbin) (The TVPRA "will allow Federal prosecutors to investigate and prosecute traffickers found in the United States even if their trafficking crimes were committed abroad.").  There were good reasons for Congress not to empower foreign plaintiffs to sue U.S. companies for injuries arising in foreign countries, and nothing in Section 1595 indicates Congress created such a right.  *See Jesner v. Arab Bank, PLC*, 584 U.S. 241, 269-70 (2018) (plurality op.) (recognizing the risk of discouraging U.S. companies from investing "in developing economies where the host government might have a history of alleged human-rights violations," deterring the "corporate investment that contributes to the economic development that so often is an essential foundation for human rights").

Plaintiffs' reliance on Section 1596 independently fails for another reason: that provision applies only to the federal courts' subject matter jurisdiction and cannot extend the territorial

reach of the TVPRA's substantive provisions.[6]  AC ¶ 7.  Section 1596 expressly grants "**the courts of the United States** . . . extra-territorial jurisdiction" over any "offense . . . under section 1581, 1583, 1584, 1589, 1590, or 1591" subject to certain conditions.  18 U.S.C. § 1596(a) (emphasis added).  Jurisdictional provisions like Section 1596 concern "a tribunal's power to hear a case," which is separate from the "merits question" of "what conduct" a statute "reaches." *Morrison*, 561 U.S. at 254 (quotation marks omitted).

### 2.    Plaintiffs Do Not Seek a Domestic Application of Section 1595

Plaintiffs claim that they were trafficked from the Philippines to Qatar, were forced to labor in Qatar, and suffered their alleged harms entirely outside the United States.  *E.g.*, AC ¶¶ 147-99.  Those are wholly foreign claims.  Plaintiffs cannot escape that conclusion with fact-free new allegations in the AC that Defendants "participated in and knowingly benefitted from" the supposed Venture in the United States.  AC ¶ 7.  The claims remain indisputably Qatari-centric; they clearly are not domestic.  Indeed, the word "Qatar" and its derivatives occur no fewer than 447 times in the AC.

In order to assess whether Plaintiffs seek a permissible, domestic application of the statute, the Court must determine the focus of congressional concern addressed by Section 1595. *RJR Nabisco*, 579 U.S. at 336-37.  The focus of Section 1595, like the focus of the civil remedy in *RJR Nabisco*, is the harm or injury that the private right of action seeks to redress.  *Id.* at 354 ("Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries.").  Plaintiffs cannot dispute

---

[6] Even under Plaintiffs' reading, Section 1596 does not reach Defendant CH2M B.V, which is neither a U.S. national nor a person "present in" the United States.  *See* Defs.' Ex. 4, Decl. of Sally Miles ¶¶ 5-13.

that they have alleged no domestic injury in this case; they never entered the United States and allegedly suffered injuries exclusively in Qatar.  AC ¶¶ 147-99.  And even if the focus of Section 1595 is the conduct that violated the predicate offenses, as one court has held, Plaintiffs still seek an impermissibly extraterritorial application of the statute, as the alleged trafficking and forced labor occurred entirely outside of the United States.  *See Apple*, 2021 WL 5774224, at *16 (D.D.C.) ("the focus of the TVPRA will naturally fall where the violation occurred").

Indeed, because there are zero allegations of ***any*** relevant domestic conduct, Plaintiffs' claim is plainly extraterritorial.  *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419 (2023) ("Of course, if all the conduct regarding the violations took place outside the United States, then courts do not need to determine the statute's focus at all." (cleaned up)).  Plaintiffs' conclusory assertions that Defendants participated in a sprawling World Cup Construction Venture (which do not actually establish participation in a venture under the TVPRA) are all about Qatar.  Plaintiffs assert that Defendants were engaged by the Qatari Supreme Committee to "oversee[] coordination with Qatari government agencies" on infrastructure projects ***in Qatar*** and that they oversaw and monitored the Supreme Committee's contractors and subcontractors as they built the stadiums ***in Qatar***.  *E.g.*, AC ¶¶ 22, 61.  Plaintiffs' focus is obviously Qatar.

Plaintiffs' only response is to point to the type of U.S. ties that any other company headquartered in the United States would have too, and that cannot make their claims domestic. *See Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 125 (2013) ("it would reach too far to say that mere corporate presence suffices" to make a claim domestic).  For example, Plaintiffs' conclusory assertions that money must have "flowed" from the Supreme Committee "to CH2M's and Jacobs's offices in Colorado" and that Defendants presumably posted about the World Cup

project on social media "from within this District" are just other ways of saying they are U.S. companies. AC ¶¶ 143-44. Plaintiffs do not allege that the Supreme Committee paid any of the Defendants in the United States, nor do they trace any funds into the United States. And despite all of Plaintiffs' "information and belief" allegations that, to the extent Defendants employed people who resided in or travelled through Colorado, one can infer those employees worked on the World Cup project while in Colorado, *id.* ¶¶ 29-30, 112, Plaintiffs cannot identify *a single relevant action* that Defendants supposedly took in the United States. The fact that certain Defendants' employees presumably completed standard Customs and Border Protection forms when they returned to the United States from Qatar is plainly not relevant to the supposed World Cup Venture or any claim arising from it under the TVPRA. *Id.* ¶¶ 29(g), 30. Plaintiffs' allegations (*see id.*) of "general corporate activity – like decisionmaking – cannot alone establish domestic application." *Nestlé USA Inc. v. Doe*, 593 U.S. 628, 634 (2021).

### B.     Plaintiffs Still Fail to Plead the Elements of a TVPRA Claim

In order to state a claim under Section 1595, Plaintiffs must plausibly allege facts demonstrating that each Defendant "knowingly benefit[ted]" "financially or by receiving anything of value from participation in a venture which [they] knew or should have known has engaged in an act in violation of" a TVPRA predicate offense. 18 U.S.C. § 1595(a); *see Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). Plaintiffs' AC confirms they do not have a Section 1595 claim because they cannot plausibly allege (1) that their labor was coerced or that they were trafficked in violation of Sections 1589 and 1590, (2) that Defendants participated in a venture that committed those violations, (3) that Defendants either knew or should have known about the forced or trafficked labor, or (4) that Defendants knowingly benefitted. Plaintiffs'

suggestion that discovery would surely reveal the missing information, AC ¶¶ 136-37, 142, gets it backwards. A "plaintiff does not get discovery until he alleges a plausible claim." *Behav. Analyst Certification Bd., Inc. v. Solis*, 2022 WL 17736781, at *3 (D. Colo. Dec. 16, 2022).

### 1.    Plaintiffs Do Not Plead a Violation of Sections 1589 or 1590

Plaintiffs assert that certain migrant workers in Qatar, including those who worked to build the Stadiums for the 2022 World Cup, suffered truly deplorable treatment. The AC cites a wide variety of public sources that describe the "nightmarish conditions" that construction workers in Qatar have endured and features pictures of squalid living conditions that housed migrant workers in Qatar (albeit not the Plaintiffs themselves). *See, e.g.*, AC ¶¶ 2, 68-76. However, a close read of the AC reveals that Plaintiffs – even after amending their complaint – have included virtually no specific factual allegations supporting their assertions that they themselves were trafficked to Qatar and forced to labor in violation of Sections 1589 and 1590. The AC's boilerplate paragraphs for each Plaintiff simply do not plausibly allege the elements of a TVPRA claim, and are not sufficient to put Defendants on notice of the claims against them and allow them to investigate the alleged wrongdoing. *See Macias v. Monterrey Concrete LLC*, 2020 WL 5638710, at *10 (E.D. Va. Sept. 21, 2020) (Complaint must allege "each Plaintiff was subjected to a level of coercion that is redressable under the TVPA.").

Plaintiffs' allegations are largely in the passive voice, asserting that they were lied to and were mistreated by wrongdoers who are generally not just unnamed but entirely unidentified. AC ¶¶ 147-99. For example, while some Plaintiffs claim that they were not paid what they were "promised," they do not specify whether it was their Employers in Qatar or a recruiter in the Philippines (or someone else entirely) who made that promise. AC ¶¶ 148, 151-53, 160-61, 166-

67, 169-76, 178-99.  Plaintiffs cannot plead violations of Sections 1589 and 1590 without identifying which individuals or entities violated the statute.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007) (A pleading that "mentioned no specific time, place, or person" failed to "give[] the notice required by Rule 8."); *Roman v. Tyco Simplex Grinnell*, 2017 WL 2427251, at *5 (M.D. Fla. June 5, 2017) (dismissing Section 1589 claim where plaintiff failed to allege "who threatened him, how he was threatened, and for what purpose").  Plaintiffs' attempt to cure that deficiency by asserting that, "on information and belief," coercive actions were taken by "venture participants," "including" the Employers, is both improper and – given the breadth of the supposed Venture – so vague as to be utterly meaningless.  *WildEarth Guardians v. Extraction Oil & Gas, Inc.*, 457 F. Supp. 3d 936, 961 (D. Colo. 2020) ("information and belief" allegations are appropriate for issues "peculiarly within the knowledge of the defendants").

To name just one example, the first new Plaintiff to join the AC – Plaintiff L.P. – alleges that he worked on the construction of Al Thumama and Al Wakrah Stadiums for Electro Mechanical Enterprises Qatar, but provides no other specific factual allegations that demonstrate a violation of the TVPRA.  AC ¶ 185.  As relevant here, Section 1589(a)(3) and (4) prohibit knowingly providing or obtaining labor by means of "abuse or threatened abuse of law or legal process," or "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint," and Section 1590(a) imposes liability on "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services" in violation of Section 1589.  Plaintiff L.P. claims that he "was forced to live in crowded and inhumane living conditions," that he "fe[lt] anxious and afraid," that he "was forced to work

through exhaustion," and that he was "not paid what he was promised."  AC ¶ 185.  L.P. also

asserts that his passport "was confiscated," but he does not explain who took his passport and

why, or allege any facts supporting the conclusion that it was "confiscated."  *Id.*  These

allegations describe real suffering and abject poverty, but they do not show that L.P. was forced

to labor under the threat of serious harm or an abuse of the law, much less that he was forced to

do so by someone with whom Defendants participated in a venture.

### 2.    Plaintiffs Do Not Plead "Participation in a Venture"

Plaintiffs' AC is clear that whatever mistreatment they encountered did not occur at the

hands of Defendants.  Instead, Plaintiffs continue to depend on their conclusory allegations that

the Defendants were participants in an amorphous venture that they cannot fully describe with

wrongdoers whom they cannot identify.  Plaintiffs' new AC thus still fails to establish that any of

the Defendants is "equally liable" by virtue of their "participation in a 'venture' with the primary

offender[s]," precluding liability under the TVPRA.  *Bistline*, 918 F.3d at 871, 874.

Most obviously, Plaintiffs still cannot identify the "primary offender," distinguishing this

action from almost all other TVPRA cases.  Plaintiffs try and fail to fix that problem in the AC

(without providing any new information) by improperly alleging on "information and belief" that

they were harmed by "venture participants" that "include[d]" but were "not limited to" the

Employers.  But whether the entities or individuals who actually committed any TVPRA

violations – be that the Employers, the Qatari government, unidentified labor recruiting and

supply companies, or someone else – really were "venture participants" is a legal conclusion that

is not taken as true, and the AC includes no factual allegations supporting that conclusion.  *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of

action . . . do not suffice."); *Apple*, 2021 WL 5774224, at *11 (D.D.C.) ("whether Defendants are in a venture is a legal conclusion that the Court need not accept as true").  Because Plaintiffs have not identified the supposed perpetrators even after amending their complaint, there are no factual allegations establishing that they formed a venture, let alone that the Defendants, who are not themselves alleged to have acted as primary wrongdoers, participated in that venture.

### a.    Plaintiffs Have Not Alleged a Venture

Even after amending their complaint, Plaintiffs still fall short of showing the type of association "in fact" that is required to establish a "venture" under Section 1595.  *Bistline*, 918 F.3d at 873.  The Tenth Circuit outlined in *Bistline* the type of joint enterprise or undertaking that rises to the level of an association in fact for purposes of the TVPRA.  In that case, Warren Jeffs, the leader of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, forced members of that community to engage in physical labor and sex acts by exercising total control over their lives and meting out "swift and horrendous punishments."  *Id.* at 871.  The court held that Jeffs's lawyers had formed a venture with Jeffs where they designed a legal strategy "*expressly* for the purpose of facilitating [his] crimes and also ensuring that defendants would personally reap ample benefits therefrom," including because the forced labor was used to pay their legal fees and at times exchanged directly for legal services.  *Id.* at 873-76.

There is no such association alleged between Defendants and any of the Employers or any employment or labor supply companies the Employers may have worked with.  Unlike in *Bistline*, the AC contains no allegations that the Defendants designed strategies expressly to facilitate the perpetrators' alleged crimes, nor that they personally benefitted from those crimes. Indeed, the AC does not even allege that the Defendants contracted with the Employers or had

any other business relationship with them.  Asserting in conclusory fashion that Defendants did "business" with Venture "partners," "including" the Employers, as the AC now does, without spelling out what business they supposedly did, is plainly insufficient.  AC ¶ 133.

Moreover, allegations that CH2M monitored contractors' compliance with health and safety requirements, *id.* ¶ 61, do not establish a "shared enterprise" and at most suggest the type of arms-length interaction between parties with opposing interests that courts deem insufficient to establish a venture.  *Apple*, 96 F.4th at 415-16 (plaintiffs had not alleged a venture between purchasers of cobalt and suppliers who allegedly facilitated forced labor in cobalt mines because they were "on opposite sides of an arms-length transaction").  Indeed, the D.C. Circuit recently affirmed the dismissal of a TVPRA claim precisely because an ability to conduct a "third party audit" or "investigation" into labor practices – even combined with exhortations to "follow better labor standards" – is not evidence of the type of "control" that gives rise to a venture.  *Id.* at 416.

Nor does the AC allege that Defendants shared any risks or profits with the Employers in connection with the construction of the Stadiums, which some courts have found indicative of a venture.  *See Black's Law Dictionary* 1591 (8th ed. 2004) (defining "venture" as "[a]n undertaking that involves risk; esp., a speculative commercial enterprise"); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-27 (11th Cir. 2021) (holding that plaintiffs had not alleged that hotel franchisors formed a venture with sex traffickers where "they do nothing to show that the franchisors participated in a common undertaking involving risk or profit"); *Apple*, 96 F.4th at 415-16 (D.C. Cir.).  Plaintiffs' allegations that the Supreme Committee hired CH2M as PM Consultant and that, in that role, CH2M "engaged with the entities who directly employed construction laborers," AC ¶ 125, do not establish a contractual relationship with the Employers

or an association in fact between Defendants and the Employers that could render Defendants "equally liable" for the Employers' TVPRA violations. *Bistline*, 918 F.3d at 873-74.

Plaintiffs' definition of "venture" is also incoherent and overly broad. The AC vaguely asserts that the "Venture" comprised "large infrastructure projects for the World Cup, including the construction of nine new stadiums and the upgrade of three existing ones." AC ¶ 22. The breadth and lack of precision makes those allegations insufficient. *See L.H. v. Marriott Int'l, Inc.*, 604 F. Supp. 3d 1346, 1360 (S.D. Fla. 2022) (dismissing TVPRA claims that were "long on unsupported and sweeping generalizations but short on actual, particularized facts" showing "any kind of *common* undertaking"). Even after Defendants highlighted this deficiency in their Motion to Dismiss, the AC still includes in the "Venture" any and all construction projects in Qatar in advance of the 2022 World Cup and cites as evidence regarding the "Venture" sources referring to construction projects with no relationship to the Stadiums (or even other infrastructure projects in many cases). *E.g.*, AC ¶¶ 71(b), 74, 99 (citing a *Guardian* article regarding an office building); *id.* ¶ 71(g) (citing a Fox News article regarding "the government-planned city of Lusail"); *id.* ¶ 76(a) (citing video depicting an office building). Indeed, Plaintiffs still describe an unidentified individual in a *Guardian* video as a "Venture participant," even though he appears to be a Qatari soccer coach. *Id.* ¶ 76(h).

Plaintiffs tacitly concede their theory of the Venture has no logical endpoint. Plaintiffs cannot name the participants in the Venture: they allege only that it "include[s] but [is] not limited to" the Defendants and at least 25 additional entities, including a London-based architecture firm, the Qatari government, and FIFA, *id.* ¶ 34, and they imply but do not allege that it may also include Filipino recruiters and Qatari labor suppliers, *id.* ¶¶ 45, 48-49. On

Plaintiffs' interpretation of the statute, liability for their injuries would extend far beyond Defendants to the suppliers of raw materials, the architects and designers, the soccer players, the coaches, the vendors selling food or merchandise at the games, and so on.  Indeed, Plaintiffs allege that Defendants "knew or should have known that they were participating in a trafficking venture" in part because they presumably used Google and Wikipedia.  *Id.* ¶¶ 78-83.  The suppliers, architects, designers, players, coaches, and vendors presumably also had access to Google and Wikipedia, and were presumably compensated for their participation in the 2022 World Cup.  If Plaintiffs' view of the TVPRA were correct, then any organization engaged by the Supreme Committee to help monitor and improve human rights, any lawyers hired by the Supreme Committee to enforce labor standards, and even the construction workers paid to build the Stadiums could be liable for any alleged trafficking and forced labor to the same extent as the perpetrators.  That cannot be right.

The alleged "Venture" here bears no resemblance to the kinds of relationships that courts have previously found rise to the level of an association in fact.  *E.g.*, *Bistline*, 918 F.3d at 873-76 (lawyers formed a venture with Jeffs where they designed a legal strategy specifically to facilitate his crimes and directly benefitted from them); *Ricchio v. McLean*, 853 F.3d 553, 555-57 (1st Cir. 2017) (hotel operator formed a venture with sex trafficker where he "enthusiastically" confirmed his intent to reinstate their sex trafficking business by high-fiving the trafficker); *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1134, 1138 (D. Colo. 2019) (U.S. Olympic Committee and USA Taekwondo, Inc. formed a venture with an athlete where, as per the description in *Gilbert v. U.S. Olympic Comm.*, 2019 WL 1058194, at *15 (D. Colo. Mar. 6, 2019), both sides assumed risk in their joint enterprise because the institutions

invested in the athlete, and the athlete took the risk of competing). Each of these cases involved the affirmative creation of a clearly discernable joint enterprise or undertaking – be it commercial or criminal – by one or more individuals or entities. The hundreds and more likely thousands of different individuals and companies that participated in the "World Cup Construction Venture" do not share anything like the same association in fact.

        **b.**    **Plaintiffs Have Not Alleged That Defendants "Participated" in Any Venture**

Plaintiffs also have not plausibly alleged that any of the Defendants "participated" in the World Cup Construction Venture under any reasonable definition of that term. To participate requires active and intentional involvement; the AC fails to allege any facts suggesting that any of the Defendants engaged at that level with any of the Employers and unnamed entities who allegedly harmed Plaintiffs.

The Tenth Circuit held in *Bistline* that Jeffs's lawyers had participated in a venture with him by "constructing a scheme for the purpose of enabling" his criminal conduct. 918 F.3d at 874-76; *see also Ricchio*, 853 F.3d at 555-57 (holding plaintiff had pleaded participation in the venture where the defendant affirmatively agreed to reinstate a forced labor scheme with a trafficker). The *Bistline* decision is therefore consistent with the definition of "participation in a venture" found in 18 U.S.C. § 1591(e)(4): "assisting, supporting, or facilitating a violation of" the relevant TVPRA offense. Plaintiffs have not alleged that Defendants assisted, supported, or facilitated the alleged TVPRA violations, and they thus have not pleaded "participation." To the contrary, Plaintiffs allege that CH2M consulted on worker welfare standards for the Stadium projects, and then monitored the Supreme Committee's implementation of those standards, AC ¶¶ 61, 118-26, 129, 131, all of which would tend to ***frustrate*** any efforts to use forced labor, *cf.*

*A.D. v. Choice Hotels Int'l, Inc.*, 2023 WL 3004547, at *4 (M.D. Fla. Apr. 19, 2023) (allegations that hotel franchisor did "not fight hard enough to keep these traffickers from using the hotel" or took "ineffective steps to curtail the traffickers" did not establish participation in a venture).

Applying the common meaning of "participation" produces the same result.  The "ordinary meaning" of "participation is to take part in or share with others in common or in an association."  *Red Roof Inns*, 21 F.4th at 725; *see also Oxford English Dictionary* 268 (2d ed. 1989) (defining participation as "taking part, association, or sharing (with others) *in* some action or matter").  Participation thus requires active engagement in a joint endeavor, and more than just assistance or aid.  *See United States v. Papagno*, 639 F.3d 1093, 1098 (D.C. Cir. 2011) (Kavanaugh, J.) (holding "assistance" does not amount to "participation," and reasoning that the "officers who provide security at a Taylor Swift show certainly assist, but no one would say that they participate").  In line with that definition, the Seventh Circuit holds that where the defendant "provides assistance, support, or facilitation to the trafficker through" a "continuous business relationship," evidenced by multiple contracts over a number of years, "a court or jury may infer that the participant and trafficker have a tacit agreement that is sufficient for participation."  *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559-60 (7th Cir. 2023) (quotation marks omitted); *see also K. H. v. Riti, Inc.*, 2024 WL 505063, at *1 (11th Cir. Feb. 9, 2024) (allegations that hotel "financially benefitted from renting hotel rooms to" a trafficker and "observed signs of sex trafficking" do not amount to actual participation in the venture).

Here, Plaintiffs do not and cannot allege a "continuous business relationship" or other basis for inferring an agreement between Defendants and the Employers.  The fact that CH2M served as the PM Consultant ***to the Supreme Committee*** does not establish the requisite

relationship **with the Employers**.  *Cf. Salesforce.com*, 76 F.4th at 560 (Salesforce participated in Backpage venture when it contracted **with Backpage** to provide it with "tailored," "active," and "ongoing" support).  Likewise, Plaintiffs' conclusory allegations that their employers were venture participants, AC ¶¶ 115, 119-20, 122-27, 130-36, 205-06, 241-42, 244-45, are insufficient to allege a business relationship or agreement with Defendants.  Moreover, Plaintiffs do not plausibly allege that Defendants received any compensation from the Employers (or whoever was directly responsible for the alleged forced labor violations), or that CH2M's compensation was increased as a result of the perpetrators' conduct.  *Cf. Bistline*, 918 F.3d at 874-75 (lawyers participated in a venture where their legal fees were paid for by the venture and the forced labor).

### 3.    Plaintiffs Do Not Plead Defendants' Knowledge of TVPRA Violations

Plaintiffs do not plausibly allege that any of the Defendants "knew or should have known" that the Employers (or unnamed third parties) had "engaged in an act in violation of" Sections 1589 and 1590 with respect to these Plaintiffs.  18 U.S.C. § 1595(a).  Allegations that Defendants were on notice of forced or trafficked labor in the Qatari construction industry generally, or even at the Stadiums, are not sufficient to establish constructive knowledge of TVPRA violations as to these particular Plaintiffs.  *See, e.g.*, *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022) ("Sweeping generalities about the Thai shrimp industry are too attenuated to support an inference that [defendant] knew or should have known of the specifically alleged TVPRA violations."); *Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117, at *8 (D. Colo. Nov. 30, 2021) (Allegations that "defendant was on notice about the prevalence of sex trafficking generally at its hotels and in the hotel industry" are "not sufficient

to show that defendant should have known about what happened to plaintiff."); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) (refusing to impose liability "simply because [hotel franchisors] were generally aware that sex trafficking sometimes occurred on their franchisees' properties").

The AC ludicrously relies on the general availability of Google and Wikipedia to assert that Defendants (apparently in company with every other modern business in the world) were supposedly on notice of labor conditions in the Qatari construction industry or at World Cup construction sites.  AC ¶¶ 78-83.  But the AC still does not include ***any*** factual allegations that Defendants either knew or should have known of the alleged TVPRA violations by the unnamed "venture participants" ***with respect to these 53 Plaintiffs***.  For example, Plaintiffs rely heavily on statements by supposed "venture participants" FIFA and VINCI, even though the AC does not allege that either was an Employer, or had any other connection to Plaintiffs.  *Id.* ¶¶ 139-40.

Although Plaintiffs assert that CH2M was required to visit worksites, *id.* ¶ 125, they do not explain how such visits would reveal that "venture participants" were supposedly violating the TVPRA by "misrepresenting the terms and conditions of [Plaintiffs'] employment in Qatar" or through the other alleged misconduct, *id.* ¶¶ 203-04.  Similarly, Plaintiffs' conclusory allegations that CH2M had "access to and thus witnessed the inhumane living conditions the trafficked and forced laborers endured" are contradicted by the very reporting that Plaintiffs cite. *Id.* ¶ 141.  The report says that CH2M was involved with the "Better Connections" program that provided workers with internet access and training, but does not indicate that CH2M itself installed the technology or provided training, and instead identifies third parties who did so. Defs.' Ex. 1.5, *Gulf Times* Article, at 3, cited at AC ¶ 141.  Plaintiffs' only other allegations that

CH2M "took on the role of inspecting" Plaintiffs' living quarters are legal conclusions about CH2M's contractual duties. *See* AC ¶¶ 122, 124; *see Wasatch Equal. v. Alta Ski Lifts Co.*, 820 F.3d 381, 386 (10th Cir. 2016) (Courts "don't accept . . . legal conclusions as true.").

### 4.    Plaintiffs Do Not Plead a Knowing Benefit Received by Defendants

Acknowledging that the initial complaint failed to allege that any of the Defendants knowingly benefitted "financially or by receiving anything of value from participation" in the supposed venture, 18 U.S.C. § 1595(a), Plaintiffs attempt in the AC to rectify that deficiency with conclusory assertions that "each Defendant knowingly benefitted from" the "Venture" financially and "in the form" of "publicity and notoriety." AC ¶¶ 143-44. Yet Plaintiffs now concede that "the Supreme Committee" – not the subcontractors who built the Stadiums and interacted with Plaintiffs – "paid money to CH2M," and they still do not allege that Defendants stood to benefit in any way – either directly or indirectly – from the alleged TVPRA violations. *Id.* ¶ 143. Although Plaintiffs claim that their "forced labor" allowed "Defendants" to complete the Stadiums "more quickly and cheaply" than would have otherwise been possible, they do not explain how CH2M, a consultant that did not itself construct the Stadiums or engage the contractors or subcontractors, benefitted from cheaper or faster construction. *Id.* ¶ 145. The requisite "close connection between the benefit received, the knowledge of the benefit, and the improper conduct" is utterly lacking here. *Gilbert v. USA Taekwondo, Inc.*, 2020 WL 2800748, at *6 (D. Colo. May 29, 2020).

### C.    Plaintiffs Cannot Assert a Claim Under Section 1593

Although Plaintiffs still purport to assert a separate claim under Section 1593, AC ¶¶ 214-16, they once again conflate criminal aspects of the TVPRA with the more limited private

right of action.  Section 1593 concerns restitution following a criminal conviction and does not create an additional cause of action.  *See Gabbidon v. Wilson*, 2023 WL 2520732, at *1 (S.D.W. Va. Mar. 14, 2023) (Section 1593 does "not provide an individual cause of action").[7]  Section 1593(b)(2) mandates a procedure that is possible only after a conviction by requiring that any restitution order "be issued and enforced in accordance with section 3664."  Section 3664 requires the court, among other things, to "order the probation officer" to include certain information in the presentence report, and the defendant to list her assets.  18 U.S.C. §§ 3664(a), (d)(3); *see United States v. Martinez*, 812 F.3d 1200, 1205 (10th Cir. 2015) (holding Section 3664's procedure is mandatory).  Because Section 1593 can only be applied following a criminal conviction, Plaintiffs cannot assert a separate cause of action under that provision.

## III.    PLAINTIFFS' NON-FEDERAL LAW CLAIMS FAIL

Plaintiffs' unparticularized claims for negligence, gross negligence, negligent supervision, and unjust enrichment are futile and must be dismissed.

### A.    Qatari Law Applies to Plaintiffs' Non-Federal Claims

Like the original complaint, the AC does not bother to identify a source of law for its non-federal claims, but Qatari law applies under well-settled choice of law principles.  Colorado choice of law rules, which apply to non-federal claims in this Court, follow Section 145 of the Restatement (Second) of Conflict of Laws to assess choice of law for tort claims.  *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007); *see generally Foreign Trade Corp. v. Otter Prod., LLC*, 2020 WL 13450951, at *3 (D. Colo. Mar. 5, 2020).  Under the

---

[7] *See also Riggs v. Hull*, 2016 WL 742923, at *2 (W.D. Ky. Feb. 23, 2016) ("Under 18 U.S.C. § 1593(a), . . . [r]estitution is not a claim for relief; it is a remedy."); *Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at *13 n.7 (S.D. Cal. May 14, 2018) (Section 1593 "applies '*only* to cases in which a defendant has been convicted of a[ criminal] offense under the [TVPRA].'").

Restatement's "most significant relationship" test, it is clear that the jurisdiction with the most significant relationship to this dispute is Qatar.  The AC is rife with allegations that Plaintiffs were harmed by Qatari labor practices as they worked on stadium projects in Qatar in order to prepare for an historic event in Qatar.  And the fact that Plaintiffs were allegedly injured in Qatar "effectively creat[es] a presumption that that jurisdiction provides the appropriate law."  *Elvig v. Nintendo of Am., Inc.*, 696 F. Supp. 2d 1207, 1210 (D. Colo. 2010).  Because Qatar has the only significant relationship with the case, and by far the strongest policy interest in regulating worker welfare in Qatar, its law governs the non-federal claims.  *See id.* at 1210 n.2.

### B.      Plaintiffs Fail to State a Claim under Qatari Law

Qatari law creates a comprehensive regime for claims arising in employer-employee relationships, including claims brought by migrant laborers such as Plaintiffs seeking redress for harm suffered in the workplace, failure to pay wages, and labor abuse.  *See* Defs.' Ex. 2, Expert Report of Salman Mahmood ¶¶ 17, 21, 26-43; *see generally* Fed. R. Civ. P. 44.1 (permitting consideration of "any relevant material or source, including testimony" in determining foreign law).  Under Qatari law, employment-related claims must be brought exclusively against the employer and before the Labour Disputes Committee and are subject to a one-year statute of limitations, measured from the conclusion of the employment relationship or issuance of any medical report.  Defs.' Ex. 2 ¶¶ 23-24.  Because the last Plaintiff stopped working in Qatar in 2021, the one-year limitation period has run with respect to each Plaintiff's claims, requiring dismissal of the non-federal claims.  *See* AC ¶ 157.

In any event, Plaintiffs would fail to state a claim against Defendants under the applicable Qatari law even if the claims were not time-barred.  Plaintiffs assert claims based on injuries

arising from their employment, so their sole cause of action under Qatari law lies against their Employers and not third parties.  Defs.' Ex. 2, ¶ 18.  Although Qatari law provides a cause of action for general tort liability, as well as for unjust enrichment, no Qatari court or tribunal has *ever* found liability relating to a worker's employment where the defendant was not "the employer, an entity functionally identical to the employer, or some other entity that directly wronged the employee."  *Id.* ¶¶ 18, 44, 48.  The AC does not and cannot allege that Defendants directly harmed the Plaintiffs or that Defendants were "functionally identical" to employers. Therefore, the Qatari law-governed claims must be dismissed for failure to state a claim.[8]

### C.    Even If Colorado Law Applies, Plaintiffs Still Fail to State a Claim

#### 1.    Plaintiffs' Claims Are Time-Barred Under Colorado Law

Even if Colorado law applied, the outcome is the same.  Under Colorado law, Plaintiffs' claims are time-barred because Colorado subjects tort claims to a two-year statute of limitations. Colo. Rev. Stat. § 13-80-102(1)(a).  A tort action "accrue[s] on the date both the underlying injury and its cause are known or should have been known" by the plaintiff.  Colo. Rev. Stat. § 13-80-108(1).  Here, Plaintiffs all knew about their alleged injuries before October 12, 2021 (two years before they filed the AC).  Virtually all of the Plaintiffs allege that they completed their work well before 2021, AC ¶¶ 147-56, 158-99, and the single remaining Plaintiff does not claim to have worked past October 12, 2021, *id.* ¶ 157.

All Plaintiffs were on notice of the alleged causes of their injury well before October 2021 too because, as Defendants have explained, the vast majority of the sources Plaintiffs cite

---

[8] Even if Plaintiffs could assert viable Qatari law claims, they should still be dismissed for *forum non conveniens*.  *See Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d 1088, 1091 (10th Cir. 2019) ("Generally, *forum non conveniens* is proper when an adequate alternative forum is available and public- and private-interest factors weigh in favor of dismissal.").

have been public for years.  Dkt. No. 39 at 38.  Plaintiffs' conclusory new claim that they were

not on notice because "Defendants concealed their knowledge of, and profit from," the alleged

trafficking is obviously and directly contradicted by the rest of Plaintiffs' own allegations.  AC

¶ 200.  Plaintiffs themselves assert that "[a]t all relevant times it was widely known . . . that the

World Cup Construction Venture used trafficked and forced labor," *id.* ¶ 64, and they rely on

pre-2021 public sources for their misguided claims about Defendants' knowledge and profit, *see,*

*e.g.*, *id.* ¶¶ 69-111, 144.  Because the AC "itself admits the elements of the affirmative" statute of

limitations defense, Plaintiffs' time-barred claims should be dismissed.  *Fernandez v. Clean*

*House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

### 2. Plaintiffs Fail to State a Claim for Negligence or Gross Negligence

Plaintiffs' amended allegations do not change the fact that Plaintiffs cannot state a claim

for negligence, let alone gross negligence, under Colorado law because none of the Defendants

owed any duty to these Plaintiffs.  Colorado law simply does not require Defendants to take

affirmative actions to "ensure" that another company's employees, like Plaintiffs, "would not be

trafficked" and that their "labor would not be forced."  AC ¶ 228.

Under Colorado law, a negligence claim must allege "(1) the existence of a legal duty to

the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the

defendant's breach of duty caused the injury."  *Raleigh v. Performance Plumbing & Heating,*

*Inc.*, 130 P.3d 1011, 1015 (Colo. 2006).  Claims based on alleged failure to control or prevent

wrongdoing by third parties, or nonfeasance, like Plaintiffs' claims here, require pleading a

"special relationship" between the parties.  *Roland v. Letgo, Inc.*, 2024 WL 372218, at *4 (10th

Cir. Feb. 1, 2024) (unpublished).  This relationship must be of "such a character that social

policy justifies the imposition of a duty to act," *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287, 295 (Colo. 2020), and, to date, Colorado has recognized only six such special relationships, none of which is or could be alleged in the AC, *Roland v. Letgo, Inc.*, 644 F. Supp. 3d 907, 918 (D. Colo. 2022) (these are "(1) common carrier/passenger; (2) innkeeper/guest; (3) possessor of land/invited entrant; (4) employer/employee; (5) parent/child; and (6) hospital/patient"), *aff'd*, 2024 WL 372218 (10th Cir. Feb. 1, 2024).  In the absence of any such relationship among the parties, Plaintiffs' negligence claims fail under Colorado law.

Plaintiffs' AC attempts, unconvincingly, to salvage their negligence claim with a halfhearted argument that "Defendants assumed a duty of care" to "the class of workers that included Plaintiffs."  AC ¶ 227.  But Plaintiffs provide zero factual support for that legal conclusion, and fall far short of alleging that Defendants "undertook a duty to ***prevent*** the harm that the plaintiffs suffered in this case" and "either" (1) Defendants "increased the risk of harm to the plaintiffs" or (2) "the plaintiffs suffered harm because they relied on" Defendants' undertaking.  *Rocky Mountain*, 467 P.3d at 297 (emphasis added).

The AC's failure to state a claim for negligence "also eliminates a claim for gross negligence."  *Roland*, 644 F. Supp. 3d at 918.  And Plaintiffs do not allege any "willful and wanton conduct" or "conscious disregard for the safety of others."  *Id.* at 917.  Rather, the AC and documents it cites describe CH2M's efforts to promote worker welfare.  *Supra* pp. 8-9, 29-30.

### 3. Plaintiffs Fail to State a Claim for Negligent Supervision

Plaintiffs' negligent supervision claims fail because Colorado law limits the doctrine to "the context of employment or agency relationships."  *Brightspot Sols., LLC v. A+ Prods., Inc.*,

2021 WL 1251512, at *10 (D. Colo. Apr. 5, 2021); *see generally Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005).  While Plaintiffs' initial complaint did not even say who Defendants supposedly negligently supervised, referring only to "entities involved in the World Cup Construction Venture construction projects," the AC now asserts in conclusory fashion that these entities "includ[ed] Plaintiffs' direct employers."  AC ¶ 245.  That claim fails as a matter of law because this Court has properly refused to extend Colorado's negligent supervision law beyond a defendant's ***own*** employees or agents, reasoning that federal courts "should apply the state common law as it is and leave the crafting of such law to the respective state courts."  *Brightspot*, 2021 WL 1251512, at *10 (declining to extend duty to "possible bailment relationship").

### 4.    Plaintiffs Fail to State a Claim for Unjust Enrichment

Plaintiffs' unjust enrichment claims would fail under Colorado law for two independent reasons.  *First*, the AC still contains only conclusory assertions that any Defendant received a financial benefit at Plaintiffs' expense.  *See supra* p. 33; AC ¶¶ 145, 218; *see generally Menocal v. GEO Group, Inc.*, 635 F. Supp. 3d 1151, 1196 (D. Colo. 2022) (quoting *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008)) (setting forth elements of unjust enrichment).  The AC never describes how CH2M, as consultant to the Supreme Committee, would benefit from the Employers' increased productivity or reduced labor expenses.  In the absence of allegations establishing a relationship between Defendants' supposed gain and Plaintiffs' loss, the claim for unjust enrichment must be dismissed.

*Second*, Plaintiffs' unjust enrichment claim fails because it merely seeks to add another cause of action based on the same injury.  *See L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1175 (D. Colo. 2015) (holding that an "unjust enrichment claim

cannot overlap any of [plaintiff's] existing claims for relief"). Plaintiffs claim that Defendants were unjustly enriched "through forced and/or trafficked labor under inhumane working and living conditions," which is the gravamen of their other claims, too. AC ¶ 218.

### D.   The Court Should Not Exercise Supplemental Jurisdiction

If the Court exercises personal jurisdiction over CH2M B.V. but dismisses Plaintiffs' federal claims, then the Court should dismiss any remaining non-federal claims for lack of subject matter jurisdiction. CH2M B.V. destroys diversity for purposes of Section 1332(a)(2). *See Air Century SA v. Atlantique Air Assistance*, 447 Fed. Appx. 879, 881 (10th Cir. 2011) (having "foreign parties on both sides of the dispute destroys the complete diversity required by [28 U.S.C] § 1332(a)(2)"). Absent diversity jurisdiction, when "all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining [non-federal] claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

### IV.   THE COURT LACKS PERSONAL JURISDICTION OVER THE JACOBS ENTITIES AND CH2M B.V.

Plaintiffs' initial complaint included no jurisdictional allegations at all for Jacobs Engineering and Jacobs Solutions – which are both headquartered in Texas – and only the most conclusory assertions for CH2M B.V., a Dutch company (collectively, the "Non-Colorado Defendants"). Dkt. No. 39 at 41-45. But rather than simply concede error and drop the Non-Colorado Defendants, Plaintiffs devote many of the new paragraphs in their AC to strained jurisdictional allegations which, on their face, fail to establish minimum contacts between ***these Defendants***, ***this controversy***, and ***this forum***.

The Due Process Clause requires a non-resident defendant to have "'certain minimum contacts' with the forum State to assure 'that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice.'"  *Hood v. Am. Auto Care, LLC*, 21 F.4th

1216, 1221 (10th Cir. 2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

A court may thus exercise "general jurisdiction over any claims against defendants who are

essentially at home there," and specific jurisdiction only where there is "an affiliation between

the forum and the underlying controversy."  *Id.* (cleaned up).  On a motion to dismiss, it is

Plaintiffs' burden to make "a *prima facie* showing of personal jurisdiction," and courts take

Plaintiffs' allegations as true only if they are "plausible, non-conclusory, and non-speculative,"

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008), and are

"not contradicted by the defendant's affidavits," *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065

(10th Cir. 2007).  Despite their repeated attempts to meet that burden, Plaintiffs cannot get

around the fact that the Non-Colorado Defendants lack the requisite connection to Colorado.

### A.     The Court Lacks General Jurisdiction over the Non-Colorado Defendants

Plaintiffs do not (and cannot) allege that the Non-Colorado Defendants are "essentially at

home" in Colorado, as is required to exercise general jurisdiction.  *Daimler AG v. Bauman*, 571

U.S. 117, 122 (2014).  The paradigmatic examples of general jurisdiction are "the place of

incorporation and principal place of business."  *Id.* at 137; *see also Hood*, 21 F.4th at 1221.  The

Jacobs entities are incorporated in Delaware and headquartered in Texas, AC ¶ 13, where they

have their principal places of business, Defs.' Ex. 3, Decl. of Amy Lanctot ¶¶ 3, 6-7.  Indeed,

Plaintiffs concede that the Jacobs entities are not subject to general jurisdiction in Colorado by

alleging only that they are subject to specific personal jurisdiction.  AC ¶ 13.  CH2M B.V.

likewise is not at home in Colorado because it is incorporated in the Netherlands, AC ¶ 12, and

has no employees, operations, place of business, subsidiaries, or real property in the United

States, Defs.' Ex. 4 ¶¶ 5-13. Plaintiffs' allegation that Brian Shelton was a CH2M B.V. officer or director (Plaintiffs seem to use the terms interchangeably) while he was based in Colorado plainly does not render CH2M B.V. at home there. AC ¶¶ 30-31; *see also* Defs.' Ex. 4 ¶ 6 (Shelton was "never an officer or employee of CH2M B.V."). And Plaintiffs' continued assertion that CH2M B.V. is subject to general jurisdiction because it "does substantial and continuous business" in Colorado, AC ¶ 12, is directly contrary to the Supreme Court's holding in *Daimler* and borders on frivolous. *See* 571 U.S. at 138 (exercising general jurisdiction everywhere that a corporation engages in "substantial" and "continuous" business would be "unacceptably grasping" (quotation marks omitted)).

## B. The Court Lacks Specific Jurisdiction over the Non-Colorado Defendants.

Plaintiffs' new allegations fail to establish any substantial connection between Plaintiffs' claims and activity directed at or occurring in Colorado, much less that Plaintiffs' claims arose "out of the defendant's forum-related activities" in Colorado. *Dental Dynamics, LLC v. Jolly Dental Grp.*, 946 F.3d 1223, 1229 (10th Cir. 2020). If the AC's unparticularized allegations were sufficient to establish jurisdiction, then every large company would be subject to specific jurisdiction wherever it – or its subsidiaries or parent – has an office. That is not the law.

The AC asserts in conclusory fashion that both CH2M B.V. and Jacobs, "on information and belief," "made decisions and took actions in this District in furtherance of the Venture," AC ¶¶ 12-13, 29-31, but Plaintiffs do not identify *a single decision or action* that was actually made or taken in Colorado by those specific Defendants as consultants for the Supreme Committee. Nor could they. As Plaintiffs elsewhere concede, Jacobs Solutions was not even incorporated

until after the Plaintiffs completed their work.[9]  AC ¶ 13.  Jacobs Engineering did not acquire the

CH2M entities until after nearly half of the Plaintiffs had completed their work.  Defs. Ex. 3, ¶ 4.

And, as Defendants' affidavits confirm, the PM Consultant's work was performed in Qatar, not

Colorado.  Defs.' Ex. 4, Miles Decl. ¶ 7; Defs.' Ex. 5, Decl. of Keoki Sears ¶¶ 3-5.  These

affidavits would trump Plaintiffs' new factual allegations if the two were inconsistent, but

Plaintiffs' new AC does not even contradict those facts.  *Melea*, 511 F.3d at 1065.  Plaintiffs

have merely identified Jacobs Engineering personnel and a lone CH2M B.V. director whose

LinkedIn profiles suggest they worked in Colorado or worked on the World Cup project, and

they just speculate that some of them might have worked on the project while in Colorado.  AC

¶¶ 29-31.

Plaintiffs have at most asserted general and incidental connections between the forum and

CH2M B.V. and Jacobs Engineering that are unrelated to their claims.  *See id.* ¶ 31 (alleging that

CH2M B.V. "carried out some of its operations" in Colorado); *id.* ¶ 13 (claiming Jacobs did

"substantial and continuous" business in Colorado).  The Supreme Court is clear that "a

defendant's general connections with the forum are not enough."  *Bristol-Myers Squibb Co. v.

Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) (holding that "the strength of the requisite

connection between the forum and the specific claims at issue" is not relaxed by "forum contacts

---

[9] Plaintiffs' suggestion that Jacobs Solutions has "successor liability" for Jacobs Engineering is irrelevant (because there is no personal jurisdiction over Jacobs Engineering either) and frankly absurd.  AC ¶¶ 13, 16.  Jacobs Solutions did not acquire Jacobs Engineering's assets and liabilities, and Jacobs Engineering continues to exist as a subsidiary of Jacobs Solutions, such that there was no "merger of the two corporations" and Jacobs Solutions cannot be "a mere continuation" of Jacobs Engineering.  *IT Portfolio, Inc. v. NER Data Corp.*, 2018 WL 3055767, at *5 (D. Colo. May 17, 2018); *see also Frontier Station, Inc. v. Kloiber Real Est. Holdings, LLC*, 2019 WL 4643683, at *3 (D. Colo. Aug. 12, 2019) ("The insurmountable problem with Frontier's successor entity theory is that" the supposed successor "existed before the Transfer Agreement and still exists.");  Defs.' Ex. 1.6, Jacobs Engineering Entity Details; Defs.' Ex. 3 ¶ 5.

that are unrelated to those claims"); *see also Jobe v. BNSF Ry. Co.*, 2024 WL 474405, at *6 (D. Colo. Jan. 30, 2024) (no personal jurisdiction where "Plaintiff was injured in Wyoming, not the forum" and the defendants' contacts "in Colorado" were not "directly tied to the core issue of this lawsuit"), *R&R adopted*, 2024 WL 982667 (D. Colo. Feb. 16, 2024).

Recognizing that there is no basis for exercising personal jurisdiction over CH2M B.V or Jacobs Engineering in Colorado, Plaintiffs try to blur the lines between the Non-Colorado Defendants and the Colorado-headquartered CH2M entities.  *See* AC ¶¶ 13, 28-33.  But Plaintiffs must establish jurisdiction "as to each defendant."  *Bristol-Myers*, 582 U.S. at 268; *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("a defendant's relationship with" other entities, "standing alone, is an insufficient basis for jurisdiction").  Each Defendant "has a separate corporate existence" and must be "treated separately from" each other where Plaintiffs have not alleged any facts "justifying disregard of the corporate entity."  *Kennedy v. Mountainside Pizza, Inc.*, 2020 WL 4454897, at *6 (D. Colo. May 14, 2020) (quoting *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004)), *R&R adopted*, 2020 WL 4448771 (D. Colo. Aug. 3, 2020).

Plaintiffs fall far short of demonstrating that the Non-Colorado Defendants' existence as separate corporations is "merely a fiction" that is used "to perpetrate a fraud or defeat a rightful claim," as they must in order to warrant the "extraordinary remedy" of piercing the corporate veil.  *Griffith v. SSC Pueblo Belmont Operating Co.*, 381 P.3d 308, 313 (Colo. 2016).  For example, with respect to CH2M B.V., Plaintiffs identify only a single director who they claim was also an executive of another CH2M entity, and allege generally that "CH2M and each of its subsidiaries followed a globally-integrated business strategy."  AC ¶¶ 30-31; Defs.' Ex. 3, ¶ 6. Plaintiffs' general and conclusory assertions that Jacobs Engineering "finances the [CH2M]

subsidiaries," exercises "control" over them, shares unspecified "common directors or officers" with them, or practiced "integrated one-firm business models" that included the operations of the Colorado-headquartered CH2M entities, are similarly deficient.  AC ¶¶ 28-33.  The AC is entirely devoid of the requisite factual allegations *showing* that Jacobs Engineering and its subsidiaries disregarded corporate formalities.  *See First Horizon Merch. Servs., Inc. v. Wellspring Cap. Mgmt., LLC*, 166 P.3d 166, 177 (Colo. App. 2007) (plaintiffs cannot establish jurisdiction with "nothing more than conclusory allegations to support the theories of agency [or] alter ego"); *cf.* Defs.' Ex. 3 ¶ 5 (CH2M B.V. has independent board of directors and maintains corporate formalities).

Although not a necessary consideration absent a *prima facie* jurisdictional showing, exercising personal jurisdiction would not comport with fair play and substantial justice, given that Colorado has no particular interest in resolving claims by foreign Plaintiffs against foreign Defendants about conduct and injuries in Qatar.  *See Dental Dynamics*, 946 F.3d at 1229.

### C.   All Claims Against Jacobs Solutions Must Also Be Dismissed for Lack of Standing and on the Merits

Even if the Court concludes that it may exercise personal jurisdiction over Jacobs Solutions, it should still dismiss all of Plaintiffs' claims against it.  As the AC now concedes, Jacobs Solutions was not incorporated until *after* "the Plaintiffs completed their work" in Qatar. AC ¶ 13.  Accordingly, Jacobs Solutions cannot have played any part in the conduct Plaintiffs attribute to "Jacobs" – defined to include both Jacobs entities, *id.* ¶ 4 – in their AC, such that Plaintiffs lack Article III standing and have not stated a claim against Jacobs Solutions.

## CONCLUSION

For all of these reasons, the Court should dismiss the AC.

Dated:  New York, New York        DEBEVOISE & PLIMPTON LLP
        April 22, 2024

/s/ *William H. Taft V*

Maura Kathleen Monaghan
Mark W. Friedman
William H. Taft V
Natascha Born
Justin R. Rassi
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
mkmonaghan@debevoise.com
mwfriedman@debevoise.com
whtaft@debevoise.com
nborn@debevoise.com
jrassi@debevoise.com

Habib Nasrullah
Frederick R. Yarger
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202-5647
303-244-1800
nasrullah@wtotrial.com
yarger@wtotrial.com

*Attorneys for Defendants*