# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

F.C., A.B., D.D.R., L.V., Ra.G., R.S., J.D.C., W.C.,
G.G., R.C., D.L., E.I., M.G., E.C., Rh.P., L.L.,
J.J.G., R.V., R.L., A.S., E.A., J.V., A.C., A.G.,
A.A., R.A., Ro.L., Ro.P., S.N., B.M., G.T., J.B.,
E.D.C., V.A., Re.D., C.S., Ra.D., M.R., L.P., I.E.,
M.A., Ro.D., A.D., Ri.D., Rod.O., M.D.L., Ri.O.,
En.C., Ron.O., G.S., B.D., C.C., and N.C.,

        Plaintiffs,

        v.

JACOBS SOLUTIONS INC., JACOBS
ENGINEERING GROUP INC., CH2M HILL
COMPANIES, LTD., CH2M HILL
INTERNATIONAL, LTD., and CH2M HILL
INTERNATIONAL B.V.,

        Defendants.

Case No. 1:23-cv-02660-MEH

ORAL ARGUMENT REQUESTED

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Legal Standard ...................................................................................................... 4

Argument ............................................................................................................... 5

   I. Plaintiffs Have Article III Standing. ............................................................ 5

   II. Plaintiffs Adequately Allege Civil Violations of the TVPRA. ..................... 9

      A. Plaintiffs Sufficiently Allege a "Venture" for Purposes of their TVPRA Claim ......... 10

      B. Plaintiffs Plausibly Allege Defendants Participated in the Venture. .......................... 12

      C. Plaintiffs Sufficiently Allege Defendants Knowingly Benefitted from Participating in the Venture. ......................................................................... 19

      D. Plaintiffs Plausibly Allege Defendants Knew or Should Have Known the Venture Used Trafficked and Forced Labor. .............................................. 21

      E. Plaintiffs Allege Their Injuries with Sufficient Specificity and Particularity. ........... 25

      F. Plaintiffs' §1593 Restitution Claim Should Not Be Dismissed. ................................ 28

   III. Extraterritorial Application of the TVPRA Is Proper, and Plaintiffs in Any Event Seek Domestic Application. ............................................................... 28

      A. The TVPRA Civil Cause of Action Applies Extraterritorially. ................................. 29

      B. Should the Court Find the TVPRA's Civil Remedy Does Not Apply Extraterritorially, Plaintiffs Seek Domestic Application. ........................... 32

   IV. Each Defendant Is Subject to Personal Jurisdiction. ................................... 35

      A. CH2M B.V. Has Minimum Contacts with Colorado Arising Out of Its Work on the Venture. ................................................................................. 35

      B. Jacobs Engineering Has Minimum Contacts with Colorado Arising Out of Its Work on the Venture. ...................................................................... 41

      C. Jacobs Solutions Has Minimum Contacts with Colorado Arising Out of Its Work on the Venture, and the Claims Against It Are Viable. ................ 42

      D. Exercising Jurisdiction Over CH2M B.V., Jacobs Engineering, and Jacobs Solutions Would Comport with the Due Process Clause. ............................ 45

Conclusion ........................................................................................................... 45

i

**TABLE OF AUTHORITIES**

**Cases**

*Abafita v. Aldukhan*,
  2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019) ............................................................... 31

*Adhikari v. Kellogg Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir. 2017) ............................................................................. 28, 31

*Alcan Aluminum Corp., v. Elec. Metal Prods., Inc.*,
  837 P.2d 282 (Colo. App. 1992) ............................................................................. 45

*Allen v. Wright*,
  468 U.S. 737 (1984) ........................................................................................... 6, 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 4, 27

*AST Sports Sci., Inc. v. CLF Distrib. Ltd.*,
  514 F.3d 1054 (10th Cir. 2008) ........................................... 35, 37, 38, 40, 42, 45

*Barton v. Waechter, L.L.C.*,
  2008 WL 11439344 (D. Kan. Jan. 3, 2008) ............................................................. 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 26

*Bennett v. Spear*,
  520 U.S. 154 (1997) ....................................................................................... 5, 6, 8, 9

*Bistline v. Jeffs*,
  2017 WL 108039 (Jan. 11, 2017 D. Colo.) ........................................................... 12

*Bistline v. Parker*,
  918 F.3d 849 (10th Cir. 2019) ......................................... 9, 10, 12, 13, 14, 19, 21, 25

*Burnett v. Mortg. Elec. Registration Sys., Inc.*,
  706 F.3d 1231 (10th Cir. 2013) ......................................................................... 4, 21

*Camayo v. John Peroulis & Sons Sheep, Inc.*,
  2012 WL 4359086 (D. Colo. Sept. 24, 2012) .................................................... 25, 26

*Caprio v. R. J. Reynolds Tobacco Co.*,
  2007 WL 9702732 (S.D. Fla. Sept. 28, 2007) ....................................................... 44

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................... 6

*ClearOne Commc'ns, Inc., v. Bowers*,
  643 F.3d 735 (10th Cir. 2011) ............................................................................... 39

*CMCB Enters., Inc. v. Ferguson*,
  114 P.3d 90 (Colo. App. 2005) ................................................................. 42, 43, 44, 45

*C.T. v. Red Roof Inns, Inc.*,
  2021 WL 2942483 (S.D. Ohio July 1, 2021) ........................................................... 31

*Day v. Bond*,
  500 F.3d 1127 (10th Cir. 2007) ................................................................................. 9

*Dinsay v. RN Staff Inc.*,
  2021 WL 2643639 (S.D. Ind. June 28, 2021) ......................................................... 28

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024) ...................................................... 5, 6, 7, 8, 9, 19, 32

*Doe I v. Apple Inc.*,
  2021 WL 5774224 (D.D.C. Nov. 2, 2021) ............................................................... 32

*Doe #1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) ............................................................................ 12, 13

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
  514 F.3d 1063 (10th Cir. 2008) .............................................................................. 40

*Duris v. Erato Shipping, Inc.*,
  684 F.2d 352 (6th Cir. 1982) .................................................................................. 44

*Ellis v. J.R.'s Country Stores, Inc.*,
  779 F.3d 1184 (10th Cir. 2015) .............................................................................. 44

*E.S. v. Best W. Int'l, Inc.*,
  510 F. Supp. 3d 420 (N.D. Tex. 2021) ................................................................... 13

*First Am. Corp. v. Price Waterhouse LLP*,
  988 F. Supp. 353 (S.D.N.Y. 1997) ......................................................................... 40

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021) ...................................................................................... 35, 39, 40

*G.G. v. Salesforce.com, Inc.*,
  76 F.4th 544 (7th Cir. 2023) .............................. 10, 12, 13, 14, 16, 19, 20, 21, 24

*Gilbert v. U.S. Olympic Comm.*,
  423 F. Supp. 3d 1112 (D. Colo. 2019) ..................................................... 10, 13, 14, 16, 19

*Gilbert v. U.S. Olympic Comm.*,
  2019 WL 1058194 (D. Colo. Mar. 6, 2019) ...................................... 10, 11-12, 20, 27

*Habecker v. Town of Estes Park, Colo.*,
  518 F.3d 1217 (10th Cir. 2008) ............................................................................. 5, 6

*Hampden Auto Body Co. v. Auto-Owners Ins. Co.*,
  2020 WL 550591 (D. Colo. Feb. 4, 2020) ............................................................... 8

*Hogan v. Winder*,
  762 F.3d 1096 (10th Cir. 2014) .............................................................................. 26

*In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*,
   2001 WL 34691976 (S.D. Ind. Nov. 14, 2001) .......................................................... 40

*Lagasan v. Al-Ghasel*,
   92 F. Supp. 3d 445 (E.D. Va. 2015) ......................................................................... 28

*Lagayan v. Odeh*,
   199 F. Supp. 3d 21 (D.D.C. 2016) ........................................................................... 26

*Lipenga v. Kambalame*,
   219 F. Supp. 3d 517 (D. Md. 2016) .................................................................... 26, 28

*Lupia v. Medicredit, Inc.*,
   8 F.4th 1184 (10th Cir. 2021) ..................................................................................... 7

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................................................... 5, 6, 8

*Melea, Ltd. v. Jawer SA*,
   511 F.3d 1060 (10th Cir. 2007) .................................................................................. 4

*Nelson v. Elway*,
   908 P.2d 102 (Colo. 1995) ......................................................................................... 8

*Nestlé USA Inc. v. Doe*,
   593 U.S. 628 (2021) ................................................................................................... 5

*Patin v. Thoroughbred Power Boats Inc.*,
   294 F.3d 640 (5th Cir. 2002) ....................................................................... 42, 43, 44

*Pro Axess, Inc. v. Orlux Dist., Inc.*,
   428 F.3d 1270 (10th Cir. 2005) .......................................................................... 37, 45

*Ratha v. Phatthana Seafood Co.*,
   35 F.4th 1159 (9th Cir. 2022) ............................................................................ 24, 31

*Ratha v. Phatthana Seafood Co.*,
   2016 WL 11020222 (C.D. Cal. Nov. 9, 2016) .................................................... 30-31

*Ricchio v. McLean*,
   853 F.3d 553 (1st Cir. 2017) ................................................................................... 12

*RJR Nabisco, Inc. v. Eur. Cmty.*,
   579 U.S. 325 (2016) ............................................................................. 29, 31, 32, 35

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*,
   2005 WL 3658006 (D.N.J. June 7, 2005) ................................................................ 40

*Rodriguez v. Pan Am. Health Org.*,
   29 F.4th 706 (D.C. Cir. 2022) ........................................................................... 32, 35

*Roe v. Howard*,
   917 F.3d 229 (4th Cir. 2019) ........................................................... 28, 29, 30, 31

*Ross v. Jenkins,*
    325 F. Supp. 3d 1141 (D. Kan. 2018) ..................................................................... 28

*Shields v. Pro. Bureau of Collections of Md., Inc.,*
    55 F.4th 823 (10th Cir. 2022).................................................................................. 8

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) .............................................................................................. 6, 8

*Sulaiman v. Laram,*
    2017 WL 11659746 (S.D.N.Y. Apr. 4, 2017)......................................................... 26

*Third Nat'l Bank in Nashville v. WEDGE Grp. Inc.,*
    882 F.2d 1087 (6th Cir. 1989).............................................................................. 41

*Tosco Corp. v. Koch Indus., Inc.,*
    216 F.3d 886 (10th Cir. 2000)................................................................................ 9

*TransFirst, LLC v. Brown,*
    323 F.R.D. 641 (D. Colo. 2018).............................................................................. 4

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................................................ 7, 8

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023) ............................................................................................ 7, 8

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC,*
    402 F. Supp. 3d 162 (D. Md. 2019) ...................................................................... 28

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC,*
    21 F.4th 1229 (10th Cir. 2021)............................................................................... 5

*Vela v. Sterigenics U.S., LLC,*
    2024 WL 83015 (D.N.M. Jan. 8, 2024) ................................................................ 45

*Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
    2021 WL 710816 (Del. Super. Ct. Feb. 23, 2021) ............................................42-43

*W. Standard, LLC v. Sourcehov Holdings, Inc.,*
    2019 WL 3322406 (Del. Ch. July 24, 2019).......................................................... 42

*W. Watersheds Project v. Michael,*
    869 F.3d 1189 (10th Cir. 2017)............................................................................ 21

*Walters v. Metro. Educ. Enters., Inc.,*
    519 U.S. 202 (1997) ............................................................................................. 13

*Williams v. Bowman Livestock Equip. Co.,*
    927 F.2d 1128 (10th Cir. 1991)............................................................................ 42

*Williams v. Sisolak,*
    2022 WL 2819842 (D. Nev. July 18, 2022) ............................................................ 6

*XMission, L.C. v. Fluent LLC,*
  955 F.3d 833 (10th Cir. 2020) .................................................................................. 35

**Constitutional Provisions and Statutes**

U.S. CONST., art. III ..................................................................................................... 5-9

COLO. REV. STAT. §18-3-501 ........................................................................................ 45

COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT,
  42 U.S.C. §9607. ........................................................................................................ 9

TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT,
  18 U.S.C. §1589 *et seq.* .................................................................................... *passim*

Trafficking Victims Protection Reauthorization Act of 2003,
  Pub. L. No. 108-193, 117 Stat. 2875. ...................................................................... 30

Victims of Trafficking and Violence Protection Act of 2000,
  Pub. L. 106-386, 114 Stat. 1464. ............................................................................. 30

**Rules**

FEDERAL RULE OF CIVIL PROCEDURE 12 ......................................................................... 4

**Other Authorities**

1 AM. L. OF TORTS §4:1 (Feb. 2024 update) .................................................................... 7

Br. for Members of Congress Sen. Blumental, Rep. Smith, *et al.*,
  as Amici Curiae Supporting Respondents,
  *Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021) (Nos. 19-416 & 19-453) ................................. 31

7 COLO. PRAC., PERSONAL INJURY TORTS AND INSURANCE §18.30 (Nov. 2023 update) ................. 7

RESTATEMENT (SECOND) OF AGENCY §219 (Mar. 2024 update) ...................................... 7

**INTRODUCTION**

The stadiums for the 2022 FIFA World Cup in Qatar were built by trafficked and forced labor. Defendants—four related American companies and one foreign affiliate—managed and profited from these construction projects despite knowing they were erected upon this ugly foundation. In doing so, Defendants violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1589 *et seq.*

Plaintiffs are 53 Filipino construction workers out of the tens of thousands trafficked to Qatar and forced to work on the stadiums. D.I. 46, Amended Compl. ("AC") ¶¶5-6, 35, 147-99. Plaintiffs allege the construction project to build World Cup Stadiums was a venture (the "World Cup Construction Venture," or "Venture"), *id.* ¶22, that their immediate employers in Qatar (the "Employers") participated in the Venture as construction subcontractors who provided labor for the Venture (including the work done by Plaintiffs), *id.* ¶34, and that each Defendant participated in the Venture and was paid handsomely to "manage and oversee" all work done, *id.* ¶¶5, 22.

Each Plaintiff has his own unique history of being exploited to provide labor for the Venture once he arrived in Qatar; but common to all Plaintiffs is an Employer, a Venture participant, that forced him to toil incredibly long hours in scorching heat that reached 118° Fahrenheit and trapped him in Qatar by taking his passport. *Id.* ¶¶1, 147-99. Plaintiffs were also forced to live in wretched and inhumane conditions, crammed into tiny rooms. *Id.* ¶¶147-99. And they were not paid what they were promised. *Id.* Plaintiffs were treated as "modern slaves," and Defendants signed a contract, *id.* ¶144(a), pursuant to which they received millions of dollars to manage the entire Venture, including the construction projects exploiting Plaintiffs' forced labor. *Id.* ¶¶22, 142.

CH2M Hill International B.V. ("CH2M B.V.") was the international subsidiary through which CH2M Hill Companies, Ltd. ("CH2M Hill"), who originally signed the contract, managed the Venture. Each of CH2M B.V., CH2M Hill, and CH2M Hill International, Ltd. ("CH2M Hill

International" and, with CH2M Hill and CH2M B.V. collectively, "CH2M") did substantial work in furtherance of the Venture. *Id.* ¶¶28-31, 141, 144(a). In 2017, Jacobs Engineering Group Inc. ("Jacobs Engineering") acquired CH2M (and all its subsidiaries, including CH2M B.V.), and thereafter took over CH2M's role as program manager of the Venture. *Id.* ¶¶24-25, 27. Plaintiffs plausibly allege Jacobs Engineering Group Inc. and Jacobs Solutions Inc. (collectively, "Jacobs") also did work in furtherance of the Venture. *Id.* ¶¶28-29, 60-61, 128-29, 144.

Defendants' participation in the Venture was far-ranging and substantial. For example, Plaintiffs plausibly allege, via public accounts, that Defendants' employees regularly interacted with Plaintiffs' Employers at the stadiums where Plaintiffs worked, had managerial authority over the Employers, conducted site visits and inspections, and ensured the Employers' contractual compliance. *E.g.*, *id.* ¶¶61, 129. CH2M Hill's Chief Executive Officer publicly stated that as program manager, Defendants were responsible for overseeing "contractor selection" for the Venture and creating "an inspection regime for enforcement" for matters relating to worker welfare. *Id.* ¶118. After it acquired CH2M, Jacobs confirmed Defendants' substantial participation in the Venture when it touted its decade-long role as the Venture's "delivery partner" providing "whole-system solutions" for the construction projects. *Id.* ¶¶60(f), 60(h).

Defendants knew—or should have known—that the use of trafficked and forced labor was rampant in their World Cup Construction Venture. *Id.* ¶211. As a baseline, any company working in the Qatar construction industry should have known; it was common knowledge that trafficked and forced labor was pervasive. *Id.* ¶¶37-51, 63-66. That general industry-wide knowledge bolsters and makes eminently plausible Plaintiffs' allegations that CH2M directly learned, via public reports and its own due diligence, *before* entering into its program management contract, that the Venture *specifically* (and not just the construction industry generally) would exploit workers. *Id.*

¶¶68, 69(a), 74, 86-89, 113. Then, in 2012, right after signing the contract, Defendants were notified by Human Rights Watch about the potential for trafficked and forced labor in the Venture. *Id.* ¶¶51, 70(a). Thereafter, from 2012 to 2017, CH2M was consistently and repeatedly put on notice by public reports, *id.* ¶¶69-70, and bipartisan media reporting, *id.* ¶¶71-76, 99-105, that the Venture relied extensively on trafficked and forced labor. All along, its years of work on the Venture also would also have alerted CH2M to the prevalence of trafficked and forced migrant labor in the Venture. *Id.* ¶¶84-92, 112, 116-18, 129, 134, 141. Indeed, just by way of example, in 2015, one Venture participant that CH2M managed, VINCI, publicly admitted to confiscating worker passports. *Id.* ¶140. CH2M cannot credibly deny it knew of the Venture's extensive use of trafficked and forced labor.

Jacobs would have learned all that before acquiring CH2M in 2017. *Id.* ¶¶ 87, 211. For example, Jacobs received a law firm client alert in 2015 in part about "Qatar and the World Cup" highlighting the "scrutiny over allegations concerning treatment of workers ***building the stadia***." *Id.* ¶88 (emphasis supplied). Then, when performing due diligence before acquiring CH2M, Jacobs should have learned the Venture was using trafficked and forced labor based on all the public reporting discussed above. For example, the year Jacobs acquired CH2M, a public report stated that "[a]n investigation into the working conditions in Qatar during preparations for the 2022 FIFA World Cup has found evidence of severe abuse of migrant laborers and indicators of human trafficking." *Id.* ¶70(d). Jacobs would have seen that report, which detailed abuses like those Plaintiffs allege here. Jacobs decided to join the Venture anyway. Thereafter, Jacobs was consistently and repeatedly put on notice by its own work on the Venture that the Venture was using trafficked and forced labor. *Id.* ¶¶29, 61, 84-85, 112, 119-35.

Defendants' motion should be denied. Plaintiffs plausibly allege they were trafficked and forced to work, in violation of the TVPRA; that CH2M and Jacobs participated in the World Cup Construction Venture and knowingly benefitted therefrom; and that CH2M and Jacobs "knew or should have known" that the Venture "engaged in an act in violation" of the TVPRA. 18 U.S.C. §1595(a). To resist this conclusion, Defendants either ignore Plaintiffs' well-plead and meticulously supported allegations, improperly seek inferences in their favor, mischaracterize factual allegations as "legal conclusions," argue factual disputes, or urge the Court to contort the TVPRA by imposing legal requirements not found in statute or precedent. But it is not proper at the pleading stage to ignore Plaintiffs' allegations, to draw inferences in Defendants' favor, or to resolve factual disputes how Defendants would like. And where there exists overwhelming publicly available documentation supporting Plaintiffs' allegations, Plaintiffs should get the benefit of the doubt. With the inferences properly drawn in their favor, Plaintiffs have successfully stated their claims.

## LEGAL STANDARD

Defeating a Rule 12(b)(2) motion to dismiss requires only "a *prima facie* showing of personal jurisdiction." *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007). "[A]ll [jurisdictional] allegations in a complaint uncontradicted by a defendant's affidavits are accepted as true, and all factual disputes are resolved in the plaintiff's favor." *TransFirst, LLC v. Brown*, 323 F.R.D. 641, 646 (D. Colo. 2018) (citation omitted). Similarly, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

**ARGUMENT**

## I.    Plaintiffs Have Article III Standing.

Plaintiffs allege a constitutionally sufficient link between their injuries and Defendants' conduct. Under the TVPRA, the only necessary connection between Defendants' conduct and Plaintiffs' injuries is Defendants' knowing participation in the trafficking venture that injured Plaintiffs. This kind of vicarious liability is widespread in both common and statutory law and is well within Congress's power to impose under Article III—as the D.C. Circuit held when recently rejecting Defendants' theory. *See Doe 1 v. Apple Inc*., 96 F.4th 403, 409-12 (D.C. Cir. 2024).

Article III causation is a threshold requirement that "need not rise to the level of proximate causation." *Habecker v. Town of Estes Park*, *Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008). It requires only that the plaintiff's injury be "fairly traceable" to the defendant's conduct—not that such conduct directly cause the injury or be the "very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). It need not be the sole or even the primary cause of the injury. *E.g.*, *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1244-45 (10th Cir. 2021). That said, the injury may not "result [from] the independent action of some third party." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted).

Like Article III, the TVPRA does not require plaintiffs to prove that a particular defendant directly caused their injuries. Instead, trafficking victims may sue both "perpetrators"—traffickers who directly harmed the plaintiffs—*and* "whoever knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPRA. §1595(a); *see infra* II.C. That is, trafficking victims have a "private right of action" to sue both the slavers and "defendants who are involved ***indirectly*** with slavery" via participation in the trafficking "venture." *Nestlé USA Inc. v. Doe*, 593 U.S. 628, 638 (2021) (emphasis supplied). The TVPRA's broad "indirect" liability reflects Congress's "recogni[tion of] a causal link between

5

the injury of forced labor and actors who indirectly facilitate it" by participating in the venture that violates the TVPRA. *Apple*, 96 F. 4th at 412.

It is that "causal link" between trafficking and those "who indirectly facilitate it" that Defendants argue violates Article III, because it imposes on venture participants liability for injuries caused by what Defendants characterize as the "independent action" of "some third party"—*i.e.*, the "perpetrators" directly liable under the statute. MTD 11 (quoting *Lujan*, 504 U.S. at 560). But Defendants mischaracterize the TVPRA, Plaintiffs' allegations, and Article III.

Neither the TVPRA nor Plaintiffs would impose liability on Defendants for "independent" acts of "third parties." The direct "perpetrators" under §1595(a)—which include Plaintiffs' direct Employers, *e.g.*, AC ¶¶2, 147-99, 205-06—are not "third parties" acting "independently" and thus breaking the chain of injury causation. Rather, they are participants in the same trafficking "venture" as the defendant—a venture that has "engaged in a violation of" the TVPRA, from which Defendants benefited. Under §1595(a), *participants* like Defendants are liable not as direct tortfeasors but as *co-venturers* with "perpetrators" of trafficking injuries. That distinguishes TVPRA venture liability from the "independent third party" cases on which Defendants rely.[1]

The question, then, is whether the statutory causal chain of liability Congress created—imputing liability from trafficking "perpetrators" to their knowing co-venturers—falls below the "irreducible constitutional minimum" of causation required by Article III. MTD 11 (quoting *Lujan*, 504 U.S. at 560). It does not. TVPRA venture liability is a form of *vicarious* liability, in which a party is legally responsible for another's wrongdoing "because of the party's relationship to the

---

[1] MTD 11-14 (citing *Lujan*, 504 U.S. at 560; *Allen v. Wright*, 468 U.S. 737, 759 (1984); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *Habecker*, 518 F.3d at 1225; *Bennett*, 520 U.S. at 169; *Williams v. Sisolak,* 2022 WL 2819842, at *4 (D. Nev. July 18, 2022)).

wrongdoer."[2] Examples from common law include aiding and abetting (liability for providing "knowing and substantial assistance" to the direct tortfeasor[3]), conspiracy (liability for "reasonably foreseeable acts" of a co-conspirator "taken to further the conspiracy"[4]), joint venture (liability for actions of "all participants" in the venture[5]), and *respondeat superior* (employer liability for employee torts "committed . . . in the scope of their employment"[6]).

The TVPRA's similarity to established causes of action forecloses Defendants' Article III challenge. The Supreme Court held in the context of Article III's "injury" requirement that Congress's power to create previously unrecognized forms of statutory injury is bounded only by the need for a "close historical or common-law analogue" to the statutory injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021); *see also Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021). Here, multiple "close historical or common-law analogues" exist for TVPRA venture liability. And just months ago, the D.C. Circuit—faced with this exact Article III challenge—identified aiding-abetting as a sufficiently "close historical analogue" to TVPRA liability to satisfy Article III, applied *TransUnion*, and held that because "[t]he TVPRA's causal chain for a 'venture' has a 'close relationship' to lawsuits that would be cognizable" at common law, "Congress's decision to establish such liability in the TVPRA is . . . consistent with Article III." *Apple*, 96 F.4th at 411.

---

[2] 1 Am. L. of Torts §4:1 n.3 (citation omitted).

[3] *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491 (2023).

[4] *Id*. at 496.

[5] *E.g.*, *Barton v. Waechter, L.L.C.*, 2008 WL 11439344, at *3 (D. Kan. Jan. 3, 2008) (citation omitted); 7 Colo. Prac., Personal Injury Torts and Insurance §18.30 ("The negligence of one joint venturer may be charged to all joint venturers.") (citations omitted).

[6] Restatement (Second) of Agency §219(a) (March 2024 update).

Defendants proffer *Apple* was wrongly decided but make no attempt to explain why.[7] They nevertheless seize upon *Apple*'s analogy to aiding-and-abetting to suggest Plaintiffs' complaint fails to state a claim for aiding-and-abetting. MTD 13-14. This bait-and-switch does not work: The relevant question under Article III is whether an analogous common-law cause of action *exists*, not whether plaintiffs state a claim under that analogous cause of action. *E.g.*, *Shields v. Pro. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 828 (10th Cir. 2022) (explaining that "a plaintiff may have standing for a statutory claim even if she could not succeed on the [analogous] traditional tort") (citation omitted). So long as there exists a "***close*** historical or common-law analogue," an "exact duplicate" in "American history and tradition" is not required to support standing. *TransUnion*, 594 U.S. at 424 (emphasis supplied).

Nor are Defendants correct to insist "indirect" causation only satisfies Article III if Plaintiffs can show Defendants *controlled* the direct tortfeasor. MTD 12 (citing *Bennett*, 520 U.S. at 169). *Bennett* does not say control is *necessary* to demonstrate "indirect" causation—merely that it is sufficient. 520 U.S. at 169. And although some of the TVPRA's participant liability common-law analogues require control over the direct tortfeasor, others—including aiding-and-abetting and conspiracy—do not.[8] If Article III required control over the tortfeasor, numerous

---

[7] Defendants' invitation (MTD 12) to "compare" *Apple* with *Lujan*, *Allen*, and *Simon* sheds no light on their claim that *Apple* adopts an "overly generous" approach to traceability. *Apple* expressly considered and quoted from each of those cases. *See* 96 F.4th at 408-09, 412-14. Having failed to explain *Apple*'s purported deficiency in their opening brief, Defendants forfeited the opportunity to do so. *E.g.*, *Hampden Auto Body Co. v. Auto-Owners Ins. Co.*, 2020 WL 550591, at *5 (D. Colo. Feb. 4, 2020) (citations omitted).

[8] *See Twitter*, 598 U.S. at 486 (delineating elements of civil aiding and abetting); *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995) (delineating elements of civil conspiracy liability).

common-law and statutory causes of action would be gutted.[9] That cannot be. And in any event, Plaintiffs *have* alleged "control." *See infra* II.B.2 (citing AC ¶¶27, 61, 129, 136, 239-44, where Plaintiffs allege, for example, Defendants had "influence over and oversight" over construction, including "managerial authority, auditing rights, and control over" Plaintiffs' direct Employers as to worker "health and safety" and "welfare").[10]

For all these reasons, Plaintiffs have amply discharged their "relatively modest" burden to demonstrate Article III standing. *Bennett*, 520 U.S. at 171.

## II.    Plaintiffs Adequately Allege Civil Violations of the TVPRA.[11]

Victims "may bring a civil action" against those who violate Chapter 77 of Title 18 of the U.S. Code. 18 U.S.C. §1595(a). "One can violate the statute either as a primary offender or simply by benefiting financially from participation in a 'venture' with the primary offender." *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). Plaintiffs plausibly allege Defendants violated statutory prohibitions on forced labor, *see* §§1589(b), 1590, through their knowing participation in the Venture.

---

[9] Many federal statutes impose vicarious liability on actors who lack control over the direct tortfeasor. As but one example, CERCLA authorizes plaintiffs to recover from the current "owner or operator of a vessel or facility . . . damages for injury . . . or loss resulting from" a release of hazardous substances, even if the owner or operator played no role in causing the release. 42 U.S.C. §9607; *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 891 (10th Cir. 2000) (CERCLA plaintiffs "need not prove a specific causal link between costs incurred and an individual responsible person's waste").

[10] Defendants' attack on the sufficiency of these allegations, MTD 12, is irrelevant: When assessing standing, the court must accept Plaintiffs' allegations as true and "assume that the Plaintiffs . . . will prevail on [their] merits argument." *Day v. Bond*, 500 F.3d 1127, 1137 (10th Cir. 2007); *see also Apple*, 96 F.4th at 409-10 (citation omitted).

[11] Although Plaintiffs believe that Colorado law should apply for their common-law claims, and that any claims' statute of limitations should be tolled based on fraudulent concealment and Plaintiffs' delayed discovery of the bases for the claims, Plaintiffs at this time consent to dismissal of their common-law claims.

A.      **Plaintiffs Sufficiently Allege a "Venture" for Purposes of their TVPRA Claim.**

Under the TVPRA, a "venture" is "any group of two or more individuals associated in fact, whether or not a legal entity." *Bistline*, 918 F.3d at 873. This "broad definition of venture," *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1137 (D. Colo. 2019), is consistent with the "broad reach of the TVPA and the broad class of individuals whom it protects," Rept. and Rec., *Gilbert v. U.S. Olympic Comm.*, 2019 WL 1058194, at *16 (D. Colo. Mar. 6, 2019) (citation and quotation omitted) (M.J. Hegarty) ("*Gilbert* R&R"), *adopted in relevant part*, 423 F. Supp. 3d 1112. The "venture" can be a commercial "joint enterprise," *see* MTD 29, or "business whose primary focus" is not "trafficking," *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023); *see also id.* at 559 (noting that "venture" should be liberally construed "so that the civil remedy does not demand more of the plaintiff than a criminal prosecution demands of the government").

Here, Plaintiffs allege a Venture, defined as the construction work to build and upgrade twelve soccer stadiums and related infrastructure for the 2022 World Cup in Qatar. AC ¶22. Defendants, the Supreme Committee, and the sub-contractors who employed Plaintiffs (*i.e.*, Plaintiffs' Employers) collaborated closely through the Venture to build and upgrade the stadiums for the 2022 World Cup. *See*, *e.g.*, *infra* II.B.2. These entities and individuals were "associated in fact," *Bistline*, 918 F.3d at 873, and thus easily meet the TVPRA's "broad definition" of venture, *Gilbert*, 423 F. Supp. 3d at 1138.[12]

---

[12] Contrary to Defendants' urging (MTD 25, 28), the Tenth Circuit in *Bistline* made clear that the close characteristics of the relationship between the primary violator and his lawyers was *sufficient* to establish an association in fact—but *not* necessary. 918 F.3d at 875-76. ("We do not present this summary as necessarily exhausting every variant of statutory violation and basis for civil liability that could survive the motion to dismiss, but merely to indicate that the claims so summarized are supported by factual allegations and reasonable inferences sufficient to pass muster under the plausibility standard.").

Defendants point to no case, MTD 24-25, and Plaintiffs know of none, requiring Plaintiffs to "identi[fy] the supposed perpetrators" of the forced labor for their Venture definition to be viable. In any event, Plaintiffs did: Plaintiffs' Employers, among others, committed immediate trafficking violations, *see* AC¶¶147-99, and Defendants were associated with them, *e.g.*, *id.* ¶¶58-59, 133 (alleging Defendants' commercial relationships with Plaintiffs' Employers).[13]

Defendants attack the alleged Venture's supposed breadth, MTD 2, 6, 24, 27-28, asserting even the "soccer players" or "vendors selling food" would fit within the Venture's scope. That is wrong. First, those groups are definitionally excluded. The Venture as alleged involved the *construction of stadiums*, AC ¶22; food vendors and footballers played no role in building stadiums and related infrastructure. And those with no or little involvement in construction are shielded from liability because of the other TVPRA elements (*i.e.*, knowing participation and benefit). *Contra* MTD 27-28. Second, Defendants' assertions ignore that, as program managers for the construction they are at the heart of the Venture, not the periphery, so they may be "liable for any alleged trafficking and forced labor to the same extent as the [immediate] perpetrators," MTD 28; *see* §§1589(b), 1590(b). Defendants should not be able to escape liability now by opining that more distant actors could also theoretically be included in the Venture. Adopting Defendants' position would create a perverse outcome where the larger the Venture, the less likely that liability would be imposed on any given participant—improperly limiting participant liability under the TVPRA where it is most needed. Finally, although Plaintiffs dispute their Venture is "amorphous," MTD 24, even if it is, the Venture need not be defined with precision at the pleading stage. *See Gilbert*

---

[13] It is not a "legal conclusion," MTD 24, to allege the Employers—construction companies providing and managing labor to build and renovate soccer stadiums—were Venture participants. Plaintiffs have alleged *facts*, based on their experiences and investigation, that their Employers were involved in constructing and upgrading the World Cup stadiums. The legal question is whether Plaintiffs defined a "Venture" consistent with Tenth Circuit precedent. They did.

R&R, 2019 WL 1058194, at *21 (declining to impose "particularity" pleading standard on TVPRA claims).

Defendants are also wrong to urge that a venture requires "shared" "risks or profits." MTD 26; *see also id.* at 2, 7, 28. That approach, adopted by the *Bistline* district court, *see Bistline v. Jeffs*, 2017 WL 108039, at *10 (Jan. 11, 2017 D. Colo.), was *rejected* by the Tenth Circuit, *see Bistline*, 918 F.3d at 873. In any event, with much more association in fact with the Employers than the "high-fives" found sufficient in *Ricchio v. McLean*, 853 F.3d 553, 555-57 (1st Cir. 2017) (cited MTD 28), Plaintiffs plausibly allege Defendants did share risks and profits with the Employers: If the stadiums were not built on time and at cost, Defendants would not have been compensated as generously. *See* AC ¶145. Indeed, as manager of delivery of the stadiums on a tight timeline and with a financial budget, it would be fair to infer from those facts that Defendants shared risks and rewards, and had continuous business relationships, *see*, *e.g.*, AC ¶¶61-62, with the Employers. Plaintiffs thus sufficiently allege a "venture" existed.

## B.  Plaintiffs Plausibly Allege Defendants Participated in the Venture.

### 1.  *Participation requires only a desire to promote a Venture's success.*

Courts interpret §1595(a) "'participation' in accord with [an] 'ordinary understanding of culpable assistance to a wrongdoer,' which requires only 'a desire to promote the wrongful venture's success.'" *Salesforce.com*, 76 F.4th at 559. Plausible allegations that a defendant "'assist[ed], support[ed], or faciliat[ed]' *a venture* that violate[d]" the TVPRA are sufficient to defeat a motion to dismiss. *Id.* (emphasis supplied). A defendant may "facilitate[] the venture's success" through a "continuous business relationship" with the primary violator. *Id.* at 560. Indeed, the "common meaning" of "participation" aligns with this approach: Defendants may be liable if they "take part in" a venture. MTD 30 (quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021)).

Defendants offer another interpretation of "participation." They claim Plaintiffs must allege that Defendants "assisted, supported, or facilitated" *trafficking or forced labor* itself. MTD 29. That interpretation has been emphatically rejected. First, there is no statutory requirement "that the defendant's participation be an overt act in furtherance of [a co-venturer's] ***TVPA violation***." *Gilbert*, 423 F. Supp. 3d at 1138 (emphasis supplied). That is because it is "the venture that must violate [the TVPRA], and not the participant." *Salesforce.com*, 76 F.4th at 559. Requiring "direct involvement" in "trafficking itself . . . goes beyond what the statutory text requires." *Id*. Second, Defendants' interpretation would nullify participant liability under the TVPRA. If a defendant assists or facilitates "the relevant TVPRA offense," MTD 29, it could be held liable as a *principal*. *See*, *e.g.*, §1589(a). There would be no such thing as liability for venture participation, because it would be redundant. *See* §§1589(b), 1595(a). Because that outcome "make[s] no sense," *Red Roof Inns*, 21 F.4th at 724, Defendants' interpretation has been repeatedly rejected. *See id.*; *Gilbert*, 423 F. Supp. 3d at 1138; *Salesforce.com*, 76 F.4th at 558-59; *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 427 (N.D. Tex. 2021) (collecting cases); *see also generally Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997) ("Statutes must be interpreted, if possible, to give each word some operative effect."). Defendants thus may be liable under §1595(a) for desiring to promote the illicit venture's success—even without directly assisting in TVPRA violations.[14]

2.     *Plaintiffs plausibly allege Defendants desired that the Venture succeed.*

Plaintiffs plausibly allege Defendants worked on the construction projects to build and update stadiums for the World Cup. *E.g.*, AC ¶¶4, 22. Defendants have now confirmed, D.I. 53-10 ¶7; D.I. 53-11 ¶3, CH2M was hired to be the Programme Management Consultant "to ensure the

---

[14] Contrary to Defendants' characterization (MTD 29), the Tenth Circuit in *Bistline* did not define "participation in a venture," nor hold that "assisting, supporting, or facilitating" "the relevant TVPRA offense" is necessary to impose beneficiary liability.

successful delivery" of the 2022 FIFA World Cup in Qatar by managing the massive construction projects necessary to host the event. AC ¶22. Defendants also do not dispute that when Jacobs acquired CH2M in 2017, Jacobs took over and began working on the construction projects. *Id.* ¶¶24, 27. It is thus undisputed based on these baseline plausible allegations and reasonable inferences therefrom that each Defendant desired to promote the Venture's success, *see Salesforce.com*, 76 F.4th at 559, including by assisting, supporting, or facilitating the Venture's stadium-construction projects, *see Bistline*, 918 F.3d at 874-75; *Gilbert*, 423 F. Supp. 3d at 1138. That is all that is needed to allege Defendants participated. But Plaintiffs allege more.

For example, Plaintiffs plausibly allege Defendants "managed and supervised" the construction. AC ¶27. Those allegations are plausible based on materials in the public domain indicating the numerous and comprehensive roles Defendants' employees played in the construction projects, reinforced by Defendants' own statements. *See*, *e.g.*, *id.* ¶60 (numerous Jacobs public admissions that Defendants worked on the construction projects for the World Cup, including Jacobs's statements that it had "oversee[n] the execution of . . . [the] FIFA World Cup," was the "delivery partner" and "deliver[ed] whole-system solutions" for the construction projects); *id.* ¶144(a) ("[w]e are proud to contribute our global programme management experience to help deliver a landmark 2022 FIFA World Cup"); *id.* ¶29(a) (worked on "worker welfare standards" as part of Venture participation); *id.* ¶29(e) (monitored violations by labor supply chain in the construction projects); *id.* ¶60(i) (worked on "health and safety" issues for the construction projects); *id.* ¶118 (CH2M "strengthened" labor "supply chain qualification requirements" and implemented an "inspection regime for enforcement" to "ensure . . . [worker] welfare standards [were] being met").

Plaintiffs allege highly detailed examples of Defendants' participation. For example, Defendants do not dispute, because they cannot, that Defendants had employees on the ground in Qatar who worked directly with Plaintiffs' Employers, at the stadiums where Plaintiffs worked, overseeing and ensuring those construction subcontractor Employers complied with their contracts, conducting weekly construction site visits and inspections, and monitoring the subcontractors to ensure they implemented corrective actions if there were issues with health and safety. *Id.* ¶¶61, 129. This level of specificity makes plausible Plaintiffs' allegations that Defendants inspected Plaintiffs' work sites and living conditions, set the Venture's standards for employee recruitment and health and safety, audited subcontractor contractual compliance, screened potential labor subcontractors, including Plaintiffs' Employers, to ensure worker welfare, managed the contractual terms the labor subcontracts imposed upon migrant laborers such as Plaintiffs, *id.* ¶¶122-27, and were "frequently involved in the day-to-day aspects of each stadium construction project," *id.* ¶128.

It is telling that Defendants do not proffer the contract defining how and to what extent they participated in the Venture, but as Plaintiffs allege at ¶144(a) it is plain to see that documentation of their participation exists:



Even without viewing the *terms* of that contract, Plaintiffs already know enough from the public record to allege Defendants had direct control or the right to control each of their Venture partners (including Plaintiffs' Employers) vis-à-vis the workers, such as Plaintiffs. *Id.* ¶136.

Defendants' story is that for the millions and millions of dollars they received, they merely "consulted," "monitored," and provided "advice and coordination," MTD 7, but even those activities would satisfy the requirement of participation in the Venture under the TVPRA. *See Gilbert*, 423 F. Supp. 3d at 1138; *Salesforce.com*, 76 F.4th at 559. And Defendants' attempt to minimize their role, at most, creates a factual dispute in opposition to the wall of already-known evidence and related plausible allegations to the contrary regarding Defendants' participation in the Venture. That factual dispute cannot be resolved at this stage.

Defendants say Plaintiffs do not allege Defendants "mistreated," "traffic[ked]," or were "involve[d] in the Plaintiffs' employment relationships." MTD 1. But none of that is necessary to

allege *participant* liability. *See* §1595(a). Regardless, Plaintiffs *do* allege such involvement: Defendants set standards for worker welfare, monitored the labor supply chain, and imposed requirements on the subcontractors, including Plaintiffs' Employers, with regard to their employment agreements. AC ¶¶29, 61, 118, 129.

When Defendants assert there was no business relationship between Defendants and Plaintiffs' Employers, MTD 2, 25-26, they simply ignore Plaintiffs' well-plead allegations. The example at Al Thumama Stadium (AC ¶61) "spell[s] out what business," MTD 26, Defendants had with Plaintiffs' Employers there, and the reasonable inference therefrom is that Defendants had similar ongoing business with each of Plaintiffs' Employers.

Unable to dodge those allegations, Defendants improperly seek inferences in their favor. As Defendants would have it, MTD 9-10, they had no control over Plaintiffs' Employers at Al Thumama or anywhere else despite their *admitted* responsibility to "ensure that the highest possible health and safety standards [were] maintained in line with client procedures, [and] contract requirements." AC ¶61(f). The proper inference is that Defendants *did* have control of the Employers, because to "ensure" indicates active work to force compliance.[15]

Defendants seek another inference that where they did have control, they should not be liable because they wished to promote worker safety. MTD 8. It is true that Defendants claimed publicly that they could influence the Venture's labor supply chain's terms and conditions. AC ¶117 (CH2M admitted that it had the practice of "ensur[ing] that appropriate terms and

---

[15] Defendants assert Plaintiffs' allegations regarding Defendants' ability to assign tasks to other Venture participants and control the means and details by which the other Venture participants worked are "impermissible legal conclusions," MTD 7, but that ignores the *rigorous bases* for those allegations. Those allegations are supported by all the detail alleged regarding how Defendants audited, inspected, influenced contract terms, and the like. What Defendants call legal conclusions are simply reasonable inferences flowing from the detailed allegations, many of which are sourced from Defendants' own public statements and admissions.

conditions are properly placed in the procurement documents of [its] clients"); *id.* ¶118 (CEO of CH2M admitted it worked on the World Cup Construction Venture, including by "improv[ing] standards for employment, safety, and worker accommodations," "strengthen[ing] supply chain qualification requirements for procurement and contractor selection," and imposing an "inspection regime for enforcement"); *id.* ¶121 (discussing CH2M's work to audit and inspect worker conditions, manage contractor selection, and manage procurement to "verif[y] contractor worker welfare"). Those facts merely confirm Defendants participated in the Venture. The questions that participation raises—such as whether it (a) should inoculate Defendants from liability, (b) was actually implemented and/or followed, and (c) effectively stopped or limited labor exploitation, as Defendants say, or, (d) in the alternative was simply lip service and window dressing meant to avert the world's gaze from the atrocities being committed, so that Defendants and their joint venturers could continue to ensure quick and cheap delivery of construction work—are all questions of fact the jury should resolve, but in any event should not be resolved in Defendants' favor at the pleading stage. Defendants cannot escape well pleaded allegations merely by asserting that while they participated they meant well.

Finally, Defendants interpret statements in emails with an ESPN reporter as absolving them of any control. *See* MTD 8 (citing AC ¶116). But a reasonable reading of those emails, *see* D.I. 53-2, provides inferences that (a) although Defendants did not have responsibility and control over the particular construction site discussed in the emails, (b) once construction began on the World Cup stadiums, Defendants did in fact have some level of control. Indeed, the emails distinguish between a construction project *before* the stadiums began being built, for which Defendants had no control, and the stadium projects, for which Defendants *would* have control. But to be clear, the

question of "control" is a red herring: Regardless of whether and to what extent Defendants *controlled* the Employer subcontractors, Defendants *participated* in the Venture.

Defendants' interactions with the subcontractors on the construction projects they were overseeing and managing is nothing like the supply-chain venture rejected by the court in *Apple*, 96 F.4th at 415-16, a case in which plaintiffs alleged a venture between downstream purchasers of cobalt and mines that allegedly used forced child labor. Here, unlike in *Apple*, Defendants were at the worksites, with the workers and directly overseeing and managing the work of the workers' Employers and the contractual terms and conditions. Here, unlike there, Defendants and the wrongdoers were working together on a common project to build World Cup stadiums. This is not about an element that eventually made it into a product based on a problematic supply chain. Plaintiffs allege that their labor was an essential element of the Venture. It is thus unfair to characterize Defendants and the Employer subcontractors working with them on that project as being "on opposite sides of an arms-length transaction," MTD 26, as they were indeed closely associated, venturing together, interacting regularly, *see, e.g.*, AC ¶61, to quickly and cheaply deliver the stadiums for their mutual client.

For these reasons, Defendants' protests regarding their participation in the Venture fail. Plaintiffs need only allege that Defendants desired to promote the Venture's success, *see Salesforce.com*, 76 F.4th at 559-60, including by assisting, supporting, or facilitating construction, *see Bistline*, 918 F.3d at 874-75; *Gilbert*, 423 F. Supp. 3d at 1138. Plaintiffs have done so.

### C.     Plaintiffs Sufficiently Allege Defendants Knowingly Benefitted from Participating in the Venture.

Section 1595(a) requires Plaintiffs to allege Defendants "knowingly benefit[ted]" "financially or by receiving anything of value" from their participation in the Venture. It suffices to allege Defendants were "aware" that that they were "benefitting in some way from [their]

participation in the venture. ***That's it.***" *Salesforce.com*, 76 F.4th at 564 (emphasis supplied). Defendants would require Plaintiffs to tie the "benefit[s]" to "the alleged TVPRA violations." MTD 33. But that is not the law: The alleged "benefit need not take the form of 'profits' that [were] 'the specific result'" of trafficking. *Salesforce.com*, 76 F.4th at 564; *see also Gilbert* R&R, 2019 WL 1058194, at *19 ("Nothing in § 1595(a) requires the party to benefit from the labor or services for liability to attach.").

Here, Plaintiffs allege Defendants benefitted financially from being retained as project managers, AC ¶¶142-45, as well as in publicity and notoriety related to participating in such a high-profile project, *id.* ¶141 (taking credit for the "Better Connections" program), *id.* ¶144 (social media posts). Each Defendant knew of these benefits—they signed the contracts and touted their accomplishments. *See Salesforce.com*, 76 F.4th at 564 ("contracts" can "satisfy the 'knowingly benefits' element").[16] Further, while not necessary to allege a knowing benefit, Plaintiffs do plausibly allege that the stadium construction involved the Venture's systematic exploitation of Plaintiffs—and the tens of thousands of other migrant laborers who were treated as "modern slaves." *See* AC ¶145. And it is reasonable to infer that Defendants had contractual, or at least implicit, incentives to ensure that cheap and consistent labor remained available without restriction, so Defendants could deliver the stadiums in time for the World Cup, at a price point acceptable to Defendants' (and Plaintiffs' Employers') mutual client, the Supreme Committee. *See, e.g.*, *id.*

---

[16] It is irrelevant that the Supreme Committee, and not Plaintiffs' direct Employers, paid Defendants, MTD 33, because the Supreme Committee is part of the Venture. AC ¶34. In any event, the TVPRA does not require Plaintiffs to allege that Defendants benefitted directly from the "trafficker itself." *Salesforce.com*, 76 F.4th at 565.

In response, Defendants (MTD 7, 33) ask this Court to improperly draw inferences in their favor, asserting they had no "incentive to keep" "labor costs low" or encourage "cheaper or faster construction." Defendants may try to tell that to the jury. But at this stage, Plaintiffs, and not the Defendants, get inferences drawn in their favor. *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1193 (10th Cir. 2017); *see also Burnett*, 706 F.3d at 1235. It is reasonable to infer Defendants, as program managers, understood that the World Cup Construction Venture required trafficked and forced labor to meet its timelines for delivery of the stadiums at a price point acceptable to Defendants' and Plaintiffs' Employers' mutual client, and had contractual reasons to keep that labor available to the Venture. Based on the publicly available information regarding what Defendants received, Plaintiffs have plausibly alleged knowing benefits sufficient to state their claims.

### D.   Plaintiffs Plausibly Allege Defendants Knew or Should Have Known the Venture Used Trafficked and Forced Labor.

Section 1595 imposes "a negligence standard" on defendants, and "all courts agree that a defendant under Section 1595 must have had at least constructive knowledge that the 'venture' in question has engaged in an act in violation of [the TVPRA] in order for participant liability to attach." *Salesforce.com*, 76 F.4th at 555 n.9 (collecting cases). Plausible allegations that the venture used trafficked or forced labor, based on public reporting or the defendants' own dealings with its venture counterparties, satisfy this requirement. *See id.* at 555-56. Defendants need not have constructive knowledge related to the plaintiffs' specific harms, only as to the venture's general use of trafficked or forced labor. *See id.* at 556-57 (collecting cases). Plaintiffs need only plausibly allege defendants "had ample notice" generally violations were taking place. *Bistline*, 918 F.3d at 874.

In addition to Defendants' general understanding of the *kafala* system and that the types of abuses Plaintiffs experienced were commonplace in the Qatar construction industry, writ large,

AC ¶¶37-51, 63-66, CH2M knew, or would have discovered based on public reporting and its own due diligence, prior to signing the contract to participate, that the Venture would use trafficked and forced labor. *Id.* ¶¶68, 69(a), 74, 86-89, 113. Indeed, CH2M disclosed in 2011 that as a matter of policy and procedure CH2M monitored the engagement of labor suppliers from countries identified by the United Nations and the United States as "high risk" for forced labor, *see id.* ¶69(a), and developed special protocols to screen labor brokers and vet contractors and suppliers, *id.* ¶113. It is a reasonable inference therefrom that CH2M knew or should have known the Venture would be rife with trafficked and forced labor before it signed the contract to participate in it.

Then, after signing the contract, CH2M was told time and again their Venture was abusing migrant laborers. For example, in 2012, Human Rights Watch reported on labor conditions not just in the "Qatari construction industry generally," MTD 31, but on the likelihood of labor abuses in the World Cup Construction Venture, itself. AC ¶51. Then, over the next ten years while construction was ongoing, CH2M and Jacobs were repeatedly put on notice by public reporting. *Id.* ¶¶69-77, 99. In 2013, the Guardian published a series of pieces detailing the labor abuses endemic to the World Cup Construction Venture, one of which was titled "Qatar's World Cup 'Slaves.'" *Id.* ¶71(b). Defendants' submissions show *without a doubt* Defendants knew about those articles back in 2013. *See* D.I. 53-2 at 1 (2013 email to CH2M's then manager of public relations, discussing worker exploitation in the World Cup Construction Venture, and stating in relevant part, "[t]his in response to the **series running this week in the Guardian, of which I'm sure you're aware**") (emphasis supplied). In 2015, the *New York Times* specifically name-checked CH2M's work on the Venture and discussed "labor abuses involving foreign laborers, including during construction in Qatar for the 2022 FIFA World Cup," AC ¶71(d), and MSNBC broadcast a video that stated in relevant part that "migrant workers are building World Cup stadiums in slave-labor

conditions, with hundreds, perhaps thousands, dying in the process," *id.* ¶75. In 2016, the BBC published a video discussing the use of "forced labor" at the Khalifa stadium project,[17] *id.* ¶74, where the reporter discussed live the interviews he had with construction workers at the site Defendants oversaw. The examples go on and on—notice goes well beyond general allegations about the Qatar construction industry; they were about *the Venture Defendants participated in* and specifically the stadiums they helped "deliver."[18]

On top of all that, Plaintiffs plausibly allege Defendants would have known about the labor abuses endemic to the Venture based on media coverage related to the FIFA corruption scandal, *id.* ¶72, any reasonable use of Google and Wikipedia, at the time, *id.* ¶¶78-83, their own internal corporate security and intelligence capabilities, *id.* ¶¶84-85, their industry-standard due diligence procedures, *id.* ¶¶ 86-89, their use of artificial intelligence and their big data expertise, *id.* ¶¶90-92, and Defendants' dealings with Qatar Foundation, *id.* ¶¶93-111.

Jacobs specifically knew the Venture's TVPRA violations in 2015, when their lawyers told them about it. *Id.* ¶88. Then, when Jacobs was contemplating acquiring CH2M in 2017, it would have seen all of the foregoing media reporting based on its own due diligence. *Id.* ¶¶86-89, 211. And based on *how* Defendants participated in the Venture they would have learned of the labor abuses going on while doing their work. *Id.* ¶¶29, 61, 84-85, 112-36, 140.

In face of that overwhelming evidence that Defendants knew or should have known of the abuses, Defendants' bald assertion that Plaintiffs' allegations are "unsupported," MTD 7, rings

---

[17] Notably, 20 of the Plaintiffs worked at Khalifa stadium, clearly part of the Venture in which Defendants participated. *See generally* AC ¶¶27, 207; *see also id.* ¶¶147-49, 151, 153, 155-56, 158, 162-65, 168-73, 181, 187.

[18] Defendants acknowledge, to avoid common-law liability, that Plaintiffs were "on notice" because "the vast majority of the sources Plaintiffs cite have been public for years." MTD 36-37. If Filipino construction workers with limited resources would have known, Defendants certainly did as well.

hollow. While general allegations regarding Qatari labor practices or the construction industry are not by themselves enough, *id.* at 31-32, here, those allegations substantiate Plaintiffs' other detailed allegations of knowledge, which are specific to the Venture, Plaintiffs' worksites, and Plaintiffs' Employers. Plaintiffs' allegations are easily sufficient to satisfy the TVPRA's negligence standard. *See*, *e.g.*, *Salesforce.com*, 76 F.4th at 555 n.9. And Plaintiffs' allegations are easily distinguishable from "[s]weeping generalities" about industry conditions that are "too attenuated" to support inferences of Defendants' knowledge. *See Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022). Here, Plaintiffs painstakingly point out that it was common knowledge that the World Cup Construction Venture specifically used trafficked or forced labor, based on public reports and Defendants' own dealings.

Defendants urge the Court to impose a heightened knowledge requirement whereby Plaintiffs must allege Defendants knew about "TVPRA violations as to these particular Plaintiffs." MTD 31-32. That is not the law. The TVPRA does not require the Venture participant to "have had actual or constructive knowledge of the specific victim." *Salesforce.com*, 76 F.4th at 556-58 (collecting cases). Were it so, "Section 1595 would be ***severely undermined*** in some of the most egregious cases," as a company "could simply bury its head in the sand with respect to individual victims" to "insulate[]" itself "from civil liability." *Id.* at 557 (emphasis supplied). "Nothing in the statutory text requires such an odd result." *Id.* In any event, Plaintiffs plausibly allege Plaintiff-specific constructive knowledge, *see*, *e.g.*, AC ¶74.

In response, Defendants cherry pick one of the many examples Plaintiffs give regarding Defendants' work on the Venture: the site inspections that Defendants would have performed at the worksites, as well as at the living quarters as part of the "Better Connections" program, which Defendants label as "legal conclusions." *See* MTD 32-33. That is simply wrong. Plaintiffs'

allegations that Defendants knew or should have known based on site inspections, both at worksites and at the living quarters, are based on multiple public disclosures known even before discovery, *see* AC ¶¶61, 118, 121, 141; the reasonable inference therefrom is that Defendants would have seen what was pervasively documented in the international media: the squalid and unsanitary conditions the workers lived in, the incredible long hours and heat that they endured, and that their passports had been taken away. That Defendants went to the worksites and housing facilities makes it more plausible that Defendants knew. At end, Plaintiffs sufficiently allege CH2M, and then Jacobs, "had ample notice" that violations of the TVPRA were taking place, and that is enough at the pleading stage. *See Bistline*, 918 F.3d at 874.

### E.    Plaintiffs Allege Their Injuries with Sufficient Specificity and Particularity.

Defendants claim Plaintiffs fail to sufficiently allege what happened to them, MTD 5, that Plaintiffs' claims are not plausible, *id.* at 22, and do not state enough allegations that if true, would show "they were trafficked to Qatar and forced to labor," *id.* at 4. Here, Defendants pick out Plaintiff L.P., and ignore all 52 others. *See id.* at 23-24.

Plaintiffs sue under §1589, which prohibits obtaining labor "by means of 'force, threats of force [or] physical restraint,' 'by means of serious harm,' 'by means of the abuse of law or legal process,' or 'b[y] means of any scheme . . . intended to cause [the victim] to believe that [failing to perform the labor] would [cause the victim or another person to] suffer serious harm.'" *Camayo v. John Peroulis & Sons Sheep, Inc.*, 2012 WL 4359086, at *2 (D. Colo. Sept. 24, 2012), *adhered to on recons.*, 2013 WL 3927677 (D. Colo. July 30, 2013). "Abuse or threatened abuse of law or legal process" means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." §1589(c)(1). Confiscation of passports is an indication of "abuse of law or legal

process," for purposes of a §1589 claim. *Camayo*, 2012 WL 4359086 at *4-5; *see also Sulaiman v. Laram*, 2017 WL 11659746, at *4 (S.D.N.Y. Apr. 4, 2017); *Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 526 (D. Md. 2016); *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 28 (D.D.C. 2016). Plaintiffs also sue under §1590, which prohibits "knowingly recruit[ing], harbor[ing] transport[ing], provid[ing], or obtain[ing] by any means, any person for labor or services in violation of this chapter." A "false promise[] of fair working conditions and appropriate compensation" can violate §1590. *Lipenga*, 219 F. Supp. at 526.

Specifically as to Plaintiff L.P., he alleges the dates he worked on the World Cup Construction Venture, the stadiums on which he worked, and the name of his Employer. AC ¶185. Plaintiff L.P. also alleges that he believes that Electro Mechanical Enterprises Qatar is the entity that took his passport, so that he could not leave, which caused him to feel anxiety and fear. *Id.* And Plaintiff L.P. specifically details how he was then forced to work through exhaustion, was denied pay, was forced to live in a tiny room with nine other people that was not properly air conditioned, and to sleep in a bed with bedbugs. *Id.* Plaintiff L.P. knows what happened to him, and the reasonable inferences from the facts he alleged—when viewed in combination of all the other evidence of abuse of migrant laborers that Plaintiffs detail in the Amended Complaint, as well as the specific allegations of the other Plaintiffs—are that he was lied to about the conditions of his work and life in Qatar, which tricked him into going to Qatar; that once he was there, because his passport was taken from him, he could not leave; and that he therefore felt trapped and that he had no choice but to endure being treated like a slave at work and live in subhuman conditions. Accepting Plaintiff L.P.'s well-pleaded allegations as true, it is reasonable to conclude there are "enough facts to state a claim to relief that is plausible on its face." *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). And

Plaintiff L.P. has sufficiently plead enough "factual content that allows the court to draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Each Plaintiff similarly alleges that his passport was taken, that he was trapped in Qatar and forced to labor interminably, was forced to live in terrible conditions, and was lied to about pay and his work and living conditions, AC ¶¶147-99, which taken together supports reasonable inferences that each Plaintiff states baseline claims regarding violations of §1589 and §1590. *See Hogan*, 762 F.3d at 1104. And while Plaintiffs allege generally that worker exploitation and abuse were rampant throughout the Qatar construction industry due to the *kafala* system, MTD 5, those alleged facts (and the fact that each Plaintiff alleges violations of the TVPRA similar to each other) do not make implausible Plaintiffs' claims, they make more reasonable the inference that each Plaintiff's specific claims are true: If they were happening elsewhere, to others, it gives credence that it happened to each Plaintiff as well.

Defendants complain Plaintiffs do not specifically allege who lied to them about pay. MTD 22-23. And Defendants say Plaintiffs' allegations "for the most part," *id.* at 5, do not identify who took their passports—but that is wrong: Plaintiffs allege their Employers took their passports and forced them to work and live in the conditions in violation of the TVPRA. *See*, *e.g.*, AC ¶185. And Plaintiffs are aware of no case that requires a plaintiff to spell out the identities of every wrongdoer in an unlawful venture. *Cf. Gilbert* R&R, 2019 WL 1058194, at *21 (rejecting application of Rule 9(b) specificity). Even without stating specifically that the recruiters in the Philippines and Plaintiffs' Employers are the ones who lied, those inferences are reasonable, so Plaintiffs have alleged enough.

### F.    Plaintiffs' §1593 Restitution Claim Should Not Be Dismissed.

Section 1593(a) authorizes mandatory "restitution" "in addition to any other civil or criminal penalties" for "any offense" under the TVPRA, "[n]otwithstanding section 3663 or 3663A"—*i.e.*, sentencing-related statutes unique to criminal proceedings. Defendants nonetheless urge that restitution is available only "following a criminal conviction." MTD 33-34. Courts nationwide have rejected that understanding. "***Nothing in the text*** of the statute suggests that restitution applies solely to criminal cases." *U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 201 (D. Md. 2019) (emphasis supplied); *see Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1171 (D. Kan. 2018) (Section 1593 "authorizes mandatory restitution for human trafficking victims"); *Lipenga*, 219 F. Supp. 3d at 530 (ordering restitution in civil case); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457 (E.D. Va. 2015) (same). Defendants' focus on §3664 "overlooks" §1593(a)'s plain language. *Dinsay v. RN Staff Inc.*, 2021 WL 2643639, at *3 (S.D. Ind. June 28, 2021) (awarding restitution in civil case). Plaintiffs are thus entitled to restitution.

### III.   Extraterritorial Application of the TVPRA Is Proper, and Plaintiffs in Any Event Seek Domestic Application.

Defendants' extraterritoriality argument is wrong. Multiple Courts of Appeals have held that the TVPRA applies extraterritorially; indeed, the Fourth Circuit directly considered and rejected the very arguments that Defendants make here. *Roe v. Howard*, 917 F.3d 229, 239-43 (4th Cir. 2019); *see also Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 204 (5th Cir. 2017). No Court of Appeals, and only one district court of which Plaintiffs are aware, has accepted Defendants' argument. This Court should follow the majority and the well-reasoned decision of the Fourth Circuit in *Roe* and find that the TVPRA applies extraterritorially. Even if this Court were to conclude otherwise, it would not matter: Plaintiffs' allegations establish a textbook case

for domestic application of the statute, and thus do not implicate extraterritoriality at all. Either way, Defendants' challenge must fail.

### A.     The TVPRA Civil Cause of Action Applies Extraterritorially.

Under the extraterritoriality analysis endorsed by the Supreme Court in *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337 (2016), the TVPRA applies extraterritorially. Here, "the most obvious textual clue" is that the statute includes "a number of predicates that plainly apply to at least some foreign conduct." *Id.* at 338. Taken as a whole, the statutory text, structure, and context provide "a clear, affirmative indication that it applies extraterritorially." *Id.* at 337.

By providing a civil remedy for any "victim of a violation of [Chapter 77]," §1595 directly incorporates predicate offenses that govern foreign conduct. Predicate offenses found in Chapter 77 include, for instance, peonage, slavery, and trafficking in persons. This provides "strong textual evidence of its extraterritorial effect." *Roe*, 917 F.3d at 241. Congress's decision to include such "extraterritorial predicates" for the private right of action provides a "clear, affirmative indication" that §1595 provides a civil remedy for foreign conduct. *Id.* at 242 (quoting *RJR Nabisco*, 579 U.S. at 339).

Confirming this interpretation, §1596 provides for "additional jurisdiction" and expressly extends "extra-territorial jurisdiction" over specified offenses when committed by a U.S. national or a person "present in" the United States. §1595, in turn, authorizes victims to bring a civil action for violations of those same offenses. Read together, these two provisions evidence a clear intent to extend extraterritorial jurisdiction over certain offenses committed abroad and to provide a coextensive civil remedy. Defendants complain that §1596 does not expressly cross-reference §1595 in its list of offenses, but that would have been illogical because §1595 does not define the underlying violation. Instead, §1595 provides a civil remedy for offenses defined elsewhere. Moreover, because §1595 *already* provided a civil remedy coextensive with the TVPRA's

predicate criminal provisions, it would have been redundant to list §1595 within §1596. Logically, all Congress had to do to extend §1595's civil remedy extraterritorially was change the extraterritorial scope of the criminal offenses to which it referred.

Here, the context of the statute—human trafficking, a violation of international law that often involves cross-border conduct—provides an additional indication that Congress intended the TVPRA civil remedy to apply to extraterritorial conduct. *See Roe*, 917 F.3d at 242 ("This is, in short, a situation in which Congress was clearly concerned with international rather than purely domestic matters."); *see also id.* (noting that the TVPRA's "stated purpose and accompanying congressional findings demonstrate that Congress enacted it to address the problem of human trafficking 'throughout the world'" (quoting Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386 §102(b)(1), 114 Stat. 1464, 1466)).[19] Indeed, when Congress added the civil remedy to the TVPRA, it highlighted the challenge of "responding to the needs of victims of trafficking in the United States ***and abroad***."[20] Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193 §2(2), 117 Stat. 2875 (emphasis supplied); *see id.* §4(a)(4)(A), 117 Stat. at 2878 (codifying civil remedy).

One district court considered legislative history and concluded "Congress added the jurisdictional expansion . . . shortly after two courts considering TVPRA civil suits held the provisions were not extraterritorial." *Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *5

---

[19] Although Defendants analogize to the Racketeer Influenced and Corrupt Organizations Act, MTD 15-16 & n.4, that statute is not explicitly related to and tailored toward conduct that is international in nature, and although it has some substantive provisions that apply extraterritorially, the nature of the *predicate offenses* are not explicitly international.

[20] The fact that Congress was focused on addressing trafficked and forced labor occurring at least in part abroad, paired with Defendants' assertion that Plaintiffs would have no civil cause of action against Defendants under Qatari law for what happened to them, *see* MTD 36, is further indication that Congress intended the law to apply extraterritorially.

(C.D. Cal. Nov. 9, 2016) (citations omitted) (reviewing legislative history). That court concluded, "[w]ith respect to the TVPRA's extraterritorial jurisdiction, ***Congress's intent is clear***. . . . Congress has clearly indicated that it intends the TVPRA, unlike statutory schemes that are silent on extraterritorial jurisdiction, to be a unified statutory scheme of interlocking provisions that provides extraterritorial jurisdiction over specific predicate offenses ***and further expressly provides for restitution and a civil remedy*** whenever a court in the United States has that jurisdiction." *Id.* (emphasis supplied).[21] Indeed, as members of Congress explained in an amicus brief, "the TVPRA including its private right of action, applies to extraterritorial conduct provided that a defendant is a U.S. national or permanent resident, or is present in the United States." *See* Br. for Members of Congress Sen. Blumental, Rep. Smith, *et al.*, as Amici Curiae Supporting Respondents, *Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021) (Nos. 19-416 & 19-453), at 32.

The Fourth and Fifth Circuits have both held the presumption against extraterritoriality of the TVPRA's civil remedy is rebutted at *RJR Nabisco* step one, which asks "whether the statute gives a clear, affirmative indication that it applies extraterritorially." 579 U.S. at 337. Both Courts held the TVPRA civil remedy contains a clear affirmative indication of extraterritorial application because it incorporates extraterritorial predicates. *See Roe*, 917 F.3d at 242; *Adhikari*, 845 F.3d at 204. Indeed, Defendants' argument that extraterritorial jurisdiction does not extend to civil actions "has been overwhelmingly rejected by the courts." *Ratha*, 2016 WL 11020222, at *6 (collecting cases); *see also C.T. v. Red Roof Inns, Inc.,* 2021 WL 2942483, at *8 (S.D. Ohio July 1, 2021); *Abafita v. Aldukhan*, 2019 WL 6735148, at *5 (S.D.N.Y. Apr. 4, 2019). Only one district court in

---

[21] The Ninth Circuit left this conclusion intact. *See Ratha*, 35 F.4th at 1168 ("[W]e assume without deciding that Plaintiffs are correct and that § 1595 permits a private cause of action for extraterritorial violations of the substantive provisions listed in § 1596."); *see also id.* at 1168 n.5. *See also* 143 S. Ct. 491 (2022) (*cert denied*).

one unpublished opinion has said otherwise. *See Doe I v. Apple Inc.*, 2021 WL 5774224, at \*14 (D.D.C. Nov. 2, 2021), *aff'd on other grounds sub nom. Apple*, 96 F.4th 403. This Court should follow the majority and hold that the TVPRA civil remedy applies extraterritorially.

**B.      Should the Court Find the TVPRA's Civil Remedy Does Not Apply Extraterritorially, Plaintiffs Seek Domestic Application.**

The second step of the *RJR Nabisco* analysis considers the statute's "focus": "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." 579 U.S. at 337. Here, the "focus" of *Defendants' culpable conduct*—participating in and knowingly benefiting from a venture that engaged in trafficking violations—"occurred in the United States," so this would be a "permissible domestic application even if other conduct occurred abroad." *See id*. Indeed, where the alleged wrongful act "gives rise to a cause of action" a court should consider "the 'gravamen' of ***that*** alleged wrongful conduct rather than any harm that may result elsewhere." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) (emphasis in original).

Plaintiffs plausibly allege Defendants did work in furtherance of, and knowingly benefited from, the World Cup Construction Venture in the United States. Far from a "conclusory allegation," MTD 14, Plaintiffs plausibly allege that by virtue of CH2M's global headquarters being in Colorado, and Jacobs having offices in Colorado after acquiring CH2M, each Defendant made decisions and took actions domestically, including in this District, in furtherance of the Venture. AC ¶¶12-13, 24, 28-31. Defendants baldly assert "there are zero allegations of ***any*** relevant domestic conduct," MTD 20 (emphasis in original), but as discussed *supra* II.B.2 and *infra* IV, it is reasonable to infer CH2M employees in the United States worked on the Venture based on strikingly specific examples and detail Plaintiffs allege even before discovery:

- Joseph Danko ran CH2M's "Sports Group" from the United States and worked on "worker welfare standards" related to the World Cup Construction Venture, AC ¶29(a);

- Brian Shelton was a CH2M executive based in Colorado and was an officer of CH2M B.V., which undisputedly performed work on the Venture, *id.* ¶¶30-31;
- Jan Walstrom worked for CH2M, was a director of CH2M Hill International, and managed global risk management while based in Colorado, *id.* ¶29(b);
- Neal Thurston worked for CH2M from Colorado on worldwide anti-corruption and ethics training, and tracked international reporting and compliance data, *id.* ¶29(f);
- Ken Degenhart worked for CH2M as a "program manager" based in Colorado who worked on the World Cup Construction Venture, *id.* ¶29b;
- Britt Howard worked for CH2M on "Health, Safety, Security, Environment and Quality" issues for global projects, and did so from Colorado, *id.* ¶29(d);
- Taggert Hansen worked for CH2M from Colorado on global labor and employment issues, *id.* ¶29(f);
- Chris Mancinelli worked for CH2M from Colorado on international ethics and compliance investigations, *id.*;
- Holly Allen, a CH2M human resources specialist based in Colorado performed global functions related to employee analytics, *id.*; and
- CH2M had an internal compliance lead in Colorado that oversaw CH2M's subsidiaries' work in foreign locations, *id.* ¶30.

It is also appropriate to infer that the legacy CH2M employees in the United States, who became Jacobs employees, continued to work on the World Cup Construction Venture for Jacobs from the United States after the acquisition. *Id.* ¶24. Indeed, many of these executives and employees— such as Danko, Shelton, Walstrom, Thurston, Degenhart, Howard, Hansen, Mancinelli, and Allen—publicly disclosed that they continued working for Jacobs in the United States in these functions after Jacobs acquired CH2M. *Id.* ¶¶29-30. Jacobs's own executives also participated from the United States. *E.g.*, *id.* ¶144(e) (the U.S.-based Jacobs President-Global Operations Patrick Hill traveled to Qatar to meet with the team delivering the World Cup in Qatar in 2022). And Jacobs mandated that one of its Colorado employees, Lorrie Paul Crum, manage communications related to its "Supplier Code of Conduct," *id.* ¶29(e), so it is reasonable to infer that Jacobs's reaction to the substantial press related to concerns of trafficked and forced labor used in the World Cup Construction Venture would have gone through her office in the United States, and any concerns raised about labor abuses and due diligence related thereto, *id.* ¶112, would have been routed through Colorado as well. It is also notable that Jacobs's Director for the

Qatar 2022 FIFA World Cup Programme listed his location as being inside the United States—the only reasonable inference therefrom is that the director of all of Jacobs's work on the World Cup Construction Venture did some of his Venture work domestically. *Id.* ¶29(g).[22] Finally, it is reasonable to infer that each of Jacobs's social media posts made in support of the World Cup Construction Venture, *id.* ¶¶60(f), 144(a)-(b), 144(d)-(f), and its public relations releases, *e.g.*, *id.* ¶141, were posted from the United States. These allegations would not apply to "any" "company headquartered in the United States," MTD 20, and are not about general corporate activity, *id.* at 21. Rather, they are highly specific examples of Defendants' conduct within the United States in furtherance of the Venture, and such conduct triggers Defendants' liability under the TVPRA. Plaintiffs have done much more than identify "a single relevant action," *id.* (emphasis removed), they have named a plethora.

On top of that litany of domestic conduct, Defendants also benefitted domestically. Defendants took credit for working on the World Cup Construction Venture through domestic channels, AC ¶¶60(d), 141, 144, benefitting within the United States for their work on such a high-profile project. And Defendants also received substantial financial benefits here in the United States. *Id.* ¶¶142-43. Each is a domestic violation of the TVPRA.

For all these reasons, the focus of *Defendants'* acts and their benefits were domestic. Plainly the "focus" of what Plaintiffs allege *Defendants* did—participating in and knowingly benefiting from a venture that engaged in trafficking violations—"occurred in the United States."

---

[22] On top of these specific examples, Jacobs has a "Global Integrated Delivery" program through which its United States-based mechanical engineers, structural engineers, digital delivery leads, and environmental planners would have done work for Jacobs related to the World Cup Construction Venture while in the United States. AC ¶29(c). CH2M's, and then Jacobs's, "one firm" culture, with cross-functional teams collaborating regardless of location, *id.* ¶¶28-30, makes these allegations about domestic work in furtherance of the Venture even more plausible.

*RJR Nabisco*, 579 U.S. at 337. And the "gravamen" of wrongs that Defendants committed were domestic, regardless of if Defendants' co-Venturers committed wrongs in Qatar. *Rodriguez*, 29 F.4th at 716; Plaintiffs therefore seek a permissible domestic application of the TVPRA.[23]

## IV.    Each Defendant Is Subject to Personal Jurisdiction.

Plaintiffs' allegations amply establish that each of CH2M B.V.—a Dutch subsidiary of Colorado-based CH2M—and Jacobs Engineering and Jacobs Solutions—corporate parents of CH2M that are headquartered in Texas—have significant purposeful contacts with Colorado relating to the World Cup Construction Venture. When those allegations are accepted as true and any factual disputes about them are resolved in Plaintiffs' favor, they are more than sufficient to establish the required *prima facie* case of personal jurisdiction over the non-Colorado defendants.[24] *See AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056-57 (10th Cir. 2008).

### A.    CH2M B.V. Has Minimum Contacts with Colorado Arising Out of Its Work on the Venture.

To establish "minimum contacts" with the forum, a plaintiff must first show that the defendant took "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (first brackets in original). In making that determination, both the "quantity and quality" of the defendant's "contacts" matter. *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020).

---

[23] For this same reason, Defendants' argument, that §1596 is a subject matter jurisdiction provision regarding only the power to hear a case, MTD 18-19 & n.6, fails. Plaintiffs have claims against each Defendant for their domestic conduct, and for acts they took while "present" in the United States.

[24] Defendants do not dispute the Court's jurisdiction over the Colorado-based entities.

Here, Plaintiffs plausibly allege CH2M B.V. employees worked closely on the Venture with their Colorado colleagues, and that at least some personnel affiliated with CH2M B.V. worked on the Venture from Colorado. *See* AC ¶¶28-31. That is enough to establish minimum contacts with the forum, but the specificity and detail in Plaintiffs' allegations leave no doubt.

As a general matter, CH2M's multinational, globally integrated "one firm" operating structure required CH2M B.V. personnel on the ground in Qatar to rely heavily on management, services, and support provided from headquarters in Colorado. *Id.* ¶¶28-29. It was CH2M, the global entity, that leveraged its "global program management experience" to win the World Cup program management contract in 2012. *Id.* ¶144(a). CH2M B.V. became the formal contracting party to the Supreme Committee (*see* Miles Declaration, D.I. 53-10 ¶7), but much of the global capability that won CH2M the contract in the first place remained in Colorado. For example, CH2M B.V. was nominally the "Programme Management Consultant" in Qatar, *id.*, but CH2M's Global Program Management *group* was based in Colorado, and Plaintiffs have identified multiple CH2M employees (Ken Degenhart and Jan Walstrom) who assisted the Venture from there. AC ¶29(b). Other enterprise-level services provided from Colorado to CH2M's global operations included "Global Integrated Delivery," health and safety operations, corporate communications, and global labor supply-chain management. *Id.* ¶¶29(c)-(f), 112(c)-(d), 113.[25] Plaintiffs allege that

---

[25] Plaintiffs identify multiple Colorado-based CH2M personnel who had enterprise-level responsibilities and so would plausibly have supported the Qatar project from Colorado. Examples include Brit Howard, the Colorado-based Enterprise Director of Health, Safety, Security, Environment and Quality (¶29(d)); Lorrie Paul Crum, a Colorado-based communications manager who would have worked directly with CH2M B.V. on the Venture regarding any violations of the labor Supplier Code of Conduct (¶29(e)); Chris Mancinelli, a Colorado-based CH2M and then Jacobs employee who performed international ethics and compliance investigations (¶29(f)); and Neal Thurston, a Colorado-based CH2M employee with responsibilities for worldwide anti-corruption training and tracking international reporting and compliance data (¶29(f)).

CH2M B.V. used these Colorado-based services to execute its role as Programme Management Consultant, and nothing in any of Defendants' affidavits refutes that contention.

Given CH2M's (and, later, Jacobs's) "one firm" integrated structure, Plaintiffs' allegation that CH2M B.V. relied on these Colorado-based services to fulfill its responsibilities as Programme Management Consultant is not merely a plausible inference—it is the *most* plausible inference. And where, as here, an out-of-forum defendant enters into a "continuing relationship" for business services provided by an in-state counterparty, the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Pro Axess, Inc. v. Orlux Dist., Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005); *see also, e.g.*, *AST Sports Sci.*, 514 F.3d at 1059-60 (explaining that "minimum contacts" can be established—as here—through "ongoing business relationship[s]" with in-forum entities, including through "[p]hone calls" and "emails").

Other allegations support CH2M's purposeful availment of Colorado. For example, Defendants do not deny that high-level CH2M B.V. employees, such as Rehan Khan,[26] Amer Battikhi, Omur Akay, and Neil Reynolds "met and made decisions" related to the Venture from CH2M's offices in Colorado. *See* AC ¶29(g). Defendants submitted an affidavit that not only

---

If these were not enough, additional examples abound. *See*, *e.g.*, LinkedIn Profile of Christy Youngsma, *available at* https://www.linkedin.com/in/christy-youngsma-474654/ (last accessed May 27, 2024) (Colorado-based CH2M employee detailing the work she did "onsite" in Qatar in furtherance of the World Cup Construction Venture).

[26] To put a fine point on it: Plaintiffs allege that Rehan Khan, the Executive Program Director for the Qatar 2022 FIFA World Cup Programme, and undoubtedly an employee of CH2M B.V., *see* D.I. 53-11 ¶5, had meetings in Colorado to work on Venture business (AC ¶29(g)); that allegation was based in part on the fact that CH2M's global headquarters were in Colorado and also in part on the fact that Mr. Khan's LinkedIn profile at the time Plaintiffs filed suit listed his location as inside the United States. Notably, since then, Mr. Khan changed his location on LinkedIn to Qatar, but both his prior listed location and his decision to change his profile location (Plaintiffs are prepared to proffer the prior version, if the Court requests it) based apparently on his consciousness of guilt regarding where he conducted CH2M B.V. business provide reasonable inferences that Plaintiffs' allegations are plausible.

admits that Colorado-based Brian Shelton was a CH2M B.V. director, D.I. 53-10 ¶6, but also—tellingly—*does not deny* Plaintiffs' allegation that Shelton "did work on behalf of [CH2M B.V.] related to the World Cup Construction Venture from and through CH2M's and then Jacobs's offices in Colorado." AC ¶30. Indeed, none of Defendants' declarants dispute that substantial aspects of CH2M B.V.'s work on the Venture in Qatar—including matters relating directly to the labor supply chain at issue here—were provided from Colorado. At the pleading stage, that failure is dispositive: taken as true with plausible inferences drawn in Plaintiffs' favor, Plaintiffs' uncontroverted allegations are sufficient to state a *prima facie* case of jurisdiction. *AST Sports Sci.*, 514 F.3d at 1056-57.

Defendants' arguments are mostly misdirection. For example, their statement that CH2M B.V. "performed its work as PM Consultant in Qatar," D.I. 53-10 ¶7, is fine as far as it goes, but it does not go far enough to help them. CH2M makes no attempt to claim that *all* Venture work was done in Qatar or, put another way, that *no* Venture work was performed in Colorado or by Colorado personnel. Nor does it matter that CH2M B.V. maintains no offices, real estate, or service agents in Colorado, D.I. 53-10 ¶¶11-13, and "employ[s] [no] officers, employees, agents, or other representatives in the United States **for the purpose of transacting business there**," *id.* ¶10 (emphasis supplied). The latter caveat is particularly striking for what it does not deny (and thus implicitly concedes): CH2M B.V. has employees, officers, agents, or other representatives in Colorado for some other "purpose"—for example, supporting Venture operations in Qatar.

Defendants' own submissions confirm CH2M B.V. had substantial suit-related Colorado contacts. The ESPN emails, D.I. 53-2, are between a *Colorado-based*[27] CH2M public relations

---

[27]   *See* CH2M Retiree/Alumni Newsletter, January 2016, at 11, *available at* https://ch2mhillalumni.org/Newsletters/January_2016.pdf (last accessed May 27, 2024).

spokesperson and a domestic ESPN reporter, discussing CH2M B.V.'s Venture work in Qatar. Those emails indicate on their face their sender was based in Denver offices. *Id.* (CH2M sender's email address is listed as "Corsi, John/***DEN***" (emphasis supplied)). The correspondence back and forth with a Colorado-based employee, by an employee of a company affiliated with CH2M B.V., regarding CH2M B.V.'s Venture work, confirms CH2M B.V. availed itself of Colorado.

In addition, the Sears Declaration admits Sears was an employee of Colorado-based CH2M Hill International who was "seconded" to Qatar for two years to work with CH2M B.V. on the Venture. *See* D.I. 53-11 ¶¶3-4. A "secondment" is an "arrangement where a company temporarily assigns an employee to a new position," but the assigning company "retains the employee and pays their salary."[28] Thus, for two years, CH2M B.V. reached into Colorado, availed itself of a Colorado-based affiliate's employee, and that work for CH2M B.V. was done on the Venture by an employee retained and paid by a Colorado entity. Regardless of whether CH2M B.V. "directed" the specifics of Sears's work in Qatar, D.I. 53-11 ¶5, his declaration further substantiates (on top of the litany of examples already detailed, *supra*) Plaintiffs' allegation that CH2M B.V. routinely collaborated with and relied upon Colorado-based personnel, at times in Colorado, on Venture-related work.

Each of these examples demonstrate that CH2M B.V. had minimum contacts with Colorado, such that it took "some act" to purposefully avail itself of this forum. *Ford Motor*, 592 U.S. at 359; *see also*, *e.g.*, *ClearOne Commc'ns, Inc., v. Bowers*, 643 F.3d 735, 763 (10th Cir. 2011). Plaintiffs detail CH2M B.V.'s voluminous suit-related contacts with Colorado—contacts related to, for example, program management collaboration, trafficking reporting and monitoring, public relations, executive oversight, high-level meetings, use of Colorado employees, and profit,

---

[28] Indeed, *What Is a Secondment? Definition and Advantages* (Mar. 10, 2023), https://www.indeed.com/career-advice/career-development/what-is-secondment.

*e.g.*, *supra* III.B—these are not "random, fortuitous, or attenuated." *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (quotation omitted). And Plaintiffs have given painstaking examples of particular activities CH2M and its subsidiary CH2M B.V. would have done together in and through the Colorado offices in support of their work on the Venture, generally, and in some instances specifically related to worker welfare and trafficking, so Plaintiffs have sufficiently alleged their claims relate to and "arise out of or relate to the defendant's contacts" with the forum. *Ford Motor*, 592 U.S. at 359, 362. Plaintiffs have more than satisfied their "light" burden of alleging personal jurisdiction. *AST Sports Sci.*, 514 F.3d at 1056-57.

Defendants' response that a subsidiary should not always be subject to jurisdiction where its corporate parent "has an office," MTD 42, dramatically minimizes and mischaracterizes Plaintiffs' allegations. The jurisdictional hook is not merely the location of CH2M B.V.'s parent; the hook is CH2M B.V.'s purposeful, years-long collaborative relationship with its Colorado parent and sister corporations on Venture-related work. These companies' "coordinated activities indicate an affiliation closer than that of unrelated corporations," and this "affiliation" "lends it weight to a determination that personal jurisdiction may be imposed over [CH2M B.V.] based on its activities" in Colorado conducted with and through other CH2M entities. *First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 363 (S.D.N.Y. 1997); *see Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*, 2005 WL 3658006, at *5-6, *8 (D.N.J. June 7, 2005) (exercising specific jurisdiction over U.K. affiliate of "unified global accounting firm" based on its "close relationship" and work performed with affiliated U.S. office); *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 2001 WL 34691976, at *6-8 (S.D. Ind. Nov. 14, 2001) (exercising jurisdiction over foreign parent that "regularly and routinely exchange[d] technology and engineering information," communicated with, and exchanged employees with subsidiary in forum).

**B.    Jacobs Engineering Has Minimum Contacts with Colorado Arising Out of Its Work on the Venture.**

Plaintiffs also plausibly allege voluminous, purposeful suit-related contacts with Colorado by Jacobs Engineering. *See* AC ¶¶24-25, 28-31, 60-61. Defendants do not answer these well-sourced, detailed factual allegations, ignoring most and mischaracterizing others as "conclusory" or "speculat[ive]." MTD 42-43. But it is clear Jacobs Engineering participated in the Venture from Colorado. Its "One Jacobs" business model ensured routine collaboration between its Colorado-based employees and their affiliates working on the Venture in Qatar. *See* AC ¶¶29, 60-61. Indeed, Jacobs Engineering had offices in Colorado through which employees worked on the Venture. *Id.* ¶¶13, 24. Far from "general and incidental" connections, MTD 43, the Amended Complaint is replete with *uncontested* examples of specific Jacobs employees and departments in Colorado that supported the Venture. *See* AC ¶¶29-33. Illustrative examples include:

- Jacobs's global program management group worked out of Colorado, and employees in that group admitted they worked on the Venture, *id.* ¶29(b);
- Jacobs's global labor supply-chain management, due diligence, data-collection, worker safety, and compliance personnel worked on the Venture from Colorado, *id.* ¶¶29(d), 29(f), 112, and Defendants do not dispute that these employees monitored Jacobs's—and its sub-contractors'—compliance with pledges not to use forced or trafficked labor related to the Venture;
- Jacobs's "Major Programs" and "Urban Environment & Sports" group made decisions about World Cup stadium construction and "worker welfare standards" from Colorado, *id.* ¶29(a);
- Jacobs's "Global Integrated Delivery" personnel in Colorado included several types of engineers and worked across borders to support their in-country affiliates working on the Venture, *id.* ¶29(c); and
- High-ranking employees in Jacobs's communications office were based in Colorado, and they handled inquiries that Jacobs received regarding its labor Supplier Code of Conduct, *id.* ¶29(e), and would have worked on Venture-related issues related thereto.

While not dispositive, Jacobs's decision to acquire CH2M, integrate its employees, and continue Venture-related activities from Colorado, *see id.* ¶¶24-25, 28-31, also shows purposeful availment.

*See Third Nat'l Bank in Nashville v. WEDGE Grp. Inc.*, 882 F.2d 1087, 1090 (6th Cir. 1989).

Defendants dispute none of these suit-related contacts. *None* of Defendants' declarations casts doubt on these detailed allegations about Jacobs Engineering's extensive Colorado contacts. Plaintiffs have again carried their "light" burden, *AST Sports Sci.*, 514 F.3d at 1056-57.

> ### C.    Jacobs Solutions Has Minimum Contacts with Colorado Arising Out of Its Work on the Venture, and the Claims Against It Are Viable.

Jacobs Solutions cannot escape jurisdiction or liability. A "corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor." *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991); *see Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (exercising jurisdiction over corporate successor is "consistently acknowledged" to be "compatible with due process"). Under Colorado law, "successor corporations have been held liable" where—as here— "the transaction results in a merger or consolidation of the two corporations" or "the purchaser is a mere continuation of the seller." *CMCB Enters., Inc. v. Ferguson*, 114 P.3d 90, 93 (Colo. App. 2005). Each theory provides independent grounds to hold Jacobs Solutions liable for Jacobs Engineering's acts and, in turn, to impute Jacobs Engineering's contacts to Jacobs Solutions.

*First*, there was a merger or consolidation when Jacobs Solutions "acquired 100% of Jacobs Engineering's stock" and made Jacobs Engineering a "wholly-owned subsidiary," D.I. 53-9 ¶6. Specifically, it was "a reverse triangular merger." Jacobs Solutions Inc., Quarterly Report (Form 10-Q), at 34 (Feb. 7, 2023).[29] And the "primary function" of a "reverse triangular merger" is "to **consolidate control** of two firms indirectly." *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co.*

---

[29] Through a reverse triangular merger, "the acquirer creates a subsidiary that merges into the target.  The merger subsidiary (and its stock) disappear while the target (and its stock) survive as a subsidiary of the acquirer." *W. Standard, LLC v. Sourcehov Holdings, Inc.*, 2019 WL 3322406, at *6 (Del. Ch. July 24, 2019).

*of Pittsburgh*, 2021 WL 710816, at *2 n.21 (Del. Super. Ct. Feb. 23, 2021) (emphasis supplied). That is what happened here: Jacobs Solutions consolidated control over Jacobs Engineering.

*Second*, Jacobs Solutions is a "mere continuation" of Jacobs Engineering because there was "a continuation of directors, management, and shareholder interest, and," while not necessary, "inadequate consideration." *CMCB Enters., Inc.*, 114 P.3d at 93. Liability is thus imposed because, as here, "the successor corporation is, in fact, the same corporate entity as the predecessor corporation, simply wearing a 'new hat.'" *Patin*, 294 F.3d at 654.

Here, Jacobs Solutions is simply a rebranding of Jacobs Engineering. *See* AC ¶16. That was how *Jacobs* presented the reorganization: the new name and structure "more closely align[ed] with Jacobs' public identity as a global technology-forward solutions company."[30] Ownership stayed the same: stockholders "automatically [became] stockholders of Jacobs Solutions Inc. on a one-for-one basis, with the same number of shares and same ownership percentage."[31] Management stayed the same: "existing directors and officers" of Jacobs Engineering became "the directors and officers of the holding company."[32]

Things stayed the same operationally, too. There were no "material operational or financial impacts" from the transition.[33] Jacobs Solutions kept the same "employees" and "contractual counterparties." AC ¶16. Jacobs Solutions even took over Jacobs Engineering's social media presence following the merger—so even "after 'the Plaintiffs completed their work,'" MTD 45

---

[30] Jacobs, *Jacobs to Implement New Holding Company Structure* (Aug. 19, 2022), https://invest.jacobs.com/news/news-details/2022/Jacobs-to-Implement-New-Holding-Company-Structure/default.aspx ("Jacobs Holding Company Press Release") (last accessed May 27, 2024).
[31] *Id.*
[32] Jacobs, *Jacobs' New Holding Company: Jacobs Solutions Inc. - Investor FAQ* (Aug. 19, 2022), https://s29.q4cdn.com/159670324/files/doc_events/2022/08/Jacobs-Holding-Company-%E2%80%93-Investor-FAQ-08.18.22.pdf (last accessed May 27, 2024).
[33] *See* Jacobs Holding Company Press Release, *supra* n.30.

(emphasis removed), Jacobs Solutions continued to participate in, and benefit from, the Venture from the United States through self-congratulatory public announcements, *see*, *e.g.*, AC ¶60(f). Each of those acts is an independent basis for personal jurisdiction.[34]

Courts have imputed liability in analogous circumstances. In *Caprio v. R. J. Reynolds Tobacco Co.*, a "holding company parent" created through a "reorganization" was deemed a "de facto merger or mere continuation" of its predecessor. 2007 WL 9702732, at *2-3 (S.D. Fla. Sept. 28, 2007). In that case—as here—there was "evidence of continuity in management and ownership," as all stockholders "became shareholders of the new entity" and "officers and directors" were "identical" between the predecessor and successor company. *Id.* Because the new entity was a "successor," liability could be imputed. *Id.* The outcome should be no different here.

Moreover, even if Jacobs Solutions claims it did not take on Engineering's liabilities as a matter of accounting, *see* D.I. 53-9 ¶6,[35] that is not enough to escape jurisdiction. For one, this suggests that there was "inadequate consideration" for the deal, which militates in favor of applying the "mere continuation" doctrine. *See CMCB Enters.*, 114 P.3d at 93. Fundamentally, though, the purpose of the "mere continuation" doctrine is to allow imputation of liability as a matter of law—notwithstanding creative accounting. Defendants' contrary view "would allow corporations to immunize themselves [from liability] by formalistically changing their titles." *Patin*, 294 F.3d at 654 (quoting *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982)).

It thus does not matter that Jacobs Engineering continues to exist as a subsidiary of Jacobs Solutions. *Contra* MTD 43 n.9. The "mere continuation" analysis is concerned with whether the

---

[34] Notably, Jacobs Solutions' profit from the World Cup Construction Venture, and public announcements in support of the Venture, all done in Colorado, are separately sufficient to justify specific personal jurisdiction, as they show substantial minimum contacts with the forum.

[35] This affidavit is also entitled to little weight because it is "conclusory and self-serving." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015).

"*purchasing corporation* [*i.e.*, Jacobs Solutions] is, in effect, a continuation of the selling corporation [*i.e.*, Jacobs Engineering], and *not* whether there is a continuation of the seller's business operation." *Alcan Aluminum Corp., v. Elec. Metal Prods., Inc.*, 837 P.2d 282, 283 (Colo. App. 1992) (emphasis supplied) (citations omitted). Thus, Jacobs Solutions is subject to jurisdiction through imputed contacts. *See CMCB Enters.*, 114 P.3d at 93.

### D. Exercising Jurisdiction Over CH2M B.V., Jacobs Engineering, and Jacobs Solutions Would Comport with the Due Process Clause.

Exercising jurisdiction over each Defendant would not "offend traditional notions of fair play and substantial justice." *Pro Axess*, 428 F.3d at 1281-82. Jacobs chose to purchase a Colorado-headquartered company that routinely collaborated with its Dutch subsidiary in Colorado on the Venture, and then itself participated on the Venture from Colorado. CH2M B.V. is not meaningfully burdened by litigating in this forum, as its corporate parent is here; it has "already retained the same counsel" as its co-defendants, *Vela v. Sterigenics U.S., LLC*, 2024 WL 83015, at *12 (D.N.M. Jan. 8, 2024); and it is fully integrated and collaborating with them. Plaintiffs chose this forum, and inefficient, "piecemeal litigation would result" if Plaintiffs "were forced" to sue CH2M B.V. in the Netherlands or elsewhere. *AST Sports Sci.*, 514 F.3d at 1062. Meanwhile, Colorado has substantial interest in "combat[ting] human trafficking"—an act "abhorrent to a civilized society," COLO. REV. STAT. §§18-3-501(1)(b), (3) (2014). Thus, Defendants cannot make a "compelling" case against exercising jurisdiction in this forum, *Pro Axess*, 428 F.3d at 1280, so the Court should deny Defendants' attempt to avoid suit here.

### CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

May 28, 2024

Respectfully submitted,

/s/ _____

Eli J. Kay-Oliphant
  eli.kay-oliphant@sparacinopllc.com
Ryan R. Sparacino
  ryan.sparacino@sparacinopllc.com
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530

Sean Grimsley, Atty. Reg. # 36422
  sgrimsley@olsongrimsley.com
Jason Murray, Atty. Reg. # 43652
  jmurray@olsongrimsley.com
Eric Olson, Atty Reg. #36414
  eolson@olsongrimsley.com
Abigail Hinchcliff, Atty Reg. #47942
  ahinchcliff@olsongrimsley.com
Olson Grimsley Kawanabe Hinchcliff & Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Tel: 303-535-9151

*Counsel for Plaintiffs*

**CERTIFICATION OF SERVICE**

I hereby certify that on this 28th day of May 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ _____

Eli J. Kay-Oliphant