IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02660-CYC

F.C., A.B., D.D.R., L.V., Ra.G, R.S., J.D.C.,
W.C., G.G., R.C., D.L., E.I., M.G., E.C., Rh.P.,
L.L., J.J.G., R.V., R.L., A.S., E.A., J.V., A.C.,
A.G., A.A., R.A., Ro.L., Ro.P., S.N., B.M., G.T.,
J.B., E.D.C., V.A., Re.D., C.S., Ra.D., M.R.,
L.P. I.E., M.A., Ro.D., A.D., Ri.D., Rod.O.,
M.D.L., Ri.O., En.C., Ron.O., G.S., B.D., C.C., and
N.C.,

      Plaintiffs,

v.

JACOBS SOLUTIONS INC.,
JACOBS ENGINEERING GROUP INC.,
CH2M HILL COMPANIES, LTD.,
CH2M HILL INTERNATIONAL, LTD., and
CH2M HILL INTERNATIONAL B.V.,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

**Cyrus Y. Chung, United States Magistrate Judge.**

      This case, centered upon labor practices in Qatar surrounding the construction of stadiums for the 2022 FIFA World Cup, raises complex issues of extraterritoriality and "venture liability" under the Trafficking Victim Protection Reauthorization Act. The defendants move to dismiss, contending that the plaintiffs lack standing under that Act, the Court lacks personal jurisdiction over some defendants, civil claims under the Act lack extraterritorial scope, and the plaintiffs' claim is insufficiently pled. For the reasons that follow, the plaintiffs have standing, the Court lacks personal jurisdiction over two defendants, the Act has some extraterritorial reach,

and the plaintiffs sufficiently plead the claim they can assert extraterritorially. As such, the motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

According to the amended complaint, whose factual allegations the Court accepts as true for this motion, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), in 2010, Qatar won a bid to host the 2022 FIFA World Cup, the quadrennial soccer tournament of nations. ECF No. 52 ¶ 55. In advance of the event, Qatar needed major infrastructure improvements, coordination of non-competition venues and, relevant here, the construction of stadiums and practice venues. *Id.* ¶ 56. To that end, the Qatari government convened the Supreme Committee for Delivery & Legacy (the "Supreme Committee") to bear direct responsibility for those preparations. *Id.*

Two years after Qatar won its bid, the Supreme Committee engaged defendants CH2M Hill Companies, Ltd., CH2M Hill International, Ltd., and CH2M HILL International B.V. (collectively, "CH2M") to be its Programme Management Consultant and ensure the successful delivery of World Cup preparations by managing the aforementioned construction projects. *Id.* ¶¶ 22, 61. In 2017, Jacobs Engineering Group Inc. ("Jacobs Engineering") acquired CH2M. *See id.* ¶¶ 13, 19. Thereafter, Jacobs Engineering shouldered the World Cup responsibilities that CH2M had previously borne. *Id.* ¶¶ 27.

Those responsibilities did not entail CH2M or Jacobs Engineering constructing World Cup venues directly. Instead, the Supreme Committee contracted with various companies — who, in turn, subcontracted with others — for the actual work of construction. *See id.* ¶¶ 56–58. Those contractors included Al Jaber Engineering, Electro Mechanical Enterprises Qatar, Imar Trading and Contracting Company, J.A.K. Construction Builders, Midmac Company, Rabban Readymix, and Tokyo Freight (the "Contractors"). *See id.* ¶¶ 147–199.

2

The plaintiffs, Filipino migrant workers whom the Contractors employed between 2012 and 2021, helped build the Al Rayyan, Al Thumama, Al Wakrah, Khalifa, and Lusail stadiums. *Id.* During most of that period, migrant workers in Qatar generally labored under that country's kafala sponsorship system, in which workers' jobs, housing, and food depended upon their Qatari employers. *See id.* ¶¶ 39, 43. That system gave employers the ability to restrict the physical movement and freedom of their migrant employees, including their ability to return to their home countries. *Id.* ¶¶ 42–46. It permitted Qatari employers to deduct migrant workers' wages arbitrarily, to force copious amounts of overtime, to house migrant workers in crowded and unsafe conditions, and to confiscate workers' passports to prevent them from returning home or changing employers in Qatar. *Id.* ¶ 48–49. The plaintiffs suffered from those very practices: all say that their passports were confiscated upon arrival in Qatar to prevent them from returning to the Philippines; most also indicate that they were forced to work through exhaustion, were not paid what they were promised, were forced to live in crowded and inhumane conditions, and were given inadequate or unsanitary food. *See id.* ¶¶ 147–199. Some were made to work up to thirty-six or even seventy-two hours at a time. *See id.* ¶¶ 147–148, 152, 154, 157, 168.

Against that backdrop, CH2M and, later, Jacobs Engineering, as "delivery partner[s]" of the Supreme Committee, were responsible for ensuring that the Contractors followed proper labor standards and practices, *id.* ¶¶ 59, 60(f), and the construction contracts highlighted CH2M's oversight role in this regard, *id.* ¶ 58. With respect to the Al Thumama Stadium, for example, the Supreme Committee awarded the contract to Al Jaber Engineering, employer to some twenty-five of the plaintiffs. *See id.* ¶¶ 61(a)–(b), 149–151, 153, 166, 173–175, 177–180, 183–184, 186, 188, 191–199. Jacobs Engineering employees worked there to ensure that Al Jaber Engineering carried out its contractual obligations, to monitor the safety of the site, and to

3

advise on corrective labor supply-chain actions. *Id.* ¶¶ 61(c)–(f). CH2M and Jacobs Engineering had a similar role across other World Cup construction projects. *Id.* ¶¶ 118–128.

On October 12, 2023, the plaintiffs filed this action. ECF No. 1. The parties consented to the jurisdiction of a magistrate judge, ECF No. 32, and an amended complaint followed in March 2024. ECF No. 52. The amended complaint asserted a claim under 18 U.S.C. §§ 1589, 1590, and 1595, each a section of the Trafficking Victim Protection Reauthorization Act ("TVPRA"), sometimes called the Trafficking Victim Protection Act ("TVPA"). *Id.* ¶¶ 201–213. It also asserted a claim for restitution under 18 U.S.C. § 1593, *id.* ¶¶ 214–216, and various state-law claims, *id.* ¶¶ 217–246. The defendants then moved to dismiss the amended complaint, ECF No. 53, the plaintiffs abandoned their state-law claims, ECF No. 53 at 9 n.11, and then-Chief Magistrate Judge Michael E. Hegarty heard oral argument several months later. ECF No. 59. Following Judge Hegarty's retirement, the case was reassigned to the undersigned. ECF No. 61.

## ANALYSIS

### I.    Standing

The defendants first challenge the Court's jurisdiction. A party may assert "by motion" a federal court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Pueblo of Jemez v. United States,* 790 F.3d 1143, 1151 (10th Cir. 2015) (quoting *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013)). The moving party may seek dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) in two forms: (1) facial attack or (2) factual challenge. *Equal Emp. Opportunity Comm'n v. 'Murica, LLC*, 694 F. Supp. 3d 1356, 1361 (D. Colo. 2023). Where, as here, the moving party "facially attack[s] the complaint's allegations as to the

existence of subject matter jurisdiction," courts will accept a complaint's allegations as true. *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004).

The defendants specifically contend that the plaintiffs lack standing. The "doctrine of standing . . . is an essential and unchanging part of the case-or-controversy requirement of Article III" of the Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That article limits "[t]he judicial Power" of federal courts to "Cases" and "Controversies," U.S. Const. art. III, and, for a plaintiff's action to be so categorized, he must "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The party invoking federal jurisdiction bears the burden of establishing standing." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). Here, the plaintiffs meet their burden.

Two of the requirements are uncontroverted. The defendants do not contest that "the forced labor to which the plaintiffs allege they have been subjected," *see* ECF No. 52 ¶¶ 147–199, "constitutes an injury in fact." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024). And it is no stretch of logic to conclude that "this injury can be redressed by the damages the plaintiffs seek." *Id.*; *see* ECF No. 52 ¶ 248.

Instead, the defendants train their lens on traceability. That element "examines the causal connection between the assertedly unlawful conduct and the alleged injury." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). It "demands 'something less than the concept of proximate cause,'" though it does "require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir.

2003)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss" a court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (alterations and internal quotation marks omitted).

In this case, the plaintiffs allege, among other things, that the defendants "participated in the World Cup Construction Venture" by "sign[ing] a contract to oversee and manage construction of all the facilities and infrastructure for the World Cup" and that "venture partners" of the defendants "forced" the plaintiffs "to work in extreme and dangerous conditions . . . and for lengths of time they otherwise would not have" by "l[ying] to Plaintiffs" and "caus[ing] Plaintiffs to agree to go to Qatar and be lured into conditions of forced labor." ECF No. 52 ¶¶ 205–206, 210. Such actions, they say, violate the TVPRA's proscription against knowingly benefitting from participation in a venture with constructive or actual knowledge that it engages in forced labor or trafficking. 18 U.S.C. § 1595; *see id.* §§ 1589, 1590. In determining whether such allegations suffice for standing, "both history and the judgment of Congress play important roles." *Spokeo*, 578 U.S. at 340.

The former guidepost "offer[s] a meaningful guide to the types of cases that Article III empowers federal courts to consider" through assessing whether the current standing theory "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo*, 578 U.S. at 341). Here, "[l]ike aiding and abetting liability, the TVPRA requires (1) a wrongful act that causes an injury, specifically forced labor; (2) knowledge, as the defendant must knowingly benefit; and (3) substantial assistance, namely participation in the 'venture.'" *Doe 1 v. Apple Inc.*, 96 F.4th 403, 411 (D.C. Cir. 2024). "Thus, in the TVPRA, Congress created a causal link

for venture liability that is a 'close . . . analogue' to common law aiding and abetting." *Id.* (quoting *TransUnion*, 594 U.S. at 424).

The defendants protest that the analogy is not exact: in "aiding-and-abetting liability," they note, "the defendant has to take some affirmative act with the intent of facilitating the offense's commission," *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490 (2023) (internal quotation marks omitted), and the Amended Complaint never alleges that the defendants intended to bring about forced labor. ECF No. 53 at 13. But the search for analogues "does not require an exact duplicate in American history and tradition." *TransUnion*, 594 U.S. at 424. To so require would ignore that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo*, 578 U.S. at 341. And "Congress" must "maintain[] some leeway when creating statutory causes of action" to exercise that power meaningfully. *Doe 1*, 96 F.4th at 411. So it is here: Congress has defined a cause of action analogous, though not identical, to aiding and abetting.

Predictably, then, the guidepost of Congress's judgment also points to the plaintiffs having standing. Congress deliberately expanded the circle of persons it gave the right to enforce the TVPRA over time. "The initial text, passed in 2000, imposed criminal liability for human trafficking." *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 638 (2021) (opinion of Thomas, J.). "Congress later added a private right of action in 2003, allowing plaintiffs to sue the immediate 'perpetrator' of a human trafficking violation." *Id.* "And then in 2008, Congress created the present private right of action, allowing plaintiffs to sue defendants who are involved indirectly with slavery." *Id.* Congress, then, has made explicit its judgment that persons like the plaintiffs ought to have standing to sue. As such, "the plaintiffs have demonstrated causation because they have alleged that the" defendants "are in a 'venture' — as the plaintiffs understand the

7

TVPRA — with" the Supreme Committee and the Contractors "who are responsible for the forced labor." *Doe 1 v. Apple Inc.*, 96 F.4th 403, 411 (D.C. Cir. 2024). No more was exigible.

The defendants demur. Noting that "it is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party before the court,'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)), they say that because the Contractors caused the forced labor, the plaintiffs' suit attempts to graft proper standing against the Contractors onto improper standing against the defendants. ECF No. 53 at 11-12; ECF No. 55 at 3. But this suggestion cannot bear the weight the defendants put on it. For one thing, the defendants are "not . . . wholly independent actor[s]." *Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464, 474 (S.D.N.Y. 2021). Instead, they contracted to oversee coordination of the World Cup construction projects, advertising themselves as a "partner" in the "delivery" of that infrastructure. ECF No. 52 ¶¶ 22, 60(e), (f); *see Toretto*, 523 F. Supp. 3d at 474 (noting that "contractual arrangements" and "advertis[ing] themselves as partners" tied company to offense).

For another, the principle animating *Murthy* is the prevention of "guesswork as to how independent decisionmakers will exercise their judgment," 603 U.S. at 58-59, and abstention from cases in which "the 'direct' relationship between the alleged injury and the claim sought to be adjudicated" can "be termed only speculative." *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973). The TVPRA's relationship between harm and claim cannot be so termed: it allows the plaintiffs to sue those who knowingly benefit from participation in a venture that engages in forced labor or trafficking when the beneficiary had actual or constructive knowledge of such practice. 18 U.S.C. §§ 1589, 1590, 1595. Such harm is indirect, but "[t]he fact that the harm to" the plaintiffs "may have resulted indirectly does not in itself preclude standing." *Warth v. Seldin*,

422 U.S. 490, 504 (1975). "As long as" they "have alleged distinct and palpable injuries that are 'fairly traceable' to" the defendants' "actions, the Art. III requirement . . . is satisfied." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982) (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261 (1977)). The plaintiffs have. As alleged, the defendants participated in the venture, the venture harmed the plaintiffs by forcing their labor in violation of the TVPRA and, thus, the harm is fairly traceable to the defendants. Nothing about that chain requires rank speculation.

The defendants have a final shot in their sling. The Supreme Court, they say, has articulated a floor for standing where third-party action is involved that requires a "determinative or coercive effect" of that action. ECF No. 53 at 12 (quoting *Bennett*, 520 U.S. at 169). On their view, a third party who does not directly cause a plaintiff's injury must at least exercise control over the one who does for a plaintiff's suit against that third party to have standing. But the "argument that" standing requires a "show[ing] that a third party's action had a determinative and coercive effect . . . is not supported by the case law." *Toretto*, 523 F. Supp. 3d at 474 (internal quotation marks omitted). Instead, *Bennett* simply means that "a showing that a third party played a central role is sufficient; a relationship based on pure speculation is not." *Id.* at 475. Thus, while allegations that "Nevada's legal system of prostitution" caused injuries by violent sex traffickers, strip clubs, and pimps represented pure speculation, *Williams v. Sisolak*, No. 2:21-cv-01676-APG-VCF, 2022 WL 2819842, at *4 (D. Nev. July 18, 2022), the TVPRA's chain of causation is far afield from such attenuated reasoning. The plaintiffs, then, have adequately pled standing here.

## II.    Personal Jurisdiction

There is another jurisdictional matter. A plaintiff bringing a civil action under 18 U.S.C.

§ 1595 may bring that action "in an appropriate district court of the United States." Three of the defendants, Jacobs Engineering, Jacobs Solutions Inc. ("Jacobs Solutions"), and CH2M Hill International B.V. ("CH2M B.V."), each contest the Court's personal jurisdiction over them.[1]

Federal Rule of Civil Procedure 12(b)(2) allows a party to move for dismissal for "lack of personal jurisdiction." In a federal-question case, this requires moving through a series of two-step pavanes. The first requires that "the court . . . determine (1) 'whether the applicable statute potentially confers jurisdiction' by authorizing service of process on the defendant and (2) 'whether the exercise of jurisdiction comports with due process.'" *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000) (quoting *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)). Because "[t]he TVPRA does not provide for nationwide service of process," *Taylor v. Salvation Army Nat'l Corp.*, 2022 WL 22861527, at *4 (N.D. Ill. Sept. 19, 2022), *aff'd*, 110 F.4th 1017 (7th Cir. 2024), at the first step, "Fed. R. Civ. P. 4(k)(1)(A) commands the district court" instead "to apply the law of the state in which the district court sits." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

The analysis proceeds, then, into the second two-step test, in which a court "must initially determine whether the exercise of jurisdiction is sanctioned by the Colorado long-arm statute, which is a question of state law, and then determine whether the exercise of jurisdiction comports with the due process requirements of the Constitution." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1506–07 (10th Cir. 1995) (internal citation omitted). But because "Colorado's long-arm statute . . . confers the maximum jurisdiction permissible consistent with the Due Process

---

[1] CH2M Hill Companies, Ltd. and CH2M Hill International, Ltd. understandably do not raise this issue, as the Amended Complaint alleges that they "maintain their corporate headquarters in Colorado." ECF No. 52 ¶ 12.

Clause . . . the first, statutory, inquiry effectively collapses into the second, constitutional analysis." *Dudnikov*, 514 F.3d at 1070 (citing *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005)). The constitutional analysis, in turn, stems from the Fourteenth Amendment's provision that states cannot "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. That clause "constrains a State's authority to bind a nonresident defendant" like the three defendants who protest the Court's jurisdiction here "to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014). "For a court to exercise jurisdiction in harmony with due process, defendants must have minimum contacts with the forum state, such that having to defend a lawsuit there would not offend traditional notions of fair play and substantial justice." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th Cir. 2020) (internal quotation marks omitted). "In giving content to that formulation, the [Supreme] Court has long focused on the nature and extent of 'the defendant's relationship to the forum State,'" which has "led to . . . recognizing two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). The plaintiffs disclaim any reliance on general jurisdiction for these three defendants, *see* ECF No. 54 at 35–45, so the inquiry again collapses into a single analysis of specific jurisdiction.

That brings the third two-step evaluation. "Specific jurisdiction is proper if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'" *XMission*, 955 F.3d at 840 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Under the first step, "[t]he

defendant . . . must" have "take[n] 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ford*, 592 U.S. at 359 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). The second step requires that "there . . . be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 359–60 (internal quotation marks and alteration omitted).

"The plaintiff has the burden of establishing personal jurisdiction." *XMission*, 955 F.3d at 839. "Where, as in the present case, there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists." *Id.* (quoting *Wenz*, 55 F.3d at 1505). "That is, the plaintiff may defeat a motion to dismiss by presenting evidence (either uncontested allegations in its complaint or other materials, or an affidavit or declaration) 'that if true would support jurisdiction over the defendant.'" *Id.* (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998)). Here, the plaintiffs carry their burden as to Jacobs Engineering, but not as to CH2M B.V. or Jacobs Solutions.

## A.  Jacobs Engineering

In 2017, Jacobs Engineering acquired Colorado-headquartered CH2M Hill Companies, Ltd. and made it into one of its wholly-owned subsidiaries. ECF No. 52 ¶¶ 12, 19. Subsequent to the acquisition, CH2M Hill Companies, Ltd. and its subsidiaries integrated their Colorado-based operations with Jacobs Engineering's Texas-based ones. *See id.* ¶¶ 24–25, 60(a). Thereafter, work on the World Cup construction project continued from Jacobs Engineering's Colorado

offices. *Id.* ¶ 29. A number of managers, executives, and other employees were "dual-hatted" for both CH2M and Jacobs Engineering, including personnel in both companies' groups relating to sports, global program management, global integrated delivery, global health and safety, communications, and labor supply-chain management. *Id.* Because these employees were in Colorado as part of CH2M prior to the acquisition, they simply continued their Colorado-based work for the venture after the acquisition and operations integration. *Id.* ¶¶ 29–30.

Such allegations suffice to show that Jacobs Engineering's contacts with Colorado were not "random, fortuitous, or attenuated, . . . or the unilateral activity of another party or a third person." *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1058 (10th Cir. 2008) (quoting *Benally v. Amon Carter Museum of W. Art*, 858 F.2d 618, 625 (10th Cir. 1988)). Indeed, "by the commission of a tortious act within Colorado, a person submits to the jurisdiction of Colorado courts concerning any cause of action arising from that act." *Wenz*, 55 F.3d at 1507 (construing Colorado's long-arm statute); *see Freestream Aircraft (Bermuda) v. Aero Law Grp.*, 905 F.3d 597, 606 (9th Cir. 2018) (reciting "the well-settled understanding that the commission of a tort within the forum state usually supports the exercise of personal jurisdiction"). And given that "[a] civil liability claim under § 1595 is essentially a tort action," *Norambuena v. W. Iowa Tech Comm. College*, --- F. Supp. 3d ----, 2025 WL 927193, at *66 (N.D. Iowa Mar. 27, 2025), and the particular violation alleged is "knowingly benefit[ting] . . . from participation in a venture," 18 U.S.C. § 1589(b), such Colorado-based aid to the construction of World Cup stadiums suffices to show purposeful availment here. Such participation in the venture of World Cup stadium construction from Colorado also indicates that "the suit 'arise[s] out of *or relate[s] to* the defendant's contacts with the forum,'" especially given that "proof of causation" is not required for the suit to relate to the contacts. *Ford*, 592 U.S. at 362 (quoting *Bristol-Myers*, 582

13

U.S. at 262). Here, the Colorado contacts are Jacobs Engineering's efforts in overseeing World Cup stadium construction. The lawsuit addresses that very same thing. No more is necessary.

Jacobs Engineering protests. It decries the aforementioned Colorado contacts as "speculat[ion]" that the dual-hatted Jacobs Engineering/CH2M employees worked on World Cup construction tasks. ECF No. 53 at 43. But, on a motion to dismiss, a district court must "accept as true any allegations in the complaint not contradicted by the defendant's affidavits, and resolve any factual disputes in the plaintiff's favor" in addressing personal jurisdiction. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007). No affidavits contradict the plaintiffs' allegations about the dual-hatted employees and, moreover, to infer that employees of an acquired company whose operations integrated with its new parent continued their same work in the location they had previously occupied hardly seems like wild guesswork.

Jacobs Engineering also argues that this lawsuit relates to actions in Qatar, not in Colorado. ECF No. 55 at 30. But the lawsuit can relate to more than one thing. To be sure, the forced labor itself occurred in Qatar. Participation in the venture exploiting that forced labor, though, need not have been so geographically limited.

The plaintiffs therefore meet the "purposeful availment" and "relating to" conditions for specific jurisdiction. But "that is not the end of the matter." *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011). A court "must still inquire whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice." *Id.* "But at that point, 'it is incumbent on defendants to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable . . . .'" *Id.* (quoting *Dudnikov*, 514 F.3d at 1080). Here, the defendants offer only a single sentence of argument on this point, broadly averring that Colorado has no interest in resolving these claims that relate to events in Qatar.

14

ECF No. 53 at 45. That, of course, proves too much: such an argument would defeat personal jurisdiction in every case involving the TVPRA's extraterritorial jurisdiction. Moreover, the argument addresses only one of the relevant factors for this inquiry, which are:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

*OMI Holdings*, 149 F.3d at 1095. Other factors favor the exercise of personal jurisdiction here. For example, given Jacobs Engineering's significant operations in Colorado and it having "already retained the same counsel" as CH2M, *Vela v. Sterigenics U.S., LLC*, No. 23-cv-00363-JCH-GBW, 2024 WL 83015, at *12 (D.N.M. Jan. 8, 2024), the burden on Jacobs Engineering is not particularly heavy. And requiring the plaintiffs to sue Jacobs Engineering in Texas or Delaware where it is subject to general jurisdiction would result in "piecemeal litigation." *AST Sports Sci.*, 514 F.3d at 1062. The defendants do not present a compelling case making jurisdiction unreasonable here.

The short of it is that by alleging that Jacobs Engineering employees, who were previously part of an acquired Colorado-headquartered entity, continued to work on World Cup stadium construction from Colorado, the plaintiffs have alleged that Jacobs Engineering purposefully availed itself of the privilege of conducting activities in Colorado in a way that relates to this lawsuit. At least at this stage, that suffices to make the prima facie case needed for personal jurisdiction.

## B. Jacobs Solutions

Jacobs Solutions stands on separate footing. The plaintiffs concede that Jacobs Solutions "was incorporated after the Plaintiffs completed their work." ECF No. 52 ¶ 13. As such, they cannot rely upon Jacobs Solutions' own contacts with Colorado to assert personal jurisdiction

over it. *See XMission*, 955 F.3d at 848-89 (teaching that specific jurisdiction deals with contacts at the time a claim accrues).

Instead, the plaintiffs point to Jacobs Solutions' acquisition of Jacobs Engineering's stock, which made Jacobs Engineering its wholly-owned subsidiary. ECF No. 54 at 42 (citing ECF No. 53-9 ¶ 6). And because "[a] corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor," *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991), the plaintiffs say, Jacobs Solutions should take on the contacts of Jacobs Engineering.

But this reads the law through rose-colored glasses. For one thing, it is true that "successor corporations have been held liable if," among other things, "the transaction results in a merger or consolidation of the two corporations" or if "the purchaser is a mere continuation of the seller." *CMCB Enters., Inc. v. Ferguson*, 114 P.3d 90, 93 (Colo. App. 2005). But these versions of successor liability apply to "a corporation that acquires the assets of another corporation." *Id.*; *see Bd. of Cnty. Comm'rs of Cnty. of Park v. Park Cnty. Sportsmen's Ranch, LLP*, 271 P.3d 562, 572 (Colo. App. 2011) ("[A] prerequisite for the imposition of liability against a corporation as a mere continuation of a predecessor is a sale or transfer of . . . the assets of the latter to the former."). And "Jacobs Solutions did not acquire Jacobs Engineering's assets and liabilities." ECF No. 53-9 ¶ 6. That forecloses successor liability here. For another, the plaintiffs cite the type of acquisition involved here, a reverse triangular merger, as a fact helpful to their cause. ECF No. 54 at 42–43. But even if the "primary function" of such a merger "is to consolidate control of two firms indirectly," *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. N18C-08-086 EMD CCLD, 2021 WL 710816, at *2 n.21 (Del. Super. Ct. Feb. 23, 2021), a "recognized purpose of this type of merger agreement is to avoid successor

liability." *Kaufmann v. LVA Holdings, Inc.*, No. 05-CV-02140-RPM, 2006 WL 8200486, at *1 (D. Colo. July 20, 2006); *see Norfolk S. Railway Co. v. Pittsburgh & W. Va. R.R.*, 153 F. Supp. 3d 778, 808 (W.D. Pa. 2015) (collecting cases). The plaintiffs do not sufficiently allege that Jacobs Solutions has successor liability for Jacobs Engineering and, as such, the Court lacks personal jurisdiction over it.

### C. CH2M B.V.

That leaves CH2M B.V., a Dutch subsidiary of CH2M Hill Companies, Ltd. *See* ECF No. 52 ¶ 12; ECF No. 53-10 ¶¶ 3–4. CH2M B.V. has no officers, employees, agents or other representatives in Colorado, does not maintain an office in Colorado, is not licensed to do business in Colorado, does not own property in Colorado, and has no agent for service of process in Colorado.[2] *See* ECF No. 53-10 ¶¶ 9–13. Such circumstances would ordinarily prohibit the exercise of personal jurisdiction. *See, e.g.*, *Faber v. Townsend Farms, Inc.*, 54 F. Supp. 3d 1182, 1189 (D. Colo. 2014) (finding no personal jurisdiction over defendant that "has no offices or employees in Colorado, does not pay taxes in Colorado, does not advertise in Colorado, and did not engage in any commercial transactions with the plaintiffs in this case").

Nevertheless, the plaintiffs point to CH2M B.V.'s contacts with its Colorado-based parent and contend that such contacts make it amenable to personal jurisdiction here. ECF No. 54 at 40. But the cases they cite do not compel this conclusion. *Rocker Mgmt, L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, No. Civ.A. 00-5965 JCL, 2005 WL 3658006, at *7 (D.N.J. Jun. 7, 2005), for example, was built on a concept of general jurisdiction arising from "'continuous and systematic' business activities within the United States," but, absent an exceptional case,

---

[2] At oral argument, the plaintiffs suggested that these averments applied only to CH2M B.V.'s present status, ECF No. 60 at 52, but the affidavit is clear that it applies to "the entire period covered in the Amended Complaint." ECF No. 53-10 ¶ 2.

general jurisdiction for a corporation now lies only in "its place of incorporation and principal place of business." *Ford*, 592 U.S. at 359. And *First American Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 363 (S.D.N.Y. 1997), relied on an agency relationship between partner companies to impute the domestic company's contacts to a foreign company, but "[w]hile under some circumstances a subsidiary corporation's contacts may be imputed to a parent for the purposes of jurisdiction, the reverse is not true." *Vacation Travel Int'l, Inc. v. Sunchase Beachfront Condo. Owners Ass'n, Inc.*, No. 06-cv-02195-LTB-CBS, 2007 WL 757580, at *5 (D. Colo. Mar. 8, 2007) (citing *Home-Stake Prod. Co. v. Talon Petro., C.A.*, 907 F.2d 1012, 1021 (10th Cir. 1990)).

Beyond that, the plaintiffs identify a single employee of one of CH2M B.V.'s Colorado-based parent companies who entered a secondment to work for CH2M B.V. in Qatar and a CH2M B.V. director who lived in Colorado. But neither shows the same sort of purposeful availment directed toward Colorado that Jacobs Engineering has. The former of these two people left Colorado to work on the World Cup construction venture. ECF No. 53-11 ¶¶ 3, 5. The latter would have attended CH2M B.V. board meetings in Europe, ECF No. 53-10 ¶ 5, and it is unclear what he did in Colorado such that CH2M B.V. purposefully availed itself of the privilege of doing business in Colorado through him. Finally, the plaintiffs point to CH2M B.V. personnel at times traveling to Colorado based on CH2M's global headquarters being there, ECF No. 54 at 37 & n.26, but this is merely its assertion that CH2M B.V.'s contacts with its parent justify personal jurisdiction dressed in different garb. That will not do.

To sum up, it is the plaintiff's burden to show personal jurisdiction, *XMission*, 955 F.3d at 839, and the contacts they cite are too "random" or "isolated" to put CH2M B.V. on notice that it would be haled into a Colorado court. *Ford*, 592 U.S. at 359.

Because the Court lacks personal jurisdiction over Jacobs Solutions and CH2M B.V., the claims against those defendants will be dismissed without prejudice.

**III.    Extraterritoriality**

Noting that this case involves Filipino plaintiffs laboring in Qatar, the defendants next say that the TVPRA's private right of action, an American statute, cannot reach such conduct. ECF No. 53 at 15–21. But Congress has extended the reach of the TVPRA's private cause of action beyond the territory of the United States, though not quite as far as the plaintiffs claim.

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)). Thus, under "the presumption against extraterritoriality[, a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)). "To decide whether an act of Congress rebuts the presumption, courts apply a 'two-step framework.'" *Hetronic Int'l, Inc. v. Hetronic Ger. GmbH*, 99 F.4th 1150, 1160 (10th Cir. 2024) (quoting *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023)). "At the first step," courts "ask . . . whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 579 U.S. at 337. "If the statute contains such an instruction, then 'claims alleging exclusively foreign conduct may proceed, subject to the limits Congress has (or has not) imposed on the statute's foreign application.'" *Hetronic Int'l*, 99 F.4th at 1160 (quoting *Abitron*, 600 U.S. at 417). "But if the provision lacks any express intent for the law to apply outside the United States, then" a court must "proceed to step two." *Id.*

The TVPRA makes pellucid that "the courts of the United States have extra-territorial jurisdiction over any offense" under sections 1589 and 1590, both of which the plaintiffs invoke. 18 U.S.C. § 1596(a). These statutes therefore give "a clear, affirmative indication that" they "appl[y] extraterritorially." *RJR Nabisco*, 579 U.S. at 337.

Of course, 18 U.S.C. §§ 1589 and 1590 are criminal statutes, not civil causes of action, and the plaintiffs can only invoke them through the TVPRA's private cause of action in 18 U.S.C. § 1595. That statute allows a victim of a TVPRA violation to "bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States." Even where "the presumption" against extraterritoriality "has been overcome with respect to" a criminal statute's "substantive prohibitions," a court must "separately apply the presumption against extraterritoriality to" its private "cause of action." *RJR Nabisco*, 579 U.S. at 346.

That analysis reveals that Congress intended to imbue the TVPRA's private cause of action with extraterritorial jurisdiction. To begin, "§ 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates." *Roe v. Howard*, 917 F.3d 229, 241 (4th Cir. 2019). Its proscription against "act[s] in violation of this chapter," 18 U.S.C. § 1595, for example, includes a prohibition "on any foreign shore" against taking a person to make him a slave, *id.* § 1585, and another against serving on a slave-transporting vessel "from any foreign country or place to another," *id.* § 1586. It also incorporates "predicate offenses" that "apply extraterritorially . . . by way of other provisions delineating their extraterritorial application." *Howard*, 917 F.3d at 242.

20

Indeed, Section 1596 gives most of the TVPRA's other provisions extraterritorial reach. *See* 18 U.S.C. § 1596(a). Other TVPRA provisions not covered by section 1596 but incorporated by section 1595 also have extraterritorial, if somewhat more limited, application. *See, e.g.*, *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 198–99 (D. Md. 2019) (noting that 18 U.S.C. § 3271(a) gives 18 U.S.C. § 1592 "extraterritorial reach" when it concerns United States employees). Thus, "'Congress's incorporation' of such 'extraterritorial predicates' into § 1595 'gives a clear, affirmative indication' that § 1595 provides a civil remedy for the foreign conduct that is prohibited by" the TVPRA, at least "to the extent that the particular predicate offense supporting a specific claim applies extraterritorially." *Howard*, 917 F.3d at 242 (quoting *RJR Nabisco*, 579 U.S. at 339).

Moreover, "the purpose, structure, history, and context of the TVPA militate toward the extraterritorial application of § 1595." *Id.* at 241. "The congressional findings that accompanied the TVPA in its original form" in 2000, for example, "repeatedly emphasized the transnational nature of human trafficking and sexual exploitation, and the enforcement challenges posed by the international scope of that criminal activity." *Howard*, 917 F.3d at 236. Thus, "Congress enacted it to address the problem of human trafficking 'throughout the world.'" *Id.* at 242 (quoting Pub. L. 106-386 §§ 101–102 (2000)). "In 2003, Congress reauthorized and amended the TVPA . . . stress[ing] the challenges that remained 'in responding to the needs of victims of trafficking in the United States and abroad.'" *Id.* at 236 (quoting Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193 § 2(2)). It also "added a civil remedy provision to chapter 77" of title 18, codified at 18 U.S.C. § 1595. *Howard*, 917 F.3d at 236. And "[t]he 2008 TVPRA further expanded the extraterritorial reach of the" statute by adding 18 U.S.C. § 1596. *Howard*, 917 F.3d at 237. In short, "Congress has consistently amended the

21

TVPA to reach and proscribe additional categories of foreign conduct." *Id.* at 242. "Viewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Id.*; *accord Ratha v. Phatthana Seafood Co., Ltd.*, No. CV 16-4271-JFW (ASx), 2016 WL 11020222, at *6 (C.D. Cal. Nov. 9, 2016) ("Congress has clearly indicated that it intends the TVPRA, unlike statutory schemes that are silent on extraterritorial jurisdiction, to be a unified statutory scheme of interlocking provisions that provides extraterritorial jurisdiction over specific predicate offenses . . . ."). In line with that view, "the overwhelming majority of courts" have concluded that section 1596's jurisdictional grant applies to section 1595's private right of action. *Ratha*, 2016 WL 11020222, at *6; *see, e.g.*, *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 204 (5th Cir. 2017) ("After § 1596's enactment, a TVPRA defendant in a civil suit could no longer rely on a previously available defense: the presumption against extraterritoriality."); *Abafita v. Aldukhan*, No. 1:16-cv-06072 (RMB) (SDA), 2019 WL 6735148, at *5 (S.D.N.Y. Apr. 4, 2019) ("The TVPRA has extraterritorial effect."), *report and recommendation adopted*, 2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019); *Plaintiff A. v. Schair*, No. 2:11-cv-00145-WCO, 2014 WL 12495639, at *6 (N.D. Ga. Sept. 9, 2014) (noting that "Plaintiffs could salvage their" pre-2008 extraterritorial "claim if section 1596 could be retroactively applied").

The defendants resist this conclusion. On their view, Congress needed to put extraterritoriality into Section 1595 itself to imbue it with extraterritoriality. ECF No. 53 at 15 (citing *Doe I v. Apple Inc.*, No. 1:19-cv-03737 (CJN), 2021 WL 5774224, at *14 (D.D.C. Nov. 2, 2021)). But "an express statement of extraterritoriality is not essential." *RJR Nabisco*, 579 U.S. at 340. Thus, "*RJR Nabisco* teaches that, even absent an express statement of extraterritoriality, a

statute may apply to foreign conduct insofar as it clearly and directly incorporates a predicate statutory provision that applies extraterritoriality." *Howard*, 917 F.3d at 242 (citing *RJR Nabisco*, 579 U.S. at 339–41). The TVPRA's private right of action does and, thus, "§ 1595 reflects congressional intent that it applies extraterritorially to the extent that a plaintiff seeks redress for a predicate offense 'that is itself extraterritorial.'" *Id.* (quoting *RJR Nabisco*, 579 U.S. at 340).

Along similar lines, the defendants say that section 1596 must explicitly list section 1595 to give it extraterritorial reach and that the lack of such reference is fatal. ECF No. 53 at 6-7. "But that would not have made sense." *United States ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 133 (D.D.C. 2024). Section 1596(a) "listed 'offenses' over which courts would have extraterritorial jurisdiction, and section 1595 is not an 'offense' — it is a free-standing provision that creates a civil remedy for an 'offense,' that is, 'any violation of this chapter.'" *Id.* (quoting 18 U.S.C. § 1595(a)).

Even so, the defendants say, the TVPRA's private right of action is indistinguishable from the private right of action in the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1964(c), whose extraterritorial scope *RJR Nabisco* rejected. ECF No. 53 at 7; *see Mia v. Kimberly-Clark Corp.*, No. 1:22-cv-02353 (CJN), 2025 WL 752564, at *7 (D.D.C. Mar. 10, 2025). Not so. *RJR Nabisco*'s treatment of RICO's private right of action "depended on factors that do not apply to § 1595 of the TVPA." *Howard*, 917 F.3d at 243. "[T]he extraterritoriality of the RICO criminal provisions was purely derivative," for instance, whereas "[t]he TVPRA . . . prohibits conduct at home and abroad *itself*, and not by reference to other statutes." *United States ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 132 (D.D.C. 2024). RICO's private cause of action had "a gap between the reach of" its "civil liability" and its "criminal liability," whereas section "1595 . . . applies coextensively with its

predicate offenses, omitting any qualifying or modifying language." *Howard*, 917 F.3d at 243. And "the TVPA more clearly targets foreign conduct than any provision of RICO, as demonstrated by its international scope and Congress's repeated expansions of its extraterritorial reach." *Id.* The analogy is therefore inapt.

In a last-ditch effort to change the trajectory of the debate, the defendants claim that section 1596 cannot give section 1595 extraterritorial scope because its application was intended to be limited to criminal offenses. ECF No. 53 at 17–18; *see Doe I*, 2021 WL 5774224, at *14–16. They point to section 1596's use of the word "offense," claiming that this lexical choice limits the reach of the statute to criminal cases.

It does not. The "argument that TVPRA's extraterritorial jurisdiction does not extend to civil actions has been overwhelmingly rejected by the courts." *Ratha*, 2016 WL 11020222, at *6 (collecting cases). For one thing, "it fails to take into account the order in which the various provisions were enacted." *Hawkins*, 752 F. Supp. 3d at 133. From the TVPA's enactment in 2000 with extraterritorial scope through the creation of section 1595's civil cause of action and expansion of territorial scope in 2003 and the addition of section 1596 in 2008, Congress expanded the rights and remedies available to victims of human trafficking over time. Indeed, members of the House of Representatives, 154 Congr. Rec. H10888-01, H10903 (2008) (statement of Congressman Berman that the 2008 bill "provides additional protections for trafficking survivors who are threatened by trafficking perpetrators"), and the Senate, 154 Congr. Rec. S10886-01, S10886 (2008) (statement of Senator Leahy that the bill would "provide more protection to victims, particularly child victims of human trafficking"), noted that this was the very point of the 2008 amendment. "So it would be inappropriate to predicate a narrowing

construction of the civil provision on" the 2008 TVPRA amendment adding section 1596, which intended to expand victims' remedies. *Hawkins*, 752 F. Supp. 3d at 133.

For another, this construction ignores the design of the 2008 amendments to the TVPRA, and "[a]ssuredly context can be consulted" in evaluating extraterritoriality. *RJR Nabisco*, 579 U.S. at 340. Amongst other things, those amendments modified 22 U.S.C. § 7105 to "permit an alien" who witnessed a severe form of trafficking and "filed a civil action under section 1595 of title 18, United States Code, to remain in the United States until such action is concluded." Pub. L. No. 110-457 § 205. The chapter housing section 7105, in turn, is meant "to combat trafficking in persons," 22 U.S.C. § 7101(a), a "growing transnational crime" and "a matter of pressing international concern" that "includes forced labor," *id.* § 7101(b)(3), (23), and "to protect their victims," *id.* § 7101(a), people who are "transport[ed] . . . from their home communities to . . . foreign countries." *Id.* § 7101(b)(5); *see Adhikari*, 845 F.3d at 201 (noting that section 7105 "expressly contemplated overseas endeavors"). An interpretation that limits section 1596's reach to criminal prosecutions would render section 7105's protections illusory for any alien who had suffered trafficking abroad, at odds with the stated purpose of chapter 78 of title 22.

And, in all events, despite the defendants' claim that "offense" is a talisman for criminal-only application, "the TVPRA's civil provision specifically . . . uses the terms 'offense' and 'perpetrator.'" *Hawkins*, 752 F. Supp. 3d at 134 n.16; *see* 18 U.S.C. § 1595(c)(2) (providing for civil statute of limitations "if the victim was a minor at the time of the alleged offense"); *id.* § 1595(a) (allowing "civil action against the perpetrator"). The term, then, hardly conveys an intent to limit the extraterritoriality of section 1596 to criminal cases.

The short of it is that the history, structure, context, and purpose of the TVPRA all reveal Congress's intent that section 1596's extraterritorial scope apply to section 1595. Neither the

lack of explicit cross-reference between the two sections nor the use of the criminal lexicon compel a different conclusion.

That does not mean that the reach of section 1595 is limitless. A "claim[] alleging exclusive foreign conduct" is still "subject to 'the limits Congress has (or has not) imposed on the statute's foreign application.'" *Abitron*, 600 U.S. at 418 (quoting *RJR Nabisco*, 579 U.S. at 337–38). The parties assume that if section 1596's extraterritoriality applies to section 1595, the applicable limit is that the civil defendant must be a United States national or a person present in the United States. *See* ECF No. 53 at 19 n.6; ECF No. 54 at 29. That misreads the statute. Congress has made extraterritorial jurisdiction contingent upon "an alleged offender" being "a national of the United States . . . an alien lawfully admitted for permanent residence; or . . . present in the United States." 18 U.S.C. § 1596(a)(1)–(2). In context, the "offender" is one who directly violates 18 U.S.C. §§ "1581, 1583, 1584, 1589, 1590, or 1591." *Id.* § 1596(a). That is, the "offender" of section 1596(a) is more akin to the "perpetrator" of section 1595(a) than to its participant in a venture. To avail themselves of section 1596's extraterritorial reach, then, the plaintiffs must allege that the persons or entities in the venture that committed direct violations of sections 1589 or 1590 fit in one of the three categories tying them to the United States.

The alternative, that "offender" in section 1596(a) means any civil defendant in section 1595, makes little sense. In the criminal context, section 1596(a) authorizes a grant of "extra-territorial jurisdiction" only where the direct violator of "section 1581, 1583, 1584, 1589, 1590, or 1591" has United States citizenship, permanent residence status, or presence. A separate provision of the TVPRA, 18 U.S.C. § 1593A, provides generally for venture liability relating to TVPRA violations, but that section is absent from section 1596's grant of extraterritorial jurisdiction for criminal cases. By the parties' reading, Congress intended that the government

could prosecute extraterritorial violations of the TVPRA only where the direct offender had connections to the United States but removed those shackles for civil plaintiffs, endowing them with greater powers to police the world's violations of the TVPRA than federal prosecutors. The parties adduce no evidence for this proposition, and the Court has found none.

With respect to section 1589, that presents little issue for the plaintiffs. After all, section 1589(b) holds directly liable one who "knowingly benefits, financially or by receiving anything of value from participation in a venture" that engages in forced-labor practices "knowing or in reckless disregard of the fact" that the venture has so engaged.  That mostly aligns with section 1595(a)'s provision authorizing suit against a defendant who "knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged" in a TVPRA violation.

The same cannot be said of the plaintiffs' labor-trafficking claim based on section 1590 violations. Unlike section 1589, section 1590 lacks any venture liability provision. And the plaintiffs do not allege that a national of the United States, permanent resident of the United States, or person present in the United States engaged in such human trafficking. Instead, the Amended Complaint explicitly limits its allegations on that point to "Qatari employers in Qatar." ECF No. 52 ¶ 64; *see id.* ¶ 80 (alleging that "employers in Qatar widely, and systematically, engaged in trafficking"); *id.* ¶ 83 (describing knowledge of "the pervasiveness of human trafficking . . . by Qatari employers throughout Qatar"). For that reason, the plaintiffs cannot invoke section 1596's extraterritorial scope in their claim of section 1590 violations.

The analysis for that claim therefore proceeds to the second step of the *RJR Nabisco* framework. "[A]t the second step," a court will "determine whether the case involves a domestic application of the statute . . . by looking to the statute's 'focus,'" *RJR Nabisco*, 579 U.S. at 337,

and "whether the conduct relevant to that focus occurred in United States territory." *Hetronic Int'l*, 99 F.4th at 1160 (quoting *Abitron*, 600 U.S. at 418). Because the financial benefit to the defendants was felt in the United States, the plaintiffs say, they seek only a domestic application of section 1590.

The suggestion elevates hope over reason. Courts have regularly held that "the TVPA's central focus is on the act of trafficking itself, not wherever the benefits of trafficking activity may accrue." *Plaintiff A*, 2014 WL 12495639, at *5; *Adhikari v. KBR Inc.*, No. 4:16-cv-2478, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017) (concluding that because "Plaintiffs' injuries . . . were suffered only in foreign countries," that defendant's "alleged domestic violations of Section 1590 caused . . . irremediable foreign injuries"); *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. SA CV10-01172 JAK (MLGx), 2012 WL 5378742, at *6 (C.D. Cal. Aug. 27, 2012) (holding that "the focus of § 1590 is the trafficking of people to perform labor" and, therefore, "the touchstone of the territoriality inquiry of the TVPA is . . . to where the victims were trafficked"). Here, then, the injuries from the alleged trafficking were felt in Qatar, the place to which the plaintiffs were trafficked.

The plaintiffs protest, pointing to *Rodriguez v. Pan American Health Organization*'s, 29 F.4th 706, 716 (D.C. Cir. 2022), conclusion that the gravamen of a TVPRA claim resided in the United States, where the financial benefits of the alleged forced labor accrued. But that was because there, "the alleged financial activity itself g[ave] rise to a cause of action." *Id.* (citing 18 U.S.C. § 1589(b)). By contrast, "§ 1595 provides a civil remedy to a victim of a violation of the TVPRA—it does not create a new violation merely for benefitting from other violations." *Mia*, 2025 WL 752564, at *8 (internal quotation marks omitted). Indeed, *Rodriguez* emphasized its reliance on the financial "conduct" being "itself wrongful — as opposed to wrongful based only

on other conduct," and cautioned that other provisions of the TVPRA were not susceptible to the same analysis. *Rodriguez*, 29 F.4th at 716 & n.5 (warning that "[u]nder a § 1589(a) claim, the suffered injury is plainly involuntary servitude").

In sum, section 1596 provides a vehicle for extraterritorial application of the TVPRA's private right of action in section 1595. But section 1596's own limits cabin the scope of the extraterritoriality application of section 1595 by requiring that an offender of the underlying criminal statute have United States nationality, permanent residence, or presence. Those circumstances are lacking in the Amended Complaint with respect to the section 1590 claim and, therefore, that claim must be dismissed.

## IV.    Failure to State a Claim — Section 1595(a)

That the plaintiffs' claim under sections 1589 and 1595 can be extraterritorial does not mean it is well-pleaded, and the defendants accordingly challenge the Amended Complaint's sufficiency. Federal Rule of Civil Procedure 8(a)(2) requires that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." As such, a plaintiff's "failure to state a claim upon which relief can be granted" warrants dismissal under Rule 12(b)(6). A district court faced with a Rule 12(b)(6) motion evaluates whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, a court looks to whether "the plaintiff" has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

As discussed above, the only claim that can be asserted extraterritorially is perpetrator liability under 18 U.S.C. § 1595(a) for a violation of 18 U.S.C. § 1589(b). Thus, to state a claim, the plaintiffs must plausibly allege that (1) the defendants "participated in a venture"; (2) the defendants "knowingly benefitted from the venture"; (3) "the venture has engaged in the providing or obtaining of labor or services in violation of the" TVPRA; and (4) the defendants "knew or recklessly disregarded the fact that the venture has engaged in the providing or obtaining of such labor or services." *Gilbert v. U.S. Olympic Comm.*, No. 18-cv-00981-CMA-MEH, 2019 WL 1058194, at *12 (D. Colo. Mar. 6, 2019), *recommendation adopted in part and rejected in part*, 423 F. Supp. 3d 1112 (D. Colo. 2019); *see Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019) (noting that "to succeed in avoiding dismissal of their § 1589 claims . . . , plaintiffs must plausibly allege that they provided labor or services that were procured by a method that is prohibited under the TVPRA, and that defendants knowingly benefited from participating in this venture" but not specifying scienter); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023) (construing section 1595 venture liability). The Amended Complaint alleges each element sufficiently.

### A.  Participation in a Venture

The defendants say the Amended Complaint insufficiently alleges that they participated in a venture. ECF No. 53. That challenge has two aspects: first, they contend that the allegations show no "venture" at all; and second, they assert that their alleged actions cannot comprise "participation" in any such venture. ECF No. 53 at 24–31.

As to "venture," that "term . . . has not been defined in the context of § 1589(b)," but in this Circuit, a "venture" is "any group of two or more individuals associated in fact, whether or not a legal entity." *Bistline*, 918 F.3d at 873 (quoting 18 U.S.C. § 1591(e)(6)); *see Gilbert*, 423 F.

Supp. 3d at 1137–38 (describing the "broad definition of venture" that "the Tenth Circuit applied" in *Bistline*); *Lewis v. Monks of Most Blessed Virgin Mary of Mount Carmel*, No. 23-cv-202-KHR, 2024 WL 3374140 at *4 (D. Wyo. Jul. 11, 2024). That venture need not have as its primary purpose violating the TVPRA, but instead "can be a '*commercial* venture[]' like running or expanding a business." *G.G.*, 76 F.4th at 554 (quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021)). Thus, "Section 1589(b)" does not require "that the entire venture at issue be actively engaged in TVPA violations." *Gilbert*, 423 F. Supp. at 1138; *accord Doe (C.J.) v. Cotugno*, Civ. No. 23-02973, 2024 WL 4500994, at *3 (D.N.J. May 16, 2024); *L.M.H. v. Red Roof Inns*, No. 2:24-cv-1823, 2025 WL 961720, at *13 (S.D. Ohio Mar. 31, 2025).

The Amended Complaint shows a group of two or more associated in fact. It alleges that the Supreme Committee tasked CH2M with coordinating twelve stadium projects and related infrastructure. ECF No. 52 ¶¶ 22, 57. Given authority to act on the Supreme Committee's behalf, CH2M and Jacobs Engineering "served as the Precinct Health, Safety, and Environment Manager" at Al Thumama Stadium, being built in part by Al Jaber Engineering, employer to roughly half of the plaintiffs. *Id.* ¶¶ 57, 61. And all contracts for the World Cup stadium builders acknowledged CH2M and Jacobs Engineering's oversight role. *Id.* ¶ 58; *see id.* ¶ 117 (acknowledging supervisory role over contractors); *id.* ¶ 126 (management of contractor selection); *id.* ¶ 127 (responsibility for worker procurement). The builders, CH2M, Jacobs Engineering, and the Supreme Committee are more than two entities. CH2M and Jacobs Engineering's oversight role associates them in fact with others in the venture. No more was necessary.

The Amended Complaint also alleges participation. Finding a consistent standard in the case law for evaluating participation is no simple exercise. "Congress has not defined

'participation'" in a venture, *G.G.*, 76 F.4th at 558, and "[t]he district courts are all over the map on the meaning" of the term. *Doe #1*, 21 F.4th at 725; *see Doe (K.E.C.) v. G6 Hospitality, LLC*, 750 F. Supp. 3d 719, 730 (E.D. Tex. 2024) ("[C]ourts have deconstructed 'participation in a venture' in different ways."). The Eleventh Circuit, for example, has required allegations that a defendant has "take[n] part in a common undertaking involving risk or profit." *Doe #1*, 21 F.4th at 727. The D.C. Circuit embraces a similar definition. *Apple Inc.*, 96 F.4th at 415. The Seventh Circuit, by contrast, has required "only 'a desire to promote the wrongful venture's success,'" regardless of "actual knowledge of criminal wrongdoing." *G.G.*, 76 F.4th at 559 (quoting *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003)). Alleging a "continuous business relationship," that court said, would allow "an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success." *Id.* at 560. Courts examining these phrasings have concluded that "[u]ltimately, the Seventh and Eleventh Circuits have painted slightly different pictures of the same object." *K.E.C.*, 750 F. Supp. 3d at 731; *accord Doe*, 2025 WL 1119736, at *4.

Both phrasings, however, present problems. The Eleventh and D.C. Circuit's interpretations, *see Apple Inc.*, 96 F.4th at 415 n.5, explicitly reject the "venture" definition embraced in *Bistline*, 918 F.3d at 873, and this Court cannot disregard the Tenth Circuit's guidance. Courts have also noted that the Seventh Circuit's literal interpretation "cannot be what Congress intended." *T.S. v. Wyndham Hotels & Resorts, Inc.*, Case No. 23-CV-2530 (PJS/ECW), 2024 WL 3927382, at *10 (D. Minn. Aug. 23, 2024). "If the Seventh Circuit is taken at its word, then everyone in a 'continuous business relationship' with the" venture, including, for example, utility companies, "is a 'participant' for purposes of § 1595." *Id.* Using its language would impose "strict liability on anyone who is in a 'continuous business relationship' with" a venture engaged in TVPRA violations. *Id.*

32

Nevertheless, despite the lack of precise verbiage defining the concept, there is widespread agreement on some aspects of participation. "[M]any 'district courts to have examined the issue have rejected the . . . argument,'" for example, that alleging an "overt act" of trafficking or forced labor is required for TVPRA liability. *Lundstrom v. Choice Hotels Int'l, Inc.*, 21-cv-00619-PAB-SKC, 2021 WL 5579117, at *6 (D. Colo. Nov. 30, 2021) (quoting *J.L. v. Best W. Int'l*, 521 F. Supp. 3d 1048, 1062 (D. Colo. 2021)); *accord G.G.*, 76 F.4th at 561 ("'[P]articipation' does not require getting your hands dirty."); *K.E.C.*, 750 F. Supp. 3d at 731 (noting "a general consensus that an overt act in furtherance of" a TVPRA violation "is not required for a defendant to 'participate[] in a venture'" (quoting *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 427 (N.D. Tex. 2021))); *Doe v. Wyndham Hotels and Resorts, Inc.*, No. 2:24-cv-04895-SVW-MAR, 2025 WL 1119736, at *4 (C.D. Cal. Mar. 5, 2025) ("[C]ourts analyzing this element have generally agreed that a plaintiff need not allege an overt act in furtherance of sex trafficking by the defendant in order for the defendant to participate in a venture."). On the other end, courts also widely agree that "something more than engaging in an ordinary buyer-seller transaction is required to establish 'participation' in an unlawful venture." *Apple Inc.*, 96 F.4th at 415; *see T.S.*, 2024 WL 3927382, at *10 (noting that utility companies and gas stations do not participate in a venture with pimps who trafficked victim); *G.G.*, 76 F.4th at 562 (distinguishing "an arms-length seller of off-the-shelf products" from a proper TVPRA defendant). Along those same lines, courts have held that "observing something is not the same as participating in it." *Doe #1*, 21 F.4th at 727; *see K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *3 (11th Cir. Feb. 2, 2024) (per curiam) ("[O]bserving signs of . . . trafficking 'is not the same as participating in it.'" (quoting *Doe #1*, 21 F.4th at 727))).

But the difficulty in articulating a single definition for "participation in a venture" comes because there are two separate threads running through the case law. The first has "combined, at least in part, analysis of the . . . elements of participation and knowledge" to transform otherwise generic services into associations with the TVPRA-violating venture. *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464, 470 n.7 (E.D.N.C. 2024). The canonical example of this is *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (Souter, J.), in which the court highlighted the defendant "exchanging high-fives" with the principal offender "while speaking about 'getting this thing going again,'" an apparent celebration of renting hotel rooms to the offender so that he could engage in sex trafficking. The court also emphasized the principal offender's "prior commercial dealings with the" defendants, "which the parties wished to reinstate for profit." *Id.* Both sets of allegations meant that the defendant's renting of a hotel room to the plaintiff was not a mere arms-length transaction, but instead participation in the principal offender's TVPRA-violating venture. In the years since *Ricchio*, district courts have distilled the two principal factors from that case into "two key ways" to "connect the dots between the plaintiff's particular experience" of TVPRA violations "and the specific defendant in the case . . . : (1) by alleging a 'direct association between the defendant and the plaintiff's trafficker,' and (2) by alleging a 'continuous business relationship between the defendant and the plaintiff's trafficker based on the continuous rental of rooms to people it knew or should have known were engaged in sex trafficking.'" *K.O. v. G6 Hospitality, LLC*, 728 F. Supp. 3d 624, 642–43 (E.D. Mich. 2024) (quoting *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1235–36 (N.D. Ga. 2022)) (internal quotation marks omitted). In such cases, the defendant's knowledge of the trafficker's activities transforms its provision of services into "assistance, support, or facilitation to the trafficker" undergirded by a 'tacit agreement' that is sufficient for 'participation' under" the

TVPRA. *G.G.*, 76 F.4th at 559 (citing *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970–71 (S.D. Ohio 2019)).

The second thread requires no such knowledge, focusing instead on whether the particular services the defendants provided to the venture were customized or personalized enough to demonstrate a volitional act of association with the venture. In *Bistline*, for example, the defendant attorneys designed a particular legal "scheme" that "facilitat[ed] the[] crimes" of forced labor by the principal offenders that "also ensur[ed] that defendants would personally reap ample benefits therefrom," distinguishing such conduct from "merely 'help[ing] with Trust documents.'" 918 F.3d at 874–75 (quoting *Bistline v. Jeffs*, No. 2:16-CV-788 TS, 2017 WL 108039, at *9 (D. Utah. Jan. 11, 2017)). In *G.G.*, the defendant's provision of "tailored services" based on particularized "assess[ments of] Backpage's 'operational needs'" made the defendant "much more involved in helping Backpage grow its business" than "a one-time sale of an off-the-shelf product." 76 F.4th at 560 & nn.17, 18. In *Gilbert*, the U.S. Olympic Committee and USA Taekwondo's participation came when they "invest[ed] in" a particular TVPRA-offending "athlete with the risk that he or she may not generate the corporate sponsorships that serve as part of their funding." 2019 WL 1058194, at *15. And in the sex-trafficking context, courts have found it dispositive that a hotel "provided services to . . . traffickers . . . that it did not provide to the general public." *T.S.*, 2024 WL 3927382, at *10. In each case, the venture participant provided personalized, particular services for the venture.

By contrast, courts have found allegations insufficient where there is no customization in in the defendant's actions toward the venture. "[A]llegations of financial benefit alone," for example, "are not sufficient to establish that the defendant participated in a sex trafficking venture" — even when they were four years' worth of rental revenue. *Riti*, 2024 WL 505063, at

*3–4. "[P]urchasing a commodity, without more, is not 'participation in a venture' with the seller." *Apple Inc.*, 96 F.4th at 416. And "routine financial services" provided to ISIS-connected customers were nothing more than the sort of "ordinary buyer-seller transaction" that does not qualify as TVPRA "participation" because it did not suggest that the bank "provided services or support that was tailored to those customers in any way." *Mueller v. Deutsche Bank Aktiengesellschaft*, --- F. Supp. 3d ----, 2025 WL 1019201, at *6 (S.D.N.Y. Apr. 4, 2025). Where a defendant provided only generic, non-particularized services, absent knowledge that they assisted TVPRA violations, such services have not constituted participation in the venture.

In sum, there are two ways a plaintiff can allege "participation in a venture" under the TVPRA. First, a plaintiff can allege that the defendant had sufficient knowledge, actual or constructive, of the venture's TVPRA violations such that it was aware that its actions, however generic they would otherwise be, with respect to the venture would comprise assistance, facilitation, or support of the venture. And second, regardless of the defendant's knowledge, a plaintiff can allege that the defendant associated itself with the venture by performing particularized services for it. Participation, after all, is "active involvement in a matter or event." *Participation*, Oxford English Dictionary, https://www.oed.com/dictionary/participation_n?tab=meaning_and_use#31573450 (last visited June 26, 2025). And a defendant who offers generic services to a venture without knowledge, actual or constructive, of its TVPRA violations, can hardly be said to have "active" involvement. But a defendant who continues offering those services after becoming aware of their facilitation of the venture's violations or one who tailors their services for the venture assumes a more active role.

The Amended Complaint easily traverses the second path. It alleges that the Supreme Committee specifically hired CH2M to oversee and manage delivery of facilities and

infrastructure for the 2022 FIFA World Cup. ECF No. 52 ¶ 57. CH2M and Jacobs Engineering publicly and repeatedly touted the customized, unique nature of its services to the Supreme Committee, *see id.* ¶¶ 60, 118, 121, 144, including site inspections to monitor compliance with health and safety guidelines at locations operated by the plaintiffs' employers to construct World Cup stadiums. *See id.* ¶¶ 61, 129. The benefits from this association and the particularized services CH2M and Jacobs Engineering provided are measured in the tens of millions of dollars. *Id.* ¶ 142. That suffices to allege plausibly that the defendants engaged in personalized behavior toward the venture.

The defendants demur, beginning with three arguments against the existence of any TVPRA venture. First, they contend that the Amended Complaint needed to, but did not, allege that they personally benefitted from TVPRA violations to allege a venture. ECF No. 53 at 25. That is not the law. "[N]othing in Section 1595(a) requires the party to benefit from the [forced] labor or services for liability to attach." *Gilbert*, 423 F. Supp. 3d at 1137. Indeed, "the party need not be involved in obtaining forced labor or services to be civilly liable under the venture theory of liability." *Id.* (internal quotation marks omitted).

Second, they suggest that their inspection and compliance-monitoring actions amount to nothing more than arms-length interactions. ECF No. 53 at 26–27. The suggestion has little to commend it. *Apple Inc.* did hold that an ability to perform a "third-party audit" did not elevate a buyer's relationship with the seller to anything more than ordinary. 96 F.4th at 416. But there, the D.C. Circuit emphasized that "a third-party investigation is not evidence of a contractual right to inspect." *Id.* Here, CH2M and Jacobs Engineering had "a contractual duty" to "conduct[] periodic inspections of work and living sites." ECF No. 52 ¶ 124. The defendants also invoke *Doe #1*'s exhortation that shared risks or profits are necessary for participation in a venture, ECF

No. 53 at 26, but, as discussed above, that definition is in conflict with *Bistline*. And with the binding definition applied here, the alleged structure — where the Supreme Committee commissioned CH2M and Jacobs Engineering to monitor and control their stadium builders — suffices to show an association in fact. *Cf. Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Pharmacy, Inc.*, 305 F. Supp. 3d 337, 348 (D.R.I. 2018) (teaching that a "rimless hub-and-spoke enterprise[]" can suffice as a RICO association-in-fact enterprise where they "associated together for a common purpose of engaging in a course of conduct").

And third, the defendants attack the plaintiffs' "World Cup Construction Venture" as having no logical endpoint, potentially reaching raw-materials suppliers, soccer players, and World Cup food vendors. ECF No. 53 at 27–28. But definitionally, the plaintiffs have limited their alleged venture to the construction and upgrade of twelve stadiums in preparation for the World Cup, excluding soccer players and food vendors from liability. ECF No. 52 ¶ 22. Moreover, the definition of participation in a venture applied here — requiring either personalized services or services delivered with tacit approval of the venture's TVPRA violations — would exclude run-of-the-mill service providers. And other TVPRA requirements, such as scienter, *see* 18 U.S.C. § 1589(b), further circumscribe potential liability.

The defendants pivot. Regardless of whether a venture was alleged, they say, they did not participate in that venture. ECF No. 53 at 29–31. After all, "the TVPRA does not impose an affirmative duty to police and prevent" its violations, *A.D. v. Choice Hotels Int'l*, No. 2:22-cv-648-JES-NPM, 2023 WL 3004547 at *4 (M.D. Fla. Apr. 19, 2023) (quoting *A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021)), and, their thesis runs, the plaintiffs seek to do exactly that, "impos[ing] a duty" on them "to prevent" forced labor, which "is not the TVPRA's purpose." *S.C. v. Hilton Franchise Holding LLC*, No. 2:23-cv-02037-APG-

DJA, 2024 WL 4773981, at *5 (D. Nev. Nov. 12, 2024). But unlike hotels complaining of being punished for nonfeasance against sex trafficking happening on their premises, the defendants here sought out a contract and touted their duty to ensure the welfare of people like the plaintiffs. ECF No. 52 ¶¶ 27, 57–61, 119–129. The TVPRA does "establish[] a duty to refrain from knowingly benefitting from participation in a venture" where one knows or recklessly disregards the fact that it violated the TVPRA, *S.C.*, 2024 WL 4773981, at *5; *see* 18 U.S.C. § 1589(b), and here, the plaintiffs do not simply allege that the defendants stood idle while forced labor hid in shadowy corners. Instead, they allege that the defendants actively "managed and supervised construction" of the World Cup stadiums, ECF No. 52 ¶ 27, were the Supreme Committee's "delivery partner" in stadium and infrastructure construction, *see id.* ¶ 60(f), and publicly boasted of their "***inspection regime for enforcement***," *id.* ¶ 118.

The short of it is that the plaintiffs' allegations that the defendants provided personalized services to the Supreme Committee and the World Cup stadium builders suffice to show that the defendants participated in a venture for the purposes of 18 U.S.C. § 1589(b).

## B. Knowingly Benefitted

To allege sufficiently that the defendants "knowingly benefitted" from the venture, the plaintiffs "must allege that the defendant[s] knew [they were] receiving some value from participating in the alleged venture." *Doe #1*, 21 F.4th at 724; *accord G.G.*, 76 F.4th at 564 ("A plaintiff can allege that the defendant 'knowingly benefitted' by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture."); *T.S.*, 2024 WL 3927382, at *11; *K.E.C.*, 750 F. Supp. 3d at 729. Here, the plaintiffs assert that the defendants realized more than $50 million from their participation in the venture. ECF No. ¶ 142. That pleads a knowing benefit.

The defendants have a different view. They contend that "a close connection between the benefit received, the knowledge of the benefit, and the improper conduct" is required. ECF No. 53 at 33 (quoting *Gilbert v. USA Taekwondo, Inc.*, No. 18-cv-00981-CMA-MEH, 2020 WL 2800748, at *6 (D. Colo. May 29, 2020)). "But Section 1595 says nothing about *why* the" venture "provides any benefit to the participant-defendant." *G.G.*, 76 F.4th at 565. "In fact, the statute does not even require that the" principal offender "itself or himself provide any benefit." *Id.* Thus, "where the defendant is simply aware that it is benefiting, that is enough." *Id.* In all events, to the extent a connection must exist, the defendants "inaccurately appl[y] the notion . . . to [their] own situation." *Gilbert*, 2020 WL 2800748, at *6. The concept simply requires a reading of the whole complaint to assure that knowledge of the TVPRA violations by the venture has some connection with the benefit the participant-defendant receives. *See id.* As discussed below, *see infra* section III.D, the plaintiffs sufficiently allege the defendants' knowledge of the venture's TVPRA violations. As such, this element is adequately pled.

## C. TVPRA Violation by the Venture

The defendants next attack the plaintiffs' allegations that the venture engaged in the providing or obtaining of labor or services in violation of the TVPRA. ECF No. 53 at 22–24. The attack misses the mark.

Section 1589 prohibits "provid[ing] or obtain[ing] the labor or services of a person by," among other things, "means of the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(3). Here, each Filipino plaintiff alleges that his stadium-building employer, along with other venture participants, confiscated his passport upon arrival in Qatar to prevent him from leaving the employer or the country until the end of the contract. *See* ECF No. 52 ¶¶ 147–199. And "[t]he confiscation of an immigrant's passport" is a "common threat[] of legal process

resorted to by traffickers and others who seek to instill fear in persons and force them to labor against their will." *Muchira v. Al-Rawaf*, 850 F.3d 605, 623 (4th Cir. 2017); *see Camayo v. John Peroulis & Sons Sheep, Inc.*, Nos. 10-cv-00772-MSK-MJW & 11-cv-01132-MSK-MJW, 2012 WL 4359086, at *5 (D. Colo. Sept. 24, 2012) (citing employers having "retained important immigration paperwork" as factor in finding "abuse of the legal process, sufficient to support the TVPA claims"). Each plaintiff also alleges inhumane living conditions, such as being "packed into a room with eleven other people, with insufficient air conditioning and infestations of bedbugs," while being forced routinely to work overtime. ECF No. 52 ¶ 195. "[D]emanding or conditioning labor in 'squalid or otherwise intolerable living conditions'" is another indicia of forced labor. *Fadlalla*, 402 F. Supp. 3d at 195 (quoting *Muchira*, 850 F.3d at 618–19). The plaintiffs' allegations of TVPRA violations suffice.

The defendants do not contend that these practices are not TVPRA violations. Instead, they fault the allegations' specificity, contending that they are too vague to put them on notice of the nature or perpetrators of the TVPRA violations. ECF No. 53 at 22–23. But the allegations do not leave them in the dark. Each plaintiff individually named his employer in Qatar, specified the timeframe of his tenure with the employer, and alleged that the employer, among others, was involved in the confiscation of his passport upon arrival in Qatar. *See* ECF No. 52 ¶¶ 147–199. This is not a case, then, in which the allegations "mak[e] it impossible to determine whether the incidents even occurred at a point when each of the plaintiffs were employed by Defendants," *Macias v. Monterrey Concrete LLC*, No. 3:19cv830, 2020 WL 5638710, at *9 (E.D. Va. Sept. 21, 2020), nor is it one that fails to "allege that [the plaintiff] was forced to work against his will at all." *Roman v. Tyco Simplex Grinnell*, 8:16-cv-3449-T-33AEP, 2017 WL 2427251, at *5 (M.D. Fla. June 5, 2017). The defendants also complain that the particular paragraphs alleging

confiscation of the plaintiffs' passports do not explain the motivation behind the act. But that takes too narrow a view. After all, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). And the Amended Complaint repeatedly explains that the purpose of passport confiscation was to "prevent[] the workers from returning to their home countries until their contracts expired and restrict[] workers' ability to change employers in Qatar." ECF No. 52 ¶ 49; *see id.* ¶¶ 2, 5, 6, 50, 70(d), 71(b), 71(e), 134.

In short, the Amended Complaint alleges with sufficient specificity that the plaintiffs' employers, among others, were venture participants who violated the TVPRA by forcing the plaintiffs to labor strenuously in inhumane living conditions after confiscating their passports.

### D. Knew or Recklessly Disregarded the Fact of the Violation

Finally, the defendants attack the Amended Complaint's allegations regarding their knowledge of the alleged TVPRA violations by the venture.

Section 1589(b)'s knowledge requirement demands that a plaintiff show that a defendant was "knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services" in violation of section 1589(a). To satisfy this "knowledge element, a plaintiff must plead and ultimately prove that the defendant had actual . . . knowledge of" or recklessly disregarded "the particular . . . venture that harmed the plaintiff, although the defendant need not know that the plaintiff was a victim of that venture." *T.S.*, 2024 WL 3927382, at *8. Such knowledge "may be alleged generally." Fed. R. Civ. P. 9(b). Measured by that standard, the plaintiffs sufficiently plead knowledge or reckless disregard.

To begin, in 2015, *The New York Times* reported that construction workers in Qatar on projects that "American construction firms, including CH2M . . . manage or oversee" suffered

"conditions . . . akin to indentured servitude." ECF No. 52 ¶ 71(d). That was not the first public report regarding working conditions in World Cup construction projects. In 2013, *The Guardian* "detailed labor abuses, confiscated passports, inhumane living conditions, and debt servitude" in a "World Cup infrastructure project." *Id.* ¶ 71(b). Indeed, prior to and throughout the construction of the World Cup stadiums, various publications repeatedly reported on labor abuses not only in Qatar's kafala system generally, but also with respect to the specific stadiums at which the many of the plaintiffs worked. *See, e.g.*, *id.* ¶ 71(g) (Fox News report on "inhuman" conditions at construction of "Lusail Stadium"); *id.* ¶ 156 (alleging that plaintiff R.C. worked on Lusail Stadium "through exhaustion" and "as many as 24 hours straight"); *id.* ¶¶ 71–75.

There was more. The Amended Complaint alleges that client alerts in 2015 from a law firm that had counseled the defendants alerted them to "***increased scrutiny over allegations concerning the treatment of workers building the stadia***" in Qatar. *Id.* ¶ 88. Moreover, it alleges further that the defendants' role overseeing health and safety issues in World Cup stadium construction would have alerted them to the labor abuses the plaintiffs were suffering. Even prior to assuming that role, the defendants would have conducted due diligence that would have alerted them to the issues illuminated in public reporting. *Id.* ¶¶ 86–89. And in assuming the role of "Precinct Health, Safety, and Environment Manager" over stadium construction, the defendants' obligations "to monitor, direct, and control the labor supply chain" would have further alerted them to the venture's TVPRA violations. *Id.* ¶ 61. Indeed, the defendants specifically touted their development of "***special protocols to screen***" labor in the Middle East, *id.* ¶ 113; indicated that they had "a supervisory role" over contractors on occasion, *id.* ¶ 117; and publicly represented that they would "establish[] an inspection and enforcement regimen

including audits at multiple levels within the organization and periodic workers inspections," *id.* ¶ 121 (internal quotation marks omitted). No more was exigible.

The defendants demur. General knowledge of labor problems in an industry, they say, does not suffice to show the knowledge required by the TVPRA. ECF No. 53 at 31–32. That is true as far as it goes. *See Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177–78 (9th Cir. 2022); *see also L.M.*, 717 F. Supp. 3d at 473 ("Courts routinely have held, even at the pleading stage, that general allegations of sex trafficking in the hotel industry, and at other hotels, do not impute constructive knowledge . . . ."). But it does not take the defendants very far. For one thing, the reports alleged here do not merely show knowledge about general labor abuses in the kafala system or even the Qatari construction industry. Instead, they report on how those abuses manifested in the very projects the defendants oversaw, unlike reports that "make[] clear that identifying 'specific firms or individuals using . . . forced labor' is beyond [their] mandate." *Ratha*, 35 F.4th at 1177. For another, "general knowledge of" TVPRA violations still "often informs" the knowledge analysis, *S.M.A.*, 2024 WL 1337370, at *16, and here, that knowledge, combined with the defendants' assumption of responsibility over TVPRA-violating labor practices in World Cup stadium construction, gives rise to at least a plausible inference that the defendants knew that the venture engaged in forced-labor TVPRA violations. Indeed, the Amended Complaint alleges that the Contractors had to acknowledge the defendants' oversight responsibility and, logically, oversight would include some knowledge of the Contractors' labor practices. *Id.* ¶ 58. To be sure, the Contractors may have tried to keep the defendants in the dark, but whether that is so is a fact issue to be fleshed out through discovery. *See K.E.C.*, 750 F. Supp. 3d at 738; *Doe*, 2025 WL 1119736, at *7 (noting that whether franchisees actually reported

trafficking pursuant to obligation "is a fact issue properly resolved through discovery, not at the motion to dismiss stage").

The defendants' final attack focuses on particularity. Even if the Amended Complaint shows their knowledge generally that the venture engaged in TVPRA violations, their thesis runs, it fails to show that they knew that it compelled these specific plaintiffs to engage in forced labor. ECF No. 53 at 32. It is true that "the Eleventh Circuit's formulation" of the knowledge test "appears to require actual or constructive knowledge *as to the trafficking of the individual plaintiff*, plus some degree of acceptance or welcome of that trafficking." *C.B. v. Naseeb Invs., Inc.*, 748 F. Supp. 3d 1338, 1361 (N.D. Ga. 2024) (citing *Riti*, 2024 WL 505063, at *4). But "this construction of the statute is far more limiting than its language requires." *Id.* Indeed, "[t]he Eleventh Circuit's interpretation, in addition to being inconsistent with the text of the statute, would lead to the absurd result 'that the larger the [TVPRA] venture and the more extensive [the defendant's] participation in the venture—and so the less likely it is to have known the specifics of individual victims—the harder it should be for a victim to obtain civil relief.'" *T.S.*, 2024 WL 3927382, at *7 (quoting *G.G.*, 76 F.4th at 556). So it is here: to fault the plaintiffs for a failure to allege that the defendants knew of the particular TVPRA violations against them would create a perverse incentive for a defendant to plead ignorance of individual plaintiffs based on the widespread nature of the venture's TVPRA violations. That cannot be what Congress intended.

To sum up, by alleging that the defendants assumed specific responsibility over the very area — labor working conditions — of the World Cup stadium construction venture in which the TVPRA violations are alleged, along with widespread public reporting about the very type of violations alleged here, the plaintiffs have plausibly alleged that the defendants had knowledge of or recklessly disregarded the fact of TVPRA violations at this stage of the case.

V.    **Failure to State a Claim — Section 1593(a) Restitution**

Lastly, the defendants challenge the plaintiffs' claim under 18 U.S.C. § 1593(a), which provides that "in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any" TVPRA violation. That statute, they say, applies only to post-criminal conviction restitution. But "[n]othing in the text of the statute suggests that restitution applies solely to criminal cases, and other courts have awarded restitution in civil prosecutions." *Fadlalla*, 402 F. Supp. 3d at 201. There is no reason, then, to dismiss the claim here.

## CONCLUSION

For the foregoing reasons, the defendants' Motion To Dismiss Plaintiffs' Amended Complaint, ECF No. 53, is **GRANTED in part** and **DENIED in part**.

It is ORDERED that defendants Jacobs Solutions Inc. and CH2M Hill International B.V. be **DISMISSED** from this action **without prejudice**.

It is further ORDERED that Counts 3 through 6 are **DISMISSED without prejudice**, based on the plaintiffs' representation that they are not pursuing such claims, ECF No. 54 at 9 n.11.

It is further ORDERED that Count 1 is **DISMISSED without prejudice** insofar as it is predicated upon a violation of 18 U.S.C. § 1590.

Dated this 26th day of June, 2025 at Denver, Colorado.

BY THE COURT:

_____

Cyrus Y. Chung
United States Magistrate Judge