**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

A.B., D.D.R., L.V., R.S., J.D.C., W.C., G.G., R.C., D.L., E.I., E.C., L.L., J.J.G., R.V., R.L., A.S., E.A., A.C., A.G., A.A., R.A., Ro.L., Ro.P., S.N., B.M., J.B., E.D.C., Re.D., Ra.D., M.R., I.E., M.A., Ro. D., Ri.D., Rod.O., M.D.L., Ri.O., En.C., Ron.O., G.S., B.D., C.C., N.C., M.B., and Ad.C.

Plaintiffs,

v.

JACOBS ENGINEERING GROUP INC., CH2M HILL COMPANIES, LTD., and CH2M HILL INTERNATIONAL, LTD.

Defendants.

Case No. 1:23-cv-02660-RMR-CYC

**DEFENDANTS' MOTION FOR SANCTIONS AGAINST PLAINTIFFS' COUNSEL PURSUANT TO FED. R. CIV. P. 11 AND 26**

## TABLE OF CONTENTS


Page

I. PRELIMINARY STATEMENT .... 1

II. CERTIFICATE OF CONFERRAL .... 4

III. BACKGROUND .... 5

A. Counsel Delegated the Pre-Filing Investigation to an Unaccountable Overseas Intermediary. .... 5

B. The Pleadings Rested on Plaintiff-Specific Factual Assertions That Counsel Never Verified. .... 7

C. Counsel Certified Verified Responses. .... 8

D. The Depositions Confirmed the Absence of Any Reasonable Inquiry. .... 9

1. Verification .... 9

2. Madame Cherie .... 10

3. Worksites and Passports .... 10

E. Barwa Media City Establishes That Counsel Certified Worksite Allegations They Never Investigated. .... 12

F. Counsel Received Written Notices, Denied Every Deficiency, and Later Rewrote the Sworn Answers of Nearly Every Plaintiff. .... 13

IV. PLAINTIFFS' COUNSEL VIOLATED RULE 11 .... 14

A. Legal Standard .... 14

B. Counsel Failed to Conduct a Reasonable Pre-Filing Inquiry .... 16

1. No Reasonable Oversight of Madame Cherie's Inquiry .... 16

2. No Reasonable Inquiry into Passport Allegations .... 18

3. No Reasonable Inquiry into Plaintiffs' Claimed Need for Pseudonymity .... 19

4. No Reasonable Inquiry into Worksite Allegations .... 20

C. Counsel Have No Excuse for Failing to Conduct a Reasonable Inquiry. .... 21

V. PLAINTIFFS' COUNSEL VIOLATED RULE 26 .... 21

A. Legal Standard .... 21

B. Counsel Certified Discovery Responses Without a Reasonable Inquiry. .... 22

VI. REQUESTED RELIEF .... 24

VII. CONCLUSION .... 25

Pursuant to Federal Rules of Civil Procedure 11(c) and 26(g)(3), Defendants Jacobs Engineering Group Inc., CH2M Hill Companies, Ltd., and CH2M Hill International, Ltd. (collectively, "Defendants") respectfully move for sanctions against Plaintiffs' counsel for presenting to this Court, and repeatedly certifying, factual contentions without the reasonable inquiry the Federal Rules require.

## I. Preliminary Statement

Representing scores of individual migrant laborers, located halfway around the world, in a federal litigation asserting grave forced labor allegations imposes serious logistical and fact-gathering challenges. Instead of addressing those challenges in a manner consistent with their obligations to this Court, Plaintiffs' counsel took shortcuts by signing pleadings and repeatedly certifying sworn discovery responses without confirming basic facts uniquely within their clients' knowledge. Plaintiffs' counsel outsourced core investigation and fact-gathering duties to an intermediary in the Philippines known as "Madame Cherie," then adopted the resulting output without adequate independent verification. The predictable consequences included perjurious deposition testimony, rewritten interrogatory responses for 44 of the 45 Plaintiffs, and significant wasted legal costs. To redress harm suffered by Defendants in this case, and deter similar conduct in these and other cases, the Court should impose sanctions under Rules 11 and 26.

The record reveals how this happened: Plaintiffs' counsel made Madame Cherie the principal—if not sole—conduit between themselves and their clients. Plaintiffs testified that Madame Cherie cold-called them to solicit them for this lawsuit, told them who Defendants were and why they were supposedly responsible, collected their

documents, developed their interrogatory answers, and met with them alone before depositions to help them "remember" facts. At their depositions, Plaintiffs testified they had little or no meaningful contact with U.S. counsel. Many had never reviewed pleadings filed in their names. Others testified that they swore to interrogatory responses without receiving "their" answers, a translation, or any explanation of what they were swearing to. All these red flags demanded direct supervision and independent verification. Instead, Plaintiffs' counsel continued to adopt Madame Cherie's output and certify it as fact.

The resulting fabrications are best illustrated by the claims surrounding work supposedly performed on a project called Barwa Media City. No Plaintiff alleged work on Barwa Media City in the Complaint or Amended Complaint. On September 18, 2025, Defendants produced the PMC Contract, which identified Barwa Media City as a *contemplated* project. Eight weeks later, after counsel represented that they had worked with Plaintiffs to confirm their worksites, counsel certified interrogatory responses identifying Barwa Media City as a worksite where 15 Plaintiffs alleged they were forced to labor. Some of those 15 Plaintiffs later swore at depositions to specific details about what it was like to work on Barwa Media City. Plaintiffs' counsel even elicited further testimony from their clients regarding this work. But Barwa Media City never broke ground. No Plaintiff could have worked there because it does not exist. Plaintiffs then "supplemented" their interrogatory responses by striking every reference to Barwa Media City. The timing and substance of this episode are damning. Fifteen Plaintiffs somehow came to recall working on the same nonexistent construction site only after Plaintiffs'

counsel received a document naming that project. Plaintiffs' counsel certified those responses without making any effort to determine their plausibility.

The record shows that counsel's deficient approach extended far beyond allegations concerning Barwa Media City. During fact discovery, 20 Plaintiffs denied being forced to labor on worksites described in their prior pleadings or certified discovery responses, including 10 who disavowed work on non-Barwa Media City projects. At depositions, 27 Plaintiffs testified that they did not fear proceeding under their own names, despite counsel's categorical representation to this Court that each Plaintiff required pseudonymity because they feared retaliation if identified. And 18 Plaintiffs produced documents showing they were in possession of their passports during periods of alleged confiscation. Then, in the final days of a 12-month fact discovery period, counsel served "supplemental" interrogatory responses for 44 of 45 remaining Plaintiffs. Thirty-four "supplemented" by rewriting wage allegations, 30 by rewriting personal injury allegations, and more than half by rewriting their forced labor allegations. These were core facts about where Plaintiffs allegedly worked, whether they could leave, what injuries they suffered, and what (or who) forced their labor. The sheer scale of these rewrites touching on core elements of Plaintiffs' claims demonstrates counsel's systemic disregard of the duty of reasonable inquiry.

Plaintiffs' counsel had repeated notice of these deficiencies and repeatedly refused to address them. Defendants first raised the inadequacy of counsel's factual investigation in September 2025, served a detailed sanctions notice after the Manila depositions on April 3, 2026, and wrote again on July 31, 2026, after the massive scale of the eleventh-

hour rewriting became clear. Counsel "categorically den[ied]" any failure to conduct a reasonable inquiry and dismissed the contradictions as "factual quibbles."

Counsel's failure to conduct reasonable inquiries left Defendants to litigate against a moving target. The Court decided Defendants' motion to dismiss on Plaintiff-specific allegations that Plaintiffs themselves have disclaimed. Defendants then spent a year of fact discovery chasing shifting accounts on core facts. Defendants retained physicians to investigate claimed injuries that Plaintiffs later materially revised, including an alleged injury for which the corresponding scar was ultimately attributed to a childhood incident. And the pseudonymity order, obtained on counsel's categorical representations of feared retaliation, constrained ordinary third-party investigation in the Philippines unless Defendants first revealed the identities at issue, and with them investigative strategy, to Plaintiffs' counsel. Counsel's failure to inquire thus affected the pleadings, constrained the defense, and forced discovery to proceed on a factual record that repeatedly shifted.

Counsel had ample opportunity to take seriously and remedy their certify-first-inquire-later approach. They chose to defend their defective process and leave their violations unremedied. The Court should now find that Plaintiffs' counsel violated Rules 11(b)(3) and 26(g), require the individualized corrective inquiry counsel should have undertaken from the outset, and award the reasonable expenses those violations caused.

## II. Certificate of Conferral

Defendants served this motion on Plaintiffs on September 30, 2026, and the Rule 11(c)(2) safe harbor period elapsed on October 21, 2026. Pursuant to D.C.COLO.LCivR

7.1(a), undersigned counsel conferred with Plaintiffs' counsel via videoconference on October 22, 2026, concerning this motion. Plaintiffs oppose the requested relief.

## III. Background

### A. Counsel Delegated the Pre-Filing Investigation to an Unaccountable Overseas Intermediary.

Plaintiffs' counsel recruited for this case through solicitation calls by an intermediary in the Philippines. *See* Movants' App. at 7-10, Solicitation Exhibit. Beginning in 2022, an intermediary known to Plaintiffs as "Madame Cherie" and her assistant Graziel obtained their numbers from former co-workers and contacted them directly. *See id.* (testimony from 21 Plaintiffs). Prospective plaintiffs were then added to group chats organized by employer, in which the case was promoted as a financial opportunity requiring only proof of presence in Qatar and a short interview. *See id.* at 58, Rabban Group Chat ("Just bring the documents showing that you went to Qatar and worked at Rabban"). Plaintiffs were asked to pass along former colleagues' contact information and recruit others. *Id.* at 38-39. Plaintiffs did so, telling former colleagues: "There's money to be made"; "Just prepare the documents proving that you went to Qatar"; and "If we get lucky, we'll earn money." *Id.* at 89-97, A.B.–L.L. Facebook Chat.

Madame Cherie then told Plaintiffs, in Filipino and without any U.S. lawyer present, who Defendants were and why they supposedly bore responsibility to Plaintiffs under U.S. law. She told Plaintiffs that Defendants were "the main contractors," "earned a lot of money in Qatar," and "were responsible for paying" Plaintiffs' salaries. *Id.* at 210-212, Cherie Information Exhibit. Plaintiffs consistently testified that their understanding of Defendants' role in Qatar came exclusively from Madame Cherie. *Id.*

For Plaintiffs who agreed to participate, Plaintiffs' privilege log reflects minimal additional process before filing. *See id*. at 214–22. For most Plaintiffs, the log reflects only three pre-filing entries: a personal statement, notes, and an intake form. For several of the 16 Plaintiffs added by amendment, it reflects nothing but a personal statement, an intake questionnaire, and interview notes 16 months *after* filing. Document collection appears to have likewise been minimal. Many Plaintiffs produced key documents only on the eve of, during, or after their depositions. *See, e.g.*, *id.* at 585–86, E.C. Tr. 138:2–139:2 (employment contract produced for first time during deposition).

U.S. counsel of record appears to have had little, if any, direct involvement prior to filing this case. Counsel have only represented that their "team, overseen by multiple U.S.-licensed lawyers" conducted the pre-filing investigation. *Id.* at 314, Aug. Letter. For many Plaintiffs, their first contact with U.S. counsel came in Manila in early 2026 on the eve of their deposition. *See e.g.*, *id.* at 507, D.D.R. Tr. 10:5–12 (Plaintiff could not identify his own U.S. counsel at deposition). Other plaintiffs did not have any understanding of the Defendants they sued, the basis for their claims, or even that they had filed a claim in U.S. court at all. *See id. at* 633, E.I. Tr. 51:11–18 ("Q. Do you know who the defendants are in this case? . . . A. No. Q. Do you know who CH2M Hill is? A. No. Q. Do you know who Jacobs Engineering Group is? A. Also not"); *id*. at 1026, R.V. Tr. 64:11–14 ("Q. Are you aware that this case was brought in the United States? A. I cannot answer that because I don't have an idea about that").

The same lack of meaningful contact preceded counsel's filing of the near-identical *Omnicom* action. Numerous Plaintiffs did not know whether counsel had filed a second

TVPRA action in their names, even though their verified interrogatory answers in this action, certified by counsel, identified them as parties to it. *See, e.g.*, *id.* at 659, En.C. Tr. 95:16–18 (testifying in March 2026 that he learned about the *Omnicom* complaint filed in April 2025, "[j]ust yesterday as well."); *id* at 238–40, Omnicom Exhibit.

### B. The Pleadings Rested on Plaintiff-Specific Factual Assertions That Counsel Never Verified.

Counsel filed the initial Complaint on October 12, 2023, and amended it in March 2024 to add 16 Plaintiffs. Both pleadings rested on two categories of Plaintiff-specific allegations, supposedly based on Plaintiffs' personal knowledge: (1) that each Plaintiff "specifically" performed construction labor on a named World Cup stadium, *see, e.g.*, Dkt. 52 ¶¶ 162, 173, 175, 184, and (2) that his employer confiscated his passport on arrival and retained it for the duration of his time in Qatar, "precluding him from leaving the country or his job until the end of his contract," *see, e.g.,* Dkt. 1 ¶¶ 152, 158, 161, 174; Dkt. 52 ¶¶ 147–199. Those assertions were pleaded across the board, without qualification and without any statement that they remained subject to further investigation. The assertions were also made despite several Plaintiffs never having seen the pleadings at all—not even the one paragraph summarizing their individual allegations. Movants' App. at 1077–78, Ri.D. Tr. 13:18–14:8 ("Q. Did your lawyers give you a copy of the complaint to review before it was filed? A. No . . . Q. You did not review the complaint before it was filed; correct? A. Yes."); *id.* at 709–10, J.B. Tr. 20:18–21:14 (testifying that he had never read the Complaint and only learned an Amended Complaint had been filed on the morning of his deposition); *see id.* at 224-32, Process Failures Exhibit. Those individualized assertions have since been proven false as to numerous Plaintiffs.

Counsel also represented to Defendants and this Court that this case presented a "real danger of physical harm" and that "**each** [Plaintiff] fears a real possibility of retaliation in the Philippines if their identity becomes public." Dkt. 29 ¶¶ 1, 3–4 (emphasis added). That categorical representation covered every Plaintiff, and Defendants relied on this representation in agreeing to accommodate the request for a pseudonymity order as to every Plaintiff. The resulting order, Dkt. 30, remains in place and constrained ordinary third-party investigation in the Philippines.

**C. Counsel Certified Verified Responses.**

On September 26, 2025, Plaintiffs served verified responses to Defendants' First Set of Interrogatories, signed by counsel of record. Because the pleadings were boilerplate and Plaintiffs produced few documents—for many, nothing beyond a handful of pages—until recently those responses were the principal source of Plaintiff-specific facts in the case. *See* Dkt. 154-1 at 13 (median of 20 documents per Plaintiff). Defendants relied heavily on those responses to prepare for 46 noticed depositions.

Concerned with gaps in Plaintiffs' document productions, Defendants reminded counsel "that it is your duty to duly investigate the claims before filing suit, and to promptly withdraw any claims that were improperly made." Movants' App. at 325, Sept. Letter. Counsel responded on October 6, 2025, that they had already satisfied their "obligations to investigate the claims of each Plaintiff before this case was filed" and had produced documents "for each and every Plaintiff" showing they were a migrant worker in Qatar "during the World Cup construction projects." *Id*. at 335, Oct. Letter.

### D. The Depositions Confirmed the Absence of Any Reasonable Inquiry.

Between February and March 2026, Defendants took 43 Plaintiffs' depositions in Manila. Those depositions revealed three recurring problems: (1) Plaintiffs had verified interrogatory responses they had never meaningfully reviewed or understood because no attorney of record had explained them; (2) the intermediary Madame Cherie had played a central role in developing Plaintiffs' claims and preparing discovery responses; and (3) Plaintiffs' testimony directly contradicted pleadings and their own interrogatory responses on core facts, including alleged worksites and purported passport confiscation.

#### 1. Verification

Plaintiffs repeatedly testified that they had not reviewed or understood their interrogatory responses before verifying them. *See id.* at 224–32, Process Failures Exhibit. For example, some Plaintiffs stated that they could not read the interrogatories because they were written in English, they received no Filipino translation, and they had no one explain their contents to them before signing the verifications. *See, e.g.*, *id.* at 717–21, J.B. Tr. 29:17–33:6 (testifying he had neither read the interrogatories nor had them explained to him). Other Plaintiffs stated that they gave their answers orally by telephone to Madame Cherie, but never saw the written responses served in their names. *See, e.g.*, *id.* at 890–92, M.R. Tr. 95:22–97:1 ("Q. After you had those phone calls, would she send you the document that had the written answers? A. No."); *id.* at 782–83, L.L. Tr. 25:5–26:9 (testifying he first saw his written responses the day before his deposition).

### 2. Madame Cherie

Deposition testimony also revealed Madame Cherie's central role in developing Plaintiffs' claims and discovery responses. Plaintiffs delivered their documents directly to her rather than to counsel. *See, e.g., id.* at 640, E.I. Tr. 75:2–5; *id.* at 1161, Ro.L. Tr. 37:17–22. She drafted interrogatory responses through telephone calls with Plaintiffs. *See e.g.*, *id.* at 774–77, L.L. Tr. 17:20–20:21 ("Q. So your understanding of the verification that you signed, is the verification that you spoke with the attorney, correct? A. Correct. Q. It's not a verification that the attorney correctly understood your answers and put them in the response? A. What my attorney said, is that if -- is proof that we talked about your answers to the questions. That's it."); *id.* at 224–32 (testimony on other such process failures). And she prepared Plaintiffs for their depositions outside the presence of counsel of record. *See id.* at 234–36, Cherie Deposition Prep; *id.* at 498–99, C.C. Tr. 102:4–103:11 ("Q. Was there anyone else in the room with you when you met with Attorney Cherie yesterday? A. No. Just the two of us. . . Q. Did [the documents she showed you] help you remember things about your time in Qatar? A. Yes.").

### 3. Worksites and Passports

The depositions exposed material errors in previously pleaded and verified allegations, including those concerning worksites and passport possession. Plaintiffs frequently attributed those errors to Madame Cherie. For example, the complaints made only three Plaintiff-specific assertions about Plaintiff Ro.L., one of which was that he worked on Khalifa Stadium. Two pleadings and four sets of verified interrogatory responses placed him at Khalifa Stadium, one specifying that he worked there "from

September 2014 to November 2014." *See, e.g.*, Dkt. 1 ¶ 165; Dkt. 52 ¶ 173; Movants' App. at 245. Yet in his deposition, he disclaimed ever working at Khalifa Stadium. Movants' App. at 1155, Ro.L. Tr. 31:12–14 ("Q. So you never worked on Khalifa Stadium, correct? A. No."). Similarly, Plaintiff J.B. testified that the stadium identified in his written responses was wrong: "What's stated there, or what's written there is actually incorrect." *Id.* at 724–25, J.B. Tr. 58:19–59:3. By the end of fact discovery, 20 Plaintiffs disclaimed at least one project pleaded or certified by counsel. *See id.* at 242–50, Worksite Exhibit.

Depositions and fact discovery similarly undercut Plaintiffs' categorical passport-confiscation allegations. Many Plaintiffs renewed their passports at the Philippine Embassy in Qatar or used them to travel home during the alleged periods of forced labor; 18 Plaintiffs had possession of their passport during periods in which they alleged their passport was confiscated. *See id*. at 252–77, Passport Exhibit. Plaintiff Ad.C. provides a stark example. His verified answers described four distinct periods of work in Qatar for the same employer and stated that his passport was confiscated at the start of each, that he was never "offered the opportunity to reclaim his passport," and that he had never interacted with the Embassy of the Philippines in Qatar. *Id.* at 252, Passport Exhibit. Less than two months later, he admitted at his deposition that he had renewed his passport at the Embassy in 2017. *Id.* at 437, Ad.C. Tr. 91:16–22. At the deposition, Plaintiffs' counsel nevertheless elicited testimony that his employer never returned the passport. *Id.* at 448, 193:5–7 ("Q. Did Imar ever give your passport back to you? A. No."). Twelve days after the deposition, counsel produced thousands of Facebook documents, including a June

4, 2016 photograph of Ad.C.'s passport with his comment "The passports were just given to us. My work doesn't end until December ahahaha." *Id.* at 341, Ad.C. Facebook Post.

**E. Barwa Media City Establishes That Counsel Certified Worksite Allegations They Never Investigated.**

Fifteen different Plaintiffs claimed in interrogatories or deposition testimony that they worked at Barwa Media City, a project that does not exist—and never existed—demonstrating a total lack of diligence by Plaintiffs' counsel. *Id.* at 281, BMC Exhibit. References to Barwa Media City are absent from the complaints, appearing only after Defendants produced the Programme Management Contract ("PMC Contract"), which referenced anticipated construction of a media center called Barwa Media City. Counsel represented to the Court that after receiving the PMC Contract they had "work[ed]" with Plaintiffs to "confirm" which project sites each Plaintiff worked on. Dkt. 101, 5:20-25, 8:6-22. And eight weeks after the PMC Contract's production, on November 14, 2025, counsel certified supplemental interrogatory responses identifying Barwa Media City as a worksite for 15 Plaintiffs. Some of these Plaintiffs later swore at deposition to minute details about the supposed site. *See* Movants' App. at 878–80, M.R. Tr. 56:23–58:12 (testifying to sign-in sheet bearing the project name in English, a store, and houses at the site). And at those depositions Plaintiffs' counsel elicited further testimony about work on Barwa Media City that any reasonable inquiry would have proven false. *See e.g.*, *id.* at 895, M.R. Tr. 107:8–23; *id.* at 689, G.S. Tr. 144:22–23.

Barwa Media City was a planned media center that never broke ground. *Id.* at 1296–97, Bradbury Tr. 226:23–227:11. No Plaintiff could have performed construction work there. Yet a third of the Plaintiffs remaining in this case nonetheless swore they had

been forced to labor there. Plaintiffs' later supplemental interrogatory responses then struck every allegation that a Plaintiff had worked on Barwa Media City. *See, e.g.*, *id.* at 1618–19 (striking Plaintiff M.R.'s references to Barwa Media City).

### F. Counsel Received Written Notices, Denied Every Deficiency, and Later Rewrote the Sworn Answers of Nearly Every Plaintiff.

On April 3, 2026, immediately after the Manila depositions, Defendants served a detailed Notice of Sanctionable Conduct identifying specific deficiencies with transcript citations and demanding corrective action. *Id*. at 283–95, Apr. Notice. In response, Plaintiffs' counsel "categorically den[ied]" that they had "failed to conduct reasonable pre-filing inquiry" or "'outsourced' core litigation functions" and dismissed the contradictions as "factual quibbles" that were "at most fodder for trial." *Id.* at 297, Apr. Response.

In June and July 2026, Plaintiffs' counsel served supplemental interrogatory responses that confirmed the sheer breadth of the deficiencies. Of 45 remaining Plaintiffs, 44 supplemented; 34 rewrote their wage allegations; 30 rewrote their personal injury allegations; and more than half rewrote their forced labor allegations. *Id*. at 320, Supp. ROG Changes. Plaintiffs changed, under oath and after their depositions, descriptions of where and when they worked, what happened to their passports, what wages they received, what injuries they claim, and what made their labor "forced." *Id*.; *see also id.* at 1539–-1635, Second Supp. ROGs. For example, Plaintiff Ron.O. swore to a "severe wound approximately 17–20 centimeters in length" purportedly sustained at Lusail *Stadium*. *Id.* at 1408, First ROGs. Only after Defendants retained examining physicians in Denver and Manila did he clarify that an incident occurred at Lusail *Station*—

not Stadium—and that the prominent scar was from a childhood injury. *Id.* at 1243, 1254, Ron.O. Tr. 128:5–24, 174:6–17.

Defendants wrote a third time on July 31, 2026, again notifying Plaintiffs' counsel of their sanctionable conduct. *Id*. at 300–10. Counsel responded on August 12, 2026, by defending their pre-suit investigation, discovery process, and supplementation, and rejecting Defendants' demand for relief. *Id*. at 313–18. Counsel's continued defense of their investigative process is especially difficult to reconcile with the fact that, during fact discovery, counsel dismissed with prejudice or ceased representing a quarter of their clients across the three related actions: 8 of the 53 plaintiffs in this case, 12 of the 40 plaintiffs in *Al.C.*, and 11 of the 27 plaintiffs in *Al.B.*

## IV. Plaintiffs' Counsel Violated Rule 11

### A. Legal Standard

Rule 11 requires counsel who signs, files, submits, or "later advocat[es]" a pleading or motion to certify "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3). The inquiry must precede the certification. Counsel cannot file first and investigate later. *See Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1158 (10th Cir. 1991) (rejecting a "throw-as-much-mud-against-the-wall-as-you-can-and-hope-some-of-it-sticks" approach to pleading). If a factual contention still requires investigation, Rule 11 requires counsel to identify it as such.

The standard is objective, determined by whether "a reasonable attorney admitted to practice before the district court would file such a document." *Collins v. Daniels*, 916

F.3d 1302, 1320 (10th Cir. 2019). Subjective good faith does not suffice, and an "empty-head" but "pure-heart" is no defense. *Collins*, 916 F.3d at 1320; *White v. Gen. Motors Corp.*, 908 F.2d 675, 680 (10th Cir. 1990). Where the complaint is at issue, the court asks whether counsel conducted "a reasonable and competent inquiry" before signing and filing it. *O'Rourke v. Dominion Voting Sys., Inc.*, 552 F. Supp. 3d 1168, 1186 (D. Colo. 2021). The obligation also continues after filing: Rule 11 prohibits "later advocating" a contention once counsel learns it has "cease[d] to have any merit." Fed. R. Civ. P. 11(b).

Counsel's Rule 11 obligation is "personal" and "nondelegable." *O'Rourke*, 552 F. Supp. 3d at 1186. Counsel may use investigators, translators, or foreign intermediaries, but counsel remains responsible for determining if the resulting factual contentions have sufficient evidentiary support. *See Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1016–17 & nn.23–24 (9th Cir. 1997); *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 181–83 (N.D. Ill. 2014); *King v. Fleming*, 899 F.3d 1140, 1148–49 (10th Cir. 2018) (sanctions where counsel relied on material without assessing its accuracy). Once circumstances cast doubt on a source's reliability, continued reliance without further inquiry is unreasonable. *Sec. Farms*, 124 F.3d at 1016–17 & nn.23–24.

The Court therefore need not resolve the ultimate truth of every challenged factual contention to find a Rule 11 violation. An attorney who makes an "inadequate inquiry into the sufficiency of the facts and law underlying a document will not be saved from a Rule 11 sanction by the stroke of luck that the document happened to be justified." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir. 1994); *accord O'Rourke*, 552 F. Supp. 3d at

1201–04. The question is whether counsel had an objectively reasonable basis, following a reasonable inquiry, for factual contentions when they certified and later advocated them.

### B. Counsel Failed to Conduct a Reasonable Pre-Filing Inquiry.

Plaintiffs' counsel violated Rule 11 by certifying Plaintiff-specific allegations that a basic pre-filing investigation would have exposed as unsupported. Counsel failed to adequately supervise Madame Cherie despite obvious warning signs about the manner in which she recruited, advised, and developed Plaintiffs' claims. Counsel pleaded categorical passport confiscation allegations without adequately testing them against Plaintiffs' own passports and travel history documents. Counsel represented to the Court that every Plaintiff feared retaliation without establishing each Plaintiff's position. And they pleaded specific worksites that Plaintiffs themselves disclaimed. These were not facts buried in Defendants' files. These were facts within Plaintiffs' own knowledge and records that Plaintiffs' counsel could have (and should have) tested before filing. Rule 11 required counsel to investigate them before certification. They failed to do so.

#### 1. No Reasonable Oversight of Madame Cherie's Inquiry

Counsel's reliance on Madame Cherie required close supervision and independent verification. She served as counsel's principal conduit to Plaintiffs in the Philippines. Plaintiffs' own privilege log describes her as "Plaintiffs' counsel Cherie Lardizabal," and Plaintiffs repeatedly testified that she recruited Plaintiffs, discussed the litigation with them, collected documents, developed interrogatory responses, and, in some cases, prepared them for depositions outside the presence of counsel of record. Yet counsel have identified no basis on which they vetted her methods or reliability before certifying

factual contentions derived from her work. Had counsel performed even basic oversight such as reviewing solicitation outreach or participating directly in client meetings, they would have been on notice that Madame Cherie was improperly soliciting prospective Plaintiffs and engaging in the unauthorized practice of U.S. law.

Her conduct presented obvious red flags. Colorado restricts live solicitation of prospective clients, prohibits lawyers from assisting the unauthorized practice of law, and treats advising a person about a specific legal matter and holding oneself out as that person's legal representative as the practice of law. *See* Colo. R. Prof'l Conduct 5.5(a), 7.3; *People v. Shell*, 148 P.3d 162, 171 (Colo. 2006). Colorado ethics guidance likewise requires lawyers supervising foreign legal work to guard against unauthorized practice. CBA Formal Ethics Op. 121, at 4-442–43. Plaintiffs repeatedly referred to her as "Attorney Cherie" and testified that she cold-called them to recruit them, explained the litigation to them, and advised them about their claims and available remedies. *See, e.g.*, Movants' App. at 1216, Rod.O. Tr. 122:8–19 ("I don't know who gave [Madame Cherie] my number . . . I was actually kind of annoyed because they kept calling, and I was working."); *id.* at 7–10, Solicitation Exhibit; *id.* at 210-212, Cherie Information Exhibit. That record required counsel to scrutinize both her role and the reliability of the factual information she supplied. Yet counsel instead continued to rely on her.

That conduct should have prompted further inquiries into Madame Cherie's factual work. If counsel knew how she was aggressively soliciting, advising, and working-up Plaintiffs, they proceeded despite obvious warning signs about the reliability of the process. If they had no idea, they failed to adequately supervise the conduit for their

factual investigation. Either way, counsel had no basis to treat Madame Cherie's work as a substitute for their own reasonable inquiry. Counsel of record remained personally responsible, at all times, under Rule 11 for conducting a reasonable inquiry before presenting and certifying factual contentions generated by Madame Cherie to this Court.

#### 2. No Reasonable Inquiry into Passport Allegations

Counsel pleaded categorical passport confiscation allegations without testing them against the most obvious objective evidence available: Plaintiffs' own passports and travel documents. The means of investigation were within counsel's control: they represented that their "team" "collected and reviewed relevant documents" prior to filing any claims. *Id.* at 314, Aug. Letter. Passports identify when and where they were issued or renewed and contain entry and exit stamps. A passport showing repeated travel home to the Philippines or a renewal at the Philippine Embassy in Doha should have immediately called into question the categorical allegation that Plaintiffs' passports were continuously confiscated during their relevant time in Qatar. No credibility judgment or reconstruction of memory was required to read it. Counsel only had to look.

Discovery has revealed that, contrary to their allegations and verified interrogatory responses, over a third of the remaining Plaintiffs had possession of their passports during periods of alleged passport confiscation. *See id*. at 252–77, Passport Exhibit. Some renewed passports at the Philippine Embassy in Doha. Others used their passports to leave Qatar and later return. For example, Plaintiff R.V. renewed his passport at the Philippine Embassy in Qatar on four different occasions and returned to Qatar on at least eight different occasions, all while working for the same employer who allegedly forced

him to labor. *Id.* at 1018, R.V. Tr. 41:14–16 ("Q. You went home at least eight times, correct? A. Yes, correct."); *id.* at 1034–38, 130:9–134:20. Those facts bear directly on the categorical allegations counsel certified.

Every possible explanation points to inadequate inquiry. If counsel reviewed the passports pre-filing, they certified categorical confiscation allegations despite objective records disproving those allegations. If Madame Cherie collected the passports but U.S. counsel never reviewed them, they failed to examine the most obvious objective evidence bearing directly on the allegation. If counsel never collected the records, counsel rushed to the courthouse without waiting for basic documentation supporting an allegation they certified. Under any scenario, counsel did not conduct the reasonable inquiry required.

**3. No Reasonable Inquiry into Plaintiffs' Claimed Need for Pseudonymity**

Counsel also made a categorical representation to this Court about every Plaintiff's state of mind without first establishing a factual basis for that contention. They told the Court that "*each* [Plaintiff] fears a real possibility of retaliation in the Philippines if their identity becomes public." Dkt. 29, ¶¶ 1, 3–4 (emphasis added). At depositions, 27 Plaintiffs testified that they did not fear proceeding under their real names. *See* Movants' App. at 279, Pseudonymity Exhibit.

That testimony raises a straightforward Rule 11 problem. Counsel spoke for every Plaintiff on a matter uniquely within each Plaintiff's personal knowledge. A reasonable inquiry required counsel to determine whether each Plaintiff actually feared retaliation. The need for such inquiry is especially acute when seeking to displace the "presumption of openness" and adopt the "unusual procedure" of "[p]roceeding under a pseudonym in

federal court." *M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998); *Femedeer v. Huan*, 227 F.3d 1244, 1246 (10th Cir. 2000). The resulting order carried real consequences: Defendants relied on counsel's representation, agreed to accommodate the asserted safety concern, and thereafter faced restrictions on ordinary third-party investigation.

### 4. No Reasonable Inquiry into Worksite Allegations

Counsel likewise failed to establish where Plaintiffs actually worked before pleading specific World Cup worksites. The pleaded worksites did not depend on Defendants' records, but rather on Plaintiffs' personal experiences. Counsel could simply have asked each Plaintiff where he worked, obtained the employment records identifying the project, or—if uncertainty remained—pleaded the contention as one requiring further investigation, as Rule 11(b)(3) permits. They did none of these things.

Discovery instead unearthed an enormous volume of worksite errors, in a case about allegedly being compelled to work. Twenty Plaintiffs disclaimed projects previously pleaded or verified on their behalf, including six who admitted to never working on stadiums where prior pleadings or verified responses had placed them. *See id.* at 242–50, Worksite Exhibit. Fifteen Plaintiffs swore under penalty of perjury that they were forced to labor on a worksite that never existed (Barwa Media City)—a hallucination so widespread it cannot plausibly be explained by memory problems. *See id.* at 281, BMC Exhibit. And over two-thirds of Plaintiffs added myriad non-stadium worksites absent from the complaints. *See id.* at 242–50, Worksite Exhibit.

These errors concern the most elementary Plaintiff-specific facts in the case: where each Plaintiff worked. They required no discovery from Defendants. They required

competent interviews and basic document review before counsel certified specific worksites to the Court in pleadings and interrogatory responses.

### C. Counsel Have No Excuse for Failing to Conduct a Reasonable Inquiry.

Counsel cannot excuse these failures by pointing to the number of Plaintiffs, difficulties communicating across countries, translation, or the complexity of managing mass litigation. Rule 11 required a reasonable inquiry for each Plaintiff whose factual allegations counsel certified. The "seriousness of the subject matter does not excuse counsel from the obligation to present individualized, fact-grounded pleadings." *R.R. v. Motel 6 Operating L.P.*, 2026 WL 865685, at *1 (S.D. Fla. Mar. 25, 2026). And sheer volume cannot make acceptable in bulk what Rule 11 would prohibit in an individual case. *In re Engle Cases*, 767 F.3d 1082, 1113–14 (11th Cir. 2014).

The facts counsel failed to reasonably inquire into were basic ones: where Plaintiffs worked, whether they possessed and used their passports, and whether they feared identification in this action. Plaintiffs and their records supplied the answers. Counsel chose to represent dozens of individual Plaintiffs and personally certified those Plaintiff-specific allegations. That undertaking carried a corresponding obligation to investigate each claim before placing it before the Court.

## V. Plaintiffs' Counsel Violated Rule 26

### A. Legal Standard

By signing a discovery response, counsel personally certifies that "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry . . . with respect to a discovery request, response, or objection, it is . . . consistent with these rules

and warranted by existing law . . . ." Fed. R. Civ. P. 26(g)(1). Should counsel fail to conduct a reasonable inquiry, the Court "must impose an appropriate sanction," including the reasonable expenses caused by the violation. Fed. R. Civ. P. 26(g)(3); *In re Byrd, Inc.*, 927 F.2d 1135, 1137 (10th Cir. 1991).

The standard is objective, and the "central issue" is whether the signer conducted a reasonable inquiry into the facts supporting the paper. *Byrd*, 927 F.2d at 1137. That duty is counsel's own and exists independently of the client's duty to answer interrogatories under oath after due inquiry. *Health Grades, Inc. v. MDX Med., Inc.*, 2014 WL 30001, at *3–5 (D. Colo. Jan. 3, 2014). A client's verification, therefore, does not insulate counsel from a deficient inquiry. In *Acosta v. Maranto*, counsel certified interrogatory answers that his clients had formally verified, yet "clearly failed to conduct a reasonable inquiry" because he had not adequately consulted them and multiple factual answers proved incorrect. 2017 WL 4237114, at *1–3 (W.D. Okla. Sept. 21, 2017). Courts have reached the same result where non-English-speaking clients verified answers that were never translated or explained, *Brill v. Queens Lumber Co.*, 2012 WL 441287, at *5 (E.D.N.Y. Feb. 10, 2012) (finding an "egregious violation" of Rule 26), and where deposition questioning exposed errors in verified responses that counsel later corrected, *Wisser v. Vox Media, Inc.*, 2020 WL 1547381, at *3–8 (S.D.N.Y. Apr. 1, 2020).

### B. Counsel Certified Discovery Responses Without a Reasonable Inquiry.

Counsel's Rule 26(g) certifications rested on a process that never reliably established whether Plaintiffs' written answers were true. Numerous Plaintiffs testified that Madame Cherie elicited information by telephone and generated written responses.

Numerous Plaintiffs also testified that they never saw their interrogatory responses, never received a translation, or never had their contents explained before signing verifications. Counsel nevertheless signed the responses and certified that a reasonable inquiry supported them.

Counsel also expressly assumed responsibility for the drafting process. They rejected Defendants' requests that Plaintiffs answer in their own words because the interrogatory responses were "a legal document prepared with the assistance of counsel" and "require[d] translation from Filipino to English." *See* Movants' App. at 1526, Second ROGs. Having assumed responsibility for drafting, counsel cannot blame errors on their foreign intermediary or their clients. Nor does a client's verification discharge the certification duty, particularly where, as here, many clients did not understand what they were verifying. *See Acosta*, 2017 WL 4237114, at *3–4; *Brill*, 2012 WL 441287, at *5. Counsel had to ensure that the certified responses accurately reflected what each Plaintiff actually said and understood. The record shows they did not.

The later corrections expose the scale of that failure. On the day scheduled for the close of fact discovery, 98% of Plaintiffs submitted rewritten interrogatory responses. *See* Movants' App. at 320, Supp. ROG Changes. Plaintiffs changed where and when they worked, what happened to their passports, what wages they received, what injuries they suffered, and what allegedly compelled their labor. Rule 26(e) required correction once counsel learned that a response was materially incomplete or inaccurate, and Defendants do not contend that correcting the record is itself sanctionable. But those corrections reveal that the original Rule 26(g) certifications rested on an inadequate

inquiry: 44 of 45 Plaintiffs' original answers were wrong in at least one, and often multiple, key aspects, and counsel learned they were wrong only when Defendants' counsel asked the questions Plaintiffs' counsel had not. *See Wisser*, 2020 WL 1547381, at *3–8.

## VI. Requested Relief

Counsel's violations caused prejudice that cannot be cured by belated supplementation. Because Plaintiffs produced almost no corroborating documents, Defendants prepared for and conducted 46 depositions in substantial reliance on pleadings and verified interrogatory responses that Plaintiffs later disclaimed and counsel later rewrote. Defendants retained physicians in Denver and Manila to investigate injuries that later shifted to different worksites outside the alleged "Venture" or were attributed to events unrelated to work in Qatar. Defendants also incurred substantial expense trying to reconcile successive versions of Plaintiffs' allegations, sworn answers, deposition testimony, and post-deposition corrections. Supplementation after the fact was not a cure; it simply confirmed the enormous volume of work that had already been wasted.

Under Rules 11 and 26, any sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and may include nonmonetary directives or "part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4); *see also Health Grades*, 2014 WL 30001, at *3–5 (same standard for Rule 26) (vacated on other grounds). *First*, Defendants request findings that Plaintiffs' counsel violated Rule 11(b)(3) and Rule 26(g)(1)(B)(i). *Second*, Defendants request corrective relief, including an order directing counsel to conduct the individualized inquiry they should have conducted, including a

Plaintiff-by-Plaintiff review of the factual bases for the claims that remain pending and appropriate correction or withdrawal of unsupported contentions. Defendants further request that counsel certify completion of that review to the Court. *Third*, Defendants request an order requiring Plaintiffs' counsel, not their clients, to reimburse the reasonable expenses caused by counsel's violations. Defendants' initial analysis indicates the expenses associated with Plaintiffs' depositions came to at least $3,952,610, inclusive of the costs incurred in preparing for and conducting extensive foreign discovery on the basis of materially false factual allegations and interrogatories, and the extensive work required to reconcile successive versions of Plaintiffs' allegations, sworn answers, deposition testimony, and post-deposition corrections. Defendants also seek the reasonable fees and expenses incurred in seeking relief for counsel's violations.

Defendants request a staged procedure. The Court should determine counsel's liability, the appropriate corrective relief, and the categories of expenses recoverable from Plaintiffs' counsel now, and defer determination of the quantum to a later submission.

## VII. Conclusion

For the foregoing reasons, Defendants' motion should be granted. This motion does not ask the Court to determine whether Plaintiffs were forced to labor. It asks whether counsel had an objectively reasonable basis for the factual contentions they presented to this Court and certified in discovery. The record shows they did not.

Dated: October 27, 2026.

Respectfully submitted,

*s/* Mark W. Friedman
Maura Kathleen Monaghan
Mark W. Friedman

William H. Taft V
James P. Schaefer
Justin R. Rassi
Lisa W. Lachowicz
Ardis Strong
Alessandra G. Masciandaro
Andrew H. Rikard
Debevoise & Plimpton LLP
66 Hudson Blvd.
New York, NY 10001
Telephone: 212.909.6000
Email: mkmonaghan@debevoise.com
mwfriedman@debevoise.com
whtaft@debevoise.com
jpschaefer@debevoise.com
jrassi@debevoise.com
lwang@debevoise.com
astrong@debevoise.com
amasciandaro@debevoise.com
ahrikard@debevoise.com

and

Habib Nasrullah
Frederick R. Yarger
Danyaal Waheed
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: 303.244.1800
Facsimile: 303.244.1879
Email: nasrullah@wtotrial.com
yarger@wtotrial.com
waheed@wtotrial.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of October 2026 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Mark W. Friedman*

Mark W. Friedman
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
T: (212) 909-6000
E: mwfriedman@debevoise.com

*Counsel for Defendants*